**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARY MADISON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 23-cv-16476 |
| v. | ) | |
| | ) | Hon. Manish S. Shah |
| CREATIVE WERKS LLC, | ) | |
| and STEVE SCHROEDER, Individually | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 56.1, this is Creative Werks LLC and Steve Schroeder's Statement of Undisputed Material Facts, in support of their Motion for Summary Judgement and Memorandum in Support of their Motion for Summary Judgement.

**Background Facts**

1. Madison is an African American, female who became an employee of Creative Werks on September 27, 2022. (Complaint, ¶1). Madison was hired as a Quality Regulatory Manager and her responsibilities included compliance with the Food Safety Modernization Act "hereinafter referred to as FSMA" and other regulatory schemes regarding compliance quality, regulatory and customer requirements. (Complaint ¶¶ 2-3.)

2. At all times during Plaintiff's employment, Steve Schroeder, ("Schroeder"), a white male, held the position of founder and President of Creative Werks. (Complaint, ¶5).

3. At all times during Plaintiff's employment, Erich Zicher, ("Zicher"), a white male, coordinated regulatory, compliance, and quality activities relative to Creative Werks' operations, including but not limited to hiring, scheduling, workflow, investigations,

safety, food defense, and safety plans, as well as, internal, external, federal, state and local compliance audits relative to the Food Drug and Cosmetic Act and other relevant statutes and the like. (Complaint, par. 7, Zicher Aff. ¶¶ 2-3).

4. Zicher was Madison's immediate supervisor, and Ron Sammeth was Zicher's supervisor, who, in turn, answered to Mr. Schroeder. (Madison Dep., attached as Exhibit 1 hereto, 42: 12-14).

### FDA Inspection

5. Shortly after Plaintiff was hired, an FDA inspector visited the Creative Werks' newer Bartlett site on September 28-29, 2022. (Complaint, ¶ 9; FDA Inspection Report attached as Exhibit 2 hereto) ("September 2022 FDA Inspection"). Madison participated in the FDA inspection, along with Zicher (Complaint ¶9; Zicher Aff. ¶8).

6. The inspection was "pre-announced" and "routine" and included Current Good Manufacturing Practice, Hazard Analysis, and Risk-Based Preventative Control for Human Food Subparts, and Preventative Controls and Sanitary Human Food Operations. (Ex. 2, pgs. 1-2, Zicher Aff. ¶ 7).

7. During the September 2022 FDA Inspection, the FDA inspector first notified Creative Werks 16 month old customer "Pepsi Cheeto" complaint. (Zicher Aff. ¶ 8). Creative Werks had no prior knowledge of this complaint. (Zicher Aff. ¶¶ 8 &10). In response, Creative Werks then shared with the inspector a prior similar customer complaint that had already been remediated. (Id; Madison Dep. 208: 17-20; 209: 4-11); FDA Inspection Report attached as Ex. 2, pg. 3).

8. The two Pepsi Cheeto complaints related to discoloration of sealing packaging due to excess induction heating utilized when packing the products at issue. (Zicher Aff., ¶9, FDA Inspection Report Ex. at pg. 3). No parties reported seeking any medical attention. (Zicher Aff. at par. 9).

9. It was explained to the FDA that Creative Werks no longer packaged the product at issue. (Zicher Aff. ¶ 10; Ex. 2 at 4). This was confirmed in the FDA inspection report (Ex. at par. 4).[1] The product ceased being packaged by Creative Werks due to the high cost of labor associated with same and a prohibitively high capital expenditure that would have been required to obviate. (Schroeder Dep. ¶19).

## CREATIVE WERKS' REGULATORY COMPLIANCE

10. Prior to and during Plaintiff's employment with Creative Werks, Creative Werks' food safety programs and facilities were regularly audited and inspected by third parties entities, including the FDA (i.e. regulatory audits), customer audits by highly trained food safety auditors, and SQF audits (Zicher Aff. ¶ 11 & 14; Madison Dep. 196: 7-21; 203: 11-19; Schroeder Aff. ¶¶ 5-6). Before, during and after Madison's employment too:

   a. Creative Werks further deploys structured programs and training that develop employees' technical skills, increase awareness, manage risk, and drive increasing

---

[1] In the FDA audit report, it reflects that "Corrective Actions" as provided by the firm "identification of root cause" and it includes chart showing what Creative Werks did to remediate the friction issue over a year prior to resolve the problem. (Madison Dep., 70; Zicher Aff. ¶ 10, Ex. 2, pg. 3.)

levels of excellence within the quality department's operation, all in keeping with or exceeding industry norms. (Zicher Aff. 43-46). Indeed, in 2022, Creative Werks had approximately 42 employees exclusively devoted to food safety. (Id.)

b. Creative Werks participates in programs, including some in conjunction with its clients, for continuing improvement programs often leading to bi-weekly third party meetings and client agreements on any required remediations. (Id.)

c. Creative Werks has extremely sophisticated customers (some of whom are the largest confectionaries and food manufacturers in the World), who rely on Creative Werks to meet all food safety regulations, but who also require third party verifications (such as SQF audits), in addition to client audits and access to FDA audit inspection results. (Id.)

11. Creative Werks, which has been in operation as a food packer/co-packer since 1999, has been the subject of several dozens of inspections and food safety audits over the years, it has never received a 483 Notice from the FDA with respect to any safety concern or otherwise, nor has it lost any business with any customer relating to same. (Zicher Aff. ¶¶ 11-14; Schroeder Aff. ¶¶ 6-7).

12. A food related audit is defined as a "systematic, independent, and documented examination through observation, investigation, records review, discussions with employees of the audited entity, and as appropriate, sample and laboratory analysis to assess an entities food safety processes and procedures." (Madison Dep. 168: 5-21).

13. Routine FDA audits (i.e. regulatory audits) were conducted by the FDA and by other regulatory bodies upon the request of the FDA, with respect to Creative Werks. (Zicher

4

Aff., pars. 11-14). The purpose of these audits, in part, was to determine compliance with FDA and FSMA regulatory schemes. (Id; Madison Dep. 196: 11-20).

14. With respect to the September 2022 FDA Inspection, the conclusion was "NAI" (i.e. "No Action Indicated." (Zicher Aff., par. 15; Ex. 2 at pg. 2)

15. If the FDA finds serious violations or material regulatory non-compliance issues, it issues a "483 Notice." (Affidavit of Zicher, Ex 11-14; Schroeder Aff. ¶¶ 6-7). "An FDA Form 483 is issued to firm management at the conclusion of an inspection when an Investigator(s) has observed any conditions that in their judgement may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts"[2] Here, no Form 483 was issued, nor has Creative Werks ever received a Form 483 as a result of an FDA inspection or audit. (Zicher Aff. ¶¶12-13; Schroeder Aff. ¶¶ 6-7; Madison Dep. 139: 19-25)

16. After the September 2022 FDA inspection, both Erich Zicher and Madison sent emails to other employees summarizing the findings. (Zicher Aff., par. 16; Exhibits 2 & 3). These were high level summaries of the visit and findings.

17. In 2022, the year that Madison worked for Creative Werks, there were fourteen (14) independent/third party food safety customer audits and two (2) regulatory (FDA) audits. (Zicher Aff. ¶17; Madison Dep. 203:11-15.) None of them revealed any material food safety plan or regulatory non-compliance issues (i.e. passing or above passing results in

---

[2] See https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequentlyaskedquestions

each instance). (Zicher Aff. ¶ 17.)  Similarly, in 2023, there were fifteen (15) independent customer food safety/regulatory audits in addition to two (2) SQF audits.  (Zicher Aff. ¶ 18; Madison Dep. 203:16-19.)  None of them revealed any material food safety plan or regulatory non-compliance issues. (Zicher Aff. ¶¶17-18; Schroeder Aff. ¶¶ 5-8)

18. Creative Werks is also subject to annual SQF audits. (Zicher Aff. ¶ 19).  Madison is familiar with SQF audits. (Madison Dep/ 168: 22 - 24).  SQF audits, in part, evaluate a food facility's food safety and quality management systems to ensure they meet the requirements of SQF code and GFSI ( Global Food Safety Initiative) standards. (Madison Dep. 183: 19-24; Zicher Aff. ¶ 19).

19. Creative Werks had an SQF Food Safety Audit on March 29. 2022. (Madison Dep. 169: 14-22; Zicher Aff. ¶ 20 & See e.g., Exhibit 5 attached to Statement of Undisputed Facts). This SQF audit included a review of Creative Werks four (4) food safety plans (Madison, Dep. 170: 11-19; Ex. 5 at 2.4.3.).   Madison admitted, upon review of the March 29, 2023 SQF audit, that the results of the SQF audit reflected a rating of 96 out of 100. (Madison Dep. 182: 12-18).

20. In 2022, Nestle conducted an audit that was found to be "Satisfactory," which is defined in that audit document as "The audit results identified a few issues in need of attention, but none shows significant or fundamental weakness in controls, compliance, or operations." (Zicher Aff. par. 21; Madison Dep. 205: 6 – 21; Exhibit 6).  This was part of a regular process that Creative Werks had with this client, and many others, which included bi-weekly meetings with the client to discuss potential improvements and/or required remedial actions. (Zicher Aff. ¶ 22).  Many of these are extreme sophisticated clients with

6

sophisticated food auditors, some of which are the largest confectioners in the world and/or Fortune 100 companies. (Schroeder Aff. ¶5)

21. As was the custom, Creative Werks subsequently addressed all aspects of the audit, came up with and obtained remediation measures, signed off by Nestle.  (Zicher Aff. ¶¶ 21-22, Ex. 5; Ex. 6 (pg. 5, columns "Corrective Actions" and "Confirmed by…")).

22. Madison was assigned to work on a food safety plan that was based on a model  published by the Food Safety Preventative Controls Alliance.  It had been specifically modified by Zicher previously to address the unique ingredients, risks and measures required for Creative Werks "Dunkaroos" product line.  (Madison Dep. 59: 6-25; Zicher Aff. ¶ 23). This particular Food Safety Plan was derived from an appendix to a manual used  Madison studied to get her PCQI qualification. (Id.; Madison Dep 60: 2-5; Zicher Aff. ¶ 23)  This manual was created by the FDA, the Institute for Food Safety, and FDA Risk Based Preventative Controls for Human Food Regulations. (Id).

23. On or about October 21, 2022, Madison tendered a document that she drafted entitled Regulatory Business Problem (hereinafter "Legal Analysis") to Mr. Steve Schroeder, the President of Creative Werks. (Compliant, ¶¶58-59; Legal Analysis attached as Exhibit 8 to Statement of Undisputed Facts; Zicher Aff. ¶24; Schroeder Aff. ¶¶ 9, 25-30).  She also made contemporaneously oral statements to him.  (Id.; Email from Schroeder dated 10/24/22 attached as Exhibit 9).

24. On Friday October 21, 2022, prior to speaking with Mr. Schroeder, Plaintiff asked to speak with Ms. Gretchen Le May, VP of People.  ( LeMay Aff. ¶ 3).  Ms. LeMay indicated that

she was not available until Monday and it was agreed that they would speak on that day. (Id.). Madison did not follow up with LeMay with respect to that appointment. (Id.)

25. The Legal Analysis was subsequently shared with Ms. LeMay, Erich Zicher, and Ron Sammeth, in addition to the copy provided directly to Schroeder. (LeMay Aff. ¶ 5, Zicher Aff. ¶¶ 24-25). Collectively, it was determined that the Legal Analysis was full of gross misstatements, mischaracterizations, inadequately researched, intentionally misleading, and alarmist. (Zicher Aff ¶¶ 26, 28-41, LeMay Aff. ¶¶ 5-6; Schroeder Aff. ¶¶ 10, 12-30).

26. Madison's did not tender or attempt to tender her Legal Analysis to anyone, including, her supervisors prior to communicating directly with the President of Creative Werks (Madison Dep. 88: 8 - 13; 89: 6 – 15; Schroeder Aff. ¶ 26).

27. On October 26, 2022, Madison was suspended with pay, and it was communicated to her that she was being suspended for the unprofessional report and conversation she had with Mr. Schroeder. (Ex. 10). This was also memorialized in the suspension letter that an outside attorney would be conducting an investigation into the matters and allegations raised to Mr. Schroeder. (Complaint, par. 75, Exhibit 10).

28. After Madison's interview (with her counsel being present for same), on November 8, 2022, Plaintiff was placed on unpaid leave. Subsequently, on January 17, 2023, Madison was terminated via notice to her attorney, Jordon Hoffman. (Thorstenson Affidavit; Madison Department of Labor Declaration attached as Exhibit 11 hereto, pg. 14; Complaint ¶11(b); LeMay Aff. ¶7).

29. On January 23, 2023, Plaintiff submitted a letter to Creative Werks in "Response to the Outcomes and Findings of the investigation relative to the October 20, 2022 Risk Analysis and October 21, 2022 conversation with Mr. Steve Schroeder. (See Exhibit 12 attached hereto). In the January 23rd letter from Plaintiff, she indicates, in part, that she was informed of the investigation made by Creative Werks with respect to her October 20, 2022 Risk Analysis and in response to Creative Werks position that it is confident in its food safety practice and management. (Id. pg. 1). In the first through eleventh (11th) paragraphs, she indicated why she disagrees with Creative Werks' assessment of her Risk Assessment. In the final (12th) paragraph, she first asserts that others were treated more favorably, and that she was being retaliated based on engaging in protected activity based on her race and gender.

30. Prior to January 23, 2022, Plaintiff had never filed any legal actions against Defendants nor did she make any communications about disparate treatment or discrimination to Creative Werks. (LeMay Aff. par. 7).

**Madison's Written Legal Analysis**

31. Madison's Legal Analysis states, in its abstract and first substantive sentence, that Creative Werks' "non-compliance to the relevant statutes, standard and regulations under the FSMA is an inherent systematic and systematic issue through the organization that creates irreparable harms for all stakeholders." (Ex. 8, cover). This statement is and was considered false by Creative Werks, to have been contrary to the entire philosophy of Creative Werks, is directly contradicted by dozens of regulatory, SQF and customer audits

finding otherwise, and asserts an alarmist conclusion and is contrary to facts. (Zicher Aff. ¶ 28 & 47; Schroeder Aff. ¶ 12).

32. Madison's Legal Analysis also stated, in part, that "Other stakeholders could suffer injury, illness, or death, in addition, other can suffer loss of employment and economic stability." (Schroeder Aff. ¶13, Zicher Aff. ¶ 29).  This statement is and was considered false by Creative Werks, did not appear to be based on any rational analysis, ignored the safety plans and regulatory compliance engaged in by Creative Werks, and was both wholly unsubstantiated and asserted alarmist conclusions. (Id).

33. The Legal Analysis, asserts that Creative Werks had "culpability" due to its "breach of contract." (Schroeder Aff. ¶14, Zicher Aff. ¶ 30).  Creative Werks was not aware of and denies it had culpability with respect to any breaches of contract as asserted by Madison. (Id.) When questioned on any breach of contract, Madison asserted she based her breach of contract conclusions based on her review of a customer audit done by Nestle.  (Madison Dep. 3:9).  This is contrary to the face of the Nestle audit reflecting, in its findings that it was "Satisfactory." (Ex. 6, Zicher Aff, ¶ 30; Schroeder Aff. ¶14).  Madison also admitted that she had never read any contractual terms between Creative Werks and Nestle prior to drafting the Legal Analysis (Madison Dep. 47: 6-24).

34. The Legal Analysis asserts that Creative Werks was in breach of its "fiduciary duties." (Ex. 8).  Creative Werks did not believe this to be accurate factually or legally. (Schroeder Aff. ¶15, Zicher Aff. ¶ 32).  Madison admitted her conclusion was predicated upon there being a contractual relationship between Creative Werks and Nestle.  (Madison Dep.

155:11-25). Creative Werks disagreed that there was any breach of contract with Nestle and disagreed with Madison's legal conclusions. (Schroeder Aff. ¶15).

35. Madison's Legal Analysis asserted that "since its inception of the Preventative Controls regulations, Creative Werks has never been compliance and has had repeated violations from numerous customer audits." (Ex. 8). Creative Werks deeply disagreed with this gross mis-statement which is belied by hundreds of audits and inspections finding the opposing to be true. (Zicher Aff. ¶¶11-14, 17-19, 22 & 33; Schroeder Aff. ¶¶. 5, 12, 16, 18 & 24).

36. The Legal Analysis, stated in part, that "It can be reasonably inferred there is a high probability factor that our non-compliance is a root cause in lost business opportunities such as Pepsi." (Ex. 8). This statement was of great concern to Creative Werks because there were never any non-compliance issues that ever resulted in the lost business with Pepsi or any other client for that matter. (Zicher Aff. ¶ 34, Schroeder Aff. ¶ 17). This was an immediate indictor to Creative Werks that Madison had not researched this issue and was making sweeping conclusions and recommendations based on poor work product and/or intentionally misrepresenting issues relating to Pepsi. (Schroeder Aff. ¶ 17).

37. The Legal Analysis, stated in part, that non-compliance with regulations would subject Creative Werks to "an increase in lost revenue…". This statement was of significant concern to Creative Werks because, to its knowledge, it had never lost revenues in the past due to any regulatory non-compliance. (Schroeder Aff. ¶. 18; Zicher Aff. ¶. 34). Moreover, no Pepsi business was lost as a result of any complaints or regulatory non-compliance issues. (Id. at 19).

38. Madison admitted during her deposition that she had no idea why Pepsi discontinued its Cheetos business with Creative Werks. (Madison Dep. 71: 4 -25; 73: 21, 158: 13-17; 159:1 -13).

39. Madison's Legal Analysis stated that "Noncompliance negatively affects our sustainability, goodwill, and profitability here at Creative." (Ex. 8). Creative Werks understood this to be a false statement and false premise, entirely contradicting the compliance initiatives and evidence of regulatory compliance that had been internally and externally confirmed, by the FDA, customer audits and SQF audits. (Zicher Aff. ¶¶11-14, 17-19, 22 & 37; Schroeder Aff. ¶¶ 20). Creative Werks further was not aware of any non-compliance with regulatory schemes, let alone any that were impacting its sustainability, goodwill or profitability. (Id).

40. Madison admitted, during her deposition, that she had not engage in any research on the above noted "noncompliance" alleged impacts, nor was Madison able to identify any specific instances when Creative Werks lost business due to any regulatory or food safety non-compliance. (Madison Dep. 77: 11; 78: 1-2).

41. Madison's Legal Analysis, stated in part, that there was an expiration of civil liability as of October 2023, as it related to the Pepsi Cheeto product. (Ex. 8). Since there were no persons ever requiring medical treatment and Creative Werks knowing that the discoloration issue was not a safety concern, this statement was interpreted by Creative Werks to be an example of Madison's lack of logic, lack of rationale, and/or clear thinking, a lack of understanding of understanding of basic risk assessment, a lack of research, alarmist and an effort to distort facts. (Zicher Aff. ¶ 38; Schroeder Aff. ¶ 22).

42. Madison's statement regarding "civil liability" relating to the Pepsi Cheeto was disconcerting, in part, because there was/is no evidence of any individual requiring or obtaining medical attention due to any Pepsi Cheeto product and/or that any discoloration on packaging several years ago would or could harm any consumer. (Zicher Aff. ¶ 39; Schroeder ¶ 22).

43. Madison admitted she was not aware of any injury or medical attention obtained or required by any Pepsi Cheeto consumer (Madison Dep. 89: 17 - 25).

44. Madison's Legal Analysis raised the issue topic of potential criminal liability based on her understanding of the discoloration issue raised in the FDA Cheetos consumer complaint, even though: (a) remediated by Creative Werks nearly two (2) years earlier, with no injuries (Schroeder Aff. ¶23); (b) the FDA acknowledged the remediation measures taken by Creative Werks. (Ex. 2. Pg. 2); (c) and generally reflecting a lack by Madison of logical reasoning and/or understanding as to the nature of food safety violations that would implicate any criminal liability. (Zicher Aff. ¶ 40; Schroeder Aff. ¶ 23).

45. Madison asserts in the Legal Analysis that Creative Works also lacked change control management, to remain compliant with FSMA and other relevant statutes. (Ex.8). Creative Werks strongly disagreed with this conclusion. When questioned about the basis for her conclusion, Madison could only cite to the Nestle audit, notwithstanding any such issues being resolved with Nestle as part of a routine continuous improvement policy, with Nestle's auditor signing off as having been adequately remediated. (Madison Dep. 199: 20-24, 200: 11-22, 203: 6-10; Zicher Aff. par. 21-22, 41, Schroeder Aff., ¶24; Ex. 6).

13

46. In making negative oral conclusions to Creative Werks' President about the failure to have safety plans in compliance, Madison admitted she was only aware of one (1) food safety plan, when there were in fact, four (4) safety plans plus an additional template being used for new plans. (Madison Dep. 58: 10-20; Zicher Aff. ¶ 20; Ex. 5, ¶ 2.4.3)

**Madison's Oral Statements to Steven Schroeder On October 21, 2022**

47. After reviewing the Legal Analysis provided to Schroeder, Madison stated that Creative Werks does not follow food safety guidelines. (Schroeder Aff. par. 25; *see generally* Ex. 9). When Schroeder responded that the Company is subject to many audits by clients and third party auditors, Madison stated that they (the auditors) do not necessarily know what they are doing. (Id.) This was deemed deflection of poor work product by its President reflecting Madison's gross misunderstanding of industry accepted practices, check and balances. (Id.)

48. The above noted statement was further considered, by Creative Werks, to be a radical, alarmist position, indicating that only Madison was capable of determining if Creative Werks was complying with its food safety obligations, not any other employees, customers or regulatory bodies. (Id).

49. Madison admitted to Schroeder that she did not share her Legal Analysis with her supervisors before bringing it to the attention of Schroeder. (Id. par. 11; Madison Dep. 89: 6-15). Given the nature and materiality of the contents of same, Creative Werks considered a breach of corporate protocol and irresponsible to have done so without vetting by Madison's supervisors. (Schroeder Aff. ¶ 26)

14

50. Madison said, that Creative Werks should not be relying upon representations and/or testing done by Creative Werks clients when they provide food for packing. Creative Werks considered this a wholesale misunderstanding of the applicable regulations that allows Creative Werks to rely on same. (Id. ¶ 27).

51. Madison stated that when she participated in an FDA audit, that her supervisor, Erich Zicher, "provided too much information" to the FDA. (Id. ¶28.) It was not clear to Creative Werks by why or what information should not be shared with the FDA, nor did Madison give any such examples. (Id.)

52. Madison expressed concern over the FDA inspection at issue. (Id. ¶29.) When Schroeder responded that no 483 Citation was issued by the FDA, Madison merely stated that "I did not know what the FDA person was writing down." (Id.) This was an unprofessional and confusing statement because the FDA provided detailed findings to Creative Werks, as they do with all of their inspections. (Id). This also was interpreted as additional deflection of her poor work product.

53. Madison raised an issue about an x-ray machine being used on one of the food packing lines. (Id. par. 30). She asserted that even though it was deemed GRAS (Generally Recognized as Safe), she indicated we cannot use that designation. (Id.; see also Ex. 9) In Creative Werks' opinion, Madison was wrong about this conclusion based on the manner the x-ray was being utilized under the applicable regulations. (Id.). Moreover, Madison asserted that additional measures should be taken to ensure no radiation leaks even though Creative Werks already utilized the manufacturer's recommended maintenance schedule.

(Id.). Madison admitted that she did not look up the recommended maintenance of the x-ray in question before meeting with Schroeder. (Id)

### Comparison to Similarly Situated Employees

54. Madison alleges in her Complaint that she was retaliated and discriminated against after raising issues relative to "the same contextual conversations relative to compliance gaps that Erich Zicher had previously raised with Schroeder and others" regarding the FDA investigation of a consumer complaint along with "gaps and deficiencies in compliance documents such as food safety plans." (Complaint, par. 74, Madison Dep. 127: 2 -15.)

55. Madison is not aware of any written reports prepared by Zicher and given to Schroeder or the Company. (Madison Dep. 127: 16-25, 128: 1- 6). Rather, Ms. Madison can only testify as to oral statements made by Mr. Zicher to her or to the FDA investigator and a single email relating to the FDA inspection she was copied on from Zicher (Madison Dep. 128: 3-11, 14-20; 135: 18-25; 136: 1-20; Ex 13 of Dep.). Madison indicated that Mr. Zicher's email mentioning the FDA audit and Pepsi Cheeto matter was a "fair description" and a "very, very high-level summary") (Madison Dep. 141: 19-25; 142: 1-2; see also Ex. 8.)

56. Madison has no knowledge of any instances of Zicher making comments to the Company that it had potential criminal liabilities with respect to its FDA regulations, other than directly with Madison herself and a third party auditor—but not to the Company or to Schroeder (Madison Dep. 142: 3-25; 143: 13-16). Moreover, Zicher has never made any such statements to the Company or its President asserting the allegations and conclusions in Madison's Legal Analysis. (Schroeder Aff. ¶ 33).

57. Madison has no knowledge of Zicher reporting of any systematic failure of Creative Werks to comply with FSMA to the Company or Schroeder (Madison Dep. 143: 17-25) nor has he done so. (Schroeder Aff. ¶ 33, Zicher Aff. ¶ 42).

58. Madison has no knowledge of Zicher reporting any breached of fiduciary duties (Madison Dep. 145: 7-13) nor has Zicher ever done so. (Schroeder Aff. ¶ 33, Zicher Aff. ¶ 42)

59. Madison has no knowledge of Zicher raising concerns about the x-ray machine to the Company (Madison Dep. 150: 16-25) nor has Zicher ever done so. (Schroeder Aff. ¶ 33, Zicher Aff. ¶. 42).

60. Madison has no knowledge of nor has Zicher ever made comment to the Company or its President that year over year, Creative Werks has been out of regulatory compliance with the FD&C Act. Madison Dep. 156: 10-16; Zicher Aff. ¶42 (g); Schroeder Aff. ¶33(g).

61. Madison has no knowledge of Zicher reporting to the Company about the lack of cognitive recognition that its food safety plans were out of legal compliance (Madison Dep. 157: 24-25; 158: 1-3), nor has Zicher done so. (Zicher Aff. ¶ 42; Schroeder Aff. ¶33).

62. Madison has no knowledge as to whether Zicher orally or in writing, communicated to the Company that Creative Werks had been improperly interpreting, analyzing, and applying relevant food safety statutes (Madison Dep. 159: 15-25; 160:1-10) nor has Zicher done so. (Schroeder Aff. ¶33, Zicher Aff. ¶ 42).

63. Madison has no knowledge as to whether Zicher ever reported to the Company that Creative Werks encouraged a disregard for the law (Madison Dep. 167: 24-25; 168: 1-4), nor has Zicher done so. (Schroeder Aff. ¶ 33, Zicher Aff. ¶ 42).

64. Madison has no knowledge or evidence of any instances of Zicher telling Schroeder or the Company words to the effect that Creative Werks has ever (or year over year) has been consistently been out of regulatory compliance with the FD&C Act, which she stated in her Legal Analysis (Madison Dep. 156: 10-16, 157: 1- 24. 158: 3.; Ex. 8), nor has Zicher done so. (Schroeder Aff. ¶ 33, Zicher Aff. ¶42).

65. Madison had no knowledge or evidence of any instances of Zicher telling Schroeder or the Company of his belief that all of the food safety plans are out of legal compliance with the FSMA, which Madison stated in her Legal Analysis.(Madison Dep. 156: 10-16), nor has Zicher done so. (Schroeder ¶ par. 33, Zicher Aff. ¶ 42).

66. Madison had no knowledge or evidence of Zicher telling Schroeder or the Company that Creative Werks improperly interprets, or improperly analyses, and/or misapplies relevant food safety statutes, which she asserted in her Legal Analysis (Madison Dep., 159: 24 through160: 3), nor has Zicher done so. (Schroeder Aff. ¶ 33, Zicher Aff. ¶ 42).

67. Madison had no knowledge of or evidence of Zicher communicating or writing Schroeder or the Company of any company culture opposed to the transparency mantra of Creative Werks, which she stated in her Legal Analysis (Madison Dep. 161: 15- 18, 162: 1-14) nor has Zicher done so. (Schroeder Aff. ¶ 33, Zicher Aff. ¶ 42).

68. Madison had no knowledge of or evidence of Zicher communicating to Schroeder or the Company that the Company encourages a disregard for the law, which Madison stated in her Legal Analysis (Madison Dep. 167: 25-26, 168: 1-3), nor has Zicher done so. (Schroeder Aff. ¶ 33, Zicher Aff. ¶ 42).

69. Madison had no knowledge of or evidence as to the substance of any conversations between Zicher and Schroeder, about any topic, let alone compliance gaps and deficiencies. (Id.)

70. In addition to the specific examples above, reflecting unique actions taken by Madison that lead to her suspension and termination, it is further the case that Zicher in no way, manner or form, ever presented statements, communications, writings or work product to the President and/or to Creative Werks reflecting any of the conclusions, observations, recommendations made by Madison in her Legal Analysis and/or oral statements to Schroeder. (Schroeder Aff. ¶33). Additionally, at no time did Zicher otherwise engage in any actions deems to require, suggest or necessitate any disciplinary actions, unlike Madison. "(Id. at ¶34; LeMay Aff. ¶¶ 2 & 9).

71. Madison asserts, that Creative Werks beached a contract with Nestle, relying on a customer audit done by Nestle. (Madison Dep. 45: 21-25, 46: 6-20, 47:1-9). Madison admitted that she had never read any contract terms with Nestle. (Madison Dep. 47: 6-24). Madison said that based on her review of the Nestle audit, she believed there to be a breach of contract. (Id.) However, the Nestle audit, on its face, reflects otherwise. (Ex. 8; Zicher Aff par 21-22; Ex 6).

72. The business records maintained by both Nestle and Creative Werks reflect that Creative Werks suggested and implemented improvements, which was signed off as sufficient/closed by the Nestle auditors. (Ex. 6; Zicher Aff. 22). Madison admits this in her deposition. (Madison Dep, 199: 1-24). Madison further admits to having no basis to

dispute Nestle's having considered all audit issues resolved to its satisfaction. (Madison Dep. 52: 1-5; 203: 6-10).

73. Creative Werks decision to terminate Madison was not based on her sex or race, but merely her actions reflecting Creative Werks' determination that Madison was not qualified to perform the services she was hired to do, and other above noted issues arising out of Madison's Legal Analysis, oral statements to Creative Werks' President, and failure to follow corporate formalities. (Schroeder Aff. ¶35; LeMay Aff. ¶¶ 4-6, 8.)

74. Madison's Legal Analysis and oral statements to Schroeder, were materially irreconcilable with respect to first-hand information and beliefs held by Creative Werk's management team, and the purported risk issues raised by Madison were inconsistent with Creative Werks' history, culture, understanding of regulations, and reflected a disregard for objectively verifiable data. (LeMay Aff. ¶ 6, Schroeder Aff. ¶6)

`

Submitted on behalf of Creative Werks,
LLC and Steve Schroeder


/s Jon D. Cohen
Jon Cohen, one of their attorneys

Jon D. Cohen
Dickinson Wright PLLC
55 W. Monroe St., Suite 1200
Chicago, IL 60603
(312) 641-0060
jcohen@dickinsonwright.com

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARY MADISON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 23-cv-16476 |
| v. | ) | |
| | ) | Hon. Manish S. Shah |
| CREATIVE WERKS LLC, | ) | |
| and STEVE SCHROEDER, Individually | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATIONS AND EXHIBITS TO RULE 56.1 STATEMENT**

1. Mary Madison Deposition Excerpts

2. September 2022 FDA Inspection Report

3. E. Zicher Emails re: September 2022 FDA Inspection Report

4. M. Madison Email Re: FDA Inspection

5. 2022 SQF Audit Sample

6. Redacted Nestle Audit Report

7. Redacted Nestle Audit Report (duplicate)

8. M. Madison Legal Analysis

9. S. Schroeder Email re: M. Madison Legal Analysis

10. M. Madison October 26, 2022 Suspension Letter

11. M. Madison Declaration in Department of Labor Action

12. M. Madison January 1, 2023 email to Creative Werks

13. Mary Madison's EEOC Complaint (relevant portions)

14. Screen Shot from Creative Werks HR Management System.

15. Declaration of E. Zicher

21

16. Declaration of S. Schroeder

17. Declaration of G. LeMay

18. Declaration of C. Thorstenson