# EXHIBIT C

**Mary Madison**

**From:** Mary Madison
**Sent:** Thursday, October 20, 2022 1:54 PM
**To:** Erich Zicher
**Subject:** RE: Food Safety Plans

Good day Erich,

I still have some questions about the FSCPA training material you provided to me yesterday as your template for the FSP.

When I read through the material and looked at the Dunkaroos' FSP I am unable to see any reference(s) to where you obtained the information cited in the FSP. I cannot make that direct correlation. I am sure that I am overlooking your reference points.

Also, the FDA reference material you referred to that I had cited in my writing sampling does not support the findings either.

I have been trying to find the correlation.

Also, I am trying to understand what is the basis for your findings in the analysis. Also, how did you construct the analysis/evaluation for the hazards?

Thank you again for your time and assistance.
Best,
[[#]]
Name: Mary Madison
Phone: 773.297.9569
[[#]]

**From:** Erich Zicher <ezicher@cwerksglobal.com>
**Sent:** Wednesday, October 19, 2022 1:24 PM
**To:** Mary Madison <mmadison@cwerksglobal.com>
**Subject:** RE: Food Safety Plans

FYI



**Erich Zicher**
Director of Food Safety

1470 Brummel Ave,
Elk Grove Village, IL 60007
+1-630-509-3087 *(office)*
+1-847-826-9424 *(mobile)*
creative-werks.com 🅕 🅘 🅘🅝 🅣

**From:** Mary Madison <mmadison@cwerksglobal.com>
**Sent:** Monday, October 17, 2022 8:26 AM

1

**To:** Erich Zicher <ezicher@cwerksglobal.com>
**Subject:** RE: Food Safety Plans

Good day Erich,

Hope this finds you well and your days is off to a fantastic start!

I have a few more questions about the plan.

You mentioned to me that you extracted some of the FDA plan to construct the Dunakaroo's FSP, can you tell me framework used to choose those specific line items from the FDA plan to construct the Dunakaroo plan.

I appreciate your time.

Warm regards,



**Mary Madison**
Quality Regulatory Manager

1470 Brummel Ave,,
Elk Grove Village, IL 60007
773-297-9569 *(mobile)*
creative-werks.com 🅕 🅞 🅛 🅣

Complex packaging solutions with speed and peace of mind 🎁

**From:** Erich Zicher <ezicher@cwerksglobal.com>
**Sent:** Thursday, October 13, 2022 9:00 AM
**To:** Mary Madison <mmadison@cwerksglobal.com>
**Subject:** RE: Food Safety Plans

Angie never added dates to the cover page, but it is a live document.



**Erich Zicher**
Director of Food Safety

1470 Brummel Ave,
Elk Grove Village, IL 60007
+1-630-509-3087 *(office)*
+1-847-826-9424 *(mobile)*
creative-werks.com 🅕 🅞 🅛 🅣

**From:** Mary Madison <mmadison@cwerksglobal.com>
**Sent:** Thursday, October 13, 2022 8:48 AM
**To:** Erich Zicher <ezicher@cwerksglobal.com>
**Subject:** RE: Food Safety Plans

Hi Erich,

One (1) more question please, is this a WIP or completed doc.

Thanks



**Mary Madison**

Quality Regulatory Manager

1470 Brummel Ave,,
Elk Grove Village, IL 60007
773-297-9569 (mobile)
creative-werks.com

Complex packaging solutions with speed and peace of mind

**From:** Erich Zicher <ezicher@cwerksglobal.com>
**Sent:** Thursday, October 13, 2022 8:31 AM
**To:** Mary Madison <mmadison@cwerksglobal.com>
**Subject:** RE: Food Safety Plans

Confirmed.



**Erich Zicher**

Director of Food Safety

1470 Brummel Ave,
Elk Grove Village, IL 60007
+1-630-509-3087 (office)
+1-847-826-9424 (mobile)
creative-werks.com

**From:** Mary Madison <mmadison@cwerksglobal.com>
**Sent:** Thursday, October 13, 2022 8:01 AM
**To:** Erich Zicher <ezicher@cwerksglobal.com>
**Subject:** Food Safety Plans

Good day Erich,

Hope all is well!

I would like to confirm that the model to be used for the Food Safety Plan is the one for Dunkaroos.

Thank you for your time.



**Mary Madison**
Quality Regulatory Manager

1470 Brummel Ave,,
Elk Grove Village, IL 60007
773-297-9569 *(mobile)*
creative-werks.com

Complex packaging solutions with speed and peace of mind







# FSPCCA

## FOOD SAFETY PREVENTIVE CONTROLS ALLIANCE



# Preventive Controls for Human Food

### First Edition - 2016






# Participant Manual

# FOOD SAFETY PREVENTIVE CONTROLS ALLIANCE

## Steering Committee (October 2015)

John T. Allan III, International Dairy Foods Association (IDFA), Washington, DC

Glenn Black, Grocery Manufacturers Association (GMA), Washington, DC *(Past Chairman)*(currently FDA)

Robert E. Brackett, Institute for Food Safety and Health – Illinois Institute of Technology (IFSH-IIT), Chicago, IL

Benjamin Chapman, North Carolina State University, Raleigh, NC *(Chairman)*

Claudia Coles, Washington Department of Agriculture, Olympia, WA

Debra DeVlieger, U.S. FDA, Bainbridge Island, WA

Nancy Doyle, U.S. FDA, Beaverton, OR

David Fairfield, National Grain and Feed Association (NGFA), Atlantic, IA

Donna Garren, American Frozen Food Institute (AFFI), Washington, DC

David Gombas, United Fresh Produce Association, Washington, DC

Kathy Gombas, U.S. FDA, College Park, MD

John T. Hoffman, Food Protection and Defense Institute (FPDI) – University of Minnesota, St. Paul, MN

Sonya M. Lambkin, U.S. FDA, Rockville, MD

John Larkin, FPDI, St. Paul, MN

Anita MacMullan, North Carolina Department of Agriculture and Consumer Services, Charlotte, NC

Jianghong Meng, Joint Institute for Food Safety and Applied Nutrition – University of Maryland, College Park, MD

Dianne Milazzo, U.S. FDA, Center for Veterinary Medicine, Rockville, MD

Ramkishan Rao, U.S. Department of Agriculture, National Institute of Food and Agriculture, Washington, DC

Donald Schaffner, Rutgers University, New Brunswick, NJ

Jenny Scott, U.S. FDA, College Park, MD

Guy E. Skinner, IFSH-FDA, Chicago, IL

Katherine M.J. Swanson, KMJ Swanson Food Safety, Inc., Mendota Heights, MN *(Curriculum Development Project Manager)*

Pat Tovey, Pet Food Institute, Washington, DC

W. Henry Turlington, American Feed Industry Association, Arlington, VA

Purnendu C. Vasavada, PCV & Associates LLC, River Falls, WI *(Outreach Project Manager)*

Robert D. Waltz, Association of American Feed Control Officials (AAFCO), West Lafayette, IN

Jason Wan, IFSH-IIT, Chicago, IL

Gerald Wojtala, International Food Protection Training Institute (IFPTI), Battle Creek, MI

## Executive Committee (October 2015)

Benjamin Chapman, North Carolina State University, Raleigh, NC *(Chair)*

Claudia Coles, Washington State Department of Agriculture, Olympia, WA

Donna Garren, AFFI, Washington, DC

Donald Schaffner, Rutgers University, New Brunswick, NJ

Katherine M.J. Swanson, KMJ Swanson Food Safety, Inc., Mendota Heights, MN *(FSPCA Project Manager, Curriculum Development)*

Purnendu C. Vasavada, PCV & Associates LLC, River Falls, WI *(FSPCA Project Manager, Outreach)*

## Editorial Sub-committee (1ˢᵗ Edition)

Jeffrey Barach, Barach Enterprises LLC, Oakton, VA

Glenn Black, GMA, Washington, DC (currently FDA)

Robert Brackett, IFSH-IIT, Chicago, IL

Claudia Coles, Washington State Department of Agriculture, Olympia, WA

Debra DeVlieger, U.S. FDA, Bainbridge Island, WA

Jenny Scott, U.S. FDA, College Park, MD

Katherine M.J. Swanson, KMJ Swanson Food Safety, Inc., Mendota Heights, MN *(Executive Editor)*

Purnendu C. Vasavada, PCV & Associates LLC, River Falls, WI

Jason Wan, IFSH-IIT, Chicago, IL

## Hazard Analysis and Preventive Controls for Human Food Training

The Food Safety Preventive Controls Alliance developed this training curriculum in Food Safety Preventive Controls compliant with the FDA's *Current Good Manufacturing Practice, Hazard Analysis, and Risk-based Preventive Controls for Human Food* regulations. For the most current course information, please consult: http://www.iit.edu/ifsh/alliance/

  

This publication was developed by the Food Safety Preventive Controls Alliance (FSPCA) and was supported, in part, by a grant from the Food and Drug Administration to the Illinois Institute of Technology's Institute for Food Safety and Health. The views expressed herein do not necessarily reflect the views of these organizations. Direct all inquiries to the FSPCA at fspca@iit.edu

# FSPCA PREVENTIVE CONTROLS FOR HUMAN FOOD

## TRAINING CURRICULUM

First Edition – 2016

(Version 1.2, February 2016)

**Disclaimer**

The information provided by the Food Safety Preventive Controls Alliance (FSPCA) is for training purposes only. The FSPCA is not your attorney and cannot provide you with legal advice. The FSPCA curriculum is intended as a training tool to assist companies in complying with the FDA Food Safety Modernization Act (FSMA) preventive controls regulation; however, following this curriculum does not ensure compliance with the law or FDA's regulations. For advice regarding the legal compliance with FSMA, please consult your legal counsel.

The information provided by the FSPCA will vary in applicability to each food manufacturer. It is not possible for the FSPCA training curriculum to address every situation. Companies should implement the practices and programs that will function best to produce safe foods based on the nature of their individual operations. FSPCA materials do not outline the only approach to developing and implementing a Food Safety Plan. Companies can follow any approach that satisfies the requirements of the applicable statutes and regulations related to FSMA. The information provided by FSPCA does not create binding obligations for the Food and Drug Administration or industry.

FSPCA does not guarantee the accuracy, adequacy, completeness or availability of any information provided in its curriculum and is not responsible for any errors or omissions or for any results obtained from the use of such information. FSPCA gives no express or implied warranties, including but not limited to, any warranties of merchantability or fitness for a particular purpose or use. In no event shall FSPCA be liable for any indirect, special or consequential damages in connection with any use of this training curriculum.

Developed by the



FOOD SAFETY PREVENTIVE CONTROLS ALLIANCE

*Version 1.2* contains changes to address technical amendments and corrections published by FDA, and editorial corrections identified in earlier versions. An erratum listing for earlier versions is available on the FSPCA website.

## Contributors: FSPCA Preventive Controls for Human Food Training Curriculum

These Working Groups and individuals made significant contributions of time and expertise in developing the Food Safety Preventive Controls Alliance training curriculum and supporting documents since its inception in 2012. Affiliations while work was in progress are noted.

### FSPCA Preventive Controls Core Curriculum Development
Jeff Barach, Barach Enterprises – *Chair*
Judy Fraser Heaps, Land O' Lakes, Inc. – *Vice Chair*

### Food Categories and Representative Processing
Kurt Deibel, Heinz, North America – *Chair*
Alejandro Mazzotta, Chobani, Inc. – *Vice Chair*
Tim Jackson, Nestlé North America

### Allergen Management and Controls
Joseph Scimeca, Cargill, Inc. – *Chair*
Sue Estes, PepsiCo, Inc. – *Vice Chair*

### Sanitation, Current Good Manufacturing Practices and Environmental Monitoring
John Allan, American Frozen Food Institute – *Chair*
Joe Shebuski, Cargill, Inc. – *Vice Chair*

### Supply Chain and Ingredient Management
Steve Mavity, Bumble Bee Foods, Inc. – *Chair*
Faye Feldstein, Deloitte Consulting, LLC – *Vice Chair*

The following people or organizations made significant contributions to the content of specific chapters:

### Sanitation Control Plan
American Frozen Food Institute, Cargill Inc., Ecolab Inc., Leprino Foods

### Recall
Grocery Manufacturers Association

### Class Exercise Activities
Judy Fraser-Heaps, Land O' Lakes, Inc.
Pamela Wilger, Cargill, Inc.
Katherine Simons, Minnesota Department of Agriculture



Food Safety Plan – Dunkaroos (21 CFR 117.126)   Page 1 of 36
FSQ 1.01.00
Issue Date: 12/20/21     Supersedes: NEW     Revision: NEW

| Section | Revised Date | Page(s) |
|---|---|---|
| Title and Signature Page | | 1 |
| Product Description, Distribution, Consumers and Intended Use | | 2 |
| Flow Diagram | | 3 |
| Hazard Analysis (21 CFR 117.130) | | 4-16 |
| Hazard Analysis Risk Matrix | | 17 |
| Process Preventive Controls / CCP's (21 CFR 117.135) | | 18 |
| Allergen Preventive Controls | | 19 |
| Sanitation Preventive Controls | | 20 |
| Supply Chain Preventive Controls | | 21 |

Food Safety Plan Origination Date:        12/20/2021     Completed By:  Angie Knabe

Food Safety Plan Last Validation Date:     New          Completed By:  N/A

Food Safety Plan Action Status:            ☒ New Food Safety Plan  ☐ Annual Review     ☐ Plan Updated

HACCP/HARPC Coordinator:        Angie Knabe
_____   _____
                                                                          (Date)

Responsible Individual:         Ulises Rodela
_____   _____
                               Plant Manager                 (Date)

Preventive Controls Qualified Individual:  Anu Sharma
                               Quality Manager            __  _____
                                                                          (Date)



Case: 1:23-cv-16476 Document #: 94-1 Filed: 07/01/25 Page 17 of 257 PageID #:1725

Food Safety Plan – Dunkaroos (21 CFR 117.126)      Page 2 of 36
FSQ 1.01.00
Issue Date: 12/20/21          Supersedes: NEW          Revision: NEW

**Product Description, Distribution, Consumers and Intended Use**

| Product or Process Description | Cookies with Frosting |
|---|---|
| Intrinsic Product Attributes | Dry, shelf stable |
| Customer/Consumer Use | Ready-to-Eat |
| Packaging | Thermoformed tray with incomplete statement |
| Target Market | General public |
| Shelf Life | 7 months |
| Label Instructions | No labeled storage or preparation requirements are identified for this product |
| Storage and Distribution | No special storage requirements for food safety. |

Product Description and SKU

| Product Description | Customer |
|---|---|
| Vanilla Cookies with Chocolate Frosting | General Mills |
| Chocolate Cookies with Chocolate Chip Frosting | General Mills |
| Vanilla Cookies with Rainbow Chip Frosting | General Mills |

# WHAT IS A FOOD SAFETY PLAN? 21 CFR 117.126

A food safety plan is a set of documents that shows how a food business operates safely. It is a requirement for almost all food producers under FDA regulation. If you are familiar with HACCP, a food safety plan is very similar to a HACCP plan.

## WHAT ARE THE REQUIREMENTS IN A FOOD SAFETY PLAN?

Most Food Safety Plans contain the following written components:

- Hazard analysis
- Preventive controls
- Monitoring procedures and records
- Corrective action procedures and records
- Validation — Evidence that your preventive controls are valid
- Verification records that demonstrate your preventive controls are being enacted properly
- Recall plan

# OTHER REQUIREMENTS

- Your plan must be developed by a Preventive Controls Qualified Individual (PQCI). This person does not have to be an employee of the company.

Food Safety Plan – Dunkaroos (21 CFR 117.126)       Page 3 of 36
FSQ 1.01.00
Issue Date: 12/20/21       Supersedes: NEW       Revision: NEW

- You must reanalyze and update your food safety plan every time something changes in your operation or every 3 years, minimum.
- You must keep records of *everything*. (What are the company's minimum established record keeping time frame, if any)


**In sum Product & Facility Plan**

Food companies under FSMA governance must develop a written food safety plan for each product or group of similar products as well as the facility itself. This could require thousands or even tens of thousands of plan components, incorporating elements such as PRPs, CCPs, specifications, and more. There must also be demonstrable proof that product and facility plans are being implemented and monitored continuously.



Food Safety Plan – Dunkaroos (21 CFR 117.126)     Page 4 of 36
FSQ 1.01.00
Issue Date: 12/20/21          Supersedes: NEW          Revision: NEW

**A Legend would be helpful**



This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan – Dunkaroos (21 CFR 117.126)  Page 5 of 36
FSQ 1.01.00
Issue Date: 12/20/21      Supersedes: NEW      Revision: NEW

**Hazard Analysis does not comply with 21 CFR 117.130**

| Ingredient/ Process Step | | Potential Food Safety Hazard | Likelihood | Severity | Reasonably Likely to Occur/Hazard Risk Level | Basis/Justification | Measures Applied to Prevent, Eliminate or Reduced the Hazard to an Acceptable Level | Preventive Control or CCP |
|---|---|---|---|---|---|---|---|---|
| 1a). Receive Cookies | B | Vegetative pathogens | 1 | 2 | NO 2-Quality Risk | Contamination would be resultant of poor controls at supplier. Product at receipt is intact and protected from environment by packaging which is verified via receiving inspection of materials. Cookies undergo a lethality step at the supplier, are shelf stable, and do not require any refrigeration. | WI 8.3 Supplier Approval WI 2.20 Raw Material and Finished Good Release | Supply-Chain PC |
| | C | Undeclared allergens, cleaning or sanitizing compounds | 1 | 3 | NO 3-Safety Risk | Contamination would be resultant of poor controls at supplier. Product at receipt is intact and protected from environment by packaging which is verified via receiving inspection of materials. | WI 5.6 Material Receiving WI 8.3 Supplier Approval WI 2.15 Allergen Control | Supply-Chain PC Allergen PC |
| | P. | Foreign materials from processing ingredients or pack machinery at supplier | 1 | 1 | NO 1-Quality Risk | Contamination would be resultant of poor controls at supplier. Product at receipt is intact and protected from environment by packaging which is verified via receiving inspection of materials. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| 1b). Receive Frosting | B | Vegetative pathogens | 1 | 2 | NO 2-Quality Risk | Contamination would be resultant of poor controls at supplier. Product at receipt is intact and protected from environment by packaging which is verified via receiving inspection of materials. Frosting undergoes a lethality step at the supplier, and does not require any refrigeration. | WI 8.3 Supplier Approval WI 2.20 Raw Material and Finished Good Release | Supply-Chain PC |
| | C | Undeclared allergens, cleaning or sanitizing compounds | 1 | 3 | NO 3-Safety Risk | Contamination would be resultant of poor controls at supplier. Product at receipt is intact and protected from environment by packaging which is verified via receiving inspection of materials. | WI 5.6 Material Receiving WI 8.3 Supplier Approval WI 2.15 Allergen Control | Supply-Chain PC Allergen PC |
| | P. | Foreign materials from processing ingredients or pack machinery at supplier | 1 | 1 | NO 1-Quality Risk | Contamination would be resultant of poor controls at supplier. Product at receipt is intact and protected from environment by packaging which is verified via receiving inspection of materials. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| 1c). Receive Sprinkles | B | Vegetative pathogens | 1 | 2 | NO 2-Quality Risk | Contamination would be resultant of poor controls at supplier. Product at receipt is intact and protected from environment by packaging which is verified via receiving inspection of materials. Sprinkles are shelf stable and do not require any refrigeration. | WI 8.3 Supplier Approval WI 2.20 Raw Material and Finished Good Release | Supply-Chain PC |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan – Dunkaroos (21 CFR 117.126)   Page 6 of 36
FSQ 1.01.00
Issue Date: 12/20/21   Supersedes: NEW   Revision: NEW

| Step | | Hazard | | | Risk | Justification | Controls | Supply-Chain PC |
|---|---|---|---|---|---|---|---|---|
| | C | Undeclared allergens, cleaning or sanitizing compounds | 1 | 3 | NO 3-Safety Risk | Contamination would be resultant of poor controls at supplier. Product at receipt is intact and protected from environment by packaging which is verified via receiving inspection of materials. | WI 5.6 Material Receiving WI 8.3 Supplier Approval WI 2.15 Allergen Control | Supply-Chain PC Allergen PC |
| | P | Foreign materials from processing ingredients or pack machinery at supplier | 1 | 1 | NO 1-Quality Risk | Contamination would be resultant of poor controls at supplier. Product at receipt is intact and protected from environment by packaging which is verified via receiving inspection of materials. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| | B | None | 1 | 1 | NO 1-Quality Risk | Packaging materials not likely to support growth of microorganisms. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| 2a). Receive Food Contact Thermoform Film | C | Unintentional processing aids or undeclared chemical preservatives added to packaging. Undeclared allergens in product, but not included on packaging. | 1 | 3 | NO 3-Safety Risk | Contamination by processing aids or chemical preservatives would be resultant of poor controls at supplier. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| | P | None | 1 | 1 | NO 1-Quality Risk | Packaging film not likely to contain or provide transfer of physical hazards to product. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| | B | None | 1 | 1 | NO 1-Quality Risk | Packaging materials not likely to support growth of microorganisms. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| 2b). Receive Food Contact Top Lid-Stock Film | C | Unintentional processing aids or undeclared chemical preservatives added to packaging. Undeclared allergens in product, but not included on packaging. | 1 | 3 | NO 3-Safety Risk | Contamination by processing aids or chemical preservatives would be resultant of poor controls at supplier. Allergens in product, but not labeled on packaging materials would also be resultant of supplier issue. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| | P | None | 1 | 1 | NO 1-Quality Risk | Packaging film not likely to contain or provide transfer of physical hazards to product. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| | B | None | 1 | 1 | NO 1-Quality Risk | Chip board packaging not likely to support growth of microorganisms. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| 3a.) Receive Chip Board | C | None | 1 | 1 | NO 1-Quality Risk | Chip board packaging are used in secondary pack of product and are not direct food contact. Allergens in product, but not labeled on packaging materials would also be resultant of supplier issue. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |
| | P | None | 1 | 1 | NO 1-Quality Risk | Chip board packaging are used in secondary pack and would not be a method for introduction of foreign materials to product. | WI 5.6 Material Receiving WI 8.3 Supplier Approval | Supply-Chain PC |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan – Dunkaroos (21 CFR 117.126)   Page 7 of 36
FSQ 1.01.00
Issue Date: 12/20/21   Supersedes: NEW   Revision: NEW

| Step | | Hazard | | | Risk | Justification | Reference | Preventive Control |
|---|---|---|---|---|---|---|---|---|
| 3b.) Receive Corrugated Components | B | None | 1 | 1 | NO 1-Quality Risk | Corrugate not likely to support growth of microorganisms. | WI 5.6 Material Receiving / WI 8.3 Supplier Approval | Supply-Chain PC |
| | C | None | 1 | 1 | NO 1-Quality Risk | Corrugate packaging materials are used in secondary pack of product and are not direct food contact. Transfer of chemical hazards to product is unlikely. | WI 5.6 Material Receiving / WI 8.3 Supplier Approval | Supply-Chain PC |
| | P | None | 1 | 1 | NO 1-Quality Risk | Corrugate packaging materials are used in secondary pack and would not be a method for introduction of foreign materials to product. | WI 5.6 Material Receiving / WI 8.3 Supplier Approval | Supply-Chain PC |
| 4.) Store in Temperature Controlled Warehousing | B | Vegetative pathogen introduction through component damage | 2 | 2 | NO 4-Safety Risk | The most likely introduction of vegetative pathogens from environment would be through component damage in storage. | WI 5.6 Material Receiving | No |
| | C | Allergen cross contamination through component damage | 2 | 2 | NO 4-Safety Risk | Spillage of allergens in the warehouse due to component damage, though the likelihood of cross contact is minimal as materials are all closed and sealed and managed through warehousing controls. | WI 2.15 Allergen Control | Allergen PC |
| | P | Introduction of foreign bodies through component damage | 2 | 1 | NO 2-Quality Risk | Warehouse damage of components is a potential vector for introduction of foreign materials. Materials that are damaged would likely be identified prior to usage in operations. | WI 5.6 Material Receiving | No |
| 5.) Store Food Contract Packaging Components in Warehouse - temp. controlled or ambient. | B | None | 1 | 1 | NO 1-Quality Risk | Packaging materials not likely to support growth of microorganisms. | WI 5.6 Material Receiving | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | Packaging materials are kept stored in liners/wrapped. Chemical contamination from external sources while in storage deemed unlikely. | WI 5.6 Material Receiving | No |
| | P | None | 1 | 1 | NO 1-Quality Risk | Introduction of foreign bodies through component damage would also likely be significant to render use of materials impossible. | WI 5.6 Material Receiving | No |
| 6.) Store Cartons and Corrugated Components in Ambient Warehousing | B | None | 1 | 1 | NO 1-Quality Risk | Packaging materials not likely to support growth of microorganisms and materials are not direct food contact. | WI 5.6 Material Receiving | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | Carton or corrugated packaging materials are used in secondary pack and are not direct food contact. | WI 5.6 Material Receiving | No |
| | P | None | 1 | 1 | NO 1-Quality Risk | Carton or corrugated packaging materials are used in secondary pack and would not be a method for introduction of foreign materials to product. | WI 5.6 Material Receiving | No |
| 7.) Transport Food Components to the Line | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | | No |
| | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | | No |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan – Dunkaroos (21 CFR 117.126)     Page 8 of 36
FSQ 1.01.00
Issue Date: 12/20/21     Supersedes: NEW     Revision: NEW

| Step | Cat. | Hazard | | | Risk | Justification | References | PC |
|---|---|---|---|---|---|---|---|---|
| 8.) Open and Create Chip Batch – by Weight | B | Introduction of environmental vegetative pathogens – Salmonella through equipment tools or personnel. HPC and Coliform | 1 | 2 | NO 2-Quality Risk | The likelihood of introduction of environmental pathogens is limited due to the operating conditions required through prerequisite programs and preventive controls programs. | WI 2.19 Environmental/Pathogen Monitoring; SSOP 6.16 Allergen Cleaning Validation Protocol; WI 2.16 Food Defense & Bio-Security | Sanitation PC |
| | C | Allergen cross-contact from employees, product residuals not adequately removed from packaging machinery or tools through routine sanitation, or introduction of cleaning/sanitizing or maintenance chemicals. | 1 | 3 | NO 3-Safety Risk | Introduction of allergens or other processing chemicals (oil, lubricant, sanitation chemicals) within the operation are limited due to the conditions required through prerequisite programs and preventive control programs. | WI 2.21 Foreign Material; WI 2.16 Food Defense & Bio-Security; WI 4.2 Chemical Procurement, Storage, & Control; WI 2.15 Allergen Control; WI 6.1 Master Cleaning Schedule, Housekeeping, & Line Clearance; Allergen & Identity Preserved Food Cleaning Matrix | Allergen PC |
| | P | Plastics, fabric or metal maybe introduced through use of tools or seasoner equipment. | 2 | 2 | NO 4-Safety Risk | Due to the direct contact nature of opening components, a likelihood does exist for the introduction of foreign materials at this step. Physical hazards potentially introduced here are controlled at a later step. | WI 2.21 Foreign Material | No |
| 9.) Transport Food Contact Packaging to Line | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | | No |
| | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | | No |
| 10.) Transport Cartons and Corrugate to the Line | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | | No |
| | P | | | | | | | |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan – Dunkaroos (21 CFR 117.126)    Page 9 of 36
FSQ 1.01.00
Issue Date: 12/20/21    Supersedes: NEW    Revision: NEW

| Process Step | | Hazard | | | Risk | Justification | References | Preventive Control |
|---|---|---|---|---|---|---|---|---|
| 11.) De-case and Feed Cookies to Hopper | B | Introduction of environmental vegetative pathogens - Salmonella through equipment tools or personnel. HPC and Coliform | 1 | 2 | NO 2-Quality Risk | The likelihood of introduction of environmental pathogens is limited due to the operating conditions required through prerequisite programs and preventive controls programs. | WI 2.19 Environmental/Pathogen Monitoring; SSOP 6.16 Allergen Cleaning Validation Protocol; WI 2.16 Food Defense & Bio-Security | Sanitation PC |
| | C | Allergen cross-contact from employees, product residuals not adequately removed from packaging machinery or tools throughout routine sanitation, or introduction of cleaning/sanitizing or maintenance chemicals. | 1 | 3 | NO 3-Safety Risk | Introduction of allergens or other processing chemicals (oil, lubricant, sanitation chemicals) within the operation are limited due to the conditions required through prerequisite programs and preventive control programs. | WI 2.21 Foreign Material; WI 2.16 Food Defense & Bio-Security; WI 4.2 Chemical Procurement, Storage, & Control; WI 2.15 Allergen Control; WI 6.1 Master Cleaning Schedule, Housekeeping, & Line Clearance; Allergen & Identity Preserved Food Cleaning Matrix | Allergen PC |
| | P | Plastics, fabric or metal maybe introduced through use of tools or seasoner equipment. | 2 | 2 | NO 4-Safety Risk | Due to the direct contact nature of opening components, a likelihood does exist for the introduction of foreign materials at this step. Physical hazards potentially introduced here are controlled at a later step. | WI 2.21 Foreign Material | No |
| 12.) Open Drum and Use Drum Pump to Feed to Kettle | B | Introduction of environmental vegetative pathogens - Salmonella through equipment tools or personnel. HPC and Coliform | 1 | 2 | NO 2-Quality Risk | The likelihood of introduction of environmental pathogens is limited due to the operating conditions required through prerequisite programs and preventive controls programs. | WI 2.19 Environmental/Pathogen Monitoring; SSOP 6.16 Allergen Cleaning Validation Protocol; WI 2.16 Food Defense & Bio-Security | Sanitation PC |
| | C | Allergen cross-contact from employees, product residuals not adequately removed from packaging machinery or tools throughout routine sanitation, | 1 | 3 | NO 3-Safety Risk | Introduction of allergens or other processing chemicals (oil, lubricant, sanitation chemicals) within the operation are limited due to the conditions required through prerequisite programs and preventive control programs. | WI 2.21 Foreign Material; WI 2.16 Food Defense & Bio-Security | Allergen PC |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan – Dunkaroos (21 CFR 117.126)  Page 10 of 36
FSQ 1.01.00
Issue Date: 12/20/21   Supersedes: NEW   Revision: NEW

| Step | | Hazard | | | Risk | Justification | References | PC |
|---|---|---|---|---|---|---|---|---|
| | | or introduction of cleaning/sanitizing or maintenance chemicals. | | | | | WI 4.2 Chemical Procurement, Storage, & Control; WI 2.15 Allergen Control; WI 6.1 Master Cleaning Schedule, Housekeeping, & Line Clearance; Allergen & Identity Preserved Food Cleaning Matrix | No |
| | p. | Plastics, fabric or metal maybe introduced through use of tools or seasoner equipment. | 2 | 2 | NO 4-Safety Risk | Due to the direct contact nature of opening components, a likelihood does exist for the introduction of foreign materials at this step. Physical hazards potentially introduced here are controlled at a later step. | WI 2.21 Foreign Material | |
| | B. | Introduction of environmental vegetative pathogens - Salmonella through equipment tools or personnel. HPC and Coliform | 1 | 2 | NO 2-Quality Risk | The likelihood of introduction of environmental pathogens is limited due to the operating conditions required through prerequisite programs and preventive controls programs. | WI 2.19 Environmental/Pathogen Monitoring; SSOP 6.16 Allergen Cleaning Validation Protocol; WI 2.16 Food Defense & Bio-Security | Sanitation PC |
| | C. | Allergen cross-contact from employees, product residuals not adequately removed from packaging machinery or tools through routine sanitation, or introduction of cleaning/sanitizing or maintenance chemicals. | 1 | 3 | NO 3-Safety Risk | Introduction of allergens or other processing chemicals (oil, lubricant, sanitation chemicals) within the operation are limited due to the conditions required through prerequisite programs and preventive control programs. | WI 2.21 Foreign Material; WI 2.16 Food Defense & Bio-Security; WI 4.2 Chemical Procurement, Storage, &Control | Allergen PC |
| 14.) Convey to Scales (Iffovrac and Vibratory Feeds). | p. | Plastics, fabric or metal may be introduced through use of tools or seasoner equipment. | 2 | 2 | NO 4-Safety Risk | Due to the direct contact nature of opening components, a likelihood does exist for the introduction of foreign materials at this step. Physical hazards potentially introduced here are controlled at a later step. | WI 2.15 Allergen Control; WI 6.1 Master Cleaning Schedule, Housekeeping, & Line Clearance; Allergen & Identity Preserved Food Cleaning Matrix; WI 2.21 Foreign Material | No |



This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan – Dunkaroos (21 CFR 117.126)    Page 11 of 36
FSQ 1.01.00
Issue Date: 12/20/21    Supersedes: NEW    Revision: NEW

| Process Step | | Potential Hazard | L | S | Risk | Justification | Preventive Control | PC? |
|---|---|---|---|---|---|---|---|---|
| 15.) Harvest and re-introduce cookies to Hopper. | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | | No |
| | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | | No |
| 16.) Put Bottom/Sheet Film on Thermoformer | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | | No |
| | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | | No |
| 17.) Load Top Film Roll to Thermoformer | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | | No |
| | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | | No |
| 18.) Load Cartons to Carton Former – Cartons Formed and Glued | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | | No |
| | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | | No |
| 19.) Thermoform Trays | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | | No |
| | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | | No |
| 20.) Gravimetric Filling of Cookies to Trays | B | Introduction of environmental/vegetative pathogens. | 1 | 2 | NO 2-Quality Risk | The likelihood of introduction of environmental pathogens is limited due to the operating conditions required through prerequisite programs and preventive controls programs. | WI 2.19 Environmental/Pathogen Monitoring | Sanitation PC |
| | C | Cleaning/sanitizing or maintenance chemicals introduced from inadequate removal from production equipment. | 1 | 3 | NO 3-Safety Risk | Introduction of allergens or other processing chemicals within the operation are limited due to the conditions required through prerequisite programs and preventive control programs. | WI 4.2 Chemical Procurement, Storage, & Control / WI 2.15 Allergen Control | Allergen PC |
| | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | | No |
| 21.) Blend Chips into Frosting (optional step) | B | Introduction of environmental/vegetative pathogens through | 1 | 2 | NO 2-Quality Risk | The likelihood of introduction of environmental pathogens is limited due to the operating conditions required through prerequisite programs and preventive controls programs. | WI 2.19 Environmental/Pathogen Monitoring | Sanitation PC |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan – Dunkaroos (21 CFR 117.126)  Page 12 of 36

FSQ 1.01.00

Issue Date: 12/20/21  Supersedes: NEW  Revision: NEW

| Process Step | Type | Hazard | L | S | Risk | Justification | Program | PC |
|---|---|---|---|---|---|---|---|---|
| | | equipment tools or personnel. | | | | | | |
| | C | Allergen cross-contact from employee vectors, product residuals not adequately removed from packaging machinery or tools through routine sanitation, or introduction of cleaning/sanitizing or maintenance chemicals. | 1 | 3 | NO 3-Safety Risk | Introduction of allergens or other processing chemicals within the operation are limited due to the conditions required through prerequisite programs and preventive control programs. | WI 4.2 Chemical Procurement, Storage, & Control / WI 2.15 Allergen Control | Allergen PC |
| | P | Plastics, fabric or metal maybe introduced through use of blending tools or seasoner equipment. | 2 | 2 | NO 4-Safety Risk | Due to the direct contact nature of blending components, a likelihood does exist for the introduction of foreign materials at this step. Physical hazards potentially introduced here are controlled at a later step. | WI 2.33 Good Manufacturing Practices / WI 2.1 Foreign Material | PPC-1 |
| 22.) Pump to Unifiller | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | | No |
| | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | | No |
| 23.) Volumetric Filling of Frosting to Trays | B | Introduction of environmental vegetative pathogens. | 1 | 2 | NO 2-Quality Risk | The likelihood of introduction of environmental pathogens is limited due to the operating conditions required through prerequisite programs and preventive controls programs. | WI 2.19 Environmental/Pathogen Monitoring | Sanitation PC |
| | C | Cleaning/sanitizing or maintenance chemicals introduced from inadequate removal from production equipment. | 1 | 3 | NO 3-Safety Risk | Introduction of allergens or other processing chemicals within the operation are limited due to the conditions required through prerequisite programs and preventive control programs. | WI 4.2 Chemical Procurement, Storage, & Control / WI 2.15 Allergen Control | Allergen PC |
| | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | | No |
| 24.) Barcode Scan, Seal Top Film, and Punch Trays From Sheet | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | | No |
| | P | Plastics from tray being punched from sheet | 1 | 1 | NO 1-Quality Risk | All trays will be sealed at this step and the flow of materials on the line is downstream of the tray sealing station. | Sanitary Design | No |
| 25.) Rejection Bin | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | | No |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan – Dunkaroos  
FSQ 1.01.00  
Issue Date: 12/20/21       Supersedes: NEW       Revision: NEW       Page 13 of 36



| Process Step | Hazard | Control | | | Risk | Justification | CCP |
|---|---|---|---|---|---|---|---|
| 26). Inspect Inspect for Barcode/Empty | C | None | 1 | 1 | NO / 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO / 1-Quality Risk | No physical food safety hazards expected at this step. | No |
| | B | None | 1 | 1 | NO / 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| 27). Trays Robotically Transferred to Conveyor System | C | None | 1 | 1 | NO / 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO / 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO / 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| 28). Trays Checkweighed | C | None | 1 | 1 | NO / 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO / 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO / 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| 29). Verify Weight on Static Scale | C | None | 1 | 1 | NO / 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO / 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO / 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| 30.) Trays are Date Coded | C | None | 1 | 1 | NO / 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO / 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO / 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| 31.) Trays Robotically Packed to Cartons | C | None | 1 | 1 | NO / 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO / 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO / 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| 34.) Load Shippers into Shipper Erector – Shippers | B | None | 1 | 1 | NO / 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | NO / 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552(b).4 (2016).

Food Safety Plan – Dunkaroos (21 CFR 117.126)   Page 14 of 36
FSQ 1.01.00
Issue Date: 12/20/21   Supersedes: NEW   Revision: NEW

| Process Step | | Potential Hazard | | | Risk | Justification | CCP |
|---|---|---|---|---|---|---|---|
| Formed and Bottoms Taped | P | None | 1 | 1 | NO | No physical food safety hazards expected to be introduced at this step. | No |
| 35.) Cartons Barcode Scanned and Glued Sealed | B | None | 1 | 1 | 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO | No physical food safety hazards expected to be introduced at this step. | No |
| 36.) Rejection Bin | B | None | 1 | 1 | 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO | No physical food safety hazards expected to be introduced at this step. | No |
| 37.) Inspect Rejects for Barcode and Flaps | B | None | 1 | 1 | 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO | No physical food safety hazards expected to be introduced at this step. | No |
| 39.) Rework and Manually Reintroduce Carton | B | None | 1 | 1 | 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO | No physical food safety hazards expected to be introduced at this step. | No |
| 40.) Cartons are Date Coded | B | None | 1 | 1 | 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| | P | None | 1 | 1 | NO | No physical food safety hazards expected to be introduced at this step. | No |
| 41.) Cartons X-ray for FM and Tray Count | B | None | 1 | 1 | 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | Radiological contamination –use of x-rays during foreign material detection | 1 | 3 | 3-Safety Risk | No product irradiated for microbiological control, as such, no radiological risk is introduced. The radiation used is x-rays (Generally recognized as safe) and do not constitute a radiological hazard for consumption. All x-rays are serviced annually for radiation leakage. | No |
| | P | None | 1 | 1 | NO | No physical food safety hazards expected to be introduced at this step. | No |
| 42.) Open Carton and Harvest Trays for Repack | B | None | 1 | 1 | 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |



This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

| Step | | | | | | | |
|---|---|---|---|---|---|---|---|
| 43.) Hand Pack Cartons into Shippers | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| 44.) Shippers Top Taped, Palletized and Stretch Wrapped | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| 45.) Reinspect and Confirm FM Rejection | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| 46.) If Confirmed, Document and Retain; If Not, Destroy Rejection | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| 47.) Transport FG Pallet to Warehouse | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| 48.) Pallets Stored in Temp.Controlled Warehouse for Shipment | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |
| 49.) Finished Good Pallets Shipped | P | None | 1 | 1 | NO 1-Quality Risk | No physical food safety hazards expected to be introduced at this step. | No |
| | B | None | 1 | 1 | NO 1-Quality Risk | No biological food safety hazards expected to be introduced at this step. | No |
| | C | None | 1 | 1 | NO 1-Quality Risk | No chemical food safety hazards expected to be introduced at this step. | No |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan – Dunkaroos (21 CFR 117.126)
FSQ 1.01.00
Issue Date: 12/20/21          Supersedes: NEW          Revision: NEW          Page 16 of 36

**Severity**

| Likelihood | 1 – Unlikely to Result in Illness or Injury | 2 – Could Result in Illness or Injury or Will Result in Illness or Injury, but Not Likely to Require Medical Intervention | 3 – Illness, Injury or Death Likely; Requires Medical Intervention |
|---|---|---|---|
| 1 – Not Likely to Occur | 1: Quality Risk (Manage using PRPs) | 2: Quality Risk (Manage using PRPs) | 3: Safety Risk (Manage using PCs and PRPs) |
| 2 – May Occur | 2: Quality Risk (Manage using PRPs) | 4: Safety Risk (Manage using PCs and PRPs) | 6: Critical Risk (Manage using PCs and CCPs) |
| 3 – Has Previously or is Likely to Occur | 3: Safety Risk (Manage using PCs and PRPs) | 6: Critical Risk (Manage using PCs and CCPs) | 9: Critical Risk (Manage using PCs and CCPs) |

## HAZARD ANALYSIS OVERVIEW

1. *You must conduct a hazard analysis for each type of food manufactured, processed, packed, or held at your facility.*

2. *Your hazard analysis must be written.*

3. *The criteria used is missing used to define the probability and severity requirements to support the risk analysis, as well as, the matrix up above. Further, the assessment states that there is no quality risk... that does not correspond to the above immediate terminology used in the matrix. Further, what credible source was used to substantiate making such a statement.*

# Creating a HACCP risk assessment matrix-Refer to 21 CFR 117.130

The first step in establishing a risk assessment matrix is deciding the complexity of your matrix. That is whether to use more or less variable scale points for the hazard's likelihood of occurrence and the damage it can cause. After deciding the type of matrix to use, you can follow these definitive steps:

1. **List all process steps**, including the acquisition of materials from suppliers, storage, up to delivery for a finished product.

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan – Dunkaroos (21 CFR 117.126)     Page 17 of 36

FSQ 1.01.00

Issue Date: 12/20/21     Supersedes: NEW     Revision: NEW

2. **Identify all potential food safety hazards and risks for each step.** All potential hazards must be carefully identified and listed for further hazard analysis for the assurance of food safety. Some common hazards related to receiving raw materials would be the presence of contaminants or non-compliance with standard analyses.

3. **The next step is to identify the likelihood of occurrence of each hazard.** Choose from the previously mentioned range and assign numerical values for each level such as 1 to 5; 1 being the rarest likelihood, and 5 as almost certain.

4. **List down the degree of damage each hazard is most likely to cause.** These values can be designated with alphabets depending on your preference.

5. **Plot the ratings into the hazard matrix and determine the potential severity of each hazard.** Depending on your company's discretion and international standards, thresholds can be set to determine the appropriate action for each risk.

Risk levels are the main determinant of what food safety control and preventive measures need to be used to eliminate a hazard or at least reduce it to an acceptable level. Action criteria for these risks can be prerequisite programs, critical points, operational prerequisite programs, and critical control points.

• The plan as presented does not show evidence of how the determinations were made. This process is framed in a science risk based approach unique and specific to each instance.

• You are to risk rank the hazards to minimize the risk

Example of a Risk Matrix

https://www.ifsqn.com/fsf/Risk%20Assessment%20Under%20BRC.pdf

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan – Dunkaroos (21 CFR 117.126)   Page 18 of 36
FSQ 1.01.00
Issue Date: 12/20/21      Supersedes: NEW      Revision: NEW

# Steps in Creating a Hazard Analysis

## Example Process Flow



Example Process Flow - Each box corresponds to a process step.

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan – Dunkaroos (21 CFR 117.126)     Page 19 of 36
FSQ 1.01.00
Issue Date: 12/20/21     Supersedes: NEW     Revision: NEW

# 1. IDENTIFY THE STEPS IN YOUR PROCESS FROM START TO FINISH.

It's important that you have every step in your process identified so that you don't miss anything in your hazard analysis. Often, it's easiest to conduct a process flow diagram to identify all of the steps in your process.

# 2. CONDUCT A HAZARD IDENTIFICATION:

In this step, you review all of your process steps and identify if there are any hazards present at each step. For each step, you will consider 3 types of hazards:

- Biological Hazards (bacteria, parasites, etc.)
- Chemical hazards (i.e. toxins, pesticides, food allergens)
- Physical hazards (i.e. stone, glass, metal fragments)

Your hazard identification should also include hazards that could be present in the food because:

- The hazard occurs naturally (*i.e. toxins in fish*)
- The hazard may be accidentally introduced (*jewelry from employee falls into food*)
- The hazard may be introduced intentionally for economic gain (*i.e. sabotage by a competitor*)

# 3. CONDUCT HAZARD EVALUATION

The hazard evaluation is the last step in creating your Hazard Analysis. Here, you must evaluate each hazard that you identified to assess the probability that it would occur if left unaddressed.

If the probability is high that this hazard would cause an injury if unaddressed, then you must implement a "preventive control".

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan – Dunkaroos (21 CFR 117.126)  Page 20 of 36
FSQ 1.01.00
Issue Date: 12/20/21    Supersedes: NEW    Revision: NEW

*You also must consider the effects of these things in your hazard evaluation.*

- *Formulation of the food*
- *Condition and design of the facility*
- *Raw materials and other ingredients*
- *Transportation practices*
- *Processing procedures*
- *Packaging and labeling activities*
- *Storage and distribution*
- *Intended use of the product*
- *Sanitation, including employee hygiene*
- *Any other relevant factors (i.e. weather, natural toxins)*
- *Environmental pathogens whenever a ready-to-eat (RTE) food is exposed to the environment before packaging.*

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan – Dunkaroos (21 CFR 117.126)    Page 21 of 36
FSQ 1.01.00
Issue Date: 12/20/21    Supersedes: NEW    Revision: NEW

Process Preventive Controls and/or Critical Control Points

| Process Preventive Control /CCP | Hazard | Critical Limit | Monitoring | | | | Corrective Action | Verification | Records |
| | | | What | How | Frequency | Who | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1.5mm Fe 2.0mm Non-Fe 2.0 Stainless Steel | X-ray afterfilling and sealing of package. | Functioning and calibrated metal detector or X-ray | At the beginning and end of shift and not less than every 2 hours. | QA Technician | In the event of a critical limit failure, stop line and notify QA and Operations Supervision and Maintenance. Place all materials back to the last good check for rescreening. Investigate, identify and document root cause and corrective actions. | | |
| PPC-1 X-Ray | Metal | Confirmed finding of metal that would cause injury or choking within product. | Rejected product due to presence of foreign metal bodies. | Inspection of rejected product to identify foreign metal body identified by Metal Detector or X-ray | Examine product rejected by Metal Detector or X-ray periodically throughout shift. | QA Technician | Challenge finding through online Metal Detector or X-ray equipment ten times to ensure detectability. If not consistently detectable, place product on hold back to start of run. Investigate source of contaminant. If source is internal and further material appears to be missing, place product on hold back to last code of inbound bulk good check. Stop line if three or more findings in one hour or within one lot code of inbound bulk materials if determined to be external source. | QA leadership to verify record daily. QA Manager or designee to signoff within 7 days. QA Tech and Production Line Leads to perform direct observation of monitoring through the day. | PPC-1-monitoring records via Qwerks Metal Detection / X-Ray Calibration Records cw security camera video WI 2.17 *Metal Detection* |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan – Dunkaroos (21 CFR 117.126)    Page 22 of 36
FSQ 1.01.00
Issue Date: 12/20/21    Supersedes: NEW    Revision: NEW

***These requirements are a part of the Current Good Manufacturing Practices that relates to Processes and Controls and are missing from the above matrix.***

General Requirements related to Processes and Controls

1. All operations involving food must align with sanitation principles.

2. Quality control must be used to ensure food and packaging is safe.

3. One or more competent individuals must be responsible for sanitation

4. You must protect your food from allergens and contamination.

5. Testing must be used to identify sanitation failures or possible product contamination.

6. Any contaminated food must be discarded or treated to eliminate the contamination.

Raw Materials & Ingredients

1. Ingredients must be inspected for cleanliness and stored safely. If necessary, raw materials should be washed using clean water.

2. Ingredients must be safe for consumption or treated to make them safe (i.e. washed or cooked).

3. Ingredients susceptible to toxins must comply with FDA regulations.

4. Ingredients that are contaminated must comply with FDA regulations if they are to be used.

exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan – Dunkaroos (21 CFR 117.126)     Page 23 of 36

FSQ 1.01.00

Issue Date: 12/20/21     Supersedes: NEW     Revision: NEW

5. Ingredients must be held in containers that prevent contamination and at an acceptable temperature and humidity level.

6. Frozen ingredients must be kept frozen.

7. Ingredients stored in bulk must be safe from contamination.

8. Ingredients that contain allergens must be identified and held in a way that prevents cross-contact.

Manufacturing Operations:

1. Equipment must be maintained in clean condition.

2. All operations should be controlled to minimize growth of bacteria, contamination and spoilage.

3. Food requiring refrigeration must be refrigerated throughout the operation.

4. Measures used to prevent bacteria growth (i.e. cooking, sterilizing, refrigerating) must be adequate.

5. Re-work must prevent contamination and bacteria growth.

6. When ingredients are unprotected they must not be handled in a way that could cause contamination. Food on conveyor belts must be protected.

7. Equipment, containers, and utensils must be constructed and used in a way that doesn't contaminate food.

8. You must take measures to protect your product from metal or foreign objects.

exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan – Dunkaroos (21 CFR 117.126)
FSQ 1.01.00

| | | |
|---|---|---|
| Issue Date: 12/20/21 | Supersedes: NEW | Page 24 of 36 |
| | | Revision: NEW |

9. Contaminated food must:

   i. Be disposed of OR

   ii. Re-worked and re-examined,

10. Food that is being processed must be protected from contamination.

11. Heat blanching --if used-- must be performed properly

12. Foods that are used repeatedly (i.e. dipping sauces, breading) must be protected from contamination and bacteria growth

13. Filling, assembling, and packaging processes must not contaminate food.

14. Dry foods that rely on low moisture for safety must be sufficiently dry.

15. Acidified foods that rely on acid for safety must be sufficiently acidic (pH≤4.6)

16. Ice that touches food must be food quality.

**Allergen Preventive Control (Incomplete/non-compliant)**

*Finished Good Product Allergen Identification*

| Product Description | Customer | Wheat | Soy | Milk | Egg | Tree Nut | Peanut | Fish | Shellfish | Shellfish | Precautionary Labeling |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Vanilla Cookies with Chocolate Frosting | GMI | Yes | Yes | Yes | No | No | No | No | No | No | None |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan – Dunkaroos (21 CFR 117.126)     Page 25 of 36
FSQ 1.01.00
Issue Date: 12/20/21     Supersedes: NEW     Revision: NEW

| Chocolate Cookies with Chocolate Chip Frosting | GMI | Yes | Yes | Yes | Yes | No | No | No | No | No | No | None |
| Vanilla Cookies with Rainbow Chip Frosting | GMI | Yes | No | No | No | No | No | No | No | No | No | None |

*Scheduling Implications:* Production will be sequenced so that products with unique allergens will not be scheduled prior to other products that do not contain the same allergen. Alternatively, when this cannot be accomplished via scheduling, a sanitation will be completed to eliminate allergenic protein residual from the line.

| Allergen Preventive Control | Hazard | Critical Limit | Monitoring | | | | Corrective Action | Verification | Records |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | What | How | Frequency | Who | | | |
| Film Review | Undeclared Allergens | All finished goods must have packaging materials that match allergen statement to the product. | Allergen declaration matches product. | Visual check of film allergen statement against registered allergens/spec | At beginning of shift and not less than every 2 hours. | QA Technician | If allergen information does not match, stop line and notify Operations and QA Supervision. Check previous product to identify scope. Repack product, as necessary. Investigate, identify and document root cause and corrective actions. | QA leadership to verify record daily. QA Manager or designee to signoff within 7 days. | Film Review Check / Corrective Action process |
| Bar Code Scanning | Undeclared Allergens | All finished goods must have packaging materials that match allergen statement to the product. | Challenge of barcode reader for wrong code, and unreadable code. | Use of mismatch barcode and barcode rendered unreadable. | At beginning of shift and not less than every 2 hours. | QA Technician | If allergen information does not match, stop line and notify Operations and QA Supervision. Check previous product to identify scope. Repack product, as necessary. Investigate, identify and document root cause and corrective actions. | QA leadership to verify record daily. QA Manager or designee to signoff within 7 days. QA Tech and Production Line Leads to perform direct observation of monitoring through the day. | Records via Qwerks WI 2.31 *Bar Code Scanning* |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552(b).4 (2016).



Food Safety Plan - Dunkaroos

| FSQ 1.01.00 | | Page 20 of 23 |
|---|---|---|
| Issue | Supersedes: | Revision #: |

**Sanitation Preventive Control**

***Purpose:*** Cleaning of production equipment and infrastructure helps to prevent establishment or growth of environmental pathogens.

***Frequency:*** Sanitation of open food contact production areas shall not exceed 28 days between full sanitation.

***Who:*** Sanitation Technician and Operations personnel

***Procedures:*** Specific cleaning processes are outlined through site SSOP's. Usage of sanitizer shall be per prescribed EPA labelling requirements for application.

***Monitoring:*** Following sanitation, all production lines shall be inspected by Quality personnel and verified as visibly residual free. Testing with ATP swabs will be used to confirm the visual inspection with a critical limit of ≤10 RLU's.

***Corrections:*** If the line does not pass visual inspection or ATP swabbing, reclean and sanitize effected area. Reinspect/swab area and document corrections and inspection on Preoperational Inspection form.

***Records:*** Pre-Operational Inspection Form (Line specific), ATP results form, Master Sanitation Schedule

***Verification:*** Environmental Monitoring Program (per program frequency) and Quality Leadership review of cleaning records within 7 days.

**Environmental Monitoring for Sanitation Preventive Control Verification**

***Purpose:*** Environmental monitoring is conducted throughout the facility to verify the effectiveness of sanitation and hygienic zoning procedures throughout the facility.

***Sample identification:*** Sample sites are determined based on

***Sampling procedure:*** Sampling is conducted once per month during production and at least 3 hours after the start of run. Sampling time is not uniform to avoid bias of results. Samples are refrigerated until picked up by laboratory courier. Sample includes Zone 2, Zone 3 and Zone 4 sites each month and sites are rotated each month completing one full rotation of sites on a quarterly basis.

***Laboratory:*** The laboratory is Mérieux NutriSciences. The laboratory utilizes courier pickup services.

***Analysis Conducted:*** The environmental monitoring program includes *Salmonella* (VIDAS) and *Listeria spp.* (ELFA) as the target pathogens. Conformation shall be conducted for presumptive/suspect results using a PCR based method.

***Interpretation of results:*** Negative results shall be considered in-spec or pass. In the event of a presumptive/suspect results from the conformational method the results will be considered positive. The following process steps will be conducted in such cases:

-   Conducting investigative vector sampling prior to sanitation. This includes vector locations based on the original presumptive/suspect site. Number of vector samples will be based on potential sources of harborage conditions identified through investigation.

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan - Dunkaroos
FSQ 1.01.00                                    Page 21 of 23
Issue              Supersedes:              Revision #:

- Continuance of production operations shall be determined based on a risk assessment for the locale that returned the unfavorable result, and likelihood of cross contamination from that site to the food stream. Sanitation of the area will be scheduled to occur at the soonest availability of resources.
- Following cleaning, post-sanitation samples will be collected of the investigative vector sampling sites.
- After resuming production/normal operations in the area, three additional sample sets including both the original site and vectors will be completed as evenly as possible between the resumption and fourteen days elapsed from the receipt of the original result. The initial sample should not be sooner than 3 hours after resumption of production. This process is to demonstrate remediation of the unacceptable results before resuming routine sampling frequencies.

**Supply Chain Preventive Control**

**Approved Suppliers for Ingredients Requiring a Supply Chain Applied Control:**

All approved suppliers are directed or sourced from General Mills. Supply Chain Preventive Controls are thereby managed by General Mills and hazard control verification owned by General Mills. This is in contradiction to 21 CFR 117.415; each receiver is responsible for their own verification. Additionally, no activity by the shipper substitutes or waives this responsibility. This is a CAR on Nestle #1.

**PREVENTIVE CONTROL OVERVIEW**

- A preventive control is a strategy implemented to eliminate a hazard in a food manufacturing environment
- You must identify and implement preventive controls when you identify a hazard that is reasonably likely to cause injury to a customer if left unaddressed.
- Preventive controls include Critical Control Points and other types of controls.
- Preventive controls must be written

Types of Preventive Controls

## PROCESS CONTROLS:

These are procedures and processes that are used to control parameters of processing (i.e. acidifying, refrigerating, cooking.) They must be written in a way that is specific to your process and they must include:

- parameters associated with controlling the hazard *(i.e. if you are using cooking as a process control, then you must include the required cook temperature and cook time)*
- The maximum or minimum values required to control the hazard.

## FOOD ALLERGEN CONTROLS

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan - Dunkaroos
FSQ 1.01.00                                                    Page 21 of 23
Issue                    Supersedes:                    Revision #:

These include processes to control food allergens. These are implemented to:

- Protect food from allergen cross contact
- Label food properly with allergens to ensure it isn't misbranded

## SANITATION CONTROLS:

These are practices to ensure the facility is kept clean and to minimize biological hazards. They relate to:

- Cleanliness of food-contact surfaces (equipment, utensils, tables)
- Prevention of contamination of food from dirty sources (i.e. dirty people, dirty food, dirty packaging, dirty raw ingredients)

## SUPPLY CHAIN CONTROLS:

*Supply Chain Controls are described fully in Part G of 21 CFR 117*

## **OTHER CONTROLS**

You may have other types of controls (i.e. hygiene training and current good manufacturing practices)

What To Do If You Implement a Preventive Control

If you implement one or more preventive controls then you must conduct the following activities for each one:

1. Monitoring activities
2. Corrective actions
3. Verification activities

**Revision Record**

| Revision Date | Revised By | Sections Revised | Summary of Revision |
|---|---|---|---|
| | | | |
| | | | |

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan - Dunkaroos
FSQ 1.01.00
Issue                    Supersedes:

Page 21 of 23
Revision #:

**The plan as is missing the following:**

## Monitoring Procedures & records 21 CFR §§ 117.145 & .190

- Monitoring means observing some activity in your production— such as checking the temperature of your walk-in refrigerator
- Monitoring is required for all preventive controls to ensure they are implemented properly.
- You must have written procedures for *how* and *how often* you will monitor preventive controls.
- You must monitor preventive controls enough to ensure they are being performed.

Record Keeping Requirements

1. You must document your monitoring actions, store them, and also verify them (*see verification*)
2. Exception records are acceptable type of monitoring record (this means records are only taken when a deviation occurs.) For example, a refrigeration log may shows records only when the temperature is outside the acceptable range.

## Corrective Procedures & records 21 CFR §§ 117.159 & .190

- Corrective Action is a response that must be taken if a preventive control is not properly implemented.
- Corrective Actions must be written and are often completed using a standard form. (See Attached Exhibit A)

## What You Need to Do:

1. Write Corrective Actions Procedures

You must establish and implement written corrective action procedures. These procedures must describe the steps to be taken to ensure that:

- Appropriate action is taken to correct a problem associated with a preventive control.
- Appropriate action is taken to reduce the likelihood that the problem will reoccur.
- All affected food is evaluated for safety

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan - Dunkaroos
FSQ 1.01.00                                          Page 21 of 23
Issue                        Supersedes:            Revision #:

- All affected food is prevented from entering commerce.

## 2. Take Corrective Action When it is Required

## WHEN TO TAKE CORRECTIVE ACTION:

You must take a corrective action if

- A preventive control fails and a corrective action hasn't been established.
- A preventive control is found to be ineffective
- Verification records are found to be incomplete or improper decisions were made about corrective action

## 3. Keep Records of Your Corrective Actions

All corrective actions taken in this section must be documented. We recommend using a pre-written form so that it's easy to complete and no details are missing. (See Exhibit A)

Corrective actions must also be verified (See *Verification* or §117.155)

**Further,**

A *correction* means taking action in a timely manner to identify and correct a minor and isolated problem that does not directly impact product safety.

Examples of corrections include:

- Re-cleaning the production line if it appears dirty after the first clean.
- An employee is asked to leave the production area and put on the proper attire before re-entering the production area.
- The temperature of a walk-in refrigerator is adjusted because it is a time of high traffic and the temperature is approaching the critical limit.

Corrections occur in the moment and don't require any documentation

## *CORRECTIVE ACTION*

A *corrective action* is a procedure that must be taken if a corrective action is not properly implemented. This must be documented and the record should describe:

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan - Dunkaroos
FSQ 1.01.00
Issue                Supersedes:

Page 21 of 23
Revision #:

- What occurred
- How the problem was corrected
- How it will be avoided in the future
- What was done with the product in question

Examples where corrective action is required include:

- A sample of canned salsa is tested and the pH exceeds the requirement of <4.3.
- A refrigerator is found to have exceeded the temperature requirement of ≤41°F for several hours.
- The producer of bottled juice realizes that during the last production run, numerous bottles were not properly sealed by the capping machine, possibly due to defective packaging.

## Validation 21 CFR §§ 117.160 & .190

- Validation answers the question "How *do you know* it works?"
- You must validate that the preventive controls that you implement actually work.
- Validation activities includes using scientific and technical evidence (or conducting your own studies)

Example of Validation: Collecting scientific research and conducting tests to prove that the cooking temperature in your recipe is effective in killing the harmful bacteria in the product.

*Hint: you can find information to validate many food processing practices on the FDA website.*

What is Validation?

*Validation means obtaining and evaluating scientific and technical evidence that a control measure, combination of control measures, or the food safety plan as a whole, when properly implemented, is capable of effectively controlling the identified hazards.*

*21 CFR 117(c)(1)(i)*
## WHEN IS VALIDATION REQUIRED?

You are required to validate every preventive control you are implementing. This means that if you use cooking as a means to kill bacteria, then you need to show that the time and temperature are a valid method for killing that bacteria type. This can often be achieved by referencing FDA guidance materials.

exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan - Dunkaroos
FSQ 1.01.00                                                    Page 21 of 23
Issue                         Supersedes:                     Revision #:

You are not required to validate the following types of preventive controls:

- Sanitation Preventive Controls
- Food Allergen Controls
- Recall Plan

## WHO CONDUCTS VALIDATION?

All validation activities must be performed by a preventive controls qualified individual.

## WHEN DO I NEED TO VALIDATE MY PREVENTIVE CONTROLS?

You must validate your preventive controls:

- Within 90 days of beginning production or there must be written justification for why if >90 days after production begins.
- Whenever a change is made that could impact how a hazard is controlled.
- Whenever the food safety plan is reanalyzed.

What Part of My Food Safety Plan Require Validation?

Some parts of your food safety plan do not need to be validated. Sanitation activities, for example, do not need to be validated because most people use a small set of scientifically proven processes (i.e. soap and water, common chemical sanitizers). As a result, there is no need to require each business to prove their sanitation practices *actually work*.  Issues relative to validation were also brought up on the Nestle audit. No 3, 4, 8, & 13

The following activities do not require validation

- Food allergen controls
- Sanitation controls
- Recall plan
- Supply chain program
- Other preventive controls if the PCQI prepares the written justification that a validation is not applicable based the nature of the hazard and the preventive control.

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan - Dunkaroos
FSQ 1.01.00                                    Page 21 of 23
Issue                 Supersedes:             Revision #:

## Verification 21 CFR §§ 117.155, .165 &.190

- Verification means confirming that other parts of the food safety plan have been undertaken as specified.
- Verification can take the form of a supervisor regularly reviewing records and verifying them with a signature.

## What is Verification?

*Verification means the application of methods, procedures, tests and other evaluations, in addition to monitoring, to determine whether a control measure or combination of control measures is or has been operating as intended and to establish the validity of the food safety plan.*

*21 CFR 117(c)(1)(i)*

## Examples of Verification

Common examples of verification include:

- Reviewing cooking records to confirm the required temperature and cook time was reached
- Reviewing refrigeration records to confirm food was held sufficiently cold
- Observation that employees are following good food-handling practices
- Calibrating thermometers – this verifies that they are reading properly
- Sampling your own product for pathogens to verify that your process was faithfully performed
- Environmental monitoring – testing your production space for pathogens living on surfaces, in drains, etc.
- Supplier Verification – reviewing a supplier's records to confirm they are faithful to their food safety practices and claims.

## When is Verification Required?

All records which monitor a preventive control must be verified within 7 days of their creation.

All corrective action records must be reviewed within 7 days of their creation.

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan - Dunkaroos
FSQ 1.01.00                                         Page 21 of 23
Issue                    Supersedes:               Revision #:

Other verification records, such as instrument calibration, product testing, and environmental monitoring, must be verified "within a reasonable amount of time" as determined by the producer.

## Who Conducts Verification?

All verification activities must be performed by a preventive controls qualified individual (PCQI).

## What You Need to Do:

- Verify that your preventive controls are being implemented and monitored. You can do this by checking that monitoring records were completed.
- Verify that corrective actions are taken when necessary and that the right decisions are being made in relation to any process deviations.
- You must keep your verification records on file (digital is fine)

### Recall Plan 21 CFR §§ 7.3, 117.139 & .190

FD&C Act § 423 [21 U.S.C. § 350l] – Mandatory Recall Authority (food)

In 2019, the FDA launched the New Era of Smarter Food Safety, an initiative that builds on the foundations laid by FSMA, with an increased focus on leveraging technology and other tools to create a more digital, traceable food system, and thereby a safer food supply. In 2020, the FDA released the New Era of Smarter Food Safety Blueprint, which outlines specific approaches the FDA and others will take over the next decade to address food safety in the rapidly changing food system. The blueprint contains four "Core Elements," which address new food safety challenges the food system will face as well as new technologies (e.g., tracing technologies, genomics, advancements in detection methodologies, and advanced analytics) that can be harnessed to improve food safety. (FDA 2022)

### Records in general for 21 CFR 117 is subject to Subpart F of this section

- Keep all of your records related to your food safety lan.
- Records can be electronic or paper.
- You must store records onsite for at least 2 years
- All records must be made available upon request

Record Keeping Requirements

## HOW RECORDS MUST BE KEPT

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

Food Safety Plan - Dunkaroos
FSQ 1.01.00                                              Page 21 of 23
Issue                        Supersedes:                 Revision #:

- Records must be kept as originals, true copies (i.e. scans, photocopies) or electronic records.
- They must contain the actual values and observations, not summaries.
- They must be accurate, unchangeable (i.e. pen) and legible
- They must have been created in real-time with the activity being documented.

## REQUIRED INFORMATION ON ALL RECORDS

The following information is required on all records you keep:

1. information about the plant identity
2. The date (and time, if necessary)
3. Signature or initials of the observer
4. Product name and lot code, if applicable

## HOW LONG DO I NEED TO KEEP THEM FOR?

All records must be retained onsite for 2 years. Additionally, you must be able to retrieve records within 24 hours if an authorized request is made.

Looking for More?

Check out our comprehensive guide to Part 117 Subpart F, Record Keeping

Additionally, the plan is missing references and authorities to support the information that is stated thus far. Without that supporting information, the plan is not valid, and it is baseless. Further, it is not known, if the deductions and conclusions are based on credible sources. Attached is an example of the FDA's food safety plan and how it correlates the statutes. Exhibit B

Also, there is a footnote that alleges that this document is exempt. This is in direct contravention to the statutes (21 CFR 117.126 and other relevant statutes listed above). Based upon my read, I do not see any patented or trademarked secret process and if so, it needs to be identified. Nor is there any financial information being shared.

Further, making such a claim without merit can be in violation of other statutes and subject to whatever punishments, fines, penalties and/or imprisonment associated with those violations and can be construed as a means to avoid liability and culpability or an obstruction to justice. Further, if an adverse event occurs, it could harm your legal position and/or ability to properly defend one's self due to this claim.

Also, I have attached some templates for review related to the above. Exhibit C

Recommendation:

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).



Food Safety Plan - Dunkaroos

FSQ 1.01.00                                                    Page 21 of 23

Issue                    Supersedes:                Revision #:

To be compliant, the processor owner should address the outlined plan deficiencies to ensure accuracy of information and processes currently in use to complete this plan. I am willing to work with the processor owner to ensure that all the boxes are ticked.

This document contains trade secrets or commercial or financial information that is confidential or privileged, and therefore is exempt from physical or electronic disclosure under the Freedom of Information Act §552.(b).4 (2016).

# EXHIBIT D

**Mary Madison**

| | |
|---|---|
| **From:** | Do_Not_Reply@TraceGains.net |
| **Sent:** | Tuesday, October 18, 2022 4:05 AM |
| **To:** | Mary Madison |
| **Subject:** | Creative Werks LLC Weekly Update from TraceGains |

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Mary Madison,

This weekly email from TraceGains for Creative Werks LLC notifies you of your pending tasks on TraceGains Gather™.

> ## 7 - Connection requests from Customers.
> Connection requests must be completed in order for Customers to receive your documents.
>
> ## 139 - Document requests pending
> Includes Documents that are missing (111), in process (27) and expiring soon (1).
>
> ## 0 - Specification requests pending
>
> 0 - Specifications need your action
> 0 - Specifications are pending customer approval
>
> **<u>Click here to complete these tasks</u>**

If you have questions about any of these requests, contact your customer contact.

Please do not reply to this email. If you have questions regarding the TraceGains Network contact our support team, <u>NetworkSupport@TraceGains.com</u>.

Thank you for using TraceGains Gather™!



This eNotification Powered By TraceGains.



Kathy Knutson Food Safety Consulting LLC
1421 Argonne Drive
Green Bay, WI 54304
920.309.2412 mobile
drkathyknutson@gmail.com
www.linkedin.com/in/kathyknutsonphd/

## DECLARATION OF KATHY KNUTSON, PH.D.
*July 9, 2023*

**Background**

1. Attorney Eric Greenberg contacted me on June 16, 2023, with a request to review two documents, Complaint to Gretchen LeMay (1) dated May 26, 2023 and Regulatory Business Problem (2) dated October 20, 2022, which I did on June 17, 2023. Following the initial review, I received additional documents to review for this declaration to evaluate the reasonableness of judgments and actions expressed by former employee, Ms. Mary Madison. Ms. Gretchen LeMay and Mr. Erich Zicher of creative werks llc have cooperated throughout the process by providing documents upon request. creative werks has extensive documentation; the Food Safety and Quality Manual alone holds 85 documents for food safety and quality procedures. See the section on Documents Reviewed for details on the documents I reviewed.

2. I am qualified for this review as a Food Safety Preventive Controls Alliance (FSPCA) Lead Instructor for the training of Preventive Control Qualified Individuals (PCQIs). Since 2016 I have delivered over 50 training courses of the 20-h standardized curriculum and have personally trained over 500 PCQIs. The federal Food and Drug Administration (FDA) requires a PCQI as a member of the food safety team at a food facility. Ms. Madison was trained as a PCQI (3) before her hire. As a consultant, I work with Quality Managers in the food industry to write their hazard analysis, food safety plan, Standard Operating Procedures (SOPs), document templates, and recall plan. Personnel in the Quality department, such as Ms. Madison, are responsible for the development and implementation of procedures for food safety and their corresponding records. My education includes a Ph.D. in Food Science, and my work experience includes roles in education and laboratory operations for the testing of food.

**General Introduction**

3. Ms. Madison completed a report titled Regulatory Business Problem (2) on October 20, 2022. She makes the following statements her report and these will be addressed in my declaration.

   a. *Creative Werks LLC's non-compliance with the relevant statutes, standards and regulations under FSMA is an inherent systematic and systemic issue throughout the organization that creates irreparable harms for all stakeholders.*

   b. *More specifically for Creative Werks LLC, this non-compliance creates legal liability and culpability due to our breach of contract, breach of fiduciary duty and falsifying documents, among other things, to our clients, the managing members of Creative Werks LLC, governmental regulatory agencies, the end users and society at large.*

   c. *Other stakeholders could suffer injury, illness or death; in addition, others can suffer loss of employment and economic instability.*

   d. *Analysis of the current Food Safety Plans at Creative Werks LLC., evidences that Creative Werks LLC., has year over year, consistently been out of regulatory compliance with the Federal Food, Drug, and Cosmetic Act "hereinafter" (FD&C Act), as amended by the Food Safety Modernization Act "hereinafter" FSMA and its relevant subparts.*

   e. *Further analysis suggests that there is no cognitive recognition that the Food Safety Plans are out of legal compliance with FSMA.*

   f. *Also, it can be reasonably inferred that there is a high probability factor that our non-compliance is a root cause in lost business opportunities, such as Pepsi.*

   g. *Further, there is no evidence that a formidable plan of action is in place or being developed to remediate the noncompliance and outstanding compliance issues.*

   h. *Additionally, there has been an improper interpretation, analysis and application of the relevant statutes, standards and regulations relative to the business unit's objectives of manufacturing, co-packing and compliance.*

   i. *One hundred percent (100%) of our organization is governed by the regulatory framework and guidance of the FD&C Act, as amended by FSMA.*

   j. *Since the inception of the Preventive Controls regulations, Creative Werks LLC has never been compliant and has had repeated violations from numerous customer audits.*

   k. *We also have lost business opportunities that translate into the loss of dollars, profitability and goodwill; translating into market share loss.*

   l. *Also, a culture that is diametrically opposed to the transparency mantra of Creative Werks LLC has evolved.*

      i. *Further, this culture exhibits and encourages a blatant disregard for the law.*

      ii. *Additionally, this conduct is in direct contravention to domestic and international regulatory framework used for transparency to promote and underscore food protection initiatives.*

   m. *Failure to act swiftly within the prescribed time frame will also subject us to additional civil and criminal liabilities for once again failing to comply with the standards.*

    n. *E.g. the incident raised, by the FDA in its September 2022 inspection, relative to product failure in conjunction with Pepsi that was reported in October of 2021.*
- i. *This incident has an expiry date for civil liability of October 2023.*
- ii. *Criminal liability has no statute of limitation.*

    o. **Recommendations:**
- i. *Implement an immediate course correction.*
- ii. *Refrain from hiring any persons or purchasing any compliance aids until a needs assessment is conducted and analyzed that supports a formidable plan of action accompanied by a supporting business case.*
- iii. *Implement proper oversight.*
- iv. *Identify, interpret and apply the proper relevant statutes, standards and regulations necessary to achieve compliance.*
- v. *Line balance the appropriate standards against customer requirements.*
- vi. *Develop, implement and sustain communication plans.*
- vii. *Implement a Risk Management program.*
- viii. *Contract Management*
- ix. *Choose a certification that synergizes all the necessary elements for compliance and success.*
- x. *Answer questions as asked; speak only to issues at hand.*
- xi. *Refrain from comingling facts from various situations or instances.*
- xii. *Refrain from comingling relevant statutes, standards and regulations during audit and inspection proceedings.*

4. The above statements are inflammatory, confusing, false, inaccurate, or misleading. creative werks provided numerous documents to me, and I reviewed 26 of the provided documents. The vast majority of the documents I reviewed were available to Ms. Madison at the time of her employment. I concluded that creative werks is a company with very low-risk operations for the manufacture of packaging and filling of containers with food.

5. Ms. Madison uses inflammatory language to try to paint a picture of a company that is out of control and processing unsafe food. My review showed the opposite. In fact, creative werks has extensive documentation; a well-staffed Quality department; large, multi-national food manufacturers as customers; and complies with both state and federal regulations. I was pleased with the organized and plentiful documents covering much of food safety, and I found the representative documents well-written, concise, and clear. Because my work was a document review, I cannot speak about whether the policies or procedures are actually followed on-site. In my experience, food safety policies and procedures are typically implemented in the processing of food, and it is the documentation that is lax. The fact that the documents are written, revised, and signed is an excellent sign of compliance with the FDA rule. creative werks is a company with a full menu of documents and is not just getting by nor trying to cover up violations.

6. Ms. Madison's statement, *Creative Werks LLC's non-compliance with the relevant statutes, standards and regulations under FSMA is an inherent systematic and systemic issue throughout the organization that creates irreparable harms for all stakeholders*, from her report titled Regulatory Business Problem (2) states *non-compliance*. I reviewed two State of

Illinois inspection reports (9, 10) and two FDA inspection reports (7, 8). creative werks passed all four inspections with no follow-up required. No follow-up to an FDA inspection is very rare, yet alone two FDA inspections with no follow-up. Both the State of Illinois and FDA believe creative werks to be in compliance.

7. Ms. Madison makes the very serious allegation that documents were falsified due to non-compliance when stating, *More specifically for Creative Werks LLC, this non-compliance creates legal liability and culpability due to our breach of contract, breach of fiduciary duty and falsifying documents, among other things, to our clients, the managing members of Creative Werks LLC, governmental regulatory agencies, the end users and society at large.* I believe this allegation is more of a personal opinion of Ms. Madison than a statement of fact. My document review and the four government inspections show a company in compliance.

8. *Irreparable harm* from Ms. Madison's report consists of employees losing limbs or scarring and chronic lifelong illness or death of consumers. These scenarios have been associated with the food industry in the past, but there is not a significant risk for any of these harms at or from creative werks based on my document review. In her complaint, Ms. Madison raises the concern for production employees with harm from X-ray instruments, but the instruments are serviced annually, which follows industry best practice and does not affect food safety. This statement from her report is also unfounded based on my review, *Other stakeholders could suffer injury, illness or death; in addition, others can suffer loss of employment and economic instability.* The food industry and employees working in Quality departments take the responsibility for the prevention of injury, illness, or death very seriously, and creative werks has the documents to prove this starting with the hazard analysis found in each of the four food safety plans I reviewed.

9. I have struggled to understand Ms. Madison's perspective and have found no basis in much of her discussion; for example, *Analysis of the current Food Safety Plans at Creative Werks LLC., evidences that Creative Werks LLC., has year over year, consistently been out of regulatory compliance with the Federal Food, Drug, and Cosmetic Act "hereinafter" (FD&C Act), as amended by the Food Safety Modernization Act "hereinafter" FSMA and its relevant subparts.* I reviewed four food safety plans (FSPs) from creative werks that were all available to Ms. Madison at the time of her employment, and all were in compliance. The FSP for Dunkaroos is attached to her report in Exhibit C and appears to have her comments entered in red to mark areas of non-compliance.
    a. The incomplete Product Description, Distribution, Consumers and Intended Use table is not required in a FSP, so that is not a violation of the rule.
    b. There is a question about the time of keeping records. Those in the Quality department should know that the FDA requires records to be kept a minimum of two years. creative werks is under an auditing scheme which requires records to be held longer than two years, so that is not a concern.
    c. She marked that the *Hazard Analysis does not comply with 21 CFR 117.130.* First, creative werks has the required hazard analysis in each FSP. There is no required form or format, so creative werks is in compliance with the form they chose. Because there is no required form, each facility is free to create a form that works for them, and creative werks chose to include likelihood and severity of

risk on the form. This is admirable. I found the hazard analysis to be detailed and easy to follow. Every facility writes their own hazard analysis, and the process is time-consuming and requires the upmost focus to get it right. The Dunkaroos hazard analysis has a disconnect between the column marked Reasonably Likely to Occur/Hazard Risk Level and the last column Preventive Control or CCP, for which I would have completed the former column differently. They got the information correct in the latter column, a very important step in the hazard analysis.

d. On the page titled Example Process Flow, the flow diagram is not from the Dunkaroo process, but the flow diagram is not required in a FSP, so there is no violation of the rule.

e. On page 60 of her report she states, *These requirements are a part of the Current Good Manufacturing Practice that relates to Processes and Controls and are missing from the above matrix.* GMPs are not part of the FSP, so this statement is false and misleading.

f. She marked the Allergen Preventive Control as Incomplete/non-compliant but the required information is on the next page. She may be referencing allergen clean information which may be in a different document.

g. In the section on Approved Suppliers for Ingredients Requiring a Supply Chain Applied Control, she states, ... *no activity by the shipper substitutes or waives this responsibility.* This is absolutely false. Supply chain verification activities can be performed by any party including the facility shipping the product.

h. On page 21 of 23 of the Dunkaroos FSP, she states, *The plan as is missing the following: Monitoring Procedures & records... Corrective Procedures & records.* This is false. The information is provided in the Process Preventive Control form (p. 59), Allergen Preventive Control form (p. 63), and Sanitation Preventive Control (p. 20).

10. I believe some of these examples are the basis of her belief that the facilities are not in compliance. First, the Dunkaroos FSP is just one of four FSPs. Second, the arguments she has of non-compliance are just not true.

*11.* The plans are in compliance, so the following quotes from her report become null with no additional evidence.

   a. *Further analysis suggests that there is no cognitive recognition that the Food Safety Plans are out of legal compliance with FSMA.*

   b. *Additionally, there has been an improper interpretation, analysis and application of the relevant statutes, standards and regulations relative to the business unit's objectives of manufacturing, co-packing and compliance.*

   c. *Since the inception of the Preventive Controls regulations, Creative Werks LLC has never been compliant and has had repeated violations from numerous customer audits.* Audits carry no force of law.

   d. *Failure to act swiftly within the prescribed time frame will also subject us to additional civil and criminal liabilities for once again failing to comply with the standards.*

12. *Also, it can be reasonably inferred that there is a high probability factor that our non-compliance is a root cause in lost business opportunities, such as Pepsi.* This is speculation with no data or is based on incorrect information. Most employees in Quality departments do not concern themselves with sales. This related quote has no bearing on food safety: *We also have lost business opportunities that translate into the loss of dollars, profitability and goodwill; translating into market share loss.*

13. My understanding from a review of documents is that it was Ms. Madison's job to address outstanding issues with customers. When she states, *Further, there is no evidence that a formidable plan of action is in place or being developed to remediate the noncompliance and outstanding compliance issues*, again, there were no outstanding compliance issues, and it was her job to address outstanding customer issues. This is a misleading quote to complain about the lack of herself doing her job.

14. *One hundred percent (100%) of our organization is governed by the regulatory framework and guidance of the FD&C Act, as amended by FSMA.* This quote shows a fundamental lack of understanding of the company and/or a lack of understanding of FSMA. One of the FSPs is for manufacturing of packaging itself, not of packaging of food, which is not covered by FSMA. That part of the business is not even required to have a FSP, so creative werks goes above and beyond what is required by the rule.

15. Every food facility should strive to build a strong food safety culture. This means employees work with integrity and management provides training programs and resources for all employees to do their job. Ms. Madison refers to culture here, *Also, a culture that is diametrically opposed to the transparency mantra of Creative Werks LLC has evolved.* I can't speak to that because I am not in the facility. *Further, this culture exhibits and encourages a blatant disregard for the law.* I don't agree based on my document review and the facility passing four government inspections. *Additionally, this conduct is in direct contravention to domestic and international regulatory framework used for transparency to promote and underscore food protection initiatives.* That's just inflammatory language; there is no international regulatory framework.

16. I would like to discuss what I discovered about, *E.g. the incident raised, by the FDA in its September 2022 inspection, relative to product failure in conjunction with Pepsi that was reported in October of 2021.*
    a. *This incident has an expiry date for civil liability of October 2023.*
    b. *Criminal liability has no statute of limitation.*
    First, the latter statement is not true. The FDA statute of limitation is five years. More importantly, there were no observations or violations requiring follow-up with FDA, so this is another instance of inflammatory language to create a crisis where there is no crisis.

17. Also, there was **no** *product failure in conjunction with Pepsi that was reported in October of 2021*, so there is no civil liability expiry date. The FDA inspection in September 2022 was a scheduled, routine inspection; the inspection was not for cause or to follow up on a consumer complaint. I followed up with Mr. Zicher, Food Safety Director, on this point (16), and he responded that neither PepsiCo nor creative werks received a consumer complaint in October

2021 for a product packaged by creative werks. I verified this myself with a review of the log of Consumer Contacts Tracker (21).

18. The Recommendations section quoted above is a mixture of tasks for which Ms. Madison was responsible for in her job, tasks for management outside her job, or tasks that just don't make sense, e.g., *Contract Management.* There is not enough information or direction given to make meaningful decisions from the list. Most of the recommendations are her opinion based on the false sense of noncompliance with the rule.

19. I have struggled to understand Ms. Madison's perspective and have found her discussion confusing and difficult to decipher. For example, in the report section Compliance she says, *…compliance is underscored by overlap and continuity of customer requirements and Creative Werks LLC's protocol's, procedures and policies…*I disagree. Customers do not dictate food safety, and quality parameters are managed separately from food safety.

20. My review of documents and the creative werks website shows a company that cares about its employees and customers. The company does not have significant food safety issues and has ample documentation. The company is in a state of continuous improvement which is the goal of all food safety programs. Ms. Madison was not employed long enough to truly understand the three facilities, food safety procedures, and record keeping, because they are complex and extensive.

**Discussion**

21. Her report discusses in detail the FDA Food Safety Modernization Act law, Preventive Controls for Human Food rule, a rule which applied to creative werks beginning in September 2016 and six years before her employment at creative werks. Exhibit A leads the reader through a lesson on the rule. As stated in Ms. Madison's complaint (1), she first requested a meeting with her supervisor to review the report, so it appears that Ms. Madison thought her intended audience needed education. It was unreasonable of her to think her supervisor, the Food Safety Director, was not familiar with the contents of the rule.

22. Ms. Madison tries to paint the picture of a company in crisis, and I found no evidence of a company in crisis. Crisis scenarios include the lack of written food safety procedures, not enough staff to monitor and implement food safety procedures, recalls, FDA warning letters, frequent state or FDA inspections, and resulting FDA Form 483 at the conclusion of inspections. As evidenced by the timing of both the State of Illinois (9, 10) and FDA (7, 8) inspections in 2021 and 2022, plus I am not aware of an inspection in 2023, this is a company that is **not in crisis**. creative werks has none of these crisis scenarios and by my review appears to be in compliance with the rule.

**Table 1.** creative werks facilities and Food Safety Plans (FSPs).

| City | Elk Grove Village | Bensenville | Bartlett |
|---|---|---|---|
| Street | Brummel Avenue | Sivert Court | Munger Road |
| Packaging FSP (12) | X | X | X |
| Manufacturing FSP (13) | | | X |
| Dunkaroos[1] FSP (14) | | | |
| Coffee Brew Pouch Fill FSP (15) | X | | |

[1]no facility named in the FSP

23. **Overview of creative werks llc.** creative werks has three facilities for the packaging of food (Table 1). creative werks' documents refer to either the city location or street location. I reviewed the FSPs for Packaging, Manufacturing, and Dunkaroos in detail; I read 3 of 14 pages of the Coffee Brew Pouch Fill FSP which was not referenced in the complaint.

24. creative werks receives ready-to-eat foods from manufacturers and packages the products; each of the three facilities has a Packaging FSP. The Manufacturing FSP noted in Table 1 covers the manufacturing of packaging materials, not the manufacturing of food. Dunkaroos is a product with two wells-one filled with cookies and one filled with frosting-and has a FSP which contains process steps unique to the product. The Coffee Brew Pouch Fill FSP is unique to that product, process, and packaging.

25. The nature of the business is to receive manufactured food where the supplier has controlled biological, chemical, or physical hazards. The service provided by creative werks to the food industry of **packaging** is a low-risk activity. Hazards associated with the food have been controlled by the suppliers and before receipt at creative werks. The suppliers are responsible for the control of biological hazards by applying a kill step to prevent pathogens such as *Salmonella* or *Listeria monocytogenes*. Common kill steps include baking goods and roasting nuts. There are no kill steps at creative werks because this has already been done by the supplier.

26. **Organization of the Quality Department at creative werks.** Ms. Madison was hired as Quality Regulatory Manager (4), reporting to Erich Zicher, Food Safety Director. Mr. Zicher remains employed by creative werks in this position and reports to Ron Sammeth, Chief Operating Officer (5). Mr. Sammeth reports to Steven Schroeder, President. By my count on the organizational chart for the Quality department, there are 14 positions in the Quality department (5), each of whom has responsibility for food safety matters. Mr. Zicher has a total of four direct reports. Ms. Madison did not have direct reports.

27. Ms. Madison was one of fourteen employees in the Quality department responsible for the implementation of policies, procedures, and recordkeeping for food safety at creative werks, and Ms. Madison had been an employee for less than one month at the time of her suspension on October 26, 2022. Other employees in the Quality department should have also been experienced, educated, and trained in food safety. Collectively, the employees in the Quality

department should already have had an understanding of the rule and the implementation of policies and procedures for food safety. This exercise in writing about the FDA rule was not requested by her supervisor, the Food Safety Director, and it was very unprofessional to conduct a project without her supervisor's approval.

28. I found a lack of teamwork conveyed in the complaint. This is concerning because training for PCQI emphasizes the use of teams because no one person at a facility can know everything, yet alone at the three facilities of creative werks. Facilities are encouraged to have members from multiple departments represented on teams including production, sanitation, maintenance, and laboratory operations. Ms. Madison should have reported working with members of her own department in addition to the appropriate people in other departments.

29. Ms. Madison acted alone in writing and presenting the report. This goes against everything that is taught in food safety for working in cross-departmental teams. Ms. Madison went three levels above herself to the President of creative werks when her supervisor was unavailable upon request. Ms. Madison did not wait more than one day to meet with her supervisor, the Food Safety Director, before going to the President. This was very unprofessional behavior and would be in any company.

30. Ms. Madison went to the President of creative werks on October 21, 2022, with a 78-page report and as stated on page 4 of the complaint *because people's lives are at stake*. I found no evidence for the claim. She was not told to go to the President and seemed unaware of the position of COO between Mr. Zicher and Mr. Schroeder. The actions of Ms. Madison were unreasonable. Even if the company were in crisis, it is unreasonable not to address her concerns first with her supervisor, Mr. Zicher, and to not work in a team. Ms. Madison was not asked to write the report and worked alone. Ms. Madison was in her position with creative werks for less than one month when she wrote her report; her time would have been best spent learning her job and attending to her responsibilities.

31. A minor but important point is that Ms. Madison wore a dress and earrings to work. It is not reasonable to dress in this way when her job required her to be on the production floor. The job description for her position states that she leads audits and inspections (26), and the work presented on her resume (3) shows that she should have prepared to participate fully in the FDA inspection on her second day of work. Ms. Madison's training and experience prepared her to follow Good Manufacturing Practices (GMPs) and be a role model in the practice of food safety. Wearing a dress and earrings to work is indicative of her lack of understanding of common food safety best practices.

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

32. The responsibility of creative werks is to *verify* the control of hazards by the supplier. Traditional verification activities include:
    a.  Supplier record review such as a Certificate of Analysis (COA)
    b.  Sampling and testing program for the food received at creative werks, and an
    c.  Annual, on-site audit when the supplier controls serious hazards with the potential for injury, illness or death.

    I reviewed procedures for supplier approval, supplier audits, collection of records, and receiving of food from approved suppliers (22, 23, 24, 25) and found them exemplary. Note that the frequency of sampling and testing is completely up to the facility and that sampling and testing can also be performed by the suppliers with the results forwarded.

33. creative werks does not own the product for many products; they simply receive the product, package the product, and ship the packaged product. Suppliers become customers. The supplier contracts detail who owns the product and who is responsible for the verification activities. creative werks packages cereal for General Mills, and the FSP states General Mills, not creative werks, is responsible for verification. In review of the Dunkaroos FSP and in the last sentence on p. 19 it states, *Supply Chain Preventive Controls are thereby managed by General Mills and hazard control verification owned by General Mills.*

**The following observations follow the sequence of the complaint.**

34. I was unable to verify Ms. Madison's assertion that the FDA inspection was for cause. Ms. Madison states in the complaint, …*FDA conducted an inspection because of a consumer complaint received by the FDA in October of 2021 before I was hired. The complaint involved a consumer experiencing a burning sensation from a Cheetos product Respondent packaged for Pepsi (1).* The inspection was a pre-announced, routine inspection covering GMPs, including recordkeeping and labeling (8). The same inspector previously inspected the creative werks Brummel facility in Elk Grove Village in July 2022 (7). The inspector noted in the July 2022 inspection, *The firm has a written procedure in place for complaints which is Work Instruction (WI-2.6 – Effective 5/21/2019). I reviewed the content of WI-26 and it appears to be adequate. I asked Mr. Zicher if the firm performs trending and he responded yes. I randomly reviewed the firm's trending data electronically from March 2021 to June 2022.*

35. My important conclusions from the inspection report of September 29, 2022 (8), are:
    **a.** The inspection concluded without an FDA Form 483, meaning the lack of violations. **Rarely does an FDA inspection end without a Form 483.**
    b.  The inspection concluded with No Action Indicated (NAI).
    c.  The firm passed the inspection and was not required to follow up with the FDA.

36. Ms. Madison states on the second page of the complaint, *Respondent did not have adequate food safety plans, hereinafter "FSP" or Hazard analysis for each and every item that it packaged and or manufactured, as required by FDA regulations.* I reviewed four FSPs named in Table 1. Two FSP were specific to the unique products of Dunkaroos and Coffee Brew Pouch Fill. A third FSP was for the manufacture of packaging, not food. The fourth, Packaging FSP, was for the packaging of product and included the products of cookies-

frosted, cookies-plain, cookies-cream filled, chocolate w/o inclusion, cocoa/ chocolate for baking, chocolate w/ inclusions, sugar confections, cereal (grain-based w/o inclusions), cereal (grain-based w/inclusions), crackers, roasted peanuts and tree nuts, dried/dehydrated fruits, pretzels, and cheese puffs. **I would write the Packaging FSP in the same way.** There is no reason to have additional FSPs when the FSP focuses on the process steps in a facility. creative werks is using one Packaging FSP for all three facilities when a FSP must be specific to a facility. This is a minor adjustment if the equipment at each facility is similar. In other words, the Packaging FSP can be used as a model and changed slightly for each facility.

37. **Most facilities function with one FSP.** Ms. Madison states two paragraphs later, *Each product needed its own food safety plan because they all have different ingredients.* This is an inaccurate statement of the rule. FSPs are written based on process steps, not ingredients. Allergens are managed with policies, procedures, and sanitation, not with different FSPs. As a trained PCQI, Ms. Madison should have learned that products are grouped into food safety plans in Chapter 6 of the Preventive Controls for Human Food manual and in the Chapter 6 group exercise of the course. This was covered again in Chapter 8 Hazard Analysis.

38. Quality issues are managed separately from food safety. Ms. Madison states on the same page of the complaint, *...lack of food safety plans underscored quality issues...* FDA is not concerned about quality issues, and quality issues should not be a part of the complaint.

39. I reviewed the written hazard analysis contained in the Packaging FSP (12). The hazard analysis is where hazards with products at Receiving and hazards at process steps within a facility are identified. All foods must be received at creative werks from suppliers as safe. By my analysis, creative werks is responsible for the control of the following hazards within each facility:
    a. Foreign objects such as the hazard of metal introduced at creative werks,
    b. Cross-contamination of environmental pathogens such as *Salmonella* from the creative werks facility, and
    c. Cross-contact of allergens on shared equipment at creative werks.
I found these hazards identified in the hazard analysis, and I reviewed data from the creative werks environmental monitoring program (18, 19, 20). The latter data shows that the facilities are monitoring for pathogens as required by the FDA Preventive Controls for Human Food rule, and the results are typical and reasonable for their facilities.

40. Ms. Madison states on the same page of the complaint that Mr. Zicher provided resources for the writing of FSPs, including the Dunkaroos FSP (14). As a trained PCQI, Ms. Madison should have known the importance of using resources as taught in Chapter 7 of the Preventive Controls for Human Food manual and course. Appendix 3 of the manual is a complete model FSP, and the FSPCA offers nine additional model FSPs to PCQIs, all of which include packaging. Learners in the Preventive Controls for Human Food course are specifically instructed to review model food safety plans to assist them when writing their own. People working in food safety say that food safety is not competitive, and resources are widely available. The FSPCA provides several templates of documents to download for free on their website.

41. Ms. Madison states on the same page of the complaint, ...*outstanding customer audit findings*...Ms. Madison seems to confuse audits with inspections. Audits are conducted by customers or auditors on behalf of customers, often as part of meeting the requirements for certification under a certification scheme such as the GFSI certification schemes of SQF or BRC. FDA does not audit a facility, grant certification, or review audit data. Third-party audits and certification are outside a food safety plan and managed separately.

42. Ms. Madison states on the second page of the complaint and in the fifth paragraph that in her position, she was tasked with remediating *139 outstanding document requests* from customers. creative werks had large corporations as customers, such as General Mills and Hershey. It is not unusual for customers to request documents for review and in support of their own food safety plans. I interpret this statement as part of her position and am not concerned with the number of 139 requests. It is possible that many of those requests did not apply to the creative werks facility and the packaging of the product.

43. Ms. Madison states on page three of the complaint that she was instructed to disregard protocol for the receiving of product from Mondelez. As a large multinational company, Mondelez has greater resources than small companies for control of food safety and can be expected to exercise that control. However, creative werks is responsible for a supply chain preventive control for the product under the Preventive Controls for Human Food rule, 21 CFR 117. Importers must comply with *either* the Preventive Controls for Human Food rule *or* the Foreign Supplier Verification Program rule mentioned in the complaint. creative werks identifies a supply chain preventive control in the Packaging hazard analysis (12) which complies with the former rule. I believe creative werks is not the importer of record for the products and is not under enforcement of the Foreign Supplier Verification Program rule. The responsibility of creative werks and procedures at receiving are detailed in work instructions, i.e., procedures for receiving (22, 23, 24); I found these procedures exemplary.

44. Ms. Madison states on page three of the complaint that when customers were not notified of an *FDA visit* that was another disregard for protocol. Notification is not a legal requirement, so creative werks is not in violation of the law. I am not aware if creative werks has an SOP or agreement with customers for this notification.

45. Ms. Madison on page three of the complaint notes audits by Blue Diamond and Nestle. Ms. Madison notes that she performed her responsibility in preparing for the audits. She notes audit findings that are within the norm of an audit. Most audits in the food industry result in observations of issues and requests for improvement of food safety. No facility has a perfectly functioning quality management system, and the goal is continuous improvement.

46. I reviewed two documents referred to as a risk analysis on page three of the complaint, written by Ms. Madison and titled *Regulatory Business Problem* (2) and Legal *Analysis of Regulatory Business Problem* (11), respectively. Ms. Madison on page three of the complaint notes that she attempted to review the risk analysis document with Mr. Zicher on October 20th. There is no mention in the complaint nor in the documents themselves of these documents being requested or of the purpose of the documents. Ms. Madison escalated the

conversation three levels above her to Mr. Schroeder, CEO [President], on October 21. This timeframe was less than one month after the start of Ms. Madison's employment. This action was unnecessary in an environment that is not in crisis. The documents are extensive - 42 pages in the latter. I am surprised, given Ms. Madison's responsibilities as Quality Regulatory Manager, that she had the time to create the documents. Her time would have been best applied to resolve the issues she claimed to find. In my opinion, it was completely unreasonable not to wait until her supervisor, Mr. Zicher, was available and to instead go three levels above her for the meeting with Mr. Schroeder when the company was not in crisis.

47. Continuing from the complaint: *I explained whatever plans they had were not sufficient…* Ms. Madison is acknowledging here that more than one FSP exists, although she seems uninformed about the four FSPs. It was her job to know how many FSPs creative werks had and the content of those FSPs. As stated above, I disagree with the conclusion that creative werks' FSPs were not sufficient, but for the requirement for facility-specific FSPs.

48. Ms. Madison on page three of the complaint states, *For example, the FDA inspector asked about an event that occurred in October 2021, but that was not responded to until May 2022.* This is a misleading statement as a review of the inspection report (8) details a different consumer complaint of black particles and the corrective action initiated in May 2021. According to Mr. Zicher's email of July 3, 2023 (16), neither PepsiCo nor creative werks received a consumer complaint about *a burning sensation from a Cheetos product.* Here is a quote from the July 3 email:
   a. *The inspector during the visit was inquiring about a similar scenario that purportedly had come into the FDA. Neither the client (PepsiCo) nor creative werks had received any such complaint reported. We shared the attached complaint corrective action on our conference room screen as referenced in the EIR in an effort to demonstrate transparency and cooperation.*

Continuing in the complaint, *He was not able to demonstrate that any remediation was performed.* This is an inaccurate statement.
   a. If the complaint referenced is for the burning sensation, no complaint was registered, so there was no documentation.
   b. If the complaint referenced is for the black particles, the corrective action was provided and is detailed in the inspection report.

49. Ms. Madison on page four of the complaint notes the lack of training requisites. I do not understand the meaning of training requisites. The *Firm's Training Program* is discussed in the inspection report (8), and the inspector reports, *During this inspection I randomly reviewed employees training records that appeared to be adequate except the firm's recordkeeping is not consistent.* WI-7.2 Training v10.2 is the SOP for training.

50. Ms. Madison on page 4 of the complaint brings up the concern with X-ray exposure monitoring. This is an OSHA worker safety issue and not a food safety issue.

51. Ms. Madison on page 5 of the complaint in the fourth paragraph refers to wearing a dress and earrings. It is my experience that people working in the food industry do not wear dresses or

earrings to work at all. It is unreasonable to wear a dress or earrings when you may be called to the production floor at any time as part of your job. Ms. Madison is an employee trained in GMPs and would be expected to behave as a role model for best practices in food safety. It was unreasonable to take time to change clothes when she needed to go to the production floor.

52. [Loss of format]
Ms. Madison on page 6 of the complaint states, I would have been held responsible. Legally, this is an inaccurate statement. The FDA wrote the Preventive Controls for Human Food to the owner, operator, or agent in charge of a facility. That is not Ms. Madison. In addition, the Park Doctrine lays responsibility for food safety with the owner of the company. That is not Ms.Madison. In some cases, prosecuted by the Department of Justice, the person in charge of food safety has been charged. That is Mr. Zicher, not Ms. Madison. Mr. Zicher and the owner are responsible for food safety.

53. I have worked on this project for less than one month, and I know that creative werks is not capitalized, but Ms. Madison did not. It is that attention to detail that is required of professionals working in Quality and makes me question if Ms. Madison was suitable for the position of Quality Regulatory Manager (26).

**Summary**

creative werks operates three facilities for the manufacture of packaging and the process of packaging customers' foods. creative werks is in compliance with state and federal food safety laws and has large, multi-national food customers. The review of documents shows that creative werks appears to have the resources necessary to implement food safety policies and procedures. Food facilities function with continuous improvement, so no facility is perfect and there are always opportunities for improvement. Ms. Madison was in a position to effect change and improve food safety. Her short time at creative werks and lack of understanding of the law, complicated by overlapping customer requirements and quality issues with food safety caused her to make a crisis where there was no crisis. I find her actions unprofessional and unreasonable for her or anyone working in the food industry.

**Documents Reviewed**

The **name of the file** is followed by the description of the document.

1. **Mary Madison complaint.** Statement of Ms. Mary Madison to OSHA in the form of a whistleblower complaint.
2. **Regulatory Business Problem report**. October 20, 2022. 78-page report written by Ms. Madison and referred to as a risk analysis in the complaint. The Word version was provided on July 9, 2023, to assist with the writing of the declaration.
3. **Mary Madison Resume.** 2-page resume of Ms. Mary Madison.
4. **Mary Madison Quality reg Manager.** creative werks employment offer letter to Ms. Madison.
5. **Quality Team.** Organizational chart for the Quality department comprised of 14 positions.
6. **ILDHP_NoticeofInspection (2)**. This is simply a one-page legal document and contains no information specific to the facility. Reviewed but not referenced in the declaration.
7. **Establishment Inspection Report – 1460 Brummel Ave 07-15-2022.** FDA EIR for the facility in Elk Grove Village ending on July 15, 2022, before the employment of Ms. Madison.
8. **Establishment Inspection Report – 1350 Munger Rd 9.28.22.** FDA EIR for the facility in Bartlett ending on September 29, 2022, for which Ms. Madison was present.
9. **Inspection Report (3).** Illinois Department of Public Health, Division of Food, Drugs and Dairies, Good Manufacturing Practice (GMP) Inspection Report for the Bensenville facility.
10. **Inspection Report (004).** Illinois Department of Public Health, Division of Food, Drugs and Dairies, Good Manufacturing Practice (GMP) Inspection Report for the Elk Grove Village facility.
11. **Madison Mary_Creative Werks_Risk Analysis 111522.** *Legal Analysis of Regulatory Business Problem*, November 15, 2022. 42-page report written by Ms. Madison and referred to as a risk analysis in the complaint.

The following food safety plans were operational at the time of Ms. Madison's employment.
12. **Packaging FSP v4 02.21.2023.** 21-page document for the Brummel Facility [Elk Grove Village]/ Bensenville Facility [Sivert Court]/ Bartlett Facility [Munger Road] and includes the hazard analysis of received foods.
13. **Manufacturing FSP v2.0 (12.16.2022).** 16-page document for "Bartlett Facilities" covering the hazard analysis of packaging manufacturing.
14. **Dunkaroos FSP Final vNew (12.16.2022).** 20-page document dedicated to General Mills product. Missing facility name and location.
15. **Coffee Brew Pouch Fill v3.0 (12.14.2022). 14-page document for the Elk Grove Village facility.**
16. **Email from Mr. Zicher 070323.**
    1. *What Kathy is inquiring about is the PepsiCo complaint that was investigated by the FDA inspector during the September, 2022 visit. This EIR was sent originally with the first set of document requests (week of 6/12/23), but I have attached a copy here. The inspector during the visit was inquiring about a similar scenario that purportedly had come into the FDA. Neither the client (PepsiCo) nor creative werks had received any such complaint reported. We shared the*

*attached complaint corrective action on our conference room screen as*
*referenced in the EIR in an effort to demonstrate transparency and cooperation.*

17. **PepsiCo Complaint.zip. RE Mold Complaint.** Email between Mr. Zicher and PepsiCo dated 060721.

18. **Bartlett EMP OOS 21-23.** Excel spreadsheet showing four *Listeria* Suspect from 2021 & 2022 and three *Salmonella* from 2023.

19. **Bensenville EMP OOS 21-23.** Excel spreadsheet showing 33 *Listeria* not all speciated to *L. monocytogenes*, some samples appear to be positive vector samples, and no *Salmonella* Suspect in the timeframe.

20. **Brummel EMP OOS 21-23.** Excel spreadsheet showing nine Out of Spec with two *Salmonella* and seven *Listeria*.

21. **Consumer Contacts Tracker.** Excel spreadsheet. 080919 to 050223

22. **WI 5.2 Trailer Inspection and Control.**

23. **WI-5.1 Receiving & Shipping Instructions.**

24. **WI 5.6 Material Receiving.**

25. **WI-8.3 Supplier Approval.**

26. **Quality Regulatory Manager.** Ms. Madison's job description.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 9, 2023

Kathy Knutson, Ph.D.

EXHIBIT C

**U.S. DEPARTMENT OF LABOR**
**Occupational Safety and Health Administration**

| | | |
|---|---|---|
| Mary Madison | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | |
| v. | ) | No. 301015087 |
| | ) | |
| Creative Werks LLC | ) | |
| a Delaware limited liability company | ) | |
| | ) | |
| Respondent, | ) | |

## DECLARATION OF ERICH ZICHER

I, Erich Zicher, under penalties as provided by law pursuant to 28 U.S.C. § 1746, certify that the statements set forth in this Declaration are true and correct.

1. I am over 21 years old and am the Director of Food Safety for Creative Werks LLC ("Creative Werks").

2. I have reviewed and am familiar with the DOL Complaint and accompanying statement (the "Complaint") that Claimant, Mary Madison ("Madison"), filed.

### Qualifications and Duties as Director of Food Safety

3. I have been Creative Werks' Director of Food Safety since November 2020. Prior to that, I have worked in quality assurance, sanitation, and food safety compliance for food manufacturers and packagers since 2009.

4. I hold food safety certifications including: Preventive Control Qualified Individual Training issued by the Food Safety Preventive Controls Alliance; Intentional Adulteration and Mitigation issued by the Food Safety Preventive Controls Alliance; HACCP issued by the International HACCP Alliance Accredited; Implementing SQF Systems (Post Farm Gate) – SQF Practitioner Training issued by the Safe Quality Foods Institute; Food Vulnerability

Assessment issued by the Center for Agriculture and Food Safety and Preparedness; Food Safety and Sanitation for Food Plants issued by AIB International; and Food Processing Sanitation/Hygiene issued by AIB International.

5.      As part of my duties as Creative Werks' Director of Food Safety, I oversee all food safety and quality processes for Creative Werks' three (3) production facilities. This includes drafting and implementing Creative Werks' Food Safety Manual, Work Instructions, and Food Safety Plans for all of Creative Werks' products. My duties also include overseeing, training, and evaluating all Creative Werks' food safety and quality resources personnel, including Creative Werks' Quality Regulatory Manager.

### Hiring of Quality Regulatory Manager

6.      In September 2022, Creative Werks was looking to hire a new Quality Regulatory Manager for its Food Safety team. A copy of the Quality Regulatory Manager job description for that time is attached as Exhibit 1.

7.      I was involved in the interview and evaluation process for all job candidates for Creative Werks' September 2022 quality regulatory positions.

8.      I evaluated and interviewed Madison for the Quality Regulatory Manager position, and I recommended that she be hired for the position. A copy of Madison's resume presented to Creative Werks at this time is attached as Exhibit 2.

9.      Her stated experience and certifications in food safety and quality assurance was a requisite for my recommendation to hire her.

10.      Creative Werks hired Madison for the Quality Regulatory Manager position in September 2022, and her first day on the job was September 27, 2022.

## FDA Inspection – September 28, 2022

11.     On September 28, 2022 through September 29, 2022, a Food and Drug Administration ("FDA") investigator inspected Creative Werks' Bartlett, Illinois production facility ("Bartlett").

12.     This was the first time that the FDA had inspected Bartlett, and the FDA identified this inspection as a "routine inspection." Following the inspection, the FDA investigator issued an Establishment Inspection Report ("EIR"). A copy of the EIR is attached as Exhibit 3.

13.     The EIR describes the inspection as a "pre-announced routine surveillance inspection." The EIR does reference an FDA consumer complaint #170623 (the "FDA Complaint" regarding a Frito Lay Chester's Cheddar Flavored Paws Cheese Snack – 20 Ounce (the "Snack"); however, this was not the basis for the inspection and only came up through conversation with the FDA inspector.

14.     The EIR identified five (5) Objectionable Conditions: (i) light seeping through dock door #5, (ii) Creative Werks was inconsistent with recordkeeping after reviewing training documents, (iii) consumer complaint investigation for consumer complaint #170623, (iv) pest control activities were inconsistent and needed work, and (v) one (1) production employee showed unsanitary production procedures.

15.     I committed and promised to make corrections to these observations as soon as possible.

16.     The EIR did not result in the issuance of an FDA Form 483, which would have required specific, mandated corrective measures. FDA investigators issue Form 483s following

inspections where the conditions suggest a violation of the Food Safety Modernization Act ("FSMA").

17.     In response to the FDA investigator's questions related to the FDA Complaint, Creative Werks determined that it never received notice of the FDA Complaint, and Creative Werks confirmed with its customer, PepsiCo (Frito Lay's parent company), that the customer also had not received notice. Because neither Creative Werks nor Frito Lay received notice of the FDA Complaint, Creative Werks had no records or documentation related to the FDA Complaint.

18.     Creative Werks did receive a separate consumer complaint directly from Frito Lay's consumer complaint system in March 2021 (the "Frito Lay Complaint"). In that instance, the consumer noticed a black substance around the rim of the food container where the lid attached to the container.

19.     It was determined that the cap to the container could melt in the final sealing process that would leave a black substance residue.

20.     As noted in the EIR, Creative Werks took corrective measures to resolve the Frito Lay Complaint, and I provided the FDA investigator access to Creative Werks' electronic records related to the Frito Lays Complaint, including all corrective measures taken, for electric, on-site review.

21.     I decided to share information related to the Frito Lay Complaint with the FDA investigator because it involved the same product as the FDA Complaint, and I wanted to show that Creative Werks had worked to resolve the Frito Lay Complaint and believed that it had.

22.     Creative Werks no longer packages the Snack.

23.     This inspection occurred on Madison's second and third day of employment with Creative Werks.

24.     As part of her duties as Quality Regulatory Manager, Madison would be expected to lead contact with FDA investigators and other investigative bodies whether through third-party inspection or certification of customer audits.

25.     However, Madison was unable to accompany the FDA investigator and myself on the inspection on September 28, 2022, because she was unable to remove her earrings. Good Manufacturing Processes ("GMP") prevent anyone from wearing jewelry on the food production floor. (21 CFR 110.10(b)(4))

26.     GMP is a common industry practice, and one with Madison's stated experience, education, and certification would be expected to know how to comply with Creative Werks' GMP rules.

27.     Madison knew the inspection was to occur that day. Notwithstanding, she appeared at work wearing a dress, non-removable earrings, painted fingernails, and glasses with rhinestone-embedded frames. Each of these items violate Creative Werks' GMP rules.

28.     That day, it was determined that Madison could enter the facility with a dress because she also had leg coverings, and that she could wear gloves to cover her fingernails. However, she was unable to remove her earrings, which prevented her from entering the production floor and leading the FDA inspection. This would be one of her main duties as Quality Regulatory Manager.

29.     Following the inspection, Madison, other key Creative Werks employees, and I had a meeting to discuss the inspection, the EIR, and how Creative Werks was to respond. We considered issuing a rebuttal or request for correction to the FDA investigator regarding certain

findings in the EIR. Notably, the EIR identifies that Creative Werks failed to respond to the FDA Complaint in a timely manner and that I refused to provide documentation regarding the FDA Complaint. However, as noted above, Creative Werks never received notice of the FDA Complaint, and therefore, Creative Werks had no complaint to respond to and no corresponding records to produce. Notwithstanding, Creative Werks ultimately decided not to pursue a rebuttal or request for correction.

30.      Creative Werks also notified all Creative Werks customers of the inspection via email, per the duties and obligations of Creative Werks' agreements with those customers. Creative Werks identified the inspection as routine in such notices because it was.

### Creative Werks' Food Safety Plans

31.      Creative Werks maintains complete and compliant written Food Safety Plans ("FSP") for each of its product categories and manufactured packages.

32.      Each of the products that Creative Werks produces falls into one of four FSPs: (i) packaging food safety plan, (ii) manufacturing food safety plan for the manufacturing of packaging, (iii) coffee product food safety plan, and (iv) the Dunkaroos Food Safety Plan (the "Dunkaroos FSP").

33.      In my experience, it is common for food manufacturers and packagers to group products in these broad FSPs. It is not common and not required under FSMA to have an FSP for each individual product or SKU that is produced.

34.      The Dunkaroos FSP was the most recent and most detailed FSP that Creative Werks has created and uses. The Dunkaroos FSP includes greater detail than what the majority of Creative Werks' customers require.

35.     As part of her initial duties, I directed Madison to use the Dunkaroos FSP as a template and point of direction to update the other FSPs with similar detail and formatting. She was hired specifically to complete this task.

36.     Creative Werks is committed to continually improving its Food Safety Plans, and that was this project's purpose.

37.     On October 19, 2022, I spent considerable time with Madison at an in-person conference showing her the particulars of the Dunkaroos FSP that should be used in her revisions, and I showed her how to update the other FSPs to be in line with the desired new detail and formatting, referencing both new and old FSPs. Madison asked several questions, and we discussed the project in detail. She also had access to each of Creative Werks' new and old FSPs on Creative Werks' document management system. She left the meeting saying that she would work through and complete the project; however, she never produced any updated FSPs and appears to have never worked on updating the FSPs.

38.     Madison and I never had a conversation where she expressed that she had concerns about being untruthful or that the FSP update project was somehow improper or misleading to any party. Likewise, I have no knowledge of any conversation of this kind between Madison and any other member of the food safety/regulatory department.

### Trace Gains – Unanswered Customer Requests

39.     As another part of her duties, Madison was tasked with managing and responding to customer audit and information requests.

40.     Creative Werks utilizes Trace Gains, an industry-wide software program, to communicate with its customers regarding documentation requests.

7

41.     When Madison was a Creative Werks employee, there were several Trace Gains requests from one particular customer that were old and had not been cleared from the Trace Gains system. However, the customer issued these specific requests in error. They were automated requests resulting from another customer's sale of a certain division of its business, and the requests asked for information that was not in Creative Werks' possession, such as product specifications that customer, and not Creative Werks, dictated. Creative Werks resolved all such requests with the customer via email but failed to remove these erroneous requests from the Trace Gains system. These requests were not active, and the customer was not expecting a Trace Gains response or resolution.

42.     Notably, Madison was hired to remove these old requests and clean up the Trace Gains system; however, she never completed that task.

### Mondelez – Acceptance of Customer-Supplied Inputs

43.     As a co-packaging service provider, FSMA requires Creative Werks to verify and approve an input vendor or supplier, and the criteria for such approval is based in risk-assessment. However, when a vendor or supplier is customer-directed, then Creative Werks may rely on that customer's verification of the vendor or supplier. (21 CFR 117.136(a)(2)). In other words, if a Creative Werks customer purchases a certain packaging input and directs that input to Creative Werks to form the final packaged product, then the customer is required to investigate that input, not Creative Werks.

44.     Madison was directed to confirm US Customs paperwork for release and accept incoming Mondelez product once released from US Customs review; however, this was a customer-directed product and did not require further Creative Werks' investigation.

8

45.     This Mondelez product did originate in Canada, but Mondelez, as the importer, was required to complete Foreign Supplier Verification analysis. (21 CFR 1.500 "Importer"; 21 CFR 1.501 *et seq*.). Creative Werks had no duty or obligation under FSMA to complete such Foreign Supplier Verification analysis.

### Blue Diamond Audit & Nestle Corrective Actions

46.     As noted in the Complaint, Madison did participate in the Blue Diamond audit and Nestle corrective actions. These were part of her duties as Quality Regulatory Manager.

47.     As is common in the industry, each customer identified some necessary audit responses and corrective actions to show continuous improvement of food safety and quality assurance. None of these audit responses were related to food safety issues or defects impacting any customer packaging requiring immediate attention.

48.     Each such audit response and corrective action was noted and implemented or was in the process of being implemented.

49.     Creative Werks interacts with Nestle and Blue Diamond at least on a monthly basis to address all noted audit responses and corrective actions, and Madison had access to information noting Creative Werks' contact with Nestle and Blue Diamond, and all of Creative Werks' customers, when she was employed by Creative Werks.

### Zicher's Direction – Food Safety and Quality Assurance Compliance and Recordkeeping

50.     I never instructed Madison to lie or to be nothing other than completely truthful in her representations to customers. Likewise, I never instructed Madison to do anything in contravention of FSMA or any other food safety or quality assurance practice or protocol.

51.    In my communications with Madison, I also never downplayed or minimized the necessity for food safety and quality assurance compliance, recordkeeping, and communications, both internal and external.

52.    In my experience and as I know to be common in the industry, the use of an X Ray machine like the kind Creative Werks uses and mentioned in the Complaint does not create a radiological hazard to the food, is recognized as safe, and is required to be used by certain customers.

53.    Creative Werks also follows all published safety recommendations for the X Ray machine as well as all manufacturer-recommended maintenance protocols. Creative Werks has never discovered any food hazards or injuries caused by the X Ray machine.

### Madison's Report

54.    I now know that on or about October 20, 2022, Madison presented her Regulatory Business Problem Report (the "Report") to Steve Schroeder, Creative Werks' President.

55.    Madison never shared the Report with me. I saw the Report for the first time on October 31, 2022. Similarly, Madison never made her concerns known to me. She and I never had a conversation about the concerns contained in the Report.

56.    I was Madison's direct superior, and it is common practice for me to interact with and discuss productive and useful revisions to the Food Safety Quality Manual, Work Instructions, Food Safety Plans, and other internal policy with those on my team. It is also common for productive and useful revisions and/or updates to be implemented.

Further, Declarant sayeth not.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in this foregoing Declaration are true and correct, except as to those matters set forth on information and belief, and with respect to those, I state that I verily believe the same to be true.

Dated: July 10, 2023

Erich Zicher
Creative Werks LLC – Director of Food Safety

STATE OF ILLINOIS    )
                        ) ss
COUNTY OF COOK    )

        I, the undersigned, a Notary Public, in and for the County and State aforesaid, DO HEREBY CERTIFY, that on this 10th day of July, 2023, Erich Zicher, appeared before me this day in person and acknowledged that he signed and delivered this Declaration, as his free and voluntary act, for the uses and purposes therein set forth.

My commission expires: 02-04-2027

Official Seal
KATARZYNA KWIATKOWSKI
Notary Public, State of Illinois
Commission No. 813651
My Commission Expires February 4, 2027

Notary Public

11

EXHIBIT 1

**creative werks**

| Job Title: | Quality Regulatory Specialist | Department: | Quality Regulatory |
|---|---|---|---|
| Reports To: | Quality Regulatory Manager | Backup: | Quality Regulatory Manager |
| FLSA Classification: | Salary Exempt | EEO Class: | 3 |

**Job Summary:**

The Quality Regulatory Specialist is responsible for the support of both internal and external customers as it pertains to maintenance of regulatorily required documentation and specifications. The role works cross functionally to help manage and prioritize customer needs and requests including specifications, questionnaires, labeling, identity preserved statuses. The QRS also is responsible for identifying opportunities to standardize and streamline processes, reduce unnecessary redundancy, and continuously improve management food safety, quality, and regulatory compliance systems to create value for CW and its customers.

**Responsibilities of the Position:**

- Create, maintain, and update the company's Food Safety Plans, Food Defense Plans, and Food Quality Plans, keeping current with all new or changing processes or products.
- Ensure documentation of all regulatory required records and related files are complete, accurate, and uploaded into SharePoint.
- Review and manage all raw material specifications for current and new products.
- Create, route for approvals, and publish internal co-pack product specifications.
- Management of Food Safety and Quality Item setups in ERP (Syteline).
- Creation and updates to in-process documentation QMS software (Qwerks).
- Participate as team member, supporting internal and external audits.
- Proof and approve primary packaging label artwork for accurate information prior to first production.
- Complete finished product label audits against ingredient specifications and label approvals.
- Administrate the Identity Preserved status program (kosher,

It is creative werks' policy to hire, train, promote, compensate, and administer all employment practices without regard to race, color, sex, national origin, religion, age, gender identity, sexual orientation, physical or mental disability, veteran status, marital status, or any other characteristic protected by law. The company will not tolerate any such discrimination. The EEO policy applies to all terms and conditions of employment including recruitment, hiring, training, promotion, transfer, performance evaluation, compensation, benefits and termination.

creative werks

organic, NGP, gluten free, etc.).
- Monitor company policies and procedures for compliance with FDA regulations, and identity preserved statuses (kosher, organic, NGP, gluten free, etc.).
- Provide requested documentation via email, customer portals, and through uploading into 3rd party systems such as TraceGains.
- Assist in creation, updating, and implementation of Standard Operating Procedures and Standard Work documents.
- Calculate checkweigher control limit weights based on declared labeling and demonstrated equipment capabilities to ensure compliance with NIST net content requirements.
- Model the Company's values of passion, resilience, performance, creativity, accuracy, balance, collaboration, flexibility, and innovation.
- Perform other duties as assigned by Management

**Knowledge/Skills/Abilities:**

- Working knowledge of labeling laws, ingredient statement builds, allergen issues, and government regulations (CFR 21, NIST HB 133, NOP, etc.) required
- Demonstrated competency at creating food safety and food defense plans, and utilization of other risk assessment tools required
- Competency with quality/food safety programs including HACCP, SSOP, Integrated Pest Management, FDA cGMP required
- Versed in potential hazards for foods and processes, and appropriate mitigation techniques required
- Competent with Microsoft Office (i.e. intermediate Word formatting, Excel pivot tables, Visio, and SharePoint) is required
- Familiarity and adaptability to auxiliary programs such as ERP preferred
- Collaborative approach: able to work cross-functionally and with external resources

**Education and Experience:**

- Bachelor of Science (BS) degree in life or physical sciences, Food Science, Engineering, or related field required
- 3-5 years' experience in related discipline
- Certified in HACCP and/or PCQI required
- Certification in FDQI preferred

**Working Conditions:**

- Office setting and warehouse environment with temperature range

It is creative werks' policy to hire, train, promote, compensate, and administer all employment practices without regard to race, color, sex, national origin, religion, age, gender identity, sexual orientation, physical or mental disability, veteran status, marital status, or any other characteristic protected by law. The company will not tolerate any such discrimination. The EEO policy applies to all terms and conditions of employment including recruitment, hiring, training, promotion, transfer, performance evaluation, compensation, benefits and termination.

of 55 – 80 degrees

**Physical Requirements:**

- Operate standard office equipment
- Reach with hands and arms
- Lift up to 25 pounds

**Revision History and Log:**

| Effective Date | Written by: | Revision Log |
|----------------|-------------|--------------|
| 8/24/22 | EZ | Update to new template |
| | | |
| | | |

It is creative werks' policy to hire, train, promote, compensate, and administer all employment practices without regard to race, color, sex, national origin, religion, age, gender identity, sexual orientation, physical or mental disability, veteran status, marital status, or any other characteristic protected by law. The company will not tolerate any such discrimination. The EEO policy applies to all terms and conditions of employment including recruitment, hiring, training, promotion, transfer, performance evaluation, compensation, benefits and termination.

**Establishment Inspection Report**　　　　　　　　FEI: 3011417063
**Creative Werks, LLC**　　　　　　　　EI Start Date: 09/28/2022
**Bartlett, IL 60103**　　　　　　　　EI End Date: 09/29/2022

## Table of Contents

Summary………………………………………………………………………..1-4

Administrative Data……………………………………………………….4-5

History……………………………………………………………………….5-6

Interstate (I.S.) Commerce…………………………………………….6-7

Jurisdiction (Products Manufactured and/or Distributed) …………………….7

Individual Responsibilities and Persons Interviewed………………….7-8

Firm's Training Program……………………………………………….9

Manufacturing Design Operations…………………………………..9-13

Manufacturing Codes……………………………………………….13-14

Complaints………………………………………………………….14

Recall Procedures………………………………………………….14

Objectionable Conditions and Management Responses………………..14-15

Refusals…………………………………………………………….15

General Discussion with Management…………………………….15-16

Additional Information……………………………………………..16-17

Samples Collected ……………………………………………….17

Voluntary Actions………………………………………………….17

Exhibits Collected………………………………………………..17

Attachments……………………………………………………….17

## Summary

This pre-announced comprehensive routine surveillance inspection of a warehouse, packer/repacker, labeler/Relabler and distribution center (DC) was performed as part of HAF 6 EAST FY-2022 Workplan in MARCS/eNSpect as OP ID-#226878. This

**Establishment Inspection Report**                    FEI: 3011417063
**Creative Werks, LLC**                    EI Start Date: 09/28/2022
**Bartlett, IL 60103**                    EI End Date: 09/29/2022

inspection was accomplished utilizing CFR-21, Part 117 – Current Good Manufacturing Practice, Hazard Analysis, and Risk-Based Preventative Control for Human Food – Subparts A, B, and F along with Compliance Program 7303.040, Preventive Controls and Sanitary Human Food Operations. In addition to CP 7321.005 Domestic NLEA and General Food Labeling Program.

Creative Werks LLC functions as a warehouse, packer, repacker (Co-Packer), labeler, Relabler, and DC. The firm's top three customers are General Mills, Ghirardelli, and Hershey. The firm's top three products at this location are Cereal (year-round), Dunkaroos, and Candy Confection.

This firm store, packs/repacks (Co-Packs), labels/relabels a variety of wrapped and unwrapped ready-to-eat food products per their customer request. After packing/repacking, labeling/relabeling and final packaging is completed, the finished product is scheduled to be shipped to one of their customers distribution centers as specified by their customer.

***Previous inspection***

The firm has never been inspected by the Agency. This was the firm's initial inspection.

***Current Inspection***

This inspection was classified as NAI. Although, the firm was not issued an FDA Form 482 at the close of this inspection. The following concerns were discussed in detail with management as follows:

1. I observed light seeping through dock door #5 during the walk-through.
2. I observed that the firm is not consistent with recordkeeping after reviewing training documents.
3. I observed that the consumer complaint investigation for consumer complaint #170623 should have had a faster response.
4. I observed that the firm's pest control activities are inconsistent and needs work.
5. I observed a production employee cleaning equipment located along the north wall adjacent to Production Line 7300 with a long white towel using his right hand to touch the floor for balance and alternating the towel in his right hand as he cleans the conveyor equipment on top.

Management Response:

Mr. Zicher promised to make corrections to the observations as soon as possible.

**Establishment Inspection Report**                                    FEI: 3011417063
**Creative Werks, LLC**                                    EI Start Date: 09/28/2022
**Bartlett, IL 60103**                                    EI End Date: 09/29/2022

This inspection focused on the following areas: Sanitary Transport, Sanitation, Raw Materials, Recalls, Customer Complaints, Pest Control, Quality Control, Sales, Production, Purchasing, Recordkeeping, and Employee Training.

I did not notice any avian, insect and/or rodent activity during the inspection.

I did not take any samples and/or photos during this inspection.

The firm is registered per the 2005 Bioterriosm Act of 2002.

I did encounter one refusal during this inspection which converted to an electronic view of consumer complaint #170623 for closure.

**Consumer Complaint #170623 Follow-up –** Frito Lay Chester's Cheddar Flavored Paws Cheese Snacks- 20 ounce (1.4 rigid plastic container with screw chalking). Product of PepsiCo.

*Consumer Complaint:* This consumer complaint dealt with a consumer becoming ill after consuming Frito Lay Chester's Cheddar Flavored Paws Cheese Snack. The customer identified a black substance found around the lid as mold.

Corrective Actions as provided by the firm (Identification of Root Cause):

| Issues | Resolution | Date Accomplished |
|---|---|---|
| Slippage experienced with the lid torque. | Custom built machine chuck was installed to replace the silicone rubbing head & reduce any slipping in the lid application. | 3/22/2021 |
| Multiple passes with a barrel through the induction sealer caused burning of the film stock. | Production Team discontinued sending barrels through the sealer more than once. | 5/20/2021 |
| Settings for induction sealing equipment not documented. | Documented settings were recorded & posted on the line for the Maintenance Team. | 6/6/2021 |
| Reject cylinder & rails caused barrels to jam. | Section of rail was removed to prevent jars & counting sensors was relocated. | 6/7/2021 |
| Lid cocked sensor process had poor repeatability. | Adjusted & documented location of cocked lid sensor. Tested in various orientations. | 6/6/2021 |

**Establishment Inspection Report**                                    FEI: 3011417063
**Creative Werks, LLC**                                        EI Start Date: 09/28/2022
**Bartlett, IL 60103**                                          EI End Date: 09/29/2022

*Additional Complaints:* According to Mr. Erich P. Zicher, Director of Food Safety the firm had only one similar complaint sent by PepsiCo on March 13, 2022 regarding a burnt seal. In addition, Mr. Zicher told me he was not aware of any other complaints.

*Findings:* According to the firm's findings the induction seal for the lid was burnt due to multiple entries of the lid passing through the induction (heat) sealer. It was documented that during manual application of the lid the firm experienced jams on the production line which also resulted in burnt lids.

*Packaging Procedure:* The packaging procedure for this product was modified on May 20, 2021 as document in the firm's step-by-step corrective actions/investigation listed above.

*Preventive Controls:* The firms preventive control consisted of the removal of manual application of the lid to a pneumatic lid application to remove the variation out of manually applying the lid. According to the firm the new machinery was approved by PepsiCo.

*Product's Current Disposition:* According to Mr. Eric P. Zicher, Director of Food Safety, the firm currently is not repacking Frito Lay Chester's Cheddar Flavored Paws Cheese Snacks for PepsiCo. The contract for packing this product is stagnant until there is a negotiated procedure for lid application for this ready-to-eat product.

**Administrative Data**

***FMD-145***

A copy of this EIR should be sent to the individual listed below:

Mr. Erich P. Zicher, Director of Food Safety
Creative Werks, LLC
1460 Brummel Avenue
Elk Grove Village, IL 60007
Email address: ezicher@cwerksglobal.com

**Inspected Firm:**        Creative Werks, LLC
**Location:**              1350 Munger Rd.
                           Bartlett, IL 60103

**Establishment Inspection Report**                                      FEI: 3011417063
**Creative Werks, LLC**                                         EI Start Date: 09/28/2022
**Bartlett, IL 60103**                                            EI End Date: 09/29/2022

**Phone:**                (630) 860-2222

**Fax:**                  None

**Mailing Address:**      1460 Brummel Avenue
                          Elk Grove Village, IL 60007

**Email Address:**        ezicher@cwerksglobal.com

**Dates of Inspection:**  September 28, 2022 & September 29, 2022

**Days in Facility:**     2-Days

**Participant:**          Clotia C. Abbey-Mensah, Investigator


On September 28, 2022 I presented credentials and issued an FDA Form 482 Notice of Inspection to Mr. Eric P. Zicher, Director of Food Safety who identified himself as the person most-in-charge. We were joined by Ms. Angela K. Knabe, Quality Regulatory Manager, Ms. Anupam (N.M.I,) Sharma, Food Safety & Quality Manager, and Ms. Mary D. Madison, Quality Regulatory Manager. Throughout this inspection I was provided documents for review as requested by Mr. Zicher and Ms. Sharma. I was accompanied on a tour of this facility by Mr. Zicher and Ms. Sharma.


**History**

Creative Werks is located at 1350 Munger Rd. in Bartlett, IL 60103 in DuPage County. The firm is owned by Mr. Steven A. Schroeder, President. I asked Mr. Zicher if Mr. Schroeder maintain an office at this location and he responded no. The firm has been in business since 1999 and at this location since May 2015.

The firm is 400,000 square feet (sq. ft.). Of this square footage 100,000 is considered manufacturing per Mr. Zicher. This firm store, packs/repacks, labels/relabels a variety of wrapped and unwrapped ready-to-eat food products per their customer request.

The firm's telephone is (630) 860-2222. The firm has 513 employees at this location. This number includes hourly, salary and temporary employees per Mr. Zicher.

The firm has two other locations as listed below:

**Establishment Inspection Report**                                    FEI: 3011417063
**Creative Werks, LLC**                                                EI Start Date: 09/28/2022
**Bartlett, IL 60103**                                                 EI End Date: 09/29/2022

| Headquarters/Production Facility | Warehouse/Production Facility |
|---|---|
| Creative Werks, LLC | Creative Werks, LLC |
| 1460 Brummel Avenue | 222 Sievert Court |
| Elk Grove Village, IL 60007 | Bensenville, IL 60106 |

The firm's office hours are 8:00 am to 5:00 pm Monday – Friday. The firm's production hours are 24/6 sometimes 24/7 according to Mr. Zicher. The shifts are scheduled as follows:

| 1st Shift | 2nd Shift | 3rd Shift |
|---|---|---|
| 6:00 am to 2:00 pm | 2:00 pm to 10:00 pm | 10:00 pm to 6:00 am |

The firm runs manufacturing and co-packing on all three shifts per Mr. Zicher. The firm does not have scheduled shutdowns for preventative maintenance. According to Mr. Zicher one of the firm's main functions is private labeling.

The firm's FY starts on January 1st and ends December 31st annually. The firm's website is www.creative-werks.com. The firm's email address is ezicher@cwerksglobal.com.

## Interstate (I.S.) Commerce

I asked Mr. Zicher what percentage of the finished products at this location cross state lines. He responded 70%. I asked what percentage of the finished product is sold wholesale. He responded zero. Lastly, I asked what percentage of components are received through interstate and he responded 52%. I requested a copy of a BOL for Miniature Kit Kat which was not provided.

The firm does business with their customers Distribution Centers (DCs) domestically and internationally as listed:

1. California
2. Georgia
3. Indiana
4. New Jersey
5. Pennsylvania
6. Texas

**Establishment Inspection Report**                                      FEI: 3011417063
**Creative Werks, LLC**                                  EI Start Date: 09/28/2022
**Bartlett, IL 60103**                                    EI End Date: 09/29/2022

   7.  Utah
   8.  Wisconsin
   9.  Alberta – Canada (Calgary)
  10. Ontario – Canada (Brampton)
  11. Ontario – Canada (Mississauga)

## Jurisdiction (Products Manufactured and/or Distributed)

This firm packs/repacks, labels/relabels a variety of ready-to-eat food products such as chocolate candy, cereal, chewing gums and snack foods etc.

## Individual Responsibilities and Persons Interviewed

On September 28, 2022 I presented credentials and issued an FDA Form 482 Notice of Inspection to Mr. Eric P. Zicher, Director of Food Safety who identified himself as the person most-in-charge. We were joined by Ms. Angela K. Knabe, Quality Regulatory Manager, Ms. Anupam (N.M.I,) Sharma, Food Safety & Quality Manager, and Ms. Mary D. Madison, Quality Regulatory Manager. Throughout this inspection I was provided documents to review as requested by Mr. Zicher and Ms. Sharma. I was accompanied on a tour of this facility by Mr. Zicher and Ms. Sharma. I requested a copy of the firm's organizational chart during this inspection. (See Exhibit #1)

*Responsibilities:*

Mr. Eric P. Zicher, *Director of Food Safety*
   ➢ Food Safety & Quality
   ➢ Escalates Issues
   ➢ Environmental Issues
   ➢ Projects – (Ongoing, New)
   ➢ Identifying Potential Quality Risks
   ➢ Microbiological Aspects with Products
   ➢ Write SOPs (Work Instructions, Policies, etc.)
   ➢ Hire/Fire
   ➢ Strategic Directives for Container Safety
   ➢ Food Safety & Quality
   ➢ Time with firm: 1.9 years
   ➢ Time in current position: 1.9 years
   ➢ Direct Reports: 4
   ➢ Reports to: Mr. Ronald Sammeth, *Chief Operating Officer*

**Establishment Inspection Report**                           FEI: 3011417063
Creative Werks, LLC                                  EI Start Date: 09/28/2022
Bartlett, IL 60103                                    EI End Date: 09/29/2022


Ms. Angela K. Knabe, *Quality Regulatory Manager*
  ➢ Audits (Clients POC for Audits)
  ➢ Lead Good Manufacturing Practice (GMPs) Walk
  ➢ Ensuring Compliance (Corrective Actions)
  ➢ Vendor Approvals
  ➢ Quality Management Systems - (PCQI)
  ➢ Time with firm: 3.5 years
  ➢ Time in current position: 2 years
  ➢ Reports to: Mr. Eric P. Zicher, *Director of Food Safety*


Ms. Anupam (N.M.I,) Sharma, *Food Safety & Quality Manager*
  ➢ Discussion of Food Safety holds with Sales Personnel
  ➢ Certificate of Analysis (COA) Reviews
  ➢ Packaging Reviews
  ➢ Raw Materials Packaging; Film Review
  ➢ Hold Releases
  ➢ Operational aspects within Specifications
  ➢ Timecards
  ➢ Employees Issues
  ➢ Releasing product after review of COA
  ➢ POC for Food Safety /Food Compliance
  ➢ Assist with SOPS by other departments
  ➢ GMP Training provided to Operations, Sanitation Materials Handlers and Quality Control Employees
  ➢ Sending out samples for testing
  ➢ Time with firm: 1 year
  ➢ Time in current position: 1 year
  ➢ Direct Reports: 1
  ➢ Reports to: Mr. Eric P. Zicher, *Director of Food Safety*

Ms. Mary D. Madison, Quality Regulatory Manager
  ➢ Audits (Clients POC for Audits)
  ➢ Lead Good Manufacturing Practice (GMPs) Walk
  ➢ Ensuring Compliance (Corrective Actions)
  ➢ Vendor Approvals
  ➢ Quality Management Systems - (PCQI)
  ➢ Time with firm: 2 days
  ➢ Time in current position: 2 days
  ➢ Reports to: Mr. Eric P. Zicher, *Director of Food Safety*

Establishment Inspection Report
Creative Werks, LLC
Bartlett, IL 60103

FEI: 3011417063
EI Start Date: 09/28/2022
EI End Date: 09/29/2022

## Firm's Training Program

I asked if the firm provide any training to their employees and the response was yes. Training is provided to employees upon hire and annually. Ms. Sharma told me that the firm use an alchemy software for training. The software divides the various training modules into specific topics such as Food Safety, Foodborne Illnesses, Guidance Principles etc. I asked Ms. Sharma if the employees sign-off on training and she responded yes. During this inspection I randomly reviewed employees training records that appeared to be adequate except the firm's recordkeeping is not consistent. All employees do not consistently sign-off on training records as required in their own procedure with a signature and date, which is deemed an official document. This observation was shared with Ms. Sharma during this inspection. This was an observation previously observed at the firm's Elk Grove Village facility.

I requested a copy of management training during this inspection. (See Exhibit # 2)

## Manufacturing Design Operations

This firm packs/repacks and labels/relabels ready-to-eat products such as candy, cereal, cookies, and gums, etc. for their clients.

### *Donning Area/ Handwashing Station*

Prior to entering the manufacturing area, a visitor is required to wear the following PPE: hairnet, ear plugs, laboratory coat, safety vest and safety googles. The firm identifies individuals in production as follows:

| Red | White | Orange |
|-----|-------|--------|
| Management | Visitors | Quality Control |

After donning is completed, you proceed to the handwashing station, located adjacent to the employee's break room.

### *Ambient Warehouse*

The firm's warehouse aisles on the south-side mid-way are labeled M through U. The north-side of the aisles are labeled J through U.

**Establishment Inspection Report**                    FEI: 3011417063
**Creative Werks, LLC**                          EI Start Date: 09/28/2022
**Bartlett, IL 60103**                            EI End Date: 09/29/2022

### Dock Doors

The firm has 60 dock doors at this location. Two of the sixty are not in use. Dock Door 30 contains the firm's compactor. Dock Door 31 is used to store equipment. The firm's dock doors are grouped into 15 as follows: 1-15, 16-30, 31-45 (Kit Kat Line) and 46-60. I observed that dock door #5 has sunlight seeping in. I shared this observation with Mr. Zicher and Ms. Sharma during the walk-through.

### Production Area

The firm has 22 active production lines. Currently the firm is actively using 12 production lines. Some production lines are in segregated rooms. Some production areas can have several production lines packing a variety of products in the same room.

The firm's sanitation area is an enclosed in a box-like structure. I observed a walk-in equipment washer from the outside looking in. The doors to this area were locked but I could see from the outside mostly covered cleaned production parts and equipment.

### Lines 7000-7300 – Repacking

I observed a production employee cleaning equipment located along the north wall adjacent to Production Line 7300 with a long white towel using his right hand to touch the floor for balance and alternating the towel in his right hand as he cleans the conveyor equipment on top. This observation was immediately shared with Mr. Zicher and Ms. Sharma during the walk-through. I noticed a similar action with a production employee at the firm's Elk Grove Village location.

This area is also used for storing production equipment and supplies.

I observed Miniature Kit Kats packed on these lines in a clear plastic holiday cane. (See Exhibits #3-5)

### Sanitation Area

In the next section of the contained sanitation area, I could see compartment sinks. I observed a two and three-compartment sinks. I asked what the two-compartment sink is used for. I was told it is used for washing and sanitizing. There appears to be no rinse step for the two-compartment sink. I could also see Dunkadoos frosting pump equipment through the exterior sight windows.

The east wall in this area houses the maintenance department, and employee entrance.

**Establishment Inspection Report**　　　　　　　　　　　　　　FEI: 3011417063
Creative Werks, LLC　　　　　　　　　　　　　　EI Start Date: 09/28/2022
Bartlett, IL 60103　　　　　　　　　　　　　　　EI End Date: 09/29/2022

**Line 4000 – Whole Packing**

I observed Hershey's Christmas Tubes packed on this production line.

**Line 5100 – Nerds (Naked)**

I observed naked (unwrapped) candy been packed in tubes on this production line. The tubes are equivalent to clear plastic candy canes.

**Line 8000**

I observed Honey Nut Cheerios been packed in the cereal room.

**Lines 8700 & 8900 (Allergen Line)**

I observed Mars candy containing peanuts repacked on this production line. The firm only runs peanut production on these lines.

**Line 9000**

This line packs chewing gum. It was currently not in operation during the walk-through.

**Lines 4400, 4500 and 4600**

I observed Reese's Pieces packed on these lines in a clear plastic holiday cane.

***HACCP Plan***

I asked Mr. Zicher if the firm has a HACCP Plan and he responded yes. Ms. Angela K. Knabe, Quality Regulatory Manager is responsible for the firm's Quality Management System (QMS). Time did not permit me to verify the firm's entire food safety plan during this inspection. Ms. Knabe identified herself as the firm's PCQI. This responsibility will soon be delegated to Ms. Mary D. Madison because Ms. Knabe is leaving the firm next week. The firm also have x-ray equipment in place as a process preventive control.

***Metal Detectors***

The firm documents their metal detector every two hours. This information was not verified. This is the firm's only critical control point (ccp) in their process. The firm's metal detectors are calibrated by Regal Packaging Service, Inc. located at 22 W704 Ahlstrand Rd. Glen Ellyn, IL 60137. Their telephone number is 630.942.8461. The firm's website is www.regalpack.com.

***Leak Detector***

**Establishment Inspection Report**                                    FEI: 3011417063
**Creative Werks, LLC**                                    EI Start Date: 09/28/2022
**Bartlett, IL 60103**                                    EI End Date: 09/29/2022

I asked Mr. Zicher if the firm performs leak detection at this facility and he responded yes. The leak detection is performed on the cereal production line. This information was not verified.

### Raw Materials

The firm's raw materials consist of clear plastic candy canes, cane handle, product labels for packaging, wrapped candy products, plastic bags, cereal bowls, cardboard boxes, etc.

### Allergens

I asked management if the firm has any allergens onsite and their response was yes. The allergens consist of eggs, wheat, soy, dairy, peanuts, and tree nuts per Ms. Sharma. The firm may handle allergens contained in wrapped or unwrapped packaging. I asked Mr. Zicher what preventive controls are in place to prevent cross contamination. He responded sanitation is used to prevent cross contamination and production takes place in cycles. The firm also performs ATP swabbing prior to production per Ms. Sharma. This information was not verified.

### Internal Audits

I asked Mr. Zicher if the firm performs internal audits, and he responded yes. The firm performs internal audits annually. This information was not verified. In addition, Ms. Knabe told me that she leads GMP monthly walking audits of the facilities and Food Safety meetings.

### Sanitation

I asked Mr. Zicher if the firm has a Sanitation Standard Operating Procedure (SSOP) and he responded yes. I randomly reviewed the firm's SSOP- #6.15 effective June 21, 2022, and it appeared to be adequate. I asked who provides sanitation training and I was told Supervisors, Assistant Supervisors and Team Leads.

### Sanitary Transport

The firm has a sanitary transport SOP WI-5,2 that includes 19-conditions which is uploaded into their database via their ERP software. After review of the firm's sanitary transport SOP, it appears to be adequate.

**Establishment Inspection Report**                                          FEI: 3011417063
**Creative Werks, LLC**                                          EI Start Date: 09/28/2022
**Bartlett, IL 60103**                                          EI End Date: 09/29/2022

*Logistics*

The firm's customers broker trucks for transporting their products. The customers arrange product loads inbound and outbound of their facility. Some customers use their own fleet of trucks. Regardless per Mr. Zicher the truckers must make appointments for pick-ups and deliveries.

*Environmental Controls*

I asked management if the firm has an environmental control program, and the response was yes. I reviewed the firm's SOP and it appeared to be adequate. The firm's program is sectioned into 4-Zones. Zone-1 (food contact surfaces) per Ms. Sharma is cleaned and sanitized. The firm sends out samples for APC and E. coli as validation for sanitation. Zones 2-4 are swabbed with sponges and sent out for Salmonella and Listeria species testing. The samples are sent to Merieux NutriSciences – Silliker Laboratory Inc. located in Crete, IL. I asked who performs the swabbing and Ms. Sharma responded the Quality Supervisor, Team Lead and Quality Manager.

*Water*

I asked Mr. Zicher if the firm monitor the water for the city of Bartlett. Mr. Zicher responded yes. A copy of the city's annual test results was shared on the firm's overhead screen. Additionally, the firm collects and sends out annual water samples for Heterotrophic and coliforms.

*Refuse*

The firm's refuse is serviced by West Rock, bimonthly. West Rock is located at 417 S. 37th Ave. St. Charles, IL 60174. The firm's telephone and website are 630.587.4542 and www.westrock.com respectively.

The firm's recyclables and landfills are also maintained by West Rock. The recyclables consist of corrugated and plastics polymers such as HDPE, PP, and PETE.

## Manufacturing Codes

I asked Mr. Zicher to decipher the firm's manufacturing code as follows:

52K - (Hershey) CH - (Chicago) 1 2 272

Establishment Inspection Report                                      FEI: 3011417063
Creative Werks, LLC                                         EI Start Date: 09/28/2022
Bartlett, IL 60103                                            EI End Date: 09/29/2022

BB 07 2023

| Customer ID | Plant ID | Product Line | Shift | Julian Date | Best By Code |
|---|---|---|---|---|---|
| 52K- (Hershey) | CH- (Chicago) | 1 | 2 | 272 | BB 07 2023 |

## Complaints

I requested a copy of the firm's consumer complaint procedure during this inspection for review. The firm's consumer complaint is identified as WI-2.6 with an effective date of May 21, 2019.The firm's complaint procedure appears to be adequate. I asked Mr. Zicher if the firm performs trending, and he responds yes. Because the firm co-packs for their clients there is a relationship between Creative Werks Quality personnel and their client's Quality Contact per Mr. Zicher. I asked how investigations are performed. Mr. Zicher told me that after an investigation is completed a corrective action is provided when the root cause is determined.

## Recall Procedures

The firm has a recall procedure reference as Traceability. According to Ms. Sharma the firm performs trackabilities three times annually. I randomly reviewed the procedure, and it appears adequate. I asked management if the firm performs Mock Recalls and Ms. Sharma responded yes. This information was not verified. She told me that the firm performs traceback and trace forward.

## Objectionable Conditions and Management Responses

The following members of management were in attendance during the close-out meeting: Mr. Eric P. Zicher, Director of Food Safety, Ms. Anupam (N.M.I.) Sharma, Food Safety & Quality Manager, and Ms. Mary D. Madison, Quality Regulatory Manager. In addition, we were joined by Mr. Ronald Sammeth, Chief Operating Officer on the telephone. This inspection was classified as NAI. Although, the firm was not

**Establishment Inspection Report**                                      FEI: 3011417063
**Creative Werks, LLC**                                          EI Start Date: 09/28/2022
**Bartlett, IL 60103**                                            EI End Date: 09/29/2022

issued an FDA Form 482 at the close of this inspection. The following concerns were discussed in detail with management as follows:

1. I observed light seeping through dock door #5 during the walk-through.
2. I observed that the firm is not consistent with recordkeeping after reviewing training documents.
3. I observed that the consumer complaint investigation for consumer complaint #170623 should have had a faster response.
4. I observed that the firm's pest control activities are inconsistent and needs work.
5. I observed a production employee cleaning equipment located along the north wall adjacent to Production Line 7300 with a long white towel using his right hand to touch the floor for balance and alternating the towel in his right hand as he cleans the conveyor equipment on top.

Management Response:

Mr. Zicher promised to make corrections to the observations as soon as possible.

## Refusals

I did encounter one refusal during this inspection which converted to an electronic view of consumer complaint #170623 for closure.

## General Discussion

I requested a copy of the firm's Consumer Complaint Procedure. Instead, I was provided a copy of the firm's Customer Supplied Materials Procedure via email on September 28, 2022. (See Exhibit #6) I reviewed this procedure, and it was not easy to read or understand. N.B.-This procedure revision numbers are incorrect and annual reviews list the same revision numbers although they were reviewed in completely different years. The current revision number should be 12 instead of 6.

| Revision Number | Effective Date | Revision Log | Approved By | Approved Date |
|---|---|---|---|---|
| 4.0 | 9/15/11 | AR/NC | Veronica Vina | 9/14/2011 |
| 4.0 = 5.0 | 11/26/12 | AR/NC | Veronica Vina | 11/24/12 |
| 4.0 = 6.0 | 02/21/14 | AR/NC | Veronica Vina | 2/19/14 |
| 4.1 = 6.1 | 4/07/14 | Changed Procedure | Veronica Vina | 4/5/14 |
| 6.0 = 12 | 07/22/21 | Updated | Erich Zicher | 07/16/21 |

**Establishment Inspection Report**                                 FEI: 3011417063
**Creative Werks, LLC**                              EI Start Date: 09/28/2022
**Bartlett, IL 60103**                                 EI End Date: 09/29/2022

*Ledger:* AR = Annual Review; NC = No change

## Additional Information

### Pest Control

The firm's pest control is monitored by Pesto-X/Rentokil weekly. Pesto-X/Rentokil is located at 2050 Clearwater Drive Des Plaines, IL 60018. Their telephone number is 847.699.6888.

The firm is concerned with rodents and insects. The firm's preventive controls consist of external bait station, internal rodent mechanical traps, insect light trays and pheromones traps. I randomly reviewed the firm's pest control records from January 2022 to August 2022.

The firm's pest control records indicated that there is no consistent follow-up between the firm and the pest control technician after the service is completed. This issue appears to be ongoing for quite some time. I asked Mr. Zicher if the firm has considered replacing this pest control company due to a lack of genuine service capabilities. Mr. Zicher responded that it has been considered.

### Parking/Entry:

FYI! - The facility's visitor's parking is limited. In addition, the signage for visitor's parking is in an inconspicuous location. It's attached to the entry area façade of the building much higher than normal posting therefore, making it easy to overlook. NB: Prepare to locate available parking anywhere in the firm's parking lot.

The entry area is a virtual set-up. If you are equipped with the Director of Food Safety's cell number, please use it for prompt entry.

### Food Defense:

The firm's culture regarding Food Defense consists of "see something, say something" per management. In the firm's employee badging and entry area the firm is equipped 24 hours with an onsite security guard. But the main entry into the building is not guarded in the same manner. On September 28, 2022, I was allowed entry into the facility without signing in because there were no sign-in sheets available. I was told its okay. On September 29, 2022, the same scenario, I told the escort there were no sign-in

**Establishment Inspection Report**                                    FEI: 3011417063
**Creative Werks, LLC**                              EI Start Date: 09/28/2022
**Bartlett, IL 60103**                                EI End Date: 09/29/2022

sheets available. This time that individual returned with a sign-in sheet. The firm's business entry is easily accessible due to non-monitoring upon entry through the lobby door. Management should be aware and concerned about who enters their facility and their whereabouts upon entry.

## Samples Collected

I did not take any samples and/or photos during this inspection.

## Voluntary Actions

I did not witness any voluntary actions during this inspection.

## Exhibits Collected

1. Organizational Chart
2. Management Training Certs – 3 pages
3. Kit Kat Holiday Candy Cane – 2 pages
4. Kit Kat Labels
5. Kit Kat Miniature Candy Wrappers
6. Consumer Complaint Procedure (Customer Supplied Materials) – 3 pages

## Attachments

1. FDA Form 482 Notice of Inspection dated September 28, 2022 – 3 pages

10/18/2022

X  Clotia C. Abbey-Mensah
Clotia C. Abbey-Mensah

Signed by: Clotia C. Abbey-mensah -S

EXHIBIT 3

# Mary Madison

## Executive Leader

9758 Charles, Chicago, IL 60643 | C: 773-297-9569 | Assist2law@gmail.com

Dynamic and forward-looking experienced leader with over 30 years' experience driving operational efficiencies and improving margins. Experience in safety and compliance focusing on creating, developing and executing fit for purpose programs.

## Skills and Expertise

- Relationship Building
- Manufacturing/Distribution
- Risk Management
- FDA Regulations-21 CFR

- FSMA/GFSI/SQF/QMS/ISO/HAACP/HARPC/VACCP
- Lean Six Sigma/Strategic Leadership
- Federal Law Audits/Technical Writing
- Data Science/Analysis/Reporting

- International Law
- FDA Labeling
- ERP/CRM/WMS
- Vertical Start-Ups

## Professional Experience

### Brown Sugar DBA Cupid Candy |Chicago, IL | 2018-2021

#### Chief Food Safety Officer-Quality & Regulatory Compliance

- Diagnosed, predicted, prescribed and implemented ongoing and potential regulatory changes
- Managed and provided cross-functionally operational compliance from farm to fork (end-to-end)
- Developed and deployed vendor sourcing, supplier verification matrix and contract management
- Developed and managed HACCP, HARPC, Food Defense, Safety and Business Continuity Plans
- Developed, deployed and implemented written Quality Management system, including but not limited to: SOP, SSOP, CGMP's, Allergen management, Change Control, CAPA, work instructions and labeling, in accordance with FSMA based on ISO 22000, 22002, 9000, 9001, 9002 & 19011 standards
- Managed risk conflicts, both internally and externally, as well as, with supply chain partners
- Planning, Statistical Process Control, validation methods, Continuous Improvement and market analysis
- Facilitated internal/external audits, traceability management, asset management, KPI/KRI and ERP

### Hoffman Law PC | Chicago, IL | 2013-2018

#### Litigation Support (Consultant)

- Provided technical and legal knowledge in regards to the interpretation, application and accuracy of rule(s) (CFR's), regulations (FR's), policies, best practices, standard operating procedures, and industry standards of Federal Regulated industries, such as but not limited to: FDA, OSHA, EPA, etc...
- Provided training, coaching and certification to Lean Six Sigma participants.
- Review and Drafted written decisions and administrative support records to withstand judicial scrutiny
- Ensure compliance with litigation support and e-Discovery best practices
- Pre-Review workflows, pre-production validations for process improvements
- Championed, deployed, and implemented SOP's, quality manuals and streamline process
- Managed adherence with attorneys, paralegals, clients and other stake holders to maximize the usage of litigation support tools and applications.
- Review and Managed product scheduled delivery pre and post-trial

**Quality Engineer (Consultant)** |Manteno, IL | 2013

- Managed Quality Engineering and compliance support, for process development and improvement initiatives to reinforce the Operational Excellence goals in a 3PL environment through Lean and Six Sigma, statistical, quality management, SAP/ERP and engineering
- Provided interpretation, implementation and oversight of FDA regulations and codified standards (including 21 CFR 110) relative to Food CGMP cross-functionally to a high volume distribution center to 12 states and Canada grossing yearly on average 80 billion pounds of finished products.
- Developed, deployed and implemented a written Quality Management system in accordance with FSMA based on ISO 22000, 22002, 9000, 9001, & 19011 standards; Identified and defined KPI's, key quality and risk metrics and system processes, standard work and change control for compliance to FDA rules, guidance and practices that support the operating system's Continuous Improvement strategies

**ASI Food Safety Consultants**| St. Louis, MO | 2012-2013

<u>Food safety Auditor</u>

- Prepare and conduct audits according to ISO 22000:2008, FMEA (HACCP and HARP risk management analysis and ranking tools), various GFSI schemes, cGMP, current CODEX Alimentarius-International Law, FDA and USDA specifications, as well as, other QM Systems
- Evaluate, develop, implement and modify client-specific quality objectives and food safety manuals and defense plans from farm to fork across the supply chain
- Plan, present and provide on-site educational presentations and explanations and interpretations of food safety regulations and documents to clients, as well as, drafting written decision documents and supporting administrative records capable of withstanding public, legal and judicial scrutiny

# Brown Sugar | Chicago, IL | 2002-2012

<u>Chief Operations Officer</u>

- Start-up mid-sized of specialized food and desert Mid-sized dine-in bakery-restaurant
- Champion Continuous Process Improvements, HACCP, Allergen, Food Safety/defense Plans, RCA's, CAPA's, Risk analysis and Management both internally and with external customers, audits and supply chain partners, *KPI'S,* balanced scorecards and QMS development, VSM, vendor identification/supplier matrix, menu development, recipe scale up, food procurement, personnel training, as well as, day-to-day hands on involvement

# Education

John Hopkins University, Baltimore, MD • MS • Regulatory Science • Expected 2024

Harvard University, Cambridge, MA • Business Analytics • Expected 2023

John Hopkins University, Baltimore, MD • MS (with Honors) • Food Safety Regulation • Expected 2022

Xavier University •B.S. • Chemistry

ASQ -Exemplar Global Certified Lead Auditor--**#210202** –
ISO 22000:2018-Food Safety Management Systems & ISO 9001:2015-Quality Management Systems
FSSC 22000 CQI/IRCA-Certified Auditor-#6118738
FSPCA-PCQI Certified • SQF Level 3 Certified • HACCP Certified • CSSBB (Certified Six Sigma Black Belt)

**Exhibit 31**



ILLINOIS DEPARTMENT OF

# Human Rights

JB Pritzker, Governor
James L. Bennett, Director

## <u>Mary Madison vs Creative Werks LLC</u>

## <u>IDHR CHARGE NO.: 2024CR0389</u>

Enclosed are true and correct copies of documents from the Illinois Department of
Human Rights file, made and kept in the ordinary course of business, regarding the
above-referenced charge filed with the Department.

KEISHA T. NELSON
FREEDOM OF INFORMATION OFFICER

*Keisha T. Nelson* October 31, 2024

DATE:

**SUBSCRIBED and SWORN to before me**

This **31st** day of **OCTOBER** 2024.

*Brigid K. Barjaktarevic* NOTARY PUBLIC

OFFICIAL SEAL
BRIGID KEELY BARJAKTAREVIC
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 02/17/2027

555 W Monroe Street, 7th Floor, Chicago, IL 60661, (312) 814-6200, TTY (217)785-5125, Housing Line (800) 662-3942
524 South 2nd Street, Suite 300, Springfield, IL 62701, (217) 785-5100
2309 West Main Street, Marion, IL 62959 (618) 993-7463
www.illinois.gov/dhr

**STATE OF ILLINOIS**    )
                   ) **ss**
**COUNTY OF COOK**     )

CHARGE NO. 2024CR0389

**AFFIDAVIT OF SERVICE**

The undersigned served a copy of the attached **NOTICE OF DISMISSAL** on     July 3, 2024    , to each

person named below by email or first class mail, addressed as follows:

|  |  |
|---|---|
| <u>For Complainant</u> | <u>For Respondent</u> |
| Mary Madison | Jon Cohen |
| 9758 S. Charles | Dickinson Wright PLLC |
| Chicago, IL 60643 | 55 W. Monroe St. Ste. 1200 |
|  | Chicago, IL 60603 |

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that s/he verily believes the same to be true



**PLEASE NOTE:**

The above-signed person is responsible only for <u>mailing</u> these documents. If you wish a review of the findings in this case, you must complete the Request for Review form attached. Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Determination has been issued.

**STATE OF ILLINOIS**
**DEPARTMENT OF HUMAN RIGHTS**

IN THE MATTER OF:

MARY MADISON,                                )
                                             )
                                             )
                    COMPLAINANT,             )          CHARGE NO.      2024CR0389
                                             )          EEOC NO.        N/A
AND                                          )
                                             )
CREATIVE WERKS LLC,                          )
                                             )
                                             )
                                             )
                                             )
                    RESPONDENT.              )

**NOTICE OF DISMISSAL**

| For Complainant | For Respondent |
|---|---|
| Mary Madison | Jon Cohen |
| 9758 S. Charles | Dickinson Wright PLLC |
| Chicago, IL 60643 | 55 W. Monroe St. Ste. 1200 |
| | Chicago, IL 60603 |

DISMISSAL / NOTICE DATE: July 3, 2024

The Director of the DEPARTMENT OF HUMAN RIGHTS (Department) has entered the findings identified in the in the enclosed investigation report.

**DISMISSAL**

YOU ARE HEREBY NOTIFIED that based upon the enclosed investigation report, the Department has determined that there is a **LACK SUBSTANTIAL EVIDENCE** in support of the allegation(s) identified in the enclosed investigation report **(see investigation report).**

Accordingly, pursuant to Section 7A-102(D) of the Act (775 ILCS 5/1-101 et seq.) and the Department's Rules and Regulations, (56 Ill. Adm. Code. Chapter II, 2520.560) the charge is HEREBY DISMISSED

**PROCEDURE:**

1. If Complainant disagrees with this action, Complainant may:

   a. REQUEST FOR REVIEW: Seek review of this dismissal before the Illinois Human Rights Commission (Commission), by filing a "Request for Review" with the Commission by the request for review filing deadline date below. Respondent will be notified by the Commission if a Request for Review is filed. You can file the Request for Review by email, mail, personal delivery, or fax to:

**Page 2**
**Notice of Dismissal**
**Charge No. 2024CR0389**

Illinois Human Rights Commission
Michael A. Bilandic Building
160 N. LaSalle Street, Suite N-1000
Chicago, IL 60601
Email: HRC.News@illinois.gov
Fax: (312) 814-6517

**REQUEST FOR REVIEW FILING DEADLINE DATE: October 7, 2024**

You may review or request a copy of your investigation file, after the Department's completion of the investigation, to help prepare your Request for Review. The Department will provide you with a specific date and time for you to review your investigation file. Files larger than fifty (50) pages will be sent to an outside vendor for copying. The Department is not responsible for the fees charged by the vendor. Call (312) 814-6262 to make arrangements.

**OR**

b. CIVIL ACTION: Commence a civil action in the appropriate state circuit court within ninety (90) days after receipt of this Notice. The civil action should be filed in the circuit court in the county where the civil rights violation was allegedly committed. If you intend to exhaust your State remedies, please notify the Equal Employment Opportunity Commission (EEOC) immediately. The EEOC generally adopts the Department's findings. The Appellate Courts in Watkins v. Office of the State Public Defender, __ Ill. App. 3d __, 976 N.E.2d 387 (1st Dist. 2012) and Lynch v. Department of Transportation, __ Ill. App. 3d__, 979 N.E.2d 113 (4th Dist. 2012), have held that discrimination complaints brought under the Act against the State of Illinois in the Illinois Circuit Court are barred by the State Lawsuit Immunity Act. (745 ILCS 5/1 et seq.). Complainants are encouraged to consult with an attorney prior to commencing a civil action in the Circuit Court against the State of Illinois.

2. For Equal Employment Opportunity Commission **(EEOC) cross-filed charges ONLY**:

Complainant has the right to request that the EEOC perform a Substantial Weight Review (SWR) if:
   a. An EEOC charge number is cited above;
**AND**
   b. The charge alleges violations of federal laws enforced by the EEOC;
**AND**
   c. Complainant submits to EEOC a written and signed request for a Substantial Weight Review within fifteen (15) days of either:

   i. Receipt of this notice, if Complainant does NOT file a "Request for Review" with the Human Rights Commission (HRC);
**OR**
   ii. Receipt of the HRC's final notice/order if Complainant filed a "Request for Review" with the HRC. (This means that if you made a "Request for Review" with the HRC, you must wait to request a SWR from EEOC until after you receive notice of resolution of the HRC review, which may take many months up to a year or more).

**EEOC will not honor any request for a Substantial Weight Review that does not meet requirements (a), (b) and (c) above. If you have a pending "Request for Review" with HRC and you make a request for SWR with EEOC before you receive a final notice/order from the HRC, you will be asked to re-submit your request for SWR after you receive notice of resolution from the HRC.**

**Page 3**
**Notice of Dismissal**
**Charge No. 2024CR0389**

If you choose to file a request for a Substantial Weight Review, and the allegation(s) occurred in one of the following counties: **Alexander, Bond, Calhoun, Clinton, Greene, Jackson, Jersey, Macoupin, Madison, Monroe, Perry, Pulaski, Randolph, St. Clair, Union, or Washington**, you may email your request for a Substantial Weight Review to, or mail it to:

> EEOC
> Attn: State, Local, and Tribal Programs Manager
> Robert A. Young Federal Building
> 1222 Spruce St., Rm 8.100,
> St. Louis, MO 63103.
> Email: Joseph.Wilson@eeoc.gov

For allegation(s) that occurred in **all other Illinois counties**, you may email your request for a Substantial Weight Review, or mail it to:

> EEOC
> Attn: State, Local, and Tribal Programs Manager
> John C. Kluczynski Federal Building
> 230 South Dearborn Street, Suite 1866
> Chicago, Illinois 60604.
> Email: Sherice.Galloway@eeoc.gov

**PLEASE NOTE: The Department cannot provide any legal advice or assistance. Please contact legal counsel, your city clerk, or your county clerk with any questions.**

> DEPARTMENT OF HUMAN RIGHTS
> James L. Bennett
> Director

NOD LSE Rev 04/01/2024

**STATE OF ILLINOIS**
**HUMAN RIGHTS COMMISSION**

| | | |
|---|---|---|
| **IN THE MATTER OF:** | | |
| MARY MADISON, | ) | |
| | ) | |
| | ) | |
| COMPLAINANT, | ) | CHARGE NO.    2024CR0389 |
| | ) | EEOC NO.       N/A |
| AND | ) | |
| CREATIVE WERKS LLC, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| RESPONDENT. | ) | |

<u>REQUEST FOR REVIEW FORM</u>

<u>For Complainant</u>

Mary Madison
9758 S. Charles
Chicago, IL 60643

<u>For Respondent</u>

Jon Cohen
Dickinson Wright PLLC
55 W. Monroe St. Ste. 1200
Chicago, IL 60603

**TO:** MARY MADISON,

**DISMISSAL DATE: July 3, 2024**

**REQUEST FOR REVIEW FILING DEADLINE DATE: October 7, 2024**

> ⚠️    If you do not file a Request for Review by the filing deadline date, your case will be over.    ⚠️

I am asking the Illinois Human Rights Commission (Commission) to review the dismissal of my charge by the Illinois Department of Human Rights (Department).

My Current Address (please print clearly):

Street Address_____ Apt/Unit #_

City_____ State_____ Zip_____

Email Address*_____ Phone Number (_____)_____
* If you provide an email address, the Commission will send all future documents to you only by email. You should use an email address that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notices, or documents from other parties

**Page 2**
**Request for Review**
**Charge No. 2024CR0389**

## How To Fill Out This Form

In the space below, you can explain why your charge should not have been dismissed. If you need more space, write on the back of this form or attach extra pages. You can include supporting materials and evidence with this Request for Review. The form, extra pages, and supporting materials and evidence must not be longer than **45 pages**.

You can look at the Department's investigation file to help you prepare your Request for Review. Call the Department at (312) 814-6262 to set up a time to look at the file. You will need to call at least 3 business days before you want to look at the file. Do not wait until the last minute to ask to look at the file.

SIGNATURE

DATE

## How To File This Form

You must file the Request for Review **by the filing deadline date** on the first page of this form. You can file the Request for Review by email, mail, personal delivery, or fax to:

| | |
|---|---|
| Mail / Delivery: | Illinois Human Rights Commission |
| | Michael A. Bilandic Building |
| | 160 N. LaSalle Street, Suite N-1000 |
| | Chicago, IL 60601 |
| Email: | HRC.News@illinois.gov |
| Fax: | (312) 814-6517 |

After you file your Request for Review, you **cannot** give the Commission more information or supporting materials. If you need more time to complete your Request for Review, you can file a motion for extension of time. You must file your motion by the filing deadline date on the first page of this form.

For more information about how to fill out and file this form, go to the Commission's website at hrc.illinois.gov/rules/request-for-review.

HB1509/HB59 HRC R/R 10/10/2023

Michael A. Bilandic Building, 160 North LaSalle Street, Suite N-1000
Chicago, Illinois 60601 Phone (312) 814-6269
TTY (866) 832-2298 Fax (312) 814-6517

Jefferson Terrace, 300 West Jefferson Street, Suite 108
Springfield, Illinois 62702 Phone (217) 785-4350
TTY (866) 832-2298 Fax (217) 524-4877

**STATE OF ILLINOIS**
**DEPARTMENT OF HUMAN RIGHTS**
**INVESTIGATION REPORT**

| | | | |
|---|---|---|---|
| **Complainant:** | Mary Madison | **IDHR No.:** | 2024CR0389 |
| **Respondent:** | Creative Werks LLC | **EEOC No.:** | N/A |

**Investigator:** TLW          **Supervisor:** ABT _ABT_          **Date:** 9/1/24

**Issue/Basis:**

| | | |
|---|---|---|
| A. | Suspension/sex, female | |
| B. | Suspension /race, black | |
| C. | Suspension /retaliation | |
| D. | Harassment/sex, female | |
| E. | Harassment /race, black | |
| F. | Harassment /retaliation | |
| G. | Unequal Terms and Conditions of Employment/sex, female | |
| H. | Unequal Terms and Conditions of Employment /race, black | |
| I. | Unequal Terms and Conditions of Employment /retaliation | |

**Finding:**

| | |
|---|---|
| A. | Lack of Substantial Evidence |
| B. | Lack of Substantial Evidence |
| C. | Lack of Substantial Evidence |
| D. | Lack of Substantial Evidence |
| E. | Lack of Substantial Evidence |
| F. | Lack of Substantial Evidence |
| G. | Lack of Substantial Evidence |
| H. | Lack of Substantial Evidence |
| I. | Lack of Substantial Evidence |

**Jurisdiction:**

| | |
|---|---|
| Alleged violation: | A-C October 26, 2022 |
| | D-I October 21, 2022-December 20, 2022 |
| Charge filed: | August 21, 2023 |
| Charge perfected: | September 5, 2023 |
| Amendments: | N/A |
| Number of employees: | 276 |

**Verified Response:**

Note: Pursuant to Public Act 100-0492, a verified response is not required for a charge filed on or after September 8, 2017.

**Employment Data:**

Respondent's 2023 Employer Information Report (EEO-1 Component 1) **(Exhibit A)** indicates that it employed 276 employees during the applicable period. Of Respondent's 276 employees, the racial breakdown is as follows: Hispanic, 185 (67%); white, 67 (24%); black, 13 (5%); Native Hawaiian or other Pacific Islander, 6 (2%); Asian, 4 (1%); American Indian or Alaskan Native, 1

Charge No.: 202024CR0389
Page 2 of 14

(.03%). Of Respondent's 276 employees, 157 (57%) were male; and 119 (43%) were female. Employers are not required to compile collective data on employees' protected activity status.

**Uncontested Facts**:

1.  Respondent is a food contract packager/co-packer.

2.  In September 2022, Respondent hired Complainant as a Quality Regulatory Manager.

3.  In October 2022, Complainant submitted a letter to Respondent's president which cited workplace issues.

4.  On October 26, 2022, Respondent placed Complainant on a paid suspension.

**Complainant's Allegations-Count A-C**:

Complainant, a former Quality Regulatory Manager, alleges that on October 26, 2022, Respondent suspended her due to her sex, female **(Count A)**; race, black **(Count B)**; and in retaliation for engaging in a protected activity **(Count C)**. Complainant maintains that her sex is female, her race is black, and in the fall of 2022, she engaged in a protected activity when she submitted a letter to Respondent's president which cited workplace issues. Complainant maintains that her work performance met Respondent's expectations. Complainant alleges that on October 26, 2022, Human Resources Manager Gretchen LeMay ("LeMay") (female, non-black, no PA[1]) suspended her. Complainant alleges that no reason was given for the suspension. Complainant maintains that similarly situated employees who are male, non-black or not known to have engaged in a protected activity were treated more favorably under similar circumstances. Complainant further maintains that the suspension closely followed his protected activity within such a period of time as to raise an inference of retaliatory motivation.

**Respondent's Defenses-Count A-C**:

Respondent's articulated legitimate nondiscriminatory reason for suspending Complainant was because she presented a letter to the president that included defamatory remarks regarding leadership without going through the proper channels. Respondent admits that Complainant's sex is female and her race is black. Respondent denies that Complainant engaged in a protected activity. Respondent denies that Complainant's work performance met its expectations. Respondent denies that it treated similarly situated employees who are male, non-black or no known to have engaged in a protected activity were treated more favorably. Respondent denies a causal nexus between Complainant's suspension and alleged protected activity.

---

[1] The abbreviation of "no PA" is used in denoting individuals who are not known or alleged to have opposed alleged unlawful discrimination. The abbreviation of "PA" is used in denoting individuals who are known or alleged to have opposed alleged unlawful discrimination.

Charge No.: 202024CR0389
Page 3 of 14

**Investigation Summary-Count A-C:**

A. **Complainant's Evidence.**

    1.    Complainant stated that on September 20, 2022, Respondent submitted an offer letter to her for its Quality Regulatory Manager position **(Exhibit B)**. Complainant stated that she began employment with Respondent as a Regulatory Quality Manager on September 27, 2022. Complainant stated that her duties included compliance with the Food Safety Modernization Act ("FSMA"), and other regulatory duties such as the Bioterrorism Act of 2022, in addition to being a liaison between customers and Respondent regarding compliance quality, regulatory and customer requirements. Complainant stated that her work performance was good.

    2.    Complainant stated that on or around October 21, 2022, she engaged in a protected activity when she submitted a letter to Respondent's President/Chief Executive Officer Steve Schroeder ("Schroeder") (male, non-black, no PA) which cited workplace issues. Complainant stated that Respondent made no negative references regarding her sex or race, nor did she report discrimination based on sex or race.

    3.    Complainant stated that on October 26, 2022, LeMay suspended her. Complainant stated that she asked LeMay why she was being suspended but no reason was given. Complainant stated that LeMay issued her a suspension letter **(Exhibit C)** which stated the following:

> Dear Mary,
>
> This letter is to inform you that you are being placed on a paid suspension effective immediately. This suspension will last until a full investigation into the statements made in your report and during your conversation with Steve Schroeder on Friday, October 21, 2022 can be fully completed. This review will be conducted by an outside attorney and Human Resources will make the introduction when the time comes.
>
> During your suspension you will be paid at your regular rate of pay and have access to benefits. You will not have access to any IT systems or the building until the investigation is complete.

    4.    Complainant stated that she feels that she was suspended due to her sex because she was the only black female manager. Complainant stated that she feels that she was suspended due to her race because she was the only black manager. Complainant stated that she feels that she was suspended in retaliation because she reported workplace issues to Schroeder.

B. **Respondent's Evidence.**

    1.    LeMay stated that Respondent is a food contract packager/co-packer.

    2.    Respondent's Equal Employment Opportunity (EEO) Policy **(Exhibit D)** states the following:

> It is Creative Werks' policy to hire, train, promote, compensate, and administer all employment practices without regard to race, color, sex, national origin, religion, age, gender identity, sexual

Charge No.: 202024CR0389
Page 4 of 14

orientation, physical or mental disability, veteran status, marital status, or any other characteristic protected by law. The company will not tolerate any such discrimination. The EEO policy applies to all terms and conditions of employment including recruitment, hiring, training, promotion, transfer, performance evaluation, compensation, benefits and termination.

3.      Respondent's Complaint Procedure/Anti-Retaliation Policy **(Exhibit E)** states the following:

The company prohibits retaliation against any individual who reports discrimination or harassment and/or participates in an investigation of such reports or seeks accommodations. Retaliation against an individual for reporting discrimination or harassment, or seeking accommodations is a serious violation of this policy and, like discrimination or harassment itself, may be subject to disciplinary action up to and including termination of employment.

The company strongly urges the reporting of all incidents of discrimination, harassment, or retaliation, regardless of the offender's identity or position. Individuals who believe they have experienced conduct that is contrary to this policy or have concerns about such matters may address these concerns directly with the individual who has engaged in the conduct if they so choose, but they are not required to do so. Individuals may also raise their concerns with their immediate supervisor or higher-level manager/director/vice president or with the Human Resources Department if the associate is uncomfortable speaking directly with the "offending person". Complaints will be accepted by Human Resources in writing or orally and will be treated in a confidential manner to the extent possible.

4.      LeMay stated that in late September 2022, Respondent hired Complainant as a Quality Regulatory Manager. LeMay stated that as a Quality Regulatory Manager, Complainant's duties included reviewing, revising, reporting on and helping to maintaining Respondent's Food and Drug Administration ("FDA") regulatory compliance. LeMay stated that Complainant was also responsible for ensuring that employees wore the proper safety equipment.

5.      LeMay stated that Complainant's work performance was unsatisfactory. LeMay stated that Complainant worked for Respondent for approximately four weeks and her reports did not reflect what she was supposed to do as they were inaccurate.

6.      LeMay stated that in the fall of 2022, Complainant ignored her instructions, did not go through established supervisory channels and inappropriately presented a 78-page document, entitled a "Regulatory Business Problem" ("the Report") directly to Schroeder. LeMay stated that the Report consisted of wild and unsupported conclusions and manifestly unprofessional statements. LeMay stated that Complainant's internal report contained intentional distortions of objective data along with unsupported, alarmist and irrational findings, which reflected her failure to rely upon the documentary evidence at her disposal.

7.      LeMay stated that on October 26, 2022, she issued Complainant a Notice of Suspension **(Exhibit F)** pending an investigation regarding her report. LeMay stated that Complainant was suspended due to her demonstrable lack of competence, lack of proper priorities, and her unsupported, alarmist, and improper conclusions, which were inconsistent with her job duties.

Charge No.: 202024CR0389
Page 5 of 14

8.     LeMay stated that Complainant was not suspended because of her sex, race or in retaliation. LeMay stated that Complainant was suspended because of the defamatory report she wrote to Schroeder and for not going through the proper channels with her concerns. Lemay stated that no other employee was suspended under similar circumstances in the 12 months prior to Complainant's suspension. Lemay stated that Complainant never reported unlawful discrimination.

C.     **Complainant's Rebuttal.**

1.     Complainant did not provide any additional information other than what was previously identified in the Complainant's Evidence section.

**Analysis:**

The investigation did not reveal that Respondent suspended Complainant because of her sex, female **(Count A)**; race, black **(Count B)**; or in retaliation for engaging in a protected activity **(Count C)**.

In order to establish a *prima facia* case for discrimination based on sex or race, the Complainant must establish each of the following: 1) she is a member of a protected class; 2) her work performance met Respondent's expectations; 3) she suffered an adverse action; and 4) Respondent treated similarly situated male or non-black employees more favorably. Complainant failed to establish prongs two and four: Respondent was not satisfied with Complainant's work performance; and she named no similarly situated male or non-black employees who were not suspended under similar circumstances. The investigation revealed that Respondent deemed Complainant's work performance was unsatisfactory as she only worked for Respondent for approximately four weeks and deemed her reports to be inaccurate. The investigation also revealed that Complainant failed to go through established supervisory channels and inappropriately presented a 78-page document directly to Respondent's president. Respondent indicated that Complainant's internal report contained intentional distortions of objective data along with unsupported, alarmist and irrational findings, which reflected her failure to rely upon the documentary evidence at her disposal. Complainant failed to indicate how the suspension was based on her sex or race. There is no evidence that Respondent failed to suspend similarly situated employees who were male or non-black who engaged in similar conduct.

In order to establish a prima facie case for retaliation, the Complainant must establish each of the following: 1) she engaged in a protected activity; 2) she suffered an adverse action; and 3) the adverse action was causally connected to the alleged harm. Complainant failed to establish prongs one and three: Complainant provided no evidence that she engaged in a protected activity, nor did she establish that her suspension was causally connected to her alleged protected activity. Even if Complainant could establish a prima facie case for retaliation, Respondent had an articulated legitimate nondiscriminatory reason for suspending Complainant. It is uncontested between the parties that Complainant presented a 78-page document directly to Respondent's president without following the proper channels. It is also uncontested that the report discussed work-related issues and not harassment or unlawful discrimination. Complainant provided no evidence that she engaged in a protected activity by reporting unlawful discrimination or harassment.

Charge No.: 202024CR0389
Page 6 of 14

**Findings and Conclusion-Count A-C:**

A finding of **lack of substantial evidence** is recommended because:

There is no evidence that Respondent suspended Complainant due to her sex, race or in retaliation. There is no evidence that Respondent treated similarly situated employees who were male, non-black or not known to have engaged in a protected activity more favorably. Complainant could not establish a *prima facie* case for unlawful discrimination or retaliation. There is no evidence of an animus based on sex, race or protected activity status. There is not substantial evidence that Respondent suspended Complainant based on her sex, female **(Count A)**; race, black **(Count B)**; or in retaliation for engaging in a protected activity **(Count C)**.

**Complainant's Allegations-Count D-F:**

Complainant alleges between October 26, 2022 through July 2023, Respondent subjected her to harassment due to her sex, female **(Count D)**; race, black **(Count E)**; and in retaliation for engaging in a protected activity **(Count F)**. Complainant maintains that her sex is female, her race is black, and in the fall of 2022, she engaged in a protected activity when she submitted a letter to Respondent's president which cited workplace issues. Complainant alleges between October 26, 2022 through July 2023, Respondent subjected her to harassment when Human Resources Manager Gretchen LeMay ("LeMay") (female, non-black, no PA) told her to "make nice" with Respondent's president; she was ostracized, humiliated, conspired against during meetings; she was suspended with pay; withheld her bonus; her suspension was changed from paid to unpaid; and Supervisor Erich Zicher ("Zicher") (male, non-black, no PA) made negative references about a female federal agent. Complainant maintains that Respondent's conduct created a hostile, intimidating and offensive work environment that interfered with her ability to perform her job. Complainant further maintains that Respondent's conduct closely followed her protected activity within such a period of time as to raise an inference of retaliatory motivation.

**Respondent's Defenses-Count D-F:**

Respondent denies that it subjected Complainant to harassment or unlawful discrimination. Respondent admits that Complainant's sex is female and her race is black. Respondent denies that Complainant engaged in a protected activity. Respondent denies that it created a hostile, intimidating and offensive work environment. Respondent denies a causal nexus between Complainant's alleged protected activity and any alleged harm.

**Investigation Summary-Count D-F:**

A.    **Complainant's Evidence.**

      1.    See Investigation Summary – Counts A-C, Complainant's Evidence.

      2.    Complainant stated that from October 21, 2022 through December 20, 2022, she was subjected to harassment by Schroeder and Zicher. Complainant stated that the harassment consisted of the following:

Charge No.: 202024CR0389
Page 7 of 14

- On October 21, 2022, LeMay told her that she should have been making nice by Schroeder instead of talking to him.

- In October 2022, she was ostracized, humiliated, conspired against during meetings.

- On October 26, 2022, she was suspended with pay.

- On October 27, 2022, Respondent withheld her bonus.

- On November 8, 2022, her suspension with pay was changed to suspension without pay.

- On December 20, 2022, she was forced to see Respondent's outside counsel as a term and condition of employment.

3.      Complainant stated that while no one at Respondent made negative references regarding her sex or race, in the fall of 2022, Zicher made negative comments when referring to a female federal agent by calling her stupid. Complainant stated that Zicher was also very denigrating towards women but failed to provide details.

4.      Complainant stated that on November 4, 2022, she reported the conduct by Schroeder and Zicher but nothing was done to resolve the issues. Complainant failed to indicate whether she reported the conduct verbally or in writing.

5.      Complainant stated that she feels that she was subjected to harassment due to her sex because she was the only black female manager. Complainant stated that she feels that she was subjected to harassment due to her race because she was the only black manager. Complainant stated that she feels that she was subjected to harassment in retaliation because she reported workplace issues to Schroeder.

B.      **Respondent's Evidence.**

1.      See Investigation Summary – Counts A-C, Respondent's Evidence.

2.      LeMay stated that Complainant never reported harassment or unlawful discrimination while working at Respondent. Lemay stated that she never told Complainant that she should have been making nice with Schroeder. LeMay stated that she has no knowledge of, and Complainant never reported, being ostracized, humiliated, conspired against during meetings.

3.      LeMay stated that while Respondent's offer letter to Complainant referred to the potential of a 10% bonus, no bonus plan describing the performance targets had not yet been drafted which addresses the possibility of a bonus because Complainant had only worked for Respondent for a few weeks. Respondent's copy of the September 20, 2022 offer letter to Complainant is identified as **(Exhibit G)**. Lemay stated that the offer letter to Complainant also informed her of a signing bonus of $2,500 which was payable in one lump sum to be paid on October 27, 2022. LeMay

Charge No.: 202024CR0389
Page 8 of 14

        stated that Complainant was informed that in the event that she left the company within 12 months of her date of hire, she would be responsible for reimbursing Respondent for the entire signing bonus.

4.      LeMay stated that Complainant was not forced to see Respondent's outside counsel as a term and condition of employment, rather, Respondent launched an investigation into Complainant's false claims in her letter to Schroeder.

5.      LeMay stated that Complainant was not subjected to harassment or a hostile work environment. LeMay stated that Complainant never reported harassment or unlawful discrimination.

C.    **Complainant's Rebuttal.**

1.      Complainant did not provide any additional information other than what was previously identified in the Complainant's Evidence section.

**Analysis:**

The investigation did not reveal that Respondent subjected Complainant to harassment due to his sex, female **(Count D)**; race, black **(Count E)**; or in retaliation for engaging in a protected activity **(Count F)**.

In order to establish a *prima facie* case for harassment, the Complainant must establish each of the following: 1) she is a member of a protected class; 2) a co-worker, non-employee or member of management engaged in at least two incidents (one if egregious), that are not trivial in nature; 3) Complainant found the conduct unwelcome and unwanted; 4) the alleged harasser is a member of management with authority over Complainant; and 5) the conduct created a hostile, intimidating or offensive work environment for Complainant that substantially interfered with her ability to perform her job. Complainant failed to establish the second prong. While Complainant alleges that Zicher-who was Complainant's supervisor-and had managerial power, called a female federal agent stupid, Complainant did not allege that he said that women were stupid. Complainant also alleges that Zicher was denigrating towards women but failed to provide any details or evidence. To create a hostile work environment, the alleged incidents must be sufficiently severe or pervasive as to alter the conditions of the victim's employment by creating a hostile and abusive work environment. The bar to show hostile work environment is high in order to filter out merely boorish and offensive conduct. In this case, Complainant has failed to point to any actionable severe or pervasive conduct on Respondent's part. Complainant failed to present evidence to suggest that Respondent created a hostile work environment, or that it engaged in severe or pervasive harassment. Complainant does not allege facts establishing that she was harassed on the basis of race or sex. Complainant's allegations of Zicher telling her that a federal agent was "stupid," though unprofessional, was an isolated incident and is not sufficiently severe or pervasive enough to change the daily conditions of Complainant's employment. Complainant failed to provide specific dates, individuals, or incidents where any negative references were made regarding her race or sex. There is no evidence that Complainant reported any harassing or discriminatory actions of any employees at Respondent.

Charge No.: 202024CR0389
Page 9 of 14

In order to establish a *prima facie* case for retaliation, the Complainant must establish each of the following: 1) she engaged in a protected activity; 2) she suffered an adverse action; and 3) the adverse action was causally connected to the alleged harm. Complainant failed to establish prongs one and two. Complainant provided no evidence that she engaged in a protected activity, nor did suffer an adverse action. While Complainant alleges that Zicher-who was Complainant's supervisor-and had managerial power, called a female federal agent stupid, Complainant did not allege that he said that women were stupid. Complainant also alleges that Zicher was denigrating towards women but failed to provide any details or evidence. To create a hostile work environment, the alleged incidents must be sufficiently severe or pervasive as to alter the conditions of the victim's employment by creating a hostile and abusive work environment. The bar to show hostile work environment is high in order to filter out merely boorish and offensive conduct. In this case, Complainant has failed to point to any actionable severe or pervasive conduct on Respondent's part. Complainant failed to present evidence to suggest that Respondent created a hostile work environment, or that it engaged in severe or pervasive harassment. Complainant does not allege facts establishing that she was harassed for engaging in a protected activity. Complainant's allegations of Zicher telling her that a federal agent was "stupid," though unprofessional, was an isolated incident and is not sufficiently severe or pervasive enough to change the daily conditions of Complainant's employment. Complainant failed to provide specific dates, individuals, or incidents where any negative references were made regarding her alleged protected activity. There is no evidence that Complainant reported to Respondent that she felt she was being retaliated against.

## Findings and Conclusion-Count D-F:

A finding of **lack of substantial evidence** is recommended because:

There is no evidence that Respondent subjected Complainant to harassment or retaliation. Complainant's allegations of Zicher telling her that a federal agent was "stupid," though unprofessional, does not constitute actionable harassment. Actionable harassment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. There is no evidence of an animus based on Complainant's sex, race or protected activity status. There is not substantial evidence that Respondent subjected Complainant to harassment due to her sex, female **(Count D)**; race, black **(Count E)**; or in retaliation for engaging in a protected activity **(Count F)**.

## Complainant's Allegations-Count G-I:

Complainant alleges that from October 26, 2022 through July 2023, Respondent subjected her to unequal terms and conditions of employment due to her sex, female **(Count G)**; race, black **(Count H)**; and in retaliation for engaging in a protected activity **(Count I)**. Complainant maintains that her sex is female, her race is black, and in the fall of 2022, she engaged in a protected activity when she submitted a letter to Respondent's president which cited workplace issues. Complainant maintains that her work performance was good. Complainant alleges between October 26, 2022 through July 2023, Respondent subjected her to unequal terms and conditions of employment when Respondent converted her paid suspension to unpaid suspension; and Respondent refused to share the results of an investigation findings and personal file with her. Complainant maintains

Charge No.: 202024CR0389
Page 10 of 14

that similarly situated employees who are male, non-black and not known to have engaged in a protected activity were treated more favorably under similar circumstances. Complainant further maintains that Respondent's actions closely followed her protected activity within such a period of time as to raise an inference of retaliatory motivation.

**Respondent's Defenses-Count G-I:**

Respondent denies it subjected Complainant to unequal terms and conditions of employment or unlawful discrimination. Respondent admits that Complainant's sex is female and her race is black. Respondent denies that Complainant engaged in a protected activity. Respondent denies that Complainant's work performance met its expectations. Respondent denies that it treated similarly situated employees who are male, non-black or not known to have engaged in a protected activity were treated more favorably. Respondent denies a causal nexus between Complainant's alleged protected activity and any alleged harm.

**Investigation Summary-Count G-I:**

A.  **Complainant's Evidence.**

   1.   See Investigation Summary – Counts A-F, Complainant's Evidence.

   2.   Complainant stated that in October 2022, she was contacted by LeMay to speak with Respondent's outside legal counsel regarding the letter she previously sent to Schroeder regarding workplace issues. Complainant stated that the outside legal counsel was acting as an independent factfinder. Complainant stated that she informed LeMay that she also needed legal counsel. Complainant stated that LeMay insisted that it was not necessary for her to have legal counsel as it was an in-house matter.

   3.   Complainant stated that she insisted she could not reconcile how a third party that was unfamiliar with the issues and the organization could conduct an investigation when Respondent had not or could not.

   4.   Complainant stated that she also requested her personnel file-which was provided. Complainant stated that when she received her personnel file, there was nothing in it except for her October 26, 2022 suspension letter. Complainant stated that LeMay confirmed that nothing was in her personnel file except for things related to onboarding and the suspension letter. Complainant stated that she requested a copy of the investigation report regarding the letter she sent to Schroeder but her request was denied.

   5.   Complainant stated that on or around November 8, 2022, her suspension with pay was moved to suspension without pay. Complainant stated that she feels that she was moved to unpaid suspension in retaliation for requesting legal counsel during the investigation with Respondent.

   6.   Complainant stated that she feels that she was subjected to unequal terms and conditions of employment due to her sex because she was the only black female

Charge No.: 202024CR0389
Page 11 of 14

manager. Complainant stated that she feels that she was subjected to unequal terms and conditions of employment due to her race because she was the only black manager. Complainant stated that she feels that she was subjected to unequal terms and conditions of employment in retaliation because she reported workplace issues to Schroeder. Complainant failed to identify similarly situated employees who were male, non-black or not known to have engaged in a protected activity who were treated more favorably in similar circumstances.

B.  **Respondent's Evidence.**

1.  See Investigation Summary – Counts A-F, Respondent's Evidence.

2.  LeMay stated that in October 2022, she contacted Complainant and informed her of an investigation which was launched regarding the letter she sent to Schroeder. LeMay stated that Complainant requested to have legal counsel present during the investigation and she informed Complainant that although she did not need legal counsel, she was allowed to have counsel present. LeMay stated that a third party was needed for the investigation because the third party could show neutrality.

3.  LeMay stated that in the fall of 2022, Complainant requested a copy of her personnel file and the investigation report. LeMay stated that Complainant was sent a copy of her personnel file but not the investigation report as it was confidential and belonged to Respondent.

4.  LeMay stated that on or around November 8, 2022, Complainant's paid suspension was converted to unpaid suspension because she refused to respond to calls and emails to schedule an interview regarding the letter she sent to Schroeder regarding work-related issues.

5.  LeMay stated that Complainant was not subjected to unequal terms and conditions of employment, unlawful discrimination or retaliation. Lemay stated that Complainant was subjected to the same terms and conditions of employment as any other employee. LeMay stated that Complainant never reported unlawful discrimination and did not engage in a protected activity while employed at Respondent.

C.  **Complainant's Rebuttal.**

1.  Complainant did not provide any additional information other than what was previously identified in the Complainant's Evidence section.

Charge No.: 202024CR0389
Page 12 of 14

**Analysis:**

The investigation did not reveal that Respondent subjected Complainant to unequal terms and conditions of employment or unlawful discrimination due to her sex, female **(Count G)**; race, black **(Count H)**; or in retaliation for engaging in a protected activity **(Count I)**.

In order to establish a *prima facie* case for race and sex, the Complainant must establish each of the following: 1) she is a member of a protected class; 2) Respondent was aware of her protected class; 3) Complainant's work performance is satisfactory; 4) during her employment, she was subjected to unequal terms and conditions of employment; and 5) Respondent treated similarly situated employees outside of Complainant's protected class differently under similar circumstances. Complainant failed to establish prongs three, and five. The investigation revealed that Respondent was not satisfied with Complainant's work performance as she only worked for Respondent for approximately four weeks and Respondent deemed her reports inaccurate. Complainant provided no evidence that Respondent treated similarly situated male or non-black employees more favorably. The investigation revealed that Respondent converted Complainant's suspension from paid to unpaid leave after she refused to respond to calls and emails to schedule an interview regarding the letter she sent to Respondent's president regarding work-related issues; and because Respondent's 2022 investigation regarding Complainant was confidential and belonged to Respondent, Complainant was not privy to the investigation report. As with claims based on harassment, claims based on unequal terms and conditions of employment must also be so severe or pervasive as to alter the terms and conditions of employment. It must be more than merely disruptive.

In order to establish a *prima facie* case for retaliation, the Complainant must establish each of the following: 1) she engaged in a protected activity; 2) she suffered an adverse action; and 3) the adverse action was causally connected to the alleged harm. Complainant failed to establish prongs one and two. Complainant provided no evidence that she engaged in a protected activity by reporting unlawful discrimination or harassment and Complainant provided no evidence that she suffered an adverse action. The investigation revealed that Complainant reported workplace issues without following the proper chain of command. Complainant provided no evidence that the report contained allegations of unlawful discrimination or harassment. The investigation revealed that Respondent converted Complainant's suspension from paid to unpaid leave after she refused to respond to calls and emails to schedule an interview regarding the letter she sent to Respondent's president regarding work-related issues; and because Respondent's 2022 investigation regarding Complainant was confidential and belonged to Respondent, Complainant was not privy to the investigation report. As with claims based on harassment, claims based on unequal terms and conditions of employment must also be so severe or pervasive as to alter the terms and conditions of employment. It must be more than merely disruptive.

Charge No.: 202024CR0389
Page 13 of 14

**Findings and Conclusion-Count G-I**:

A finding of **lack of substantial evidence** is recommended because:

There is no evidence that Respondent subjected Complainant to unequal terms and conditions of employment or unlawful discrimination. There is no evidence that Respondent treated similarly situated employees who were male, non-black or not known to have engaged in a protected activity were treated more favorably. The evidence show that Complainant failed to establish a *prime facie* case for unequal terms and conditions of employment. There is no evidence of an animus based on sex, race, or protected activity status. There is not substantial evidence that Respondent subjected Complainant to unequal terms and conditions of employment due to her sex, female **(Count G)**; race, black **(Count H)**; or in retaliation for engaging in a protected activity **(Count I)**.

**Witness List**:

| For Complainant: | For Respondent: |
|---|---|
| Mary Madison | Jon D. Cohen, Member |
| 9758 S. Charles | Dickinson Wright |
| Chicago, IL 60643 | 55 W. Monroe St., Ste. 1200 |
| 773) 297-9569 | Chicago, IL 60603 |
| Assist2law@gmail.com | 312) 377-4565 |
| | Jcohen@dickinson-wright.com |

A. Complainant,
Mary Madison
9758 S. Charles
Chicago, IL 60643
773) 297-9569
Assist2law@gmail.com

FFC

B. Gretchen LeMay, Human Resources Manager
C/o Jon D. Cohen, Member
Dickinson Wright PLLC
55 W. Monroe St., Ste. 1200
Chicago, IL 60603
312) 377-4565
Jcohen@dickinson-wright.com

FFC

Charge No.: 202024CR0389
Page 14 of 14

**Exhibits:**

A.  Respondent's 2023 Employer Information Report (EEO-1 Component 1).

B.  Complainant's copy of Respondent's September 20, 2022 offer letter.

C.  Complainant's copy of the October 26, 2022 Notice of Suspension from Respondent.

D.  Respondent's Equal Employment Opportunity (EEO) Policy.

E.  Respondent's Complaint Procedure/Anti-Retaliation Policy.

F.  Respondent's copy of the October 26, 2022 Notice of Suspension issued to Complainant.

G.  Respondent's copy of the September 20, 2022 offer letter to Complainant.

MERIT REPORT docm
12 17

# CHARGE OF DISCRIMINATION

| | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [ ] FEPA | 440-2023-09356 |
| | [X] EEOC | # 240925.038 |

*40 24 CR 0389*

and EEOC

| | State or local Agency, if any |
|---|---|

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Mary Madison | 7732979569 | 09/26/1968 |

| Street Address | City, State and ZIP Code |
|---|---|
| 9758 S. Charles | Chicago, IL 60643 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| Creative Werks, LLC | 500+ | 6308602222 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1460 Brummel | ElkGrove Village, IL 60007 |

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| [X] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN | Earliest: 10/26/2022   Latest: 11/08/2022 |
| [X] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION | |
| [X] OTHER (Specify) harassment | [ ] CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was suspended on October 26, 2022 in retaliation for raising violations of the FFDCA as amended by FSMA to the owner of the company on Friday October 21, 2022. My employer provided a letter stating the same. ▓▓▓▓▓

I was never a part of any investigation.

I was subject to further retaliation and harassment when I was not paid my bonus that was due and owing to me on October 27, 2022. ▓▓▓▓▓

I was further retaliated against and harassed when my paid suspension was converted to a suspension without pay on November 8, 2022 after telling my employer that they retaliated against me and for asking for legal counsel to attend the mandatory meeting with their outside legal counsel.

I was told by my employer that they were an independent fact finder.

Further, my employer conspired with outside counsel to further violate my protected rights to create a pretext.

I was further harassed when I had to go to their outside legal counsel under the premise of them being an independent fact finder. On December 20, 2022, I spent over 6 hours speaking with their counsel, with over 5+ hours speaking about other issues not related to the issues that I was supposed to be speaking with them about .

On January 18, 2023, the law firm indicated that my assertions were unfounded and that I could not come back to work because ▓▓▓▓ could not work with me.

On January 20, 2023, the law firm claimed privilege when I asked for the investigation findings. ▓▓▓▓▓

The firm and my employer refused to share the investigation findings and my personnel file.

On January 23, 2023, I informed my employer that I had been treated differently than others who had violated company and public policy; including ▓▓▓▓ a white male.

I am technically still on suspension.

OFFICIAL SEAL
EDWIN WALKER
Notary Public - State of Illinois
My Commission Expires 06/22/2026

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - When necessary for State or Local Agency Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| I declare under penalty of perjury that the above is true and correct.  08/17/2023   Date   Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)   8/18/23 |

DEPT. OF HUMAN RIGHTS
INTAKE DIVISION
09/25/2023
**RECEIVED**
BY: _____

CHARGE OF DISCRIMINATION

| | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA | |
| | ☒ EEOC | |

| | and EEOC |
|---|---|
| State or local Agency, if any | |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

Also, during the course of my employment I refused to engage in and oppose activity that violated the Food Safety and Modernization Act and the Bioterrorism Act.

State of: Illinois

County of: DuPage

The foregoing instrument was acknowledged

on 8.18.23 by Mary D. Madison

Notary Public

My Commission Expires 06/22/2026

OFFICIAL SEAL
EDWIN WALKER
Notary Public - State of Illinois
My Commission Expires 06/22/2026

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 08/17/2023 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date          Charging Party Signature | 8/18/23 |

EEOC REDACTED



ILLINOIS DEPARTMENT OF
# Human Rights

JB Pritzker, Governor
James L. Bennett, Director

Date: 7/1/24

Complainant: Mary Madison

Respondent: Creative Works, LLC

Charge No.: 2024 CR 0389

After a thorough review of the file and investigation report in this matter, I approve the finding as indicated in the report. Further, I have determined that the investigator did not rely on an assessment of the credibility of witnesses.

James L Bennett, Director

By: _____

Investigations Supervisor

CPFORMS/Signoff
Revised 01/22/2019



55 WEST MONROE STREET, SUITE 1200
CHICAGO, IL 60603-5127
TELEPHONE: 312-641-0060
FACSIMILE: 844-670-6009
http://www.dickinsonwright.com

JON D. COHEN
JCohen@dickinsonwright.com
312-377-4565

December 29, 2023

Via First Class Mail and Email (idhr.intake@illinois.gov)

Illinois Department of Human Rights
Intake – Unassigned Case Unit
555 West Monroe St., 7th Floor
Chicago, IL 60661

      Re:    Charge No. 2024CR0389

To Whom It May Concern,

      Respondent, Creative Werks LLC, by counsel, provides the following information and materials in response to the Respondent Questionnaire, as well as a copy of Respondent's Positon Statement.

Respectfully Submitted,

/s/ Jon D. Cohen
*Counsel for Respondent –*
*Creative Werks LLC*

Jon Cohen
Joseph R. Delehanty
DICKINSON WRIGHT PLLC
55 W. Monroe Street, Suite 1200
Chicago, IL 60603
312.572.6905
jcohen@dickinsonwright.com
jdelehanty@dickinsonwright.com

ARIZONA   CALIFORNIA   FLORIDA   ILLINOIS   KENTUCKY   MICHIGAN   NEVADA   OHIO   TENNESSEE   TEXAS   WASHINGTON DC   TORONTO

Notes

Case Chronology

Charge Number: 2024CR0389    Investigator: TLW

Complainant: Mary Madison    Respondent: Creative Works LLC

| DATE ( TIME OPTIONAL ) | CONTACT |
|---|---|
| 12/6/2023 | Left VM message for Complainant to contact staff to schedule telephonic CPI. |
| 12/21/2023 | Complainant called and confirmed CPI for 12/22 @10am. |
| 2/13/2024 | Called Respondent to schedule witness interview with HR Manager Gretchen LeMay. Respondent confirmed interview for 2/29 @11am. |
| 2/29/2024 | Witness interview held; see notes. |

2/29/24 | Rp Witness Interview LeMay 2024CR0389

*Cp was discharged 1/2023 | Gretchen LeMay. Female, non-black, no P.A.
H.R. Manager

suspension 10/2022 | LeMay sts that Cp was only with Rp for about 4 weeks, but her reports did not reflect what she was supposed to be doing as they were inaccurate.

Suspension | - sts that Cp presented a report to the President of Rp that included defematory remarks regarding leadership. Sts that Cp was responsible for food safety, and to ensure that employees were wearing the correct equipment.

Hosment | Sts that Cp never reported harassment or unlawful discrimination.

uneq wil term | Sts that Cp's suspension was moved to unpaid after she refused to respond to her calls + emails regarding scheduling an interview, regarding an unfounded letter she sent regarding leadership.

Suspended | hr nt | Unequal treat
retal s F | retal s,F | retal S,F | 10/24/2022 - 7/2023
10/24/22 blk | blk | race bllc

12/22/23 CPI Madison 2024CR0389

Cp Sts that she began employment with Rp
on @ 9/27/22 as a Regulatory Quality Manager.
Cp Sts that her duties included Compliance
with the Food Safety Modernization Act
("FSMA") + other regulatory schemes Such as the
Bioterorism Act of 2002 (Food Defense) in addition
to being a liason between customers + the
Company regarding Compliance quality, regulatory +
customer requirements Lp Sts ther that her
Work performance Was good.

suspension
Sts that on 10/26/22 La May suspension Suspended
her. Sts that she asked why she was being
suspended but no reason was given for the
suspended. Sts... Sex because She was the only
blk female Manager. Sts... race because She
was the only black Manager. Sts... retal
because She advanced additional with issues
of lying to Feds.

Hrsmnt
Sts that No negative references were made
*Sts that regarding her sex or race, but Zicher made
in 11/8/22 negative references to Either her regarding
she sts that the Federal Agent (Calling her stupid etc.)
she needed Sts that he was very denigrating to
ttty + Rp women.
stopped her
pay.

Formal Response

Request For Review

Respondent



55 WEST MONROE STREET, SUITE 1200
CHICAGO, IL 60603-5127
TELEPHONE 312-641-0060
FACSIMILE 844-670-6009
http://www.dickinsonwright.com

JON D. COHEN
JCohen@dickinsonwright.com
312-377-4565

December 29, 2023

VIA Federal Express and Email (idhr.intake@illinois.gov)

Intake – Unassigned Case Unit
Illinois Department of Human Rights
555 West Monroe St., 7th floor
Chicago, IL 60661

Re: Mary Madison v. Creative Werks, LLC. Claim No. 2024CR0309

The law firm of Dickinson Wright PLLC hereby sets forth this Position Statement on behalf of Creative Werks LLC ("Creative Werks") in response to the Illinois Department of Human Rights ("IDHR") Charge of Discrimination filed by Complainant, Mary Madison ("Madison" or "Complainant"), in the above referenced matter. Also, included herewith, is a response to the Respondent Questionnaire and accompanying responsive materials.

Creative Werks did *not* terminate Madison in retaliation for whistleblowing, nor in retaliation for filing or threating to file any type of employment action (IDHR, EEOC or otherwise), nor was she terminated on the basis of her race, nor was she treated differently due to her race, nor was she harassed. It is worth noting, at the outset, that Madison does not even factually assert in her Charge that she was "sexually harassed" nor does she assert that she filed or threatened to file any action with any governmental agency (IDHR or otherwise) before being terminated in asserting "retaliation." By way of important timing too, Madison, did not assert any allegations of retaliation until approximately two (2) months *after* her termination, and thus cannot serve as a basis a retaliation claim. Accordingly, any allegations purported to be based on



Page 2                                                    DICKINSON WRIGHT PLLC

being "harassed" or based on "retaliation" must be summarily dismissed as not properly pled in this matter.

Madison also has a action against Creative Werks through a pending OSHA matter, asserting a whistle-blower/retaliation action, predicated upon the *same* material allegations asserted herein, that was filed by her on April 21, 2023, which is being disputed. Creative Works expects that said matter will be dismissed on merits.

**Relevant Factual Background**

Creative Werks (a food contract packager/co-packer) specifically hired Madison in late September 2022 as a Quality Regulatory Manager for *the very purpose of reviewing, revising, reporting on and helping to maintain Creative Werks' FDA regulatory compliance*. Madison was terminated because ignored her supervisor, did not go through established supervisory channels and inappropriately presented a 78-page document, entitled a "Regulatory Business Problem" (the "Report") directly to Creative Werks' President. The Report consisted of wild and unsupported conclusions and *manifestly unprofessional statements*. Furthermore, her internal report contained *intentional* distortions of objective data along with *unsupported, alarmist and irrational findings*, which reflected Madison's failure to rely upon the documentary evidence at her disposal. It also contained *gross misstatements of the law, intentional omissions of information showing an intent to distort facts to reach unsupportable conclusions, misrepresentations* of Creative Werks' existing and robust food safety processes, and *false allegations objectively disputable and known to be false by Complainant*. In all, the Report reflected materially poor "work product" for someone specifically hired to assist with Creative Werks' food safety and regulatory compliance, and it showed an extreme lack of the skills and

DICKINSON WRIGHT PLLC

knowledge needed for her job, in addition to ignoring the process of providing information to her supervisors before reporting mis-information directly to Creative Werk's President.

Detailed declarations from Dr. Kathy Knutson ("Knutson"), an independent food safety regulatory expert, who was given unfettered access to the Company's records, are included along with this Position Statement and support Creative Werks' arguments and positions herein, as well as the valid basis upon which Madison was terminated, "for cause." In short, Madison was terminated due to her for her demonstrable lack of competence, lack of proper priorities, and apparent inclination to distort objective facts toward the ends of asserting her unsupported, alarmist, and improper conclusions—all of which were wholly inconsistent with her job duties.

By way of context, Madison drafted her seventy-eight (78) page Report less than four (4) weeks after being hired, which she somehow completed in addition to her assigned business duties. She did *not* provide this Report to her direct supervisor, Erich Zicher, for vetting, review, or discussion. Rather, she bypassed all typical procedure and presented her Report to Creative Werks' owner and President, ignoring well-set corporate structure and its inherent checks and balances.

### The Expert Report

Knutson's expert report produced herewith (the "Expert Report") contains a detailed description of her qualifications therein. (See Exhibit A.) In short, she is an experienced food safety manufacturing compliance consultant, a Food Safety Preventive Controls Alliance ("FSPCA") Lead Instructor for the training of Preventive Control Qualified Individuals (PCQIs), with over 50 training courses in the 20-h standardized curriculum, wherein the FDA requires a PCQI as a member of the food safety team at every food/food packing facility. As a consultant,

Page 4                                              DICKINSON WRIGHT PLLC

she works with Quality Managers in the food industry to write their hazard analysis, Food Safety

Plans, Standard Operating Procedures (SOPs), document templates, and recall plans. She also

has a Ph.D. in Food Science, and her work experience includes roles in education and laboratory

operations for food testing and analysis.

      The below excerpts from the Expert Report are only a sampling of the subjectively and

objectively outrageous, unsupported, exaggerated, and factually distorted work product existing

in Madison's Report, in all representing a lack of proper executive thinking and logical analysis.

      In material part, Madison's internal Report sets forth conclusions and recommendations,

which were unprofessional, unfounded and based on intentionally misleading information. In

Dr. Knutson's Expert Report, which relied upon her extensive review of numerous other

Company records, Knutson concludes as follows:

1. Statements in Madison's Report are inflammatory, confusing, false, inaccurate, or misleading. "Creative Werks provided numerous documents to me, and I reviewed 26 of the provided documents. The vast majority of the documents I reviewed were available to Ms. Madison at the time of her employment. I concluded that Creative Werks is a company with *very low-risk operations for the manufacture of packaging and filling of containers with food*." (Ex. A, par. 4) (Emphasis added.)

2. Ms. Madison uses inflammatory language to try to paint a picture of a company that is out of control and processing unsafe food. My review showed the *opposite*. (Emphasis added.) In fact, Creative Werks has extensive documentation; a well-staffed Quality department; has large, multi-national food manufacturers as customers; and complies with both state and federal regulations. I was pleased with the organized and plentiful documents covering much of food safety, and I found the representative documents well-written, concise, and clear.....The fact that the documents are written, revised, and signed is an excellent sign of compliance with the FDA rule. Creative Werks is a company with a full menu of documents and is not just getting by nor trying to cover up violations. (*Id.* at par. 5)

3. Ms. Madison's Report, concluding in part that Creative Werks has inherent and systematic FDA issues is blatantly false. "I reviewed two State of Illinois inspection reports (9, 10) and two FDA inspection reports (7, 8). Creative Werks

Page 5                                    DICKINSON WRIGHT PLLC

passed all four inspections with no follow-up required. No follow-up to an FDA inspection is very rare, (emphasis added.) yet alone two FDA inspections with no follow-up. *Both the State of Illinois and FDA believe Creative Werks to be in compliance.* (*Id*. at par. 6)

4. Ms. Madison's report consists of statements addressing worker safety that are both false and outside of her area of hired expertise. For instance, in her Report, Ms. Madison raises the concern for production employees with harm from X-ray instruments, but the instruments are serviced annually, which follows industry best practice and does not affect food safety. This statement from her report is also unfounded based on my review.

5. Ms. Madison's report was full of allegations having no factual basis. For example, while asserting that Respondent's food safety plans were out of regulatory compliance standards, "I reviewed four food safety plans (FSPs) from Creative Werks that were all available to Ms. Madison at the time of her employment, and *all were in compliance*. (Emphasis added). The Expert Report further dives into Complainant's alleged deficiencies of the FSP, and found the asserted deficiencies to be *wholly unfounded and incorrect.* (Emphasis added.) See *Id*. at par. 9 (a-g).

Knutson's Expert Report stands on its own and deftly notes *dozens* of instances reflecting statements in Madison's Report that contain: (a) misleading statements (pars. 12, 13, 48, 49); (b) gross misstatements of the law (par. 14 -16, 52); (c) objectively untrue statements contrary to written documentation relating to the FDA inspections that she refers to ((pars. 16 &17); (d) inappropriate and inflated conclusions and/or a false urgency (pars. 15-16; 22); (e) confusing information and difficult to decipher (par. 21); (f) a failure to work in a team-like manner, generally inherent in this area of work (par. 28 & 29); (g) misrepresentations conflating customer audits with FDA, regulatory inspections (41); (h) gross misunderstandings of FSMA regarding the need to inspect customer-directed packing goods (par. 43); and (i) misrepresentations of Creative Werks' Food Safety Plans as not FSMA compliant. (Par. 37.)

Clearly, the totality of the Expert Report demonstrates what appears to be Madison's intentional effort to misstate and distort FDA-related documents and regulation to mislead

Page 6                                        DICKINSON WRIGHT PLLC

Creative Werks' management. The Expert Report further shows that Madison misinterpreted
customer communications, reported wholly fictitious issues, failed to engage in adequate
research to support her radical conclusions, and lacks accurate knowledge of the law and
regulations relevant to her position as Quality Regulatory Manager, information that she
purported to have known. Moreover, as the Expert Report notes, Madison's actions showed a
complete lack of professionalism and a significant lack of critical skill sets required for her job.

Madison has asserted, after her suspension and termination, that she disagrees with
Creative Werk's interpretation of the Report, the inaccuracy of same, the allegations of falsity
regarding allegations in her Report, the allegations of exaggeration and hyperbole, conclusions
drawn seeking actions based on areas outside of her supposed expertise, and her ignoring
contradictory records and information she had at her disposal that undermined her Report.
However, such arguments made by Madison (reflected in her OSHA Action) and/or even if made
in this forum, misses the point entirely. While she may *personally* disagree with the Company's
findings regarding her Report, the Compan's lawful actions with respect to Madison reflect that
Madison's termination was, in no way merely pretextal, nor related to her race, sex, nor in the
context of any alleged sexual harassment nor retaliation for any report filed with any government
agency. In this respect, Madison did not file or threaten to file with any governmental agency
(for employment or any other basis) until approximately four (4) months *after* she had already
been terminated for cause.

Beyond the above, demonstrating non-discriminatory and valid basis upon which
Madions was lawfully terminated, Madion's credibility is further at issue in this matter. After
Madison's termination, Creative Werks learned of her involvement in a federal civil case

ARIZONA   CALIFORNIA   FLORIDA   ILLINOIS   KENTUCKY   MICHIGAN   NEVADA   OHIO   TENNESSEE   TEXAS   WASHINGTON DC   TORONTO

DICKINSON WRIGHT PLLC

wherein she demonstrated an incredible lack of honesty and where she exhibited a willingness to lie about matters under oath, to such a degree that the her character traits must be considered when the current Charge of Discrimination is reviewed. (*See Madison v. Kenco Logistic Services*, 2017 WL 4532248 *1 (C.D. Ill, Sept. 22, 2017, a copy of which is included herewith as Exhibit B). As reflected in the attached Federal Court decision, in 2017, Madison filed an action against her former (unrelated) employer that was later *dismissed in its entirety.* Because of irregularities in her sworn statements that she tendered to the Court, the Federal Court Judge held a hearing to test the accuracy and truthfulness of Madison's sworn statements. *Id*. The Court made extraordinary findings as to Madison's propensity to lie and omit material facts, finding in part that:

(a) that her testimony during the hearing was "vague, elusive and completing lacked credibility" (*Id*. at *2);

(b) that she failed to explain her ability to make mortgage payments when she allegedly had no money or income;

(c) that she similarly failed to explain how she was able to pay for electricity, internet and cable bills that she was current on when she was allegedly broke (*Id*.);

(d) that her testimony in her sworn statements and testimony was "unbelievable" (*Id*. at *3);

(e) that made a material omission, and failed to admit receipt of royalty checks for "$8,000 or $9,000" every couple of months (*Id*.);

DICKINSON WRIGHT PLLC

(f) that Madison initially admitted to having received annuities from her mother's death declaring it to be a hundred dollars or something like that, but under subsequent examination later admitted she "meant $100,000" (*Id.* at 4);

(g) found there to be glaring contradictions between her deposition statements and her sworn court petition (*Id.*);

(h) that she "*had not been honest*" (*Id.* at 7)(emphasis added); and

(i) *that she "lied" to the Illinois Department of Human Relations or the Court* (*Id.* at 9) (Emphasis added.)

The Central District dismissed her claim for "failure to be honest and forthright." (*Id.*) (Emphasis added.)

Here, as in any legal or quasi-legal proceeding, the character and/or honesty of a Complainant is always relevant. Here, Madison's allegations should be considered in the light of her demonstrable propensity to both submit false and misleading statements to a Federal Court, and to this very IDHR agency.

## CREATIVE WERKS TERMINATED MADISON DUE TO POOR WORK PRODUCT, BAD JUDGEMENT AND LACK OF CONFIDENCE IN ABILITY TO PERFORM HER JOB

Creative Werks terminated Madison due to terrible work product, intentional distortion of Company records, asserting unsupported, false and/or reckless allegations and conclusions in her Report, and end-running her supervisor before presenting an unprofessional and flawed report to the President.

Notwithstanding Madison's assertions that she was fired for raising "purported FDA violations," this allegation make no *logical* sense. Her assertion wholly ignores the fact that

Page 9                                                    DICKINSON WRIGHT PLLC

*Creative Werks actually hired Madison to assist with and improve its compliance with*

*FDA/FSMA regulations, which would include professional internal reports based on appropriate*

*data and proper scientific methods.* In this respect, Madison was supposed to be critical of

Creative Werk's regulatory compliance efforts, to note areas needed for improvement, to create

processes to do so, etc. As such, as a starting place, it was certainly expressly contemplated that

part of Madison's job duties would necessarily entail reviewing Creative Werks' FSMA

compliance and report on issues that she felt were in need of improvement and/or any instances

where she reasonably believed there to be operations that were short of regulatory standards.

Creative Werks, moreover, has long had staffing to conduct these *same* responsibilities, and a

demonstrably rigorous system in place to understand, meet, and continually improve with respect

to best practices and FDA/FSMA compliance. Here, it was the unprofessionalism and

intentional disregard for adherence to honest reporting that resulted in Madison's termination.

  Creative Werks had a legitimate basis to terminate Madison for her poor and misleading

work product, notwithstanding Madison's attempt to insulate herself from termination by

wrongfully asserting that she was terminated for bringing "regulatory" issues to management—

and asserting her termination was in retaliation for same. For example and greater context

through analogy, if a safety engineer for a rocket company where to draft a safety report full of

gross calculation errors that were not reasonable based upon the experience of the engineer in

question, if said report was *demonstrably* based on fabricated evidence, if the report clearly

utilized *distorted* test data, if the underlying issues reported upon were merely nominal non-

safety related issues but the engineer then made broad *unsupported* catastrophic safety

allegations, if the engineer *omitted information* in the report in an effort to present *distorted*

**Page 10**                                        DICKINSON WRIGHT PLLC

*conclusions*, if the engineer *failed to report and/or vet his "alleged" concerns with his supervisor* (or other employees) in his safety/regulatory department in which he worked...*it would be entirely understandable if said engineer was terminated*. This hypothetical occurred here. Madison's Report was far outside of the bounds of work product for someone of her stated education and experience and, as a result, was problematic, showing that Creative Werks could not rely on her to complete her core duties.

  *While summarily asserting, in one sentence, that she was treated differently than a "white male,"* this is not supported by any factual assertions in her Charge or in any records or other evidence. Indeed, no employee has ever intentionally submitted a false report to Creative Werks management nor has someone at Madion's legal ever reflected such a gross lack of professionalism or deviation from accepted practices. Madison's discriminatory allegations appears to be a false conclusory statement to make a legal issue where there is none, in abuse of the legal system, not unlike false statements and conclusions she previously asserted in a former Federal Court and prior IDHR action against another employer.

  In this matter too, beyond the credibility of Complainant's allegations in her Charge, there is conflicting testimony presented herein and which Respondent would like to further buttress before any action is taken on the Charge, pursuant to <u>Cooper v. Salazar</u>, No. 98 C 2930 *26)N.D. IL 2001). This is due, in part too, to Respondent having provided and willing to provide, material first-hand knowledge of facts that contradict allegations made by Madison, and business records that contradict Madison's charges.

Page 11                                              DICKINSON WRIGHT PLLC

**Mitigation of Damages**

Finally, and solely for purposes addressing potential damages (even though there is no legal basis for same) and solely for argument, Madison has admitted to obtaining a new job only a few weeks after her termination wherein she is earning only $10,000 less per year although we are unaware of what other or new benefits she has that may be better than she had at Creative Werks. As such, if and to the extent any liability is found, further information will be required to confirm the nominal amount of asserted damages at issue.

Creative Werks LLC

/s/ Jon D. Cohen
One of its Attorneys

Jon D. Cohen
jcohen@dickinsonwright.com
Joseph R. Delehanty
jdelehanty@dickinsonwright.com
Dickinson Wright PLLC
55 W. Monroe St., Suite 1200
Chicago, IL 60603
312-641-0060

Cc:     Jordan Hoffman (jthoffman@gmail.com)
        *Complainant's Counsel*

ARIZONA   CALIFORNIA   FLORIDA   ILLINOIS   KENTUCKY   MICHIGAN   NEVADA   OHIO   TENNESSEE   TEXAS   WASHINGTON DC   TORONTO

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (EEOC)**
**2023 EMPLOYER INFORMATION REPORT (EEO-1 COMPONENT 1)**

EEOC Standard Form 100 (SF 100)
Revised 08/2023
OMB Control Number: 3046-0049
Expiration Date: 11/30/2026

### SECTION A – TYPE OF REPORT
CONSOLIDATED REPORT

### SECTION B – EMPLOYER IDENTIFICATION

| OFS COMPANY ID | EMPLOYER NAME |
|---|---|
| JG35724 | creative werks |

| ADDRESS | CITY/TOWN | STATE | ZIP CODE |
|---|---|---|---|
| 1470 Brummel Avenue | ELK GROVE VILLAGE | IL | 60007 |

### SECTION C – HEADQUARTERS OR ESTABLISHMENT-LEVEL IDENTIFICATION (if applicable)

| HQ/ESTABLISHMENT-LEVEL UNIT ID | HEADQUARTERS OR ESTABLISHMENT-LEVEL NAME |
|---|---|
| | |

| HEADQUARTERS OR ESTABLISHMENT-LEVEL ADDRESS | CITY/TOWN | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

### SECTION D – EMPLOYER IDENTIFICATION NUMBER (EIN)
522235744

### SECTION E – EMPLOYER FILING ELIGIBILITY
[X] YES (Employer Is Eligible to File) [ ] NO (Employer Is Not Eligible to File) [ ] EMPLOYER NO LONGER IN BUSINESS

### SECTION F – FEDERAL CONTRACTOR DESIGNATION (if applicable)
Unique Entity ID (UEI): Not Applicable

[ ] YES (Single-Establishment Employer is Federal Contractor) [ ] YES (Multi-Establishment Employer is Federal Contractor)

[ ] YES (Headquarters is Federal Contractor) [ ] YES (Non-Headquarters Establishment is Federal Contractor)

[ ] YES (One or More Non-Headquarters Establishments is Federal Contractor)

### SECTION G – NAICS INFORMATION
561910 - Packaging and Labeling Services

### SECTION H – WORKFORCE DEMOGRAPHIC DATA

| JOB CATEGORIES | Hispanic or Latino Male | Hispanic or Latino Female | Male White | Male Black or African American | Male Asian | Male Native Hawaiian or Other Pacific Islander | Male American Indian or Alaska Native | Male Two or More Races | Female White | Female Black or African American | Female Asian | Female Native Hawaiian or Other Pacific Islander | Female American Indian or Alaska Native | Female Two or More Races | Row Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Executive/Senior Level Officials and Managers | 1 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 7 |
| First/Mid-Level Officials and Managers | 9 | 4 | 14 | 0 | 0 | 2 | 0 | 0 | 11 | 0 | 1 | 0 | 0 | 0 | 41 |
| Professionals | 1 | 2 | 8 | 1 | 1 | 1 | 0 | 0 | 6 | 2 | 0 | 1 | 0 | 0 | 23 |
| Technicians | 3 | 14 | 1 | 3 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 24 |
| Sales Workers | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Administrative Support Workers | 3 | 15 | 1 | 2 | 0 | 0 | 0 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 26 |
| Craft Workers | 22 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 31 |
| Operatives | 18 | 5 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25 |
| Laborers and Helpers | 41 | 47 | 2 | 5 | 0 | 1 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 99 |
| Service Workers | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CURRENT 2023 REPORTING YEAR TOTAL | 98 | 87 | 40 | 11 | 2 | 5 | 1 | 0 | 27 | 2 | 2 | 1 | 0 | 0 | 276 |
| PRIOR 2022 REPORTING YEAR TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

### SECTION I – WORKFORCE SNAPSHOT PERIOD
10/16/2023 - 10/27/2023

### SECTION J – HEADQUARTERS OR ESTABLISHMENT-LEVEL COMMENTS (optional)
Not Applicable

**Exhibit 1**



c r e a t i v e  **w e r k s**

1470 Brummel Ave
Elk Grove Village, IL 60007

www.creative-werks.com
630.860.2222

September 20, 2022

Mary Madison,
Via Paycor– assist2law@gmail.com

Dear Mary,

I am very pleased to offer you the opportunity to join our team at creative werks. We believe that you will find working at creative werks challenging, fun, and a great opportunity to learn. Fit is key for us and we believe that your contributions and work ethic will help our Company grow and flourish.

We would like to confirm the arrangements made regarding this opportunity. We are very happy to offer you a position as a **Quality Regulatory Manager,** at our *Elk Grove Village*location on *1st Shift* within our **Quality** department. This position will be reporting to Erich Zicher (Food Safety Director) starting on September 27, 2022.

**Compensation**
- You will be paid a Salaried Exempt rate of $3,653.85 paid bi-weekly ($95,00 annually) so long as you are actively employed by the Company.

**Annual Incentive Plan (AIP)**

- You will be eligible to participate in creative werks 2023 Annual Incentive Plan (AIP) with a target incentive of 10% of your salary. The AIP is based on a combination of company performance, individual performance, and target incentive. The 2023 AIP will be payable in March 2024. Please refer to the AIP document for specific plan details.
- As discussed, we are pleased to offer you a signing bonus of $2,500 payable in one lump sum on October 27, 2022. This signing bonus is taxable, and all regular payroll taxes will be withheld. In the event that you leave creative werks within 12 months of your date of hire, you will be responsible for reimbursing the company for the entire signing bonus. By your signature on this employment agreement, you authorize the company to withhold $2,500 from any severance and other final pay you receive should your employment terminate on or before October 27, 2023

**Paid Time Off (PTO) and Holiday Pay**
- You will accrue PTO at the rate of 16 days per year (2.46 hours per week).
- For 2022, since you are starting later in the year, you will be eligible for 4.5 days of PTO.
- As a CW associate you will receive 9 paid holidays throughout the calendar year.



creative werks

1470 Brummel Ave
Elk Grove Village, IL 60007

www.creative-werks.com
630.860.2222

**Code of Ethics, Values and Policies**
- creative werks is committed to creating a positive environment and conducting business ethically. As an associate of the Company, you will be expected to abide by our Guiding Principles and general policies and practices set forth in our Employee Handbook.

After you return this signed offer letter, you will receive two emails from Paylocity. Paylocity is our onboarding tool which contains various online documents such as benefit forms, tax forms, a participation release form, an emergency contact form, confidentiality agreements, a background check, an employment eligibility form (I-9), and information about the Health Insurance Portability and Accountability Act. Please complete these documents as soon as you can. We need these completed in advance of your start date so we can be prepared for you when you arrive.

Please note that this offer is contingent upon successful completion of the background check and compliance with all new hire forms.

Mary, your signature below will acknowledge that there have been no representations by the Company or its agents which are not reflected in this letter. Please review all terms of this letter, returning the signed original to me by September 23, 2022

I am pleased you have decided to join creative werks. I look forward to watching your progress with the Company.


Sincerely,

*Gretchen LeMay*

Gretchen LeMay
Head Of People / Corporate VP


Mary Madison1 cef
_____
Mary Madison


September 20, 2022
_____
Date



**Exhibit 19**

werks

1470 Brummel Ave
Elk Grove Village, IL 60007

www.creative-werks.com
630.860.2222

## Notice of Suspension

October 26, 2022

Mary Madison
Quality Regulatory Manager
Via Hand Delivery

Dear Mary,

This letter is to inform you that you are being placed on a paid suspension effective immediately. This suspension will last until a full investigation into the statements made in your report and during your conversation with Steve Schroeder on Friday, October 21, 2022 can be fully completed. This review will be conducted by an outside attorney and Human Resources will make the introduction when the time comes.

During your suspension you will be paid at your regular rate of pay and have access to benefits. You will not have access to any IT systems or the building until the investigation is complete.

If you have further questions, please reach out the HR team as needed.

Thank you,

Gretchen LeMay
Head of People

# RESPECT IN THE WORKPLACE

## Company and Management Commitment

It is a commitment of the company and its management to ensure creative werks is a place of work free from negative, aggressive, and inappropriate behaviors, and that the environment is aimed at providing high quality products and services in an atmosphere of respect, collaboration, openness, safety and equality. All associates have the right to be treated with dignity and respect. This policy which includes Equal Employment Opportunity (EEO), Reasonable Accommodations, and Anti-Discrimination and Harassment and is intended to educate associates on what may constitute discrimination, harassment, or retaliation and to notify everyone that the company will not condone or tolerate disrespect in the workplace. All complaints of negative and inappropriate workplace behaviors will be taken seriously and will be followed through to resolution. Associates who file complaints will not be victimized or retaliated against for reporting inappropriate behavior.

> Diversity in the world is a basic
> characteristic of human society, and
> also the key condition for a lively
> and dynamic world as we see today.
>
> - JINATO HU

## Scope of Policy

Protection from negative, aggressive, and inappropriate behavior extends to management, associates, clients, vendors, and any other business contacts as well as expands beyond the normal place of business. This includes off site business meetings, conferences, and work related social gatherings. It is the responsibility of all associates to maintain a healthy workplace environment to others, where all communication and interactions are marked by dignity and respect.

## Equal Employment Opportunity (EEO)

It is creative werks' policy to hire, train, promote, compensate, and administer all employment practices without regard to race, color, sex, national origin, religion, age, gender identity, sexual orientation, physical or mental disability, veteran status, marital status, or any other characteristic protected by law. The company will not tolerate any such discrimination. The EEO policy applies to all terms and conditions of employment including recruitment, hiring, training, promotion, transfer, performance evaluation, compensation, benefits and termination.

Return to Table of Contents

# FUNCTIONS OF THE HANDBOOK

There are several things that are important to keep in mind about this handbook. This handbook contains only general information and guidelines. It is not intended to address all possible applications and exceptions to the general policies and procedures described. For that reason, if you have any questions concerning your eligibility for a particular benefit, or the applicability of a policy or practice to you, please address your specific questions to the Human Resources Department.

creative werks reserves the right to revise, modify, delete, or add to any and all policies and or benefits stated in this handbook. These guidelines are not contractual in nature and the company is not obligated to follow the policies and procedures in each instance and reserves the right to change or eliminate policies and procedures at any time. The Human Resources Department will try to inform you of any changes as they occur.

This handbook and the information in it are confidential and specific to creative werks (which we sometimes refer to as "CW"). No portion of this handbook should be disclosed to others, except associates directly employed by the company and others affiliated with the company whose knowledge of the information is required in the normal course of business.

# EMPLOYMENT AT WILL

Employment at creative werks is on an at-will basis and no company representative (other than the President) is authorized to modify this policy for an associate that changes the at-will relationship. Employment at-will means that either the associate or the company may terminate the employment relationship at any time, for any reason, with or without notice. Nothing in this handbook is intended as an employment or benefit agreement for any period of time. In addition, any salary figures provided to an associate in annual, bi-weekly, or hourly terms are stated for the sake of convenience and are not intended to create an employment contract for any specific period of time. Nothing in this statement is intended to interfere with, restrain, or prevent concerted activity as protected by the National Labor Relations Act. Such activity includes associate communications regarding wages, hours, or other terms or conditions of employment. creative werks associates have the right to engage in or refrain from such activities.

## Complaint Procedure / Anti-Retaliation

The company prohibits retaliation against any individual who reports discrimination or harassment and/or participates in an investigation of such reports, or seeks accommodations. Retaliation against an individual for reporting discrimination or harassment, or seeking accommodations is a serious violation of this policy and, like discrimination or harassment itself, may be subject to disciplinary action up to and including termination of employment.

Complaint Procedure: What to do if you experience or witness any conduct that might violate a policy?

The company strongly urges the reporting of all incidents of discrimination, harassment, or retaliation, regardless of the offender's identity or position. Individuals who believe they have experienced conduct that is contrary to this policy or have concerns about such matters may address these concerns directly with the individual who has engaged in the conduct if they so choose, but they are not required to do so. Individuals may also raise their concerns with their immediate supervisor or higher-level manager/director/vice president or with the Human Resources Department if the associate is uncomfortable speaking directly with the "offending person". Complaints will be accepted by Human Resources in writing or orally and will be treated in a confidential manner to the extent possible.

Upon receiving a complaint or becoming aware of alleged offending conduct, the company will conduct a prompt, thorough, and impartial investigation of the facts. If the investigation leads to a determination that an individual violated this policy, the company will take appropriate corrective action immediately, including the possible termination of the offending party. The company will discuss the result of the investigation with the person bringing the complaint. The company will attempt to keep confidential the investigation and the terms of the resolution. However, some dissemination of information may be appropriate during the investigation and resolution of the matter.

RESPECT IN THE WORKPLACE

8/14/23, 8:42 PM                                    Gmail - Attorney Interview- Tom   w

**Exhibit 21**

 Gmail

Mary Madison <assist2law@gmail.com>

---

## Attorney Interview- Tomorrow

**Mary Madison** <assist2law@gmail.com>                          Wed, Nov 2, 2022 at 2:13 AM
To: Gretchen LeMay <glemay@cwerksglobal.com>

Good day Ms. LeMay

I am in receipt of your 4:40 pm email and voice mail, of November 1, 2022, regarding an interview with the company's outside counsel on November 2, 2022. When you, Wendy and I last spoke on Wednesday, October 26, 2022, you indicated that I was being suspended for the conversation that I had with Mr. Schroder on Friday, October 21, 2022.

When I asked why I was being suspended, you indicated that you conducted an investigation that concluded that the issues raised in the risk assessment that I prepared, as the quality regulatory manager, for Mr. Schroder were totally unfounded.

In seeking to better understand the scope of the investigation, I repeatedly asked what the investigation entailed. Each time, you declined to share any information including what those findings were. It was after those requests that you stated that you reviewed my emails and I had also violated a company policy by allegedly sending company property to an outside email address, as a further reason for my suspension. In seeking further clarification, regarding sending company property to an outside email, I asked you a couple of times what was sent? You stated it was something related to the Dunkaroo's account. To which, I categorically deny such an action. You also cited my assertion in the risk assessment that the company had made false statements as the main contributing factor for my suspension.

In support of my contentions, I offered you a report that underscored issues raised in the risk assessment; which, in my opinion, would have brought clarity to the situation. However, you refused to review it and further suggested that I present it to the outside counsel. As such, the adverse employment decision to discipline me with suspension was made without affording me an opportunity to participate in the investigation.

After careful consideration and my inability to reconcile the purpose for speaking with outside legal counsel, I believe that I too need legal counsel when I speak with the company's outside counsel. In light of the circumstances, the discipline against me suggests, I need legal counsel to protect my interest.

Further, being suspended feels more like a punishment for raising issues relative to non-compliance. In my opinion, this goes against the very spirit of the purported open door policy and transparency mantra of "see something say something" that is touted in this organization. I believe this discipline goes against the purpose for which I was hired.

As a direct result of not understanding this process and my desire to protect my interest and rights, I am exercising my right to have legal counsel present during this interview. Further, you stated that you would be in contact with me within a day or so to arrange this meeting. However, almost a week later contact is made for a next day appointment. Due to this short notice, I will need time to arrange for my counsel's availability for any meeting with the company's outside counsel.

Thank you for your time, consideration and assistance in this matter.

Mary Madison

[Quoted text hidden]

**Exhibit 22**



---

## Mary Madison: Statement; Risk Analysis and Personnel File Requests

1 message

---

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                                    Thu, Jan 19, 2023 at 10:09 AM
To: Craig R. Thorstenson <CThorstenson@fordharrison.com>
Bcc: Mary Madison <assist2law@gmail.com>

Good morning, Craig. Please find the referenced documents attached. Thank you.

Jordan


The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York St., Suite 205
Aurora, IL 60502
888.956.4529 Phone and Facsimile


*"Balancing the Scales of Justice"*


CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.



## Mary Madison: Statement; Risk Analysis and Personnel File Requests

1 message

**Craig R. Thorstenson** <CThorstenson@fordharrison.com>                    Fri, Jan 20, 2023 at 9:53 AM
To: Jordan Hoffman <jthoffmanlaw@gmail.com>

Hi Jordan

I've asked Creative Werks to pull together Madison's personnel file and will provide them to you. She specifically asks for the investigation findings in her request. We will not be providing any investigation report or findings because they are subject to the attorney client privilege.

ATTORNEY WORK PRODUCT PRIVILEGED & CONFIDENTIAL

The information contained in this message from Ford & Harrison LLP and any attachments are privileged and confidential and intended only for the named recipient(s). If you have received this message in error, you are prohibited from reviewing, copying, distributing or using the information. Please contact the sender immediately by return email and delete the original message and attachments. In the absence of an executed engagement letter or fee contract, no attorney client relationship is established by this communication.



## Mary Madison: Statement; Risk Analysis and Personnel File Requests

message

**Jordan Hoffman** <jthoffmanlaw@gmail.com>                          Fri, Jan 20, 2023 at 10:59 AM
To: Craig R. Thorstenson <CThorstenson@fordharrison.com>

Good morning, Craig. Thank you for your response. Surely, the attorney-client privilege doesn't extend to the in-house communications between the decision makers that are in Ms. Madison's file relative to Creative Werk's preliminary investigation that lead to her suspension.

Jordan

The Law Office of
Jordan T. Hoffman, P.C.
2711 East New York St., Suite 205
Aurora, IL 60502
888.958.45.     nal Facsimile

*"Balancing the Scales of Justice"*

www.

The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure

**Exhibit 23**



## Mary Madison and Creative Werks

1 message

**Craig R. Thorstenson** <CThorstenson@fordharrison.com>                    Tue, Mar 7, 2023 at 3:54 PM
To: Jordan Hoffman <jthoffmanlaw@gmail.com>

Hi Jordan

Thanks for getting back to me. Creative Werks has offered a fair separation package to Ms. Madison and was aware of all the various laws she mentions at the time it made that offer. If she has a specific request she would like Creative Werks to consider she should make it. Absent a specific offer from Ms. Madison to resolve this dispute, Creative Werks will not increase its offer.

## General Questionnaire Answers

1. Creative Werks
   1460 Brummel Ave, Elk Grove Village 60007
   Creative Werks is food contract packager or co-packer.

2. Gretchen LeMay, 630-422-3587, Head of Human Resources

3. EEO report is included herewith.

4. See Position Statement provided herewith. List of persons with knowledge include the following Creative Werks Employees, Steven Schroeder, Gretchen LaMay, Ron Sammeth and Erich Zicher

5. N/A

6. Date of Hire: September 2022.
   Position: Qualify Regulatory Specialist
   Copies of personnel records included herewith. There are no applicable medical records.

## Harassment Questionnaire Answers

B1 – B5  Not Applicable. No sexual harassment or other alleged facts constituting any recognized actions under the applicable Illinois Department of Human Rights Act. Claimant merely asserts "harassment" but provides no details and Employer is unaware of any prior allegations regarding same.

D1. There is no written disciplinary policies for non-hourly employees Each disciplinary action is addressed independently with respect to non-hourly employees.

D2.a.     See Suspension letter included with Personnel File

    b.     Person(s) involved in disciplinary actions regarding Complainant:

        Steve Schroeder
        Ron Sammeth
        Gretchen LeMay

D3. Job Performance:

    a.     Job Description: See written description provided herewith in Personnel File

    b.     How Complainant was deficient. See Positon Statement.

    c.     When made aware of deficiencies. Position Statement

2

d.     Persons who measured performance and race of same (all Caucasian).

      Steve Schroeder
      Ron Sammeth
      Gretchen LeMay
      Erich Zicher

e.     Relevant performance standards.  See Position Statement.

f.     How Claimant was deficient.  See Position Statement

g.     No evaluations conducted prior to Claimant's unprofessional work product leading to termination.

D4.  Attendance not a factor.

D5.  Low Production/Not Applicable.

D6.  Employees terminated for cause in last 12 months period, list:

See **Termination Excel File** Provided herewith.  Individual Disciplinary records may exist and will be provided with particular former employees requested.

ZZ1      Retaliation

Complainant uses the term "retaliation" in her Charge of Discrimination, but she does not allege retaliation for filing any complaint with the IDHR and/or EEOC.  Rather, Complainant merely asserts that due to an internal report that she provided to the Company (noting certain alleged FDA violations), that she was terminated as a result.  It is not alleged that the threated to file any IDHR or EEOC or other action against Respondent before she was terminated, and in fact, did not do so.  Accordingly, she merely argues that the poor work product over which she was terminated for, constitutes "retaliation."  As that is not a recognized action under the IDHR Act or other applicable regulations, this portion of Complainants Charge is not cognizable.

Notwithstanding above, there are no responsive documents to ZZ1.

ZZ2      a.    In the last five (5) years, there have been one (1) claim of discriminatory treatment.

b.    No grievances have been filed by any Respondent employees asserting discrimination.

c.    Respondent is not aware of any protests or mentions of allegations of treatment in meetings with supervisors or managers.

3

d. A copy of the single **Discrimination Complaint**, predicated upon age and Polish ancestry is included herewith (See ZZ2).

E-FILED
Friday, 22 September, 2017 10:15:13 AM
Clerk, U.S. District Court, ILCD

Exhibit B

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

MARY MADISON,

    Plaintiff,

v.                                                            Case No. 15-2290

KENCO LOGISTIC SERVICES, LLC,
et al.,

    Defendants.

## REPORT AND RECOMMENDATION

This matter is before the Court following Defendant's request for a hearing regarding the accuracy of Plaintiff's In Forma Pauperis Application. Following the hearing, and for the reasons explained below, the Court recommends that this case be dismissed for Plaintiff's failure to be truthful on her in forma pauperis ("IFP") application.

### I. Background

#### a. Defendants' Motion for Hearing

Plaintiff filed her Complaint in this case on December 8, 2015. On the same date, Plaintiff filed a Motion for Leave to Proceed In Forma Pauperis (#2). Plaintiff's in forma pauperis application indicated that she was unemployed and did not have any wages, but that she received money "from family and friends" in "random amounts" as well as "a royalty check." *See* d/e #2. Plaintiff's application did not list the amount of the royalty checks or the frequency upon which they were received, and did not specify the amount of money she was receiving from family and friends. Plaintiff further claimed to have less than $100 in cash, checking, or savings. Plaintiff stated that she owned a home, but failed to state the value of the home or the amount of the mortgage. The only debts or financial obligations Plaintiff listed were "house loan" and "credit cards," but

she did not disclose their amount. On January 4, 2016, Plaintiff was granted leave to proceed in forma pauperis (#5).

On July 11, 2017, Defendants filed a Motion to Schedule a Hearing Regarding the Accuracy of Madison's In Forma Pauperis Application (#65). Defendants alleged that, during Plaintiff's June 16, 2017 deposition, Plaintiff testified she had not worked since August 2013 and was not receiving government assistance, but that she has had sufficient money available to her such that she has not needed to work since her termination from Kenco in 2013. During her deposition, Plaintiff refused to state how much money she had in her bank account and testified that she "had money before" working for Kenco. Plaintiff also testified that she has taken multiple trips over the last several years and that she has money stored under her mattress, but refused to disclose the amount. Based on Plaintiff's deposition responses regarding her financial status, Defendants requested an in person hearing on the issue of Plaintiff's financial condition.

On July 25, 2017, Plaintiff filed a Response to Defendants' Motion on the Accuracy on Madison's In Forma Pauperis Application (#67). Plaintiff attached as an Exhibit to her Response a copy of her bank statement from November 19, 2015 to December 19, 2015. Plaintiff argued that the bank statement showed that the balance in her checking account on December 7, 2015 (the date her IFP petition was filed) was $13.99. The Exhibit, however, also showed that on December 9, 2015 (2 days after her IFP petition was filed) and December 11, 2015 (4 days after her IFP petition was filed), Plaintiff deposited $477.53 and $800 into her account. The bank account statement also did not contain Plaintiff's name, but rather showed the name of Iona J. Madison.

The remainder of Plaintiff's Response did not address the merits of Defendants' Motion, but rather argued that the Motion was filed to obstruct justice, complained that Defendants did not properly notice her deposition, and continued to argue that Defendants have not produced documents in discovery.

On July 26, 2017, the Court granted Defendants' Motion for a Hearing and set a hearing on the accuracy of Plaintiff's IFP status for August 7, 2017. The hearing lasted over two hours, during which the Court extensively questioned Plaintiff, under oath,

2

regarding her financial status. On September 1, 2017, Defendants filed a Motion to Supplement the Record Related to Docket 65, the Accuracy of Testimony and Submissions of Plaintiff (#70). Defendants' Motion sought to introduce more information that Defendants claim contradict statements made by Plaintiff in her Deposition and before the Court during the August 7, 2017 hearing. The Court granted Defendants' Motion on September 18, 2017 and considered the supplemental information in making an overall credibility determination regarding Plaintiff's testimony.

### b. Plaintiff's Testimony Regarding Her Financial Status

Throughout the entirety of her testimony regarding her financial status, Plaintiff's answers were vague, elusive, and completely lacked credibility. Plaintiff took multiple extended pauses to formulate answers to what should have been simple questions. Plaintiff appeared extremely nervous and was reluctant to provide the Court with direct answers regarding any aspect of her financial condition unless the answer directly supported her alleged in forma pauperis status. Almost every answer Plaintiff provided needed to be coaxed out of her by the Court after multiple delays as well as the Court rephrasing the question several times.

Plaintiff testified that she lives in a house in Chicago, but that she did not know "at this time" how much the house is worth. According to Plaintiff there is a mortgage against her home, but she does not know the current balance. Plaintiff stated she has lived in the home her entire life and that the house was gifted to her "before 2010." Plaintiff admitted that the house was appraised when it was given to her, but did not know the appraisal value. After extensive questioning, Plaintiff guessed that it was $310,000. According to Plaintiff, the mortgage is in her name and the monthly mortgage payment is about $1,800 per month.

Plaintiff reported that she was behind on her mortgage to the point of foreclosure around 2013. In late "2015 or early 2016" a payment plan was worked out, and she has paid her mortgage ever since. Plaintiff failed to give a clear explanation of the source of her mortgage payments. Plaintiff stated that she previously had other real estate

interests in the early 2010's but she "lost them in a tax sale." Plaintiff testified that any assets that she had "were dissipated prior to filing this application [to proceed IFP]." Plaintiff also reported "having an interest in a piece of property" from her late uncle, which consists of a vacant house in Louisiana. Plaintiff did not know how much the property is worth and was unable to provide specific details about the property outside of it "being a house and a little land."

Plaintiff testified that she did have monthly expenses on her home. When asked specifically about her water bill, Plaintiff claimed she has not paid her water bill in at least 2 years, but that the water has not been turned off because she "talked to the city and explained my situation." Plaintiff reported being current with her $100 a month electric bill. Plaintiff indicated she also had internet and cable television, with the bill ranging from $100 to $150 dollars per month. Plaintiff stated she was current on her cable and internet bill.

Plaintiff admitted to the Court that she was responsible for paying all her bills, but that other people "frequently" pay her bills for her. Plaintiff was asked numerous times how often others paid her bills for her, but appeared very reluctant to provide a direct answer. When asked if others paid her bills monthly, Plaintiff stated "probably." Plaintiff named at least 3 individuals who have made direct payments on her behalf, including her pastor and multiple friends. When asked how long others had been paying her bills, Plaintiff's response was vague, stating "a good period of time," before being pressed by the Court to be more specific. Plaintiff took a very long pause before finally telling the Court other people have been paying her bills since 2013. Given Plaintiff's demeanor, the extended delays in answering the questions, and the very nature of the answers themselves, the Court finds this testimony unbelievable.

The Court also questioned Plaintiff extensively on the checking account statement she submitted in response to Defendants' Motion for a Hearing. Plaintiff claimed the checking account was hers, but that another individual, Yolanda Smith, also had access to the account. Plaintiff told the Court that in 2015 (the date on the checking account statement) her mother, Iona, was on the account, but that her mother had

passed away 10 years earlier in 2005. When asked why the checking account was in her mother's name, Plaintiff first responded "I don't know." When asked if she reported to the bank that her mom had passed away, Plaintiff stated "um, I'm sure I did."

Plaintiff became noticeably uncomfortable and vague when questioned about the $477.53 and $800 deposits that were made to her account days after her IFP petition was filed. Plaintiff admitted to making the deposits, but denied knowing the origin of the December 9, 2015 deposit for $477.53. Plaintiff was asked to provide her best recollection for what the deposit was, to which she stated "maybe, like, something from the church." When the Court pressed further and asked "for what?," Plaintiff took a very long pause before responding "I'm not sure." Plaintiff admitted that she was not receiving any type of paycheck, unemployment, or government aid at the time. Plaintiff stated that she did not know why the church would be giving her $477.53, but that "perhaps" it was to pay a bill. Plaintiff likewise stated that she was "not really sure" when asked about the $800 deposit.

The Court also noted that the bank statement showed that Plaintiff had not paid any bills during the November to December time period represented on the statement. Plaintiff admitted that she does not have another bank account and that she was "not really sure" if she paid bills during that time period. When asked further, Plaintiff reported frequently paying her bills at the currency exchange with cash.

The Court next questioned Plaintiff about her income. Plaintiff testified that she is not employed. Plaintiff again took an exceptionally long pause before telling the Court that she was a substitute teacher "for a few weeks earlier this year," but that she otherwise has been unemployed since being terminated by Kenco. Plaintiff was also questioned about the money she reported being given by friends and family. Plaintiff provided a vague response and did not give the Court an amount.

According to Plaintiff, she also owns "rights to oil wells" that she inherited from her uncle. Plaintiff testified to knowing very little about her oil well interests, stating "all I know is that I get some royalty checks every now and again." When asked about the royalty checks, Plaintiff reported getting two, but does not know from whom.

Plaintiff also reported receiving another royalty check because she "happened to be walking down the street and got caught in a commercial" so she gets "random" royalty checks from that as well. According to Plaintiff, the largest royalty check she has ever received is "maybe . . . $8,000 or $9,000 dollars." When asked how often she gets the checks, Plaintiff changed the subject by stating "I dunno, but I forgot one other thing. I owe the IRS too." Plaintiff eventually stated the royalty checks come "every couple of months." Plaintiff testified that the IRS has been seizing her checks, but that she does not know when that started.

After extensive questioning about inheritances and repeated vague responses from Plaintiff, Plaintiff eventually admitted to receiving annuities following her mother's death. Plaintiff was then asked how long the annuity payments continued. After another extensive pause (which lasted so long that the Court had to repeat its question), Plaintiff testified to receiving "one lump sum" of perhaps "like 5,000" and another payment that was "maybe like 100 something." When asked for clarification, Plaintiff stated she meant $100,000. She testified to receiving these payments in 2004 and 2005 which she invested into a restaurant business. Plaintiff reported that the business closed in 2012 before she worked for Kenco.

Plaintiff also testified that her uncle left her "some cash," to which she stated "I don't know" when asked how much. After pausing and considering the question for a long period of time, Plaintiff reported receiving $30,000 from her uncle's estate around 2010. According to Plaintiff, this money also went into her business. Plaintiff reported that her father passed away "20 some years ago" and that she still receives "small" checks from his life insurance. Plaintiff testified that at one point she had both stocks and bonds. Plaintiff was asked when she last had a bond and after a long delay guessed that it was the "early 2000s." Plaintiff also reported having mutual funds at some point in her life, but did not provide the details. Plaintiff guessed that she cashed out her retirement account in "maybe 2012 or 2013."

The Court also questioned Plaintiff extensively about the answers given in her deposition. Plaintiff testified in her deposition that she had "money before [she] went

[to Kenco]" and had been "living off her savings" since leaving Kenco[1]. When questioned further about this, Plaintiff attempted to distance herself from her deposition response by stating that "my interpretation of what they were asking was what had I been living off of since I left Kenco in 2013 and at one point I was living off of whatever money I had. So in part, that statement is true." Plaintiff became flustered when the Court explained to Plaintiff that the deposition questions were all asked in the "present tense," or rather that the deposition questions had asked her how she had been surviving on that very day. Plaintiff attempted to convince the Court that at the time of her deposition she had "dissipated" her savings in "probably the middle of 15." In direct contradiction to her deposition answers, Plaintiff represented to the Court that she has only been surviving off money from her family and royalty checks.

The Court pointed out to Plaintiff that when her deposition was taken in 2017, she reported living off her savings, but that on her IFP petition in 2015 she reported she did not have any savings. The Court asked Plaintiff to explain how these statements did not contradict each other. Plaintiff was visibly shaken and had a noticeably difficult time answering this question. Plaintiff gave a confusing and difficult to follow response that simply stated that her IFP petition was "true and accurate."

Plaintiff was also asked during her deposition whether she had a checking account, to which she responded "yes." When questioned by the Court, Plaintiff reported that she only had one checking account, and has only had one checking account since "maybe about [long pause] since I went to Kenco." Plaintiff also responded in the affirmative when asked during her deposition about whether she had a savings account. When asked to clarify, Plaintiff reported that this account was held "at Sherwin Williams" and had been opened "in the 90s." Plaintiff testified the account has "like 5 dollars in it" but that she doesn't remember the balance in 2015.

During her deposition Plaintiff also testified she had money "under my mattress at home." Plaintiff told the Court that "today" there is no money under her mattress,

---

[1] As noted, Plaintiff's IFP application was filed on December 8, 2015. Plaintiff's deposition was taken on June 16, 2017. Plaintiff was terminated from Kenco in 2013.

but that during her deposition she "may have had about $75 or $100." Plaintiff reported being unsure of when she put the money under her mattress but it "may have been about a week before [the deposition]."

### c. Plaintiff's Testimony Regarding the Involvement of Attorney Jordan Hoffman in this Case

The Court then asked Plaintiff about attorney Jordan Hoffman.[2] Plaintiff stated that Hoffman is "the attorney that is representing me in front of the Department of Labor." When questioned about Hoffman's involvement in this case (where Plaintiff has enjoyed extensive leniency often afforded to pro se plaintiffs), Plaintiff became noticeably nervous and her answers became extremely vague and elusive. Plaintiff reported that she has not paid Hoffman any money and that he has "assisted me with questions and initially helped prepare the Complaint that was filed." When questioned further, Plaintiff stated that Hoffman has "filed information and helped get papers together."

Plaintiff was asked specifically about Hoffman's involvement in all the documents filed before the Court in this case. Plaintiff simply responded that she has "had assistance with some things." Plaintiff was asked to identify the motions or pleadings with which Hoffman assisted. Plaintiff noticeably tried to avoid the question, stating that she has "pretty much got some guidance to make sure they [the pleadings] met the requirements." Plaintiff denied that Hoffman was representing her on this matter.

Plaintiff became even more hesitant to engage the Court when asked if Hoffman was preparing the filings in this case or whether she has been. Plaintiff stated "I don't know. I guess I am trying to understand what filings mean. Do you mean the papers that are being turned in?" When the Court responded in the affirmative, Plaintiff said "it's been both."

---

[2] Defendants have alleged that an attorney by the name of Jordan Hoffman has been ghost writing and preparing pleadings in Plaintiff's case, as well as several other related cases involving the same Defendants. Defendants obtained admissions during the deposition of another Plaintiff in a related case that Hoffman was providing extensive assistance to numerous related Plaintiffs, including but not limited to, drafting entire pleadings and providing detailed responses to discovery requests.

Plaintiff admitted Hoffman prepared her Complaint. The Court asked Plaintiff specifically whether she prepared the response she filed to Defendants' Motion to Dismiss (#28) or whether it was prepared by Hoffman. Plaintiff stated Hoffman "assisted me with that information." When asked again whether she prepared the 22 page response or whether Hoffman did, Plaintiff stated "I guess so, I don't really know. I can say I tried to put down my thoughts." The Court then asked the following question: "So you gave him your thoughts. Did he then give you the 22 pages to file?" Plaintiff was again noticeably hesitant to answer and took an extended period of time before responding "I'm not quite sure." The Court then simplified the question, asking Plaintiff "did you sit at home at your computer and type a 22 page response to a motion to dismiss?" Plaintiff stated "Um, I wrote...something....I can't....I mean....I can't recall."

Plaintiff was asked about the August 23, 2016 Motion for Entry of Default Judgment (#33) that she filed. Plaintiff indicated that her understanding of a default judgment was like "defaulting on a loan." The Court asked Plaintiff whether she prepared the motion, to which stated "I remember doing something . . . I don't really know." When asked specifically about her role in that motion, Plaintiff said "I think I remember [long pause] . . . I mean I had something to do with in part everything."

The Court explained to Plaintiff it was simply trying to get an understanding of what work Hoffman has done in this case. The Court repeated the question: "Did you prepare the Motion for Entry of Default or did he?" Plaintiff took almost a 20 second pause and did not provide an answer to the question. Plaintiff became visibly upset, stating she "got help every step of the way" and that she "tried to pull together from her understanding of everything that occurred and tried to formulate in some type of way and I would get assistance from him as to how to format."

The Court then printed the Motion for Entry of Default (#33) and handed it to Plaintiff. The Court asked Plaintiff if she physically typed the document in its entirety. Plaintiff paused for over a minute to contemplate this question before saying "I can't say that I don't remember this and I can't say that I did not do some work on it, but . . .

9

um . . . I'm not 100% sure." The Court again stated "my question is, did you prepare the motion or did Mr. Hoffman? It is a pretty easy question." Plaintiff again refused to provide a direct answer, stating "I'm sorry, I don't know, I'm not 100% sure if . . . you know if he . . . I'm sure that I got assistance if I did this." The Court pressed further stating "as you sit here now, who do you think did that?" Plaintiff continued to refuse to answer, taking another extended pause before stating "I think in combination we derived it . . . if I'm certain."

The Court asked if Plaintiff recalled filing a Reply (#38) to Defendants' Response to Plaintiff's Motion for Default. Plaintiff, eluding the question, stated "honestly I have just tried to keep up with whatever needed to be done. This is just a lot and I tried to as best as I can keep up with whatever the situation was at the specific time."

The Court also printed Plaintiff's Motion to Strike Answer to Complaint (#39). The Court asked Plaintiff if the document was prepared by her or Hoffman. Plaintiff appeared to read through the entire document before failing to answer the question. The Court then pointed out the caption of the case on the document and asked Plaintiff if she had ever, in her life, created anything that looked like the caption. Again, Plaintiff struggled mightily with this simple question, stumbling over her words, muttering "um" several times, taking multiple extended pauses, and requiring the Court to ask the same simple question several times before eventually saying "I want to say that I would have taken this caption probably off of some other papers that I got."

The Court inquired into who created the discovery requests that Plaintiff sent to Defendants. Plaintiff reported that she created the requests, but Hoffman had told her some of the things to request. Plaintiff took an extended period of time to craft an answer when asked whether she had shared Defendants' discovery responses (which are subject to a protective order) with Mr. Hoffman, before eventually saying "I'm sure I have."

The Court asked Plaintiff how she got her thoughts to Hoffman and whether she hand wrote things to him. Plaintiff took an extensive time to contemplate the question before stating "I would probably say I wrote it out or sometimes, a lot of times, we

10

would discuss things." To make the question even clearer, the Court asked Plaintiff if, at any point, she physically typed anything out and gave it to Hoffman. Plaintiff reported that she "probably did" and that sometimes Hoffman would send back comments. The Court eventually asked if Plaintiff supplied the information and Hoffman prepared the documents. Plaintiff stated she "couldn't specifically say." Plaintiff finally admitted that there were no documents in the case that Hoffman did not assist with in some way.

Finally the Court questioned Plaintiff about the fact that Plaintiff has disclosed an expert witness in this case.[3] Plaintiff reported that attorney Hoffman is paying for the expert witness because Hoffman is using the expert witness report in a case before the Department of Labor. Plaintiff admitted that she had not paid the expert any money and has not sent Hoffman any money to help pay for the witness.

Following the hearing the Court informed both Plaintiff and Defense counsel that it would issue a written Order after consideration of all the testimony.

## II. Analysis

The purpose of the IFP statute is to make it possible for a person to bring claims or assert defenses in federal court even if that person is unable to afford the fees and costs of litigation. *See* 28 U.S.C. § 1915(a)(1). "The opportunity to proceed in forma pauperis is a privilege provided for the benefit of indigent persons and the court system depends upon the honesty and forthrightness of applicants to ensure that the privilege is not abused." *Chung v. Dushane*, 2003 WL 22902561, *2 (N.D. Ill. 2003) (*citing Denton v. Hernandez*, 504 U.S. 25, 27 (1992)). "To prevent abuse, the privilege is guarded by a severe sanction: if 'the allegation of poverty is untrue, the court must dismiss the case.'" *La Tanya Palmer v. Dollar Tree*, 2012 U.S. Dist. LEXIS 145383, *3 (N.D. Ill. 2012) (*citing* 28 U.S.C. § 1915(e)(2)(A)). It is unquestioned that dismissal with prejudice is within the authority of the trial judge as an appropriate sanction for the filing of a false IFP application. *See Thomas v. GMAC*, 288 F.3d 305, 306 (7th Cir. 2002).

---

[3] The Court was originally perplexed by the fact that Plaintiff, who reported on her IFP petition that she had less than $100 available to her and did not have an attorney, was able to hire an expert witness. The Court also notes that the expert witness report submitted by Plaintiff is over 2,000 pages in length.

Plaintiff's testimony was completely unbelievable. As noted several times above, Plaintiff took multiple long pauses in an apparent attempt to formulate answers to what should have been simple questions to answer. Plaintiff's answers about her financial status were elusive (at best), and the Court often had to ask Plaintiff the exact same question several different ways before Plaintiff provided any answer. Even then, Plaintiff often answered in uncertain terms adding "probably," "maybe," or "I guess" as a qualifier to numerous answers.

There were several facts presented during the hearing, as well as during Plaintiff's deposition, showing that Plaintiff has not been honest and forthright about her financial situation. Plaintiff testified that she is somehow paying an $1,800 a month mortgage on a house worth at least $310,000 despite not being employed since 2013. While Plaintiff reported the house was in foreclosure at one point and testified to receiving money "from friends," Plaintiff also admitted that she is current on the mortgage payments and failed to provide the Court with any reasonable explanation as to how to she is able to pay an $1,800 a month mortgage without having any steady and consistent source of income. This claim becomes even more incredible considering Plaintiff reports being current on her $100 a month electric bill and her $100 a month cable bill. Plaintiff reported no change in her financial condition between 2015 and 2017. Instead, Plaintiff would have the Court believe that friends and family are providing her in excess of $2,000 a month just to pay 3 bills.[4] The Court finds this testimony is not credible.

During her deposition, Plaintiff testified that she was living off her savings and that she had money before going to Kenco. Plaintiff's IFP petition omitted the existence of a savings account, and reported cash on hand as "$100." When questioned by the Court, Plaintiff reversed course from her deposition and testified that she was not in fact living off her savings, while giving a confusing answer that failed to explain the inconsistency. Plaintiff tried to convince the Court that her deposition answer related to the fact that she was "at one point" living off her savings, but that she is not doing so

---

[4] This calculation does not account for any basic necessities, such as food.

anymore. Plaintiff was unable to explain the reason that she answered a question in the present tense ("how _are_ you living?") with an answer that is no longer true. In short, Plaintiff clearly appeared to be trying to distance herself from her deposition answer.

Plaintiff also had no explanation for the deposits in her bank account in 2015. While Plaintiff may have "truthfully" represented the amount in her bank account on the day she filed her IFP petition, Plaintiff's account statement shows she had over $1,200 deposited into her bank account 4 days after she filed for IFP status. While Plaintiff has no explanation for the source of this money, the Court finds it highly unlikely that Plaintiff was coincidentally given over $1,200 the day after her IFP was filed of which she had no advance knowledge. One of these deposits, $477.53, was a very specific amount that appears to the Court to indicate a pay check or a social security payment, but Plaintiff denied both of these. The only explanation Plaintiff was able to provide for the over $1,200 in deposits was "money from the church." Plaintiff also had no explanation for why her mother's name was still on her checking account 10 years after her death.

Plaintiff reports that she cannot pay a $400 filing fee, yet openly admits to receiving royalties from an oil well interest, as well as a commercial, that at one point amounted to $8,000 or $9,000. Plaintiff attempted to convince the Court that she has not paid a water bill in two years, but that she has not had her water shut off. In short, Plaintiff's demeanor, as well as her inconsistent answers at her deposition and the hearing before the Court, reveals that Plaintiff has attempted to misrepresent her financial situation to avoid paying the filing fee.

While the Court recommends dismissal based on Plaintiff's untruthful representations regarding her financial situation, the Court also notes that Plaintiff's clearly untruthful answers regarding attorney Jordan Hoffman further support the Court's adverse credibility determination. Rule 11 obligates members of the bar to sign all documents submitted to the court, and to personally represent that there are grounds to support the assertions made in each filing. FED. R. CIV. P. 11. It follows that ghost-writing of pleadings on behalf of a pro se litigant "raises a serious matter of

13

unprofessional conduct." *Thigpen v. Banas*, 2010 U.S. Dist. LEXIS 11843, *3 (N.D. Ill. 2010). As such, "the practice of 'ghost-writing' briefs for pro se litigants is unethical and will not be permitted." *Chriswell v. Big Score Entm't, LLC*, 2013 U.S. Dist. LEXIS 10819, *12 (N.D. Ill. 2013).

Plaintiff was asked extremely simple questions about Hoffman's involvement in this litigation that she was unwilling to answer. The Court went as far as to ask Plaintiff specifically if she typed a 22 page document or if Hoffman typed the 22 pages for her. Plaintiff was unwilling to give the Court a straight answer. Plaintiff refused to answer whether Hoffman responded to the Motion to Dismiss. Plaintiff would not inform the Court whether she or Hoffman filed a Motion for Default Judgment. Plaintiff provided no answer when she was asked whether she or Hoffman filed the Motion to Strike Defendants' Answer. Plaintiff's recalcitrance contributed to the Court's credibility findings.

The additional information submitted by Defendants in their Motion to Supplement (#70) further supports the Court's conclusion that Plaintiff lacks credibility. Plaintiff testified during her deposition that she had never worked for attorney Hoffman in any capacity. *See* d/e 70-1, Madison Dep. Tran. 12:4-14. Defendants, however, reviewed the Illinois Department of Human Relations ("IDHR") file in the case of a related plaintiff and discovered that Madison identified herself as a legal representative for that plaintiff from Mr. Hoffman's law firm in communications to the IDHR. *See* d/e 70-1, IDHR Investigator Telephone Notes. Moreover, Plaintiff has testified throughout this litigation, including during the August 7, 2017 hearing, that she has not worked since being fired from Kenco in 2013. However, the IDRH information shows that Plaintiff was holding herself out not only as Hoffman's employee, but as a legal representative from Hoffman's firm in September 2015. *See* d/e 70-1, IDHR Investigator Telephone Notes. Therefore, Plaintiff either lied to the Court about her last date of employment or lied to the IDHR investigator about being employed by Hoffman; either way Plaintiff was untruthful about her employment.

### III. Conclusion

For these reasons, the Court recommends that Plaintiff's case be dismissed for failure to be honest and forthright in her application to proceed in forma pauperis. The parties are advised that any objection to this recommendation must be filed in writing with the clerk within 14 days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc., v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTERED this 22nd day of September, 2017.

s/ERIC I. LONG
UNITED STATES MAGISTRATE JUDGE



Kathy Knutson Food Safety Consulting LLC
1421 Argonne Drive
Green Bay, WI 54304
920.309.2412 mobile
drkathyknutson@gmail.com
www.linkedin.com/in/kathyknutsonphd/

## DECLARATION OF KATHY KNUTSON, PH.D.
*July 9, 2023*

### Background

1. Attorney Eric Greenberg contacted me on June 16, 2023, with a request to review two documents, Complaint to Gretchen LeMay (1) dated May 26, 2023 and Regulatory Business Problem (2) dated October 20, 2022, which I did on June 17, 2023. Following the initial review, I received additional documents to review for this declaration to evaluate the reasonableness of judgments and actions expressed by former employee, Ms. Mary Madison. Ms. Gretchen LeMay and Mr. Erich Zicher of creative werks llc have cooperated throughout the process by providing documents upon request. creative werks has extensive documentation; the Food Safety and Quality Manual alone holds 85 documents for food safety and quality procedures. See the section on Documents Reviewed for details on the documents I reviewed.

2. I am qualified for this review as a Food Safety Preventive Controls Alliance (FSPCA) Lead Instructor for the training of Preventive Control Qualified Individuals (PCQIs). Since 2016 I have delivered over 50 training courses of the 20-h standardized curriculum and have personally trained over 500 PCQIs. The federal Food and Drug Administration (FDA) requires a PCQI as a member of the food safety team at a food facility. Ms. Madison was trained as a PCQI (3) before her hire. As a consultant, I work with Quality Managers in the food industry to write their hazard analysis, food safety plan, Standard Operating Procedures (SOPs), document templates, and recall plan. Personnel in the Quality department, such as Ms. Madison, are responsible for the development and implementation of procedures for food safety and their corresponding records. My education includes a Ph.D. in Food Science, and my work experience includes roles in education and laboratory operations for the testing of food.

**General Introduction**

3. Ms. Madison completed a report titled Regulatory Business Problem (2) on October 20, 2022. She makes the following statements her report and these will be addressed in my declaration.

    a. *Creative Werks LLC's non-compliance with the relevant statutes, standards and regulations under FSMA is an inherent systematic and systemic issue throughout the organization that creates irreparable harms for all stakeholders.*

    b. *More specifically for Creative Werks LLC, this non-compliance creates legal liability and culpability due to our breach of contract, breach of fiduciary duty and falsifying documents, among other things, to our clients, the managing members of Creative Werks LLC, governmental regulatory agencies, the end users and society at large.*

    c. *Other stakeholders could suffer injury, illness or death; in addition, others can suffer loss of employment and economic instability.*

    d. *Analysis of the current Food Safety Plans at Creative Werks LLC., evidences that Creative Werks LLC., has year over year, consistently been out of regulatory compliance with the Federal Food, Drug, and Cosmetic Act "hereinafter" (FD&C Act), as amended by the Food Safety Modernization Act "hereinafter" FSMA and its relevant subparts.*

    e. *Further analysis suggests that there is no cognitive recognition that the Food Safety Plans are out of legal compliance with FSMA.*

    f. *Also, it can be reasonably inferred that there is a high probability factor that our non-compliance is a root cause in lost business opportunities, such as Pepsi.*

    g. *Further, there is no evidence that a formidable plan of action is in place or being developed to remediate the noncompliance and outstanding compliance issues.*

    h. *Additionally, there has been an improper interpretation, analysis and application of the relevant statutes, standards and regulations relative to the business unit's objectives of manufacturing, co-packing and compliance.*

    i. *One hundred percent (100%) of our organization is governed by the regulatory framework and guidance of the FD&C Act, as amended by FSMA.*

    j. *Since the inception of the Preventive Controls regulations, Creative Werks LLC has never been compliant and has had repeated violations from numerous customer audits.*

    k. *We also have lost business opportunities that translate into the loss of dollars, profitability and goodwill; translating into market share loss.*

    l. *Also, a culture that is diametrically opposed to the transparency mantra of Creative Werks LLC has evolved.*

        i. *Further, this culture exhibits and encourages a blatant disregard for the law.*

        ii. *Additionally, this conduct is in direct contravention to domestic and international regulatory framework used for transparency to promote and underscore food protection initiatives.*

    m. *Failure to act swiftly within the prescribed time frame will also subject us to additional civil and criminal liabilities for once again failing to comply with the standards.*

     *n. E.g. the incident raised, by the FDA in its September 2022 inspection, relative to product failure in conjunction with Pepsi that was reported in October of 2021.*

          *i. This incident has an expiry date for civil liability of October 2023.*

          *ii. Criminal liability has no statute of limitation.*

     ***o. Recommendations:***

          *i. Implement an immediate course correction.*

          *ii. Refrain from hiring any persons or purchasing any compliance aids until a needs assessment is conducted and analyzed that supports a formidable plan of action accompanied by a supporting business case.*

          *iii. Implement proper oversight.*

          *iv. Identify, interpret and apply the proper relevant statutes, standards and regulations necessary to achieve compliance.*

          *v. Line balance the appropriate standards against customer requirements.*

          *vi. Develop, implement and sustain communication plans.*

          *vii. Implement a Risk Management program.*

          *viii. Contract Management*

          *ix. Choose a certification that synergizes all the necessary elements for compliance and success.*

          *x. Answer questions as asked; speak only to issues at hand.*

          *xi. Refrain from comingling facts from various situations or instances.*

          *xii. Refrain from comingling relevant statutes, standards and regulations during audit and inspection proceedings.*

4. The above statements are inflammatory, confusing, false, inaccurate, or misleading. creative werks provided numerous documents to me, and I reviewed 26 of the provided documents. The vast majority of the documents I reviewed were available to Ms. Madison at the time of her employment. I concluded that creative werks is a company with very low-risk operations for the manufacture of packaging and filling of containers with food.

5. Ms. Madison uses inflammatory language to try to paint a picture of a company that is out of control and processing unsafe food. My review showed the opposite. In fact, creative werks has extensive documentation; a well-staffed Quality department; large, multi-national food manufacturers as customers; and complies with both state and federal regulations. I was pleased with the organized and plentiful documents covering much of food safety, and I found the representative documents well-written, concise, and clear. Because my work was a document review, I cannot speak about whether the policies or procedures are actually followed on-site. In my experience, food safety policies and procedures are typically implemented in the processing of food, and it is the documentation that is lax. The fact that the documents are written, revised, and signed is an excellent sign of compliance with the FDA rule. creative werks is a company with a full menu of documents and is not just getting by nor trying to cover up violations.

6. Ms. Madison's statement, *Creative Werks LLC's non-compliance with the relevant statutes, standards and regulations under FSMA is an inherent systematic and systemic issue throughout the organization that creates irreparable harms for all stakeholders*, from her report titled Regulatory Business Problem (2) states *non-compliance*. I reviewed two State of

Illinois inspection reports (9, 10) and two FDA inspection reports (7, 8). creative werks passed all four inspections with no follow-up required. No follow-up to an FDA inspection is very rare, yet alone two FDA inspections with no follow-up. Both the State of Illinois and FDA believe creative werks to be in compliance.

7. Ms. Madison makes the very serious allegation that documents were falsified due to non-compliance when stating, *More specifically for Creative Werks LLC, this non-compliance creates legal liability and culpability due to our breach of contract, breach of fiduciary duty and falsifying documents, among other things, to our clients, the managing members of Creative Werks LLC, governmental regulatory agencies, the end users and society at large.* I believe this allegation is more of a personal opinion of Ms. Madison than a statement of fact. My document review and the four government inspections show a company in compliance.

8. *Irreparable harm* from Ms. Madison's report consists of employees losing limbs or scarring and chronic lifelong illness or death of consumers. These scenarios have been associated with the food industry in the past, but there is not a significant risk for any of these harms at or from creative werks based on my document review. In her complaint, Ms. Madison raises the concern for production employees with harm from X-ray instruments, but the instruments are serviced annually, which follows industry best practice and does not affect food safety. This statement from her report is also unfounded based on my review, *Other stakeholders could suffer injury, illness or death; in addition, others can suffer loss of employment and economic instability.* The food industry and employees working in Quality departments take the responsibility for the prevention of injury, illness, or death very seriously, and creative werks has the documents to prove this starting with the hazard analysis found in each of the four food safety plans I reviewed.

9. I have struggled to understand Ms. Madison's perspective and have found no basis in much of her discussion; for example, *Analysis of the current Food Safety Plans at Creative Werks LLC., evidences that Creative Werks LLC., has year over year, consistently been out of regulatory compliance with the Federal Food, Drug, and Cosmetic Act "hereinafter" (FD&C Act), as amended by the Food Safety Modernization Act "hereinafter" FSMA and its relevant subparts.* I reviewed four food safety plans (FSPs) from creative werks that were all available to Ms. Madison at the time of her employment, and all were in compliance. The FSP for Dunkaroos is attached to her report in Exhibit C and appears to have her comments entered in red to mark areas of non-compliance.

    a. The incomplete Product Description, Distribution, Consumers and Intended Use table is not required in a FSP, so that is not a violation of the rule.

    b. There is a question about the time of keeping records. Those in the Quality department should know that the FDA requires records to be kept a minimum of two years. creative werks is under an auditing scheme which requires records to be held longer than two years, so that is not a concern.

    c. She marked that the *Hazard Analysis does not comply with 21 CFR 117.130.* First, creative werks has the required hazard analysis in each FSP. There is no required form or format, so creative werks is in compliance with the form they chose. Because there is no required form, each facility is free to create a form that works for them, and creative werks chose to include likelihood and severity of

risk on the form. This is admirable. I found the hazard analysis to be detailed and easy to follow. Every facility writes their own hazard analysis, and the process is time-consuming and requires the upmost focus to get it right. The Dunkaroos hazard analysis has a disconnect between the column marked Reasonably Likely to Occur/Hazard Risk Level and the last column Preventive Control or CCP, for which I would have completed the former column differently. They got the information correct in the latter column, a very important step in the hazard analysis.

d. On the page titled Example Process Flow, the flow diagram is not from the Dunkaroo process, but the flow diagram is not required in a FSP, so there is no violation of the rule.

e. On page 60 of her report she states, *These requirements are a part of the Current Good Manufacturing Practice that relates to Processes and Controls and are missing from the above matrix.* GMPs are not part of the FSP, so this statement is false and misleading.

f. She marked the Allergen Preventive Control as Incomplete/non-compliant but the required information is on the next page. She may be referencing allergen clean information which may be in a different document.

g. In the section on Approved Suppliers for Ingredients Requiring a Supply Chain Applied Control, she states, ... *no activity by the shipper substitutes or waives this responsibility.* This is absolutely false. Supply chain verification activities can be performed by any party including the facility shipping the product.

h. On page 21 of 23 of the Dunkaroos FSP, she states, *The plan as is missing the following: Monitoring Procedures & records... Corrective Procedures & records.* This is false. The information is provided in the Process Preventive Control form (p. 59), Allergen Preventive Control form (p. 63), and Sanitation Preventive Control (p. 20).

10. I believe some of these examples are the basis of her belief that the facilities are not in compliance. First, the Dunkaroos FSP is just one of four FSPs. Second, the arguments she has of non-compliance are just not true.

11. The plans are in compliance, so the following quotes from her report become null with no additional evidence.

a. *Further analysis suggests that there is no cognitive recognition that the Food Safety Plans are out of legal compliance with FSMA.*

b. *Additionally, there has been an improper interpretation, analysis and application of the relevant statutes, standards and regulations relative to the business unit's objectives of manufacturing, co-packing and compliance.*

c. *Since the inception of the Preventive Controls regulations, Creative Werks LLC has never been compliant and has had repeated violations from numerous customer audits.* Audits carry no force of law.

d. *Failure to act swiftly within the prescribed time frame will also subject us to additional civil and criminal liabilities for once again failing to comply with the standards.*

*12. Also, it can be reasonably inferred that there is a high probability factor that our non-compliance is a root cause in lost business opportunities, such as Pepsi.* This is speculation with no data or is based on incorrect information. Most employees in Quality departments do not concern themselves with sales. This related quote has no bearing on food safety: *We also have lost business opportunities that translate into the loss of dollars, profitability and goodwill; translating into market share loss.*

*13.* My understanding from a review of documents is that it was Ms. Madison's job to address outstanding issues with customers. When she states, *Further, there is no evidence that a formidable plan of action is in place or being developed to remediate the noncompliance and outstanding compliance issues,* again, there were no outstanding compliance issues, and it was her job to address outstanding customer issues. This is a misleading quote to complain about the lack of herself doing her job.

*14. One hundred percent (100%) of our organization is governed by the regulatory framework and guidance of the FD&C Act, as amended by FSMA.* This quote shows a fundamental lack of understanding of the company and/or a lack of understanding of FSMA. One of the FSPs is for manufacturing of packaging itself, not of packaging of food, which is not covered by FSMA. That part of the business is not even required to have a FSP, so creative werks goes above and beyond what is required by the rule.

*15.* Every food facility should strive to build a strong food safety culture. This means employees work with integrity and management provides training programs and resources for all employees to do their job. Ms. Madison refers to culture here, *Also, a culture that is diametrically opposed to the transparency mantra of Creative Werks LLC has evolved.* I can't speak to that because I am not in the facility. *Further, this culture exhibits and encourages a blatant disregard for the law.* I don't agree based on my document review and the facility passing four government inspections. *Additionally, this conduct is in direct contravention to domestic and international regulatory framework used for transparency to promote and underscore food protection initiatives.* That's just inflammatory language; there is no international regulatory framework.

*16.* I would like to discuss what I discovered about, *E.g. the incident raised, by the FDA in its September 2022 inspection, relative to product failure in conjunction with Pepsi that was reported in October of 2021.*
      *a. This incident has an expiry date for civil liability of October 2023.*
      *b. Criminal liability has no statute of limitation.*
First, the latter statement is not true. The FDA statute of limitation is five years. More importantly, there were no observations or violations requiring follow-up with FDA, so this is another instance of inflammatory language to create a crisis where there is no crisis.

17. Also, there was **no** *product failure in conjunction with Pepsi that was reported in October of 2021,* so there is no civil liability expiry date. The FDA inspection in September 2022 was a scheduled, routine inspection; the inspection was not for cause or to follow up on a consumer complaint. I followed up with Mr. Zicher, Food Safety Director, on this point (16), and he responded that neither PepsiCo nor creative werks received a consumer complaint in October

2021 for a product packaged by creative werks. I verified this myself with a review of the log of Consumer Contacts Tracker (21).

18. The Recommendations section quoted above is a mixture of tasks for which Ms. Madison was responsible for in her job, tasks for management outside her job, or tasks that just don't make sense, e.g., *Contract Management*. There is not enough information or direction given to make meaningful decisions from the list. Most of the recommendations are her opinion based on the false sense of noncompliance with the rule.

19. I have struggled to understand Ms. Madison's perspective and have found her discussion confusing and difficult to decipher. For example, in the report section Compliance she says, ...*compliance is underscored by overlap and continuity of customer requirements and Creative Werks LLC's protocol's, procedures and policies*...I disagree. Customers do not dictate food safety, and quality parameters are managed separately from food safety.

20. My review of documents and the creative werks website shows a company that cares about its employees and customers. The company does not have significant food safety issues and has ample documentation. The company is in a state of continuous improvement which is the goal of all food safety programs. Ms. Madison was not employed long enough to truly understand the three facilities, food safety procedures, and record keeping, because they are complex and extensive.

**Discussion**

21. Her report discusses in detail the FDA Food Safety Modernization Act law, Preventive Controls for Human Food rule, a rule which applied to creative werks beginning in September 2016 and six years before her employment at creative werks. Exhibit A leads the reader through a lesson on the rule. As stated in Ms. Madison's complaint (1), she first requested a meeting with her supervisor to review the report, so it appears that Ms. Madison thought her intended audience needed education. It was unreasonable of her to think her supervisor, the Food Safety Director, was not familiar with the contents of the rule.

22. Ms. Madison tries to paint the picture of a company in crisis, and I found no evidence of a company in crisis. Crisis scenarios include the lack of written food safety procedures, not enough staff to monitor and implement food safety procedures, recalls, FDA warning letters, frequent state or FDA inspections, and resulting FDA Form 483 at the conclusion of inspections. As evidenced by the timing of both the State of Illinois (9, 10) and FDA (7, 8) inspections in 2021 and 2022, plus I am not aware of an inspection in 2023, this is a company that is **not in crisis**. creative werks has none of these crisis scenarios and by my review appears to be in compliance with the rule.

**Table 1.** creative werks facilities and Food Safety Plans (FSPs).

| City | Elk Grove Village | Bensenville | Bartlett |
|------|-------------------|-------------|----------|
| Street | Brummel Avenue | Sivert Court | Munger Road |
| Packaging FSP (12) | X | X | X |
| Manufacturing FSP (13) | | | X |
| Dunkaroos[1] FSP (14) | | | |
| Coffee Brew Pouch Fill FSP (15) | X | | |

[1] no facility named in the FSP

23. **Overview of creative werks llc.** creative werks has three facilities for the packaging of food (Table 1). creative werks' documents refer to either the city location or street location. I reviewed the FSPs for Packaging, Manufacturing, and Dunkaroos in detail; I read 3 of 14 pages of the Coffee Brew Pouch Fill FSP which was not referenced in the complaint.

24. creative werks receives ready-to-eat foods from manufacturers and packages the products; each of the three facilities has a Packaging FSP. The Manufacturing FSP noted in Table 1 covers the manufacturing of packaging materials, not the manufacturing of food. Dunkaroos is a product with two wells-one filled with cookies and one filled with frosting-and has a FSP which contains process steps unique to the product. The Coffee Brew Pouch Fill FSP is unique to that product, process, and packaging.

25. The nature of the business is to receive manufactured food where the supplier has controlled biological, chemical, or physical hazards. The service provided by creative werks to the food industry of **packaging** is a low-risk activity. Hazards associated with the food have been controlled by the suppliers and before receipt at creative werks. The suppliers are responsible for the control of biological hazards by applying a kill step to prevent pathogens such as *Salmonella* or *Listeria monocytogenes*. Common kill steps include baking goods and roasting nuts. There are no kill steps at creative werks because this has already been done by the supplier.

26. **Organization of the Quality Department at creative werks.** Ms. Madison was hired as Quality Regulatory Manager (4), reporting to Erich Zicher, Food Safety Director. Mr. Zicher remains employed by creative werks in this position and reports to Ron Sammeth, Chief Operating Officer (5). Mr. Sammeth reports to Steven Schroeder, President. By my count on the organizational chart for the Quality department, there are 14 positions in the Quality department (5), each of whom has responsibility for food safety matters. Mr. Zicher has a total of four direct reports. Ms. Madison did not have direct reports.

27. Ms. Madison was one of fourteen employees in the Quality department responsible for the implementation of policies, procedures, and recordkeeping for food safety at creative werks, and Ms. Madison had been an employee for less than one month at the time of her suspension on October 26, 2022. Other employees in the Quality department should have also been experienced, educated, and trained in food safety. Collectively, the employees in the Quality

department should already have had an understanding of the rule and the implementation of policies and procedures for food safety. This exercise in writing about the FDA rule was not requested by her supervisor, the Food Safety Director, and it was very unprofessional to conduct a project without her supervisor's approval.

28. I found a lack of teamwork conveyed in the complaint. This is concerning because training for PCQI emphasizes the use of teams because no one person at a facility can know everything, yet alone at the three facilities of creative werks. Facilities are encouraged to have members from multiple departments represented on teams including production, sanitation, maintenance, and laboratory operations. Ms. Madison should have reported working with members of her own department in addition to the appropriate people in other departments.

29. Ms. Madison acted alone in writing and presenting the report. This goes against everything that is taught in food safety for working in cross-departmental teams. Ms. Madison went three levels above herself to the President of creative werks when her supervisor was unavailable upon request. Ms. Madison did not wait more than one day to meet with her supervisor, the Food Safety Director, before going to the President. This was very unprofessional behavior and would be in any company.

30. Ms. Madison went to the President of creative werks on October 21, 2022, with a 78-page report and as stated on page 4 of the complaint *because people's lives are at stake*. I found no evidence for the claim. She was not told to go to the President and seemed unaware of the position of COO between Mr. Zicher and Mr. Schroeder. The actions of Ms. Madison were unreasonable. Even if the company were in crisis, it is unreasonable not to address her concerns first with her supervisor, Mr. Zicher, and to not work in a team. Ms. Madison was not asked to write the report and worked alone. Ms. Madison was in her position with creative werks for less than one month when she wrote her report; her time would have been best spent learning her job and attending to her responsibilities.

31. A minor but important point is that Ms. Madison wore a dress and earrings to work. It is not reasonable to dress in this way when her job required her to be on the production floor. The job description for her position states that she leads audits and inspections (26), and the work presented on her resume (3) shows that she should have prepared to participate fully in the FDA inspection on her second day of work. Ms. Madison's training and experience prepared her to follow Good Manufacturing Practices (GMPs) and be a role model in the practice of food safety. Wearing a dress and earrings to work is indicative of her lack of understanding of common food safety best practices.

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

32. The responsibility of creative werks is to *verify* the control of hazards by the supplier. Traditional verification activities include:
   a.  Supplier record review such as a Certificate of Analysis (COA)
   b.  Sampling and testing program for the food received at creative werks, and an
   c.  Annual, on-site audit when the supplier controls serious hazards with the potential for injury, illness or death.
   I reviewed procedures for supplier approval, supplier audits, collection of records, and receiving of food from approved suppliers (22, 23, 24, 25) and found them exemplary. Note that the frequency of sampling and testing is completely up to the facility and that sampling and testing can also be performed by the suppliers with the results forwarded.

33. creative werks does not own the product for many products; they simply receive the product, package the product, and ship the packaged product. Suppliers become customers. The supplier contracts detail who owns the product and who is responsible for the verification activities. creative werks packages cereal for General Mills, and the FSP states General Mills, not creative werks, is responsible for verification. In review of the Dunkaroos FSP and in the last sentence on p. 19 it states, *Supply Chain Preventive Controls are thereby managed by General Mills and hazard control verification owned by General Mills.*

**The following observations follow the sequence of the complaint.**

34. I was unable to verify Ms. Madison's assertion that the FDA inspection was for cause. Ms. Madison states in the complaint, *…FDA conducted an inspection because of a consumer complaint received by the FDA in October of 2021 before I was hired. The complaint involved a consumer experiencing a burning sensation from a Cheetos product Respondent packaged for Pepsi (1).* The inspection was a pre-announced, routine inspection covering GMPs, including recordkeeping and labeling (8). The same inspector previously inspected the creative werks Brummel facility in Elk Grove Village in July 2022 (7). The inspector noted in the July 2022 inspection, *The firm has a written procedure in place for complaints which is Work Instruction (WI-2.6 – Effective 5/21/2019). I reviewed the content of WI-26 and it appears to be adequate. I asked Mr. Zicher if the firm performs trending and he responded yes. I randomly reviewed the firm's trending data electronically from March 2021 to June 2022.*

35. My important conclusions from the inspection report of September 29, 2022 (8), are:
   a.  The inspection concluded without an FDA Form 483, meaning the lack of violations. **Rarely does an FDA inspection end without a Form 483.**
   b.  The inspection concluded with No Action Indicated (NAI).
   c.  The firm passed the inspection and was not required to follow up with the FDA.

36. Ms. Madison states on the second page of the complaint, *Respondent did not have adequate food safety plans, hereinafter "FSP" or Hazard analysis for each and every item that it packaged and or manufactured, as required by FDA regulations.* I reviewed four FSPs named in Table 1. Two FSP were specific to the unique products of Dunkaroos and Coffee Brew Pouch Fill. A third FSP was for the manufacture of packaging, not food. The fourth, Packaging FSP, was for the packaging of product and included the products of cookies-

frosted, cookies-plain, cookies-cream filled, chocolate w/o inclusion, cocoa/ chocolate for baking, chocolate w/ inclusions, sugar confections, cereal (grain-based w/o inclusions), cereal (grain-based w/inclusions), crackers, roasted peanuts and tree nuts, dried/dehydrated fruits, pretzels, and cheese puffs. **I would write the Packaging FSP in the same way.** There is no reason to have additional FSPs when the FSP focuses on the process steps in a facility. creative werks is using one Packaging FSP for all three facilities when a FSP must be specific to a facility. This is a minor adjustment if the equipment at each facility is similar. In other words, the Packaging FSP can be used as a model and changed slightly for each facility.

37. **Most facilities function with one FSP.** Ms. Madison states two paragraphs later, *Each product needed its own food safety plan because they all have different ingredients.* This is an inaccurate statement of the rule. FSPs are written based on process steps, not ingredients. Allergens are managed with policies, procedures, and sanitation, not with different FSPs. As a trained PCQI, Ms. Madison should have learned that products are grouped into food safety plans in Chapter 6 of the Preventive Controls for Human Food manual and in the Chapter 6 group exercise of the course. This was covered again in Chapter 8 Hazard Analysis.

38. Quality issues are managed separately from food safety. Ms. Madison states on the same page of the complaint, *...lack of food safety plans underscored quality issues...* FDA is not concerned about quality issues, and quality issues should not be a part of the complaint.

39. I reviewed the written hazard analysis contained in the Packaging FSP (12). The hazard analysis is where hazards with products at Receiving and hazards at process steps within a facility are identified. All foods must be received at creative werks from suppliers as safe. By my analysis, creative werks is responsible for the control of the following hazards within each facility:
    a. Foreign objects such as the hazard of metal introduced at creative werks,
    b. Cross-contamination of environmental pathogens such as *Salmonella* from the creative werks facility, and
    c. Cross-contact of allergens on shared equipment at creative werks.
    I found these hazards identified in the hazard analysis, and I reviewed data from the creative werks environmental monitoring program (18, 19, 20). The latter data shows that the facilities are monitoring for pathogens as required by the FDA Preventive Controls for Human Food rule, and the results are typical and reasonable for their facilities.

40. Ms. Madison states on the same page of the complaint that Mr. Zicher provided resources for the writing of FSPs, including the Dunkaroos FSP (14). As a trained PCQI, Ms. Madison should have known the importance of using resources as taught in Chapter 7 of the Preventive Controls for Human Food manual and course. Appendix 3 of the manual is a complete model FSP, and the FSPCA offers nine additional model FSPs to PCQIs, all of which include packaging. Learners in the Preventive Controls for Human Food course are specifically instructed to review model food safety plans to assist them when writing their own. People working in food safety say that food safety is not competitive, and resources are widely available. The FSPCA provides several templates of documents to download for free on their website.

41. Ms. Madison states on the same page of the complaint, ...*outstanding customer audit findings*...Ms. Madison seems to confuse audits with inspections. Audits are conducted by customers or auditors on behalf of customers, often as part of meeting the requirements for certification under a certification scheme such as the GFSI certification schemes of SQF or BRC. FDA does not audit a facility, grant certification, or review audit data. Third-party audits and certification are outside a food safety plan and managed separately.

42. Ms. Madison states on the second page of the complaint and in the fifth paragraph that in her position, she was tasked with remediating *139 outstanding document requests* from customers. creative werks had large corporations as customers, such as General Mills and Hershey. It is not unusual for customers to request documents for review and in support of their own food safety plans. I interpret this statement as part of her position and am not concerned with the number of 139 requests. It is possible that many of those requests did not apply to the creative werks facility and the packaging of the product.

43. Ms. Madison states on page three of the complaint that she was instructed to disregard protocol for the receiving of product from Mondelez. As a large multinational company, Mondelez has greater resources than small companies for control of food safety and can be expected to exercise that control. However, creative werks is responsible for a supply chain preventive control for the product under the Preventive Controls for Human Food rule, 21 CFR 117. Importers must comply with *either* the Preventive Controls for Human Food rule *or* the Foreign Supplier Verification Program rule mentioned in the complaint. creative werks identifies a supply chain preventive control in the Packaging hazard analysis (12) which complies with the former rule. I believe creative werks is not the importer of record for the products and is not under enforcement of the Foreign Supplier Verification Program rule. The responsibility of creative werks and procedures at receiving are detailed in work instructions, i.e., procedures for receiving (22, 23, 24); I found these procedures exemplary.

44. Ms. Madison states on page three of the complaint that when customers were not notified of an *FDA visit* that was another disregard for protocol. Notification is not a legal requirement, so creative werks is not in violation of the law. I am not aware if creative werks has an SOP or agreement with customers for this notification.

45. Ms. Madison on page three of the complaint notes audits by Blue Diamond and Nestle. Ms. Madison notes that she performed her responsibility in preparing for the audits. She notes audit findings that are within the norm of an audit. Most audits in the food industry result in observations of issues and requests for improvement of food safety. No facility has a perfectly functioning quality management system, and the goal is continuous improvement.

46. I reviewed two documents referred to as a risk analysis on page three of the complaint, written by Ms. Madison and titled *Regulatory Business Problem* (2) and Legal *Analysis of Regulatory Business Problem* (11), respectively. Ms. Madison on page three of the complaint notes that she attempted to review the risk analysis document with Mr. Zicher on October 20th. There is no mention in the complaint nor in the documents themselves of these documents being requested or of the purpose of the documents. Ms. Madison escalated the

conversation three levels above her to Mr. Schroeder, CEO [President], on October 21. This timeframe was less than one month after the start of Ms. Madison's employment. This action was unnecessary in an environment that is not in crisis. The documents are extensive - 42 pages in the latter. I am surprised, given Ms. Madison's responsibilities as Quality Regulatory Manager, that she had the time to create the documents. Her time would have been best applied to resolve the issues she claimed to find. In my opinion, it was completely unreasonable not to wait until her supervisor, Mr. Zicher, was available and to instead go three levels above her for the meeting with Mr. Schroeder when the company was not in crisis.

47. Continuing from the complaint: *I explained whatever plans they had were not sufficient...* Ms. Madison is acknowledging here that more than one FSP exists, although she seems uninformed about the four FSPs. It was her job to know how many FSPs creative werks had and the content of those FSPs. As stated above, I disagree with the conclusion that creative werks' FSPs were not sufficient, but for the requirement for facility-specific FSPs.

48. Ms. Madison on page three of the complaint states, *For example, the FDA inspector asked about an event that occurred in October 2021, but that was not responded to until May 2022.* This is a misleading statement as a review of the inspection report (8) details a different consumer complaint of black particles and the corrective action initiated in May 2021. According to Mr. Zicher's email of July 3, 2023 (16), neither PepsiCo nor creative werks received a consumer complaint about *a burning sensation from a Cheetos product.* Here is a quote from the July 3 email:
    a. *The inspector during the visit was inquiring about a similar scenario that purportedly had come into the FDA. Neither the client (PepsiCo) nor creative werks had received any such complaint reported. We shared the attached complaint corrective action on our conference room screen as referenced in the EIR in an effort to demonstrate transparency and cooperation.*
Continuing in the complaint, *He was not able to demonstrate that any remediation was performed.* This is an inaccurate statement.
    a. If the complaint referenced is for the burning sensation, no complaint was registered, so there was no documentation.
    b. If the complaint referenced is for the black particles, the corrective action was provided and is detailed in the inspection report.

49. Ms. Madison on page four of the complaint notes the lack of training requisites. I do not understand the meaning of training requisites. The *Firm's Training Program* is discussed in the inspection report (8), and the inspector reports, *During this inspection I randomly reviewed employees training records that appeared to be adequate except the firm's recordkeeping is not consistent.* WI-7.2 Training v10.2 is the SOP for training.

50. Ms. Madison on page 4 of the complaint brings up the concern with X-ray exposure monitoring. This is an OSHA worker safety issue and not a food safety issue.

51. Ms. Madison on page 5 of the complaint in the fourth paragraph refers to wearing a dress and earrings. It is my experience that people working in the food industry do not wear dresses or

earrings to work at all. It is unreasonable to wear a dress or earrings when you may be called to the production floor at any time as part of your job. Ms. Madison is an employee trained in GMPs and would be expected to behave as a role model for best practices in food safety. It was unreasonable to take time to change clothes when she needed to go to the production floor.

52. [Loss of format]
Ms. Madison on page 6 of the complaint states, I would have been held responsible. Legally, this is an inaccurate statement. The FDA wrote the Preventive Controls for Human Food to the owner, operator, or agent in charge of a facility. That is not Ms. Madison. In addition, the Park Doctrine lays responsibility for food safety with the owner of the company. That is not Ms.Madison. In some cases, prosecuted by the Department of Justice, the person in charge of food safety has been charged. That is Mr. Zicher, not Ms. Madison. Mr. Zicher and the owner are responsible for food safety.

53. I have worked on this project for less than one month, and I know that creative werks is not capitalized, but Ms. Madison did not. It is that attention to detail that is required of professionals working in Quality and makes me question if Ms. Madison was suitable for the position of Quality Regulatory Manager (26).

**Summary**

creative werks operates three facilities for the manufacture of packaging and the process of packaging customers' foods. creative werks is in compliance with state and federal food safety laws and has large, multi-national food customers. The review of documents shows that creative werks appears to have the resources necessary to implement food safety policies and procedures. Food facilities function with continuous improvement, so no facility is perfect and there are always opportunities for improvement. Ms. Madison was in a position to effect change and improve food safety. Her short time at creative werks and lack of understanding of the law, complicated by overlapping customer requirements and quality issues with food safety caused her to make a crisis where there was no crisis. I find her actions unprofessional and unreasonable for her or anyone working in the food industry.

**Documents Reviewed**
The **name of the file** is followed by the description of the document.

1. **Mary Madison complaint.** Statement of Ms. Mary Madison to OSHA in the form of a whistleblower complaint.
2. **Regulatory Business Problem report.** October 20, 2022. 78-page report written by Ms. Madison and referred to as a risk analysis in the complaint. The Word version was provided on July 9, 2023, to assist with the writing of the declaration.
3. **Mary Madison Resume.** 2-page resume of Ms. Mary Madison.
4. **Mary Madison Quality reg Manager.** creative werks employment offer letter to Ms. Madison.
5. **Quality Team.** Organizational chart for the Quality department comprised of 14 positions.
6. **ILDHP_NoticeofInspection (2).** This is simply a one-page legal document and contains no information specific to the facility. Reviewed but not referenced in the declaration.
7. **Establishment Inspection Report – 1460 Brummel Ave 07-15-2022.** FDA EIR for the facility in Elk Grove Village ending on July 15, 2022, before the employment of Ms. Madison.
8. **Establishment Inspection Report – 1350 Munger Rd 9.28.22.** FDA EIR for the facility in Bartlett ending on September 29, 2022, for which Ms. Madison was present.
9. **Inspection Report (3).** Illinois Department of Public Health, Division of Food, Drugs and Dairies, Good Manufacturing Practice (GMP) Inspection Report for the Bensenville facility.
10. **Inspection Report (004).** Illinois Department of Public Health, Division of Food, Drugs and Dairies, Good Manufacturing Practice (GMP) Inspection Report for the Elk Grove Village facility.
11. **Madison Mary_Creative Werks_Risk Analysis 111522.** *Legal Analysis of Regulatory Business Problem*, November 15, 2022. 42-page report written by Ms. Madison and referred to as a risk analysis in the complaint.

The following food safety plans were operational at the time of Ms. Madison's employment.
12. **Packaging FSP v4 02.21.2023.** 21-page document for the Brummel Facility [Elk Grove Village]/ Bensenville Facility [Sivert Court]/ Bartlett Facility [Munger Road] and includes the hazard analysis of received foods.
13. **Manufacturing FSP v2.0 (12.16.2022).** 16-page document for "Bartlett Facilities" covering the hazard analysis of packaging manufacturing.
14. **Dunkaroos FSP Final vNew (12.16.2022).** 20-page document dedicated to General Mills product. Missing facility name and location.
15. **Coffee Brew Pouch Fill v3.0 (12.14.2022). 14-page document for the Elk Grove Village facility.**
16. **Email from Mr. Zicher 070323.**
    1. *What Kathy is inquiring about is the PepsiCo complaint that was investigated by the FDA inspector during the September, 2022 visit. This EIR was sent originally with the first set of document requests (week of 6/12/23), but I have attached a copy here. The inspector during the visit was inquiring about a similar scenario that purportedly had come into the FDA. Neither the client (PepsiCo) nor creative werks had received any such complaint reported. We shared the*

*attached complaint corrective action on our conference room screen as referenced in the EIR in an effort to demonstrate transparency and cooperation.*

17. **PepsiCo Complaint.zip. RE Mold Complaint.** Email between Mr. Zicher and PepsiCo dated 060721.

18. **Bartlett EMP OOS 21-23.** Excel spreadsheet showing four *Listeria* Suspect from 2021 & 2022 and three *Salmonella* from 2023.

19. **Bensenville EMP OOS 21-23.** Excel spreadsheet showing 33 *Listeria* not all speciated to *L. monocytogenes*, some samples appear to be positive vector samples, and no *Salmonella* Suspect in the timeframe.

20. **Brummel EMP OOS 21-23.** Excel spreadsheet showing nine Out of Spec with two *Salmonella* and seven *Listeria*.

21. **Consumer Contacts Tracker.** Excel spreadsheet. 080919 to 050223

22. **WI 5.2 Trailer Inspection and Control.**

23. **WI-5.1 Receiving & Shipping Instructions.**

24. **WI 5.6 Material Receiving.**

25. **WI-8.3 Supplier Approval.**

26. **Quality Regulatory Manager.** Ms. Madison's job description.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 9, 2023

Kathy Knutson, Ph.D.

Complainant

CP

Exhibit 1



1470 Brummel Ave
Elk Grove Village, IL 60007

www.creative-werks.com
630 860 2222

September 20, 2022

Mary Madison,
Via Paycor– assist2law@gmail.com

Dear Mary,

I am very pleased to offer you the opportunity to join our team at creative werks. We believe that you will find working at creative werks challenging, fun, and a great opportunity to learn. Fit is key for us and we believe that your contributions and work ethic will help our Company grow and flourish.

We would like to confirm the arrangements made regarding this opportunity. We are very happy to offer you a position as a **Quality Regulatory Manager**, at our *Elk Grove Village* location on *1st Shift* within our **Quality** department. This position will be reporting to Erich Zicher (Food Safety Director) starting on September 27, 2022.

### Compensation

- You will be paid a Salaried Exempt rate of $3,653.85 paid bi-weekly ($95,00 annually) so long as you are actively employed by the Company.

### Annual Incentive Plan (AIP)

- You will be eligible to participate in creative werks 2023 Annual Incentive Plan (AIP) with a target incentive of 10% of your salary. The AIP is based on a combination of company performance, individual performance, and target incentive. The 2023 AIP will be payable in March 2024. Please refer to the AIP document for specific plan details.
- As discussed, we are pleased to offer you a signing bonus of $2,500 payable in one lump sum on October 27, 2022. This signing bonus is taxable, and all regular payroll taxes will be withheld. In the event that you leave creative werks within 12 months of your date of hire, you will be responsible for reimbursing the company for the entire signing bonus. By your signature on this employment agreement, you authorize the company to withhold $2,500 from any severance and other final pay you receive should your employment terminate on or before October 27, 2023

### Paid Time Off (PTO) and Holiday Pay

- You will accrue PTO at the rate of 16 days per year (2.46 hours per week).
- For 2022, since you are starting later in the year, you will be eligible for 4.5 days of PTO.
- As a CW associate you will receive 9 paid holidays throughout the calendar year.



**werks**

1470 Brummel Ave
Elk Grove Village IL 60007

www.creative-werks.com
630 860 2222

### Code of Ethics, Values and Policies

- creative werks is committed to creating a positive environment and conducting business ethically. As an associate of the Company, you will be expected to abide by our Guiding Principles and general policies and practices set forth in our Employee Handbook.

After you return this signed offer letter, you will receive two emails from Paylocity. Paylocity is our onboarding tool which contains various online documents such as benefit forms, tax forms, a participation release form, an emergency contact form, confidentiality agreements, a background check, an employment eligibility form (I-9), and information about the Health Insurance Portability and Accountability Act. Please complete these documents as soon as you can. We need these completed in advance of your start date so we can be prepared for you when you arrive.

Please note that this offer is contingent upon successful completion of the background check and compliance with all new hire forms.

Mary, your signature below will acknowledge that there have been no representations by the Company or its agents which are not reflected in this letter. Please review all terms of this letter, returning the signed original to me by September 23, 2022

I am pleased you have decided to join creative werks. I look forward to watching your progress with the Company.

Sincerely,

*Gretchen LeMay*

Gretchen LeMay
Head Of People / Corporate VP

Mary Madison1 cef

_____

Mary Madison

September 20, 2022

_____

Date



werks     1470 Brummel Ave     www.creative-werks.com
Elk Grove Village, IL 60007     630.860.2222

**Notice of Suspension**

October 26, 2022

Mary Madison
Quality Regulatory Manager
Via Hand Delivery

Dear Mary,

This letter is to inform you that you are being placed on a paid suspension effective immediately. This suspension will last until a full investigation into the statements made in your report and during your conversation with Steve Schroeder on Friday, October 21, 2022 can be fully completed. This review will be conducted by an outside attorney and Human Resources will make the introduction when the time comes.

During your suspension you will be paid at your regular rate of pay and have access to benefits. You will not have access to any IT systems or the building until the investigation is complete.

If you have further questions, please reach out the HR team as needed.

Thank you,

Gretchen LeMay
Head of People





# MARY MADISON

January 23, 2023

Creative Werks
1460 Brummel Ave
Elk Grove Village, IL 60007

RE: Response to Outcomes and Findings of investigation relative to the October 20, 2022 Risk Analysis and October 21, 2022 conversation with Mr. Steve Schroeder

To whom it may concern:

This statement is in regards to the outcomes and findings of the investigation of Creative Werks regarding the conversation of October 21, 2022 and Risk Analysis dated October 20, 2022 presented to Mr. Steve Schroeder. This statement shall serve as my official response to the findings. Further, it is requested that this statement be placed in my personnel file.

It has come to my attention that the outcomes and findings, of the investigation that Creative Werks conducted, did not support the non-compliances identified and summarily referenced in the Risk Analysis dated October 20, 2022. It has further come to my attention that Creative Werks contends that it is confident in its current Food Safety Matrix and its management. Creative Werks also asserts underlyingly that I had issue with the competency of its Food Safety Director along with a concern that I might highlight customer/client deficiencies of competencies to the customers.

It has further come to my attention that despite Creative Werks hiring me for my expertise to manage the Quality Regulatory Affairs of the company it now asserts that I think I know more than everyone else at Creative Werks.

First, in my opinion, no one knows everything and it is unreasonable and lofty to have such a mindset to which I do not subscribe. However, as a degreed Chemist with more than 30 years in quality and regulatory management and procuring a Master's Degree in the very narrow subject of Food Safety Regulatory Science from Johns Hopkins would reasonably support that I would and should have knowledge that others may not have regarding Food Safety. Within the scope of my education at Johns Hopkins, I earned very high marks and was cited for various signature works on Food Safety Analysis that is currently being used in its curriculum and I am slated to graduate with honors from this institution.

Further, my studies in Business Analytics at Harvard University is another narrow scope of discipline using a multidisciplinary approach, affords me additional knowledge and perspectives to uniquely analyze situations for determinative and cutting edge outcomes. It is also my intent to finish this program with distinction.

Based upon the assertions and contentions made by Creative Werks, it reasonably leads me to believe that there are communications being made regarding my professionalism, competency, understanding and application of the current statutes, regulations and rules pertaining to the Food safety Modernization Act and the operations at Creative Werks, since raising the non-compliance issues in October of 2022. Such patently false assertions, by Creative Werks, concerning my intellectual capacity and competency are not only affront to me and my professional standing; but are defamatory and an affront to two (2) of the most prestigious, esteemed and elite learning institutions in the world.

In sum, I reject the assertions and contentions inferred and made by Creative Werks regarding the Risk Analysis, my professionalism and my competency. Specifically, the crux of the Risk Analysis reiterated undisputed facts and documented occurrences noted by a federal inspection and various second (2nd) and third (3rd) party audits. In addition, it highlighted that other clients sought almost a total of one hundred and fifty (150) compliance related materials for nearly more than two (2) years. Moreover, documentation revealed and supports that Creative Werks had been apprised of these deficiencies for a good span of time prior to the October Risk Analysis.

Additionally, the Risk Analysis was a very high overview of process and operational gaps that needed addressing by the company; especially in view of the most recent consumer complaint investigated by the FDA in September of 2022, in which I participated. The analysis was not a critique of the business nor of its management nor of its staff. It was merely a Risk Analysis. Further, the current Food Safety Director's competency is well established. This competency is demonstrated through his education as a Biochemist; his work history at Kraft Foods and other places along with his PCQI and HACCP certifications among others.

Tracing the root cause of the process and operational gaps, identified in the October 20, 2022 analysis, suggest that the noncompliance dates back to as recent as 2016. Risk Analysis is an essential function of the Food Safety and Modernization Act and the job that I was hired to perform. The analysis was not meant to be an affront to the integrity of the company's operations, but the catalyst to compliance to FSMA and other statutory requirements.

Undoubtedly, the October 20, 2022 Risk Analysis, outlining the various non-compliances, and the October 21, 2022 conversation, led to my suspension and the various other adverse employment actions taken against me. Specifically, I am baffled as to how operational issues quickly devolved into a human resource issue for which I was not afforded the courtesies of an audience with the management team or HR to engage in dialogue to address the issues raised in the Risk Analysis prior to the suspension.

Further, I am more concerned that the investigatory process was conclusory and lacked independent third (3rd) party subject matter technical expertise in Food Safety and Regulations that would have allowed for a proper and thorough evaluation of the Risk Analysis to either validate or disprove its analysis and conclusions. What is even more disconcerting is the lack of acknowledgement or deference towards compliance to the Food Safety mandates that govern and underscore public safety and health initiatives. This is an affront to society at large, to willfully and recklessly, fail to ensure that products introduced into the stream of commerce for human consumption are safe.

Moreover, I contend that the assertions and contentions made by Creative Werks are false and pretextual in regards to their alleged outcomes and findings to coerce my separation from the company. I further contend that others who have violated public policy have been treated more favorably than I have and did not suffer any adverse actions, such as suspension. Finally, I contend, the treatment I am receiving is retaliatory and based upon me engaging in protected activity, my race and my gender.

Sincerely yours,


Mary Madison

1) Creative Werks
   1460 Brummel
   Elk Grove Village, IL
   Respondent is a manufacturer of food-grade in direct and direct plastics and a co-packer
   of foods.

2) 09/27/2022

3) I was offered the Job by Manny in HR- Hispanic

4) Regulatory Quality Manager

5) The responsibilities entailed compliance with the Food Safety Modernization Act
   "hereinafter referred to as FSMA" and other regulatory schemes such as the Bioterrorism
   Act of 2002 (Food Defense) in addition to being a liaison between customers and the
   company regarding compliance quality, regulatory and customer requirements.

6) Erich Zicher, white male, age 41

7) Angela Knabe, I was her replacement she worked with us for about a week

8) Justice

9) See attached

10) mmadiso3@jh.edu

Charge No. 2024CR0389-
1

A1.   Technically on indefinite suspension/de facto termination

A2.   Gretchen LeMay, VP of People, White female, age ~40

A3.   See attached

A4.   I was suspended for a conversation with Steve Schroeder regarding outstanding compliance issues that I was hired to manage.

A5.   Yes-I disagree with being suspended/de facto termination. I was not given concrete or specific reasons to justify any of the adverse actions taken against me

A6.   No

A7.   Yes

A8.   Yes 10.26.22 was the date that my indefinite suspension/de facto termination began

A9.   No

A10.  Not sure

A11.  Yes. Erich Zicher Director Food Safety; White Male, 41 yrs. old had the same contextual conversation with Mr. Schroeder and others

A12.  Mr. Zicher spoke with Mr. Schroeder about compliance and regulatory issues, as evidenced by the need to hire myself and a regulatory specialist. Not sure of the dates and times, but it was advertised positions. Further, Mr. Schroeder was well aware of the staffing needs. Further, Mr. Zicher states by declaration that I was hired to write compliance documents.

A13.  No

A14.  N/A

Charge No. 2024CR0389-

2

B1.     Steve Schroeder white-male, CEO and Founder of Creative Werks- Eric Zicher Director of Food Safety,,

B2.     Ostracized, humiliated in meetings 10/2022, Suspended with pay 10/26/2022, bonus withheld 10/27/2022, suspension without pay 11/8/2022, forced to see their outside lawyer as a term and condition of employment 12/20/2022., conspired against 10/26/2022, told that I should have been making nice by Schroeder, instead of talking to him. 10/21/022

B3.     Yes, Gretchen LeMay, VP of People 11/4/2022,

B4.     None

B5.     I engaged in protected activity. I discussed the same issues with Schroeder that Zicher did but he did/has not suffered any adverse employment actions. I contend it was due to my race and sex.

B6.     Yes. Wendy Prolux of HR, there is a written correspondence dated 10/26/2022 signed by Gretche LeMay

B7.     Not that I am aware of

B8.     Yes

B9.     N/A

B10.    Yes see attached

B11.    Erich Zicher and Steve Schroeder, Grethcen LeMay all white. In positions of authority to make determinative employment outcomes.

B12.    Ostracized, humiliated in meetings 10/2022, Suspended with pay 10/26/2022, bonus withheld 10/27/2022, suspension without pay 11/8/2022, forced to see their outside lawyer as a term and condition of employment 12/20/2022., conspired against 10/26/2022, told that I should have been making nice by Schroeder, instead of talking to him. 10/21/022- denied personnel file and findings of alleged investigation

B13.    Gretchen LeMay, VP of People

B14. Not about the complaint about being punished and being treated differently.

B15. Race and sex, when the same context was discussed by me I was punished and told that I should have been trying to make nice with my boss instead of doing my job.

B16. Yes Erich Zicher, Steve Schroeder, Wendy Prolux, Gretchen LeMay, and meeting participants. The meeting participants saw Zicher marginalize me in a meeting. Ms. Dhillion from Blue Diamond Growers saw Mr. Zicher mock me to her.

B17. Not sure

B18. Yes. That harassment is prohibited

B19. N/A

B20. Yes

C1. I was the only black female manager. I spoke about the same issues that had been previously discussed with Mr. Schroeder by Erich Zicher and he was not subjected to any of the adverse employment actions taken against me.

I had not witnessed Zicher treat anyone as poorly as myself, except the female black FDA Inspector, whom he spent several hours speaking in a vile and animus manner about, especially focusing in on her competency, often calling her stupid, etc.

C2. I was hired for my expertise and when I spoke about the same contextual issues that Mr. Zicher spoke about I was Ostracized, humiliated in meetings 10/2022, Suspended with pay 10/26/2022, bonus withheld 10/27/2022, suspended without pay 11/8/2022, forced to see their outside lawyer as a term and condition of employment 12/20/2022., conspired against 10/26/2022, told that I should have been making nice by Schroeder, instead of talking to him. 10/21/022

C3. Not sure

C4. Erich Zicher, white male, age 41

C5. Erich Zicher, white male, age 41

C6. I contend race and sex

C7. Zicher a white male in his early 40's- Zicher was not Ostracized, humiliated in meetings 10/2022, Suspended with pay 10/26/2022, bonus withheld 10/27/2022, suspended without pay 11/8/2022, forced to see their outside lawyer as a term and condition of employment 12/20/2022., conspired against 10/26/2022, told that I should have been making nice by Schroeder, instead of talking to him. 10/21/022

C8. I contacted HR prior to speaking with Mr. Schroeder, but HR never got in touch or spoke with me as promised.

D1.    It has been indefinite starting 10/26/2022-Learned about termination in a position statement to OSHA

D2.    Steve Schroeder CEO and Gretchen LeMay VP of People

D3.    Conversation had with Steve Schroeder

D4.    Yes, warning, verbal, written, pip, suspension, termination

D5.    No

D6.    I had a conversation with Mr. Schroeder regarding outstanding compliance and regulatory issues. I was suspended a few days later and there is a letter stating the same.

D7.    When a white male was able to discuss with Steve Schroeder the same content and not be punished. Is discriminatory. Further, according to Zicher, I was hired to write compliance documents.

D8.    I had a conversation with Steve Schroeder

D9.    Yes, Erich Zicher white male had the same contextual conversation with Schroeder on more than one occasion.

M1.   Suspension-De facto Term 10/26/2022 See attached

M2.   Steve Schroeder-CEO must have initiated it because I had the conversation with him.
Gretchen LeMay corroborated and executed the decision.

M3.   The conversation had with Steve Schroeder-See attached

M4.   Yes, warning, verbal, written, pip, suspension, termination

M5.   No

M6.   I had a conversation with Mr. Schroeder regarding outstanding compliance and regulatory
issues. I was suspended a few days later and there is a letter stating the same.

M7.   I was told to save anything I had for their outside legal counsel

M8.   No, race/sex. The same issues were discussed by Zicher, a white male, who suffered no
adverse actions.  ZIcher states that was what I was united to do.

M9.   Yes. Eirch Zicher and he also engaged in violations in contravention to the public policy
and instructed me to do so.

The facts supporting the plaintiff's claim of discrimination are as follows:

1. Madison an African American, female over 50 years old, began working at Creative Werks on September 27, 2022, and at the relevant time was the only African American, female manager at the corporate office over 50.

2. Madison's responsibilities entailed compliance with the Food Safety Modernization Act "hereinafter referred to as FSMA" and other regulatory schemes such as the Bioterrorism Act of 2002 (Food Defense) in addition to being a liaison between customers and the company regarding compliance quality, regulatory and customer requirements (See Exhibit 3 FDA report pg. 8).

3. Madison at all relevant times met Defendant's legitimate expectations relative to her role and responsibilities as the Quality Regulatory Manager.

4. At all relevant times, Madison possessed the skills, education, experience, and qualifications necessary to work in her employment position and adequately and completely performed all of the functions, duties, and responsibilities of her employment with Defendant Creative Werks.

5. At all times, Steve Schroeder, ("Schroeder"), a White, male, held the position of Founder and President. Mr. Schroeder was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of Madison's employment with Defendant Creative Werks.

6. At all relevant times, Schroeder, acting on behalf of himself and his alter ego Creative Werks directed and approved all operational activities, including but not limited to hiring, pay, scheduling, performance management, workflow, and the like.

7. At all relevant times, Erich Zicher, ("Zicher"), a White, male, coordinated regulatory, compliance, and quality activities relative to Creative Werks' operations, including but

The facts supporting the plaintiff's claim of discrimination are as follows:

not limited to hiring, scheduling, workflow, investigations, safety, food defense, and safety plans, as well as, internal, external, federal, state and local compliance audits relative to the Food Drug and Cosmetic Act and other relevant statutes and the like

8. Madison was hired for her expertise as the Quality Regulatory Manager at Creative Werks to manage quality and regulatory issues internally and externally, with customers such as Nestlé, Mondelez, General Mills, Hersey, Ghirardelli, Mars, Ferrara and Ferrero Candy, Tates, and other snack food and confections companies, as well as, other companies such as Wilton Brands, Blue Diamond Growers among others; in addition to other relevant third (3rd) party stakeholders.

9. Madison participated in an FDA investigation and inspection on September 28-29, 2022 along with other attendees on behalf of Creative Werks including Mr. Erich Zicher, Ms. Angela Knabe and Anupam Sharma.

10. On September 28, 2023, while waiting for the FDA Inspector Mr. Zicher began making continued disparaging remarks in a vile, animus, contemptuous and derogatory manner about the FDA Inspector and in particular her competency. Remarking that she was incompetent, stupid and even at some point stating that her requisite knowledge was akin to that of an IRS agent. ZICHER further remarked with great hostility and disdain that in the FDA's previous inspection at Brummel, the Elk Grove Facility, the inspector's report made him look stupid and incompetent as if he did not know anything. Mr. Zicher spent a considerable amount of time ad nauseam maligning and denigrating the inspector.

11. Upon the FDA Inspector's arrival, Madison learned that she was an African-American Female.

2

The facts supporting the plaintiff's claim of discrimination are as follows:

12. Madison did not ever hear Mr. Zicher speak about anyone else in such a vehemently vile and animus manner as he did regarding the FDA Inspector, even when he talked about Donna Bjurlin from Nestlé Corporate Quality, who is not an African-American female.

13. On September 30, 2022, Madison had a brief conversation with Mr. Schroeder regarding the FDA investigation regarding Pepsi. Mr. Schroeder instructed Madison to ask Mr. Zicher to provide her with the questions that Mr. Schroeder had posed to Mr. Zicher regarding the FDA investigation and visit. Madison also agreed to share her initial analysis of the requests and observations made by the FDA Inspector.

14. On September 30, 2022, Madison shared the initial analysis of the September 28-29, 2022 FDA investigation and visit.

15. On October 3, 2022, as instructed by Mr.Scroeder, Madison requested the questions from Mr. Zicher that Schroeder had posed to Mr. Zicher regarding the FDA investigation and inspection.

16. Mr. Zicher refused indicating that he and Ron Sammeth decided what Mr. Schroeder should know.

17. Among Madison's other responsibilities of attending meetings with customers and potential customers and conducting audits, she continued to conduct root cause analysis and other risk analysis relative to these and other outstanding customer and regulatory compliance issues that had been unremedied and due and owing since 2021.

18. Over the next few weeks, Madison sought information necessary to remediate outstanding issues but was instructed by Mr. Zicher to either provide false and/or misleading information to customers, or instructed to not comply, or provided with inadequate information to perform the job properly.

The facts supporting the plaintiff's claim of discrimination are as follows:

> For example:
>
> > I.    Blue Diamond Growers
> >
> > II.   Nestlé
> >
> > III.  Wilton Brand

19. Madison had raised issues and complained about violating SQF-company, customer and public policy.

20. Madison had also been in a meeting where Mr. Zicher tried to gaslight and humiliate her about not providing metrics that he was aware of that had not been supplied to Madison because they did not exist.

21. On October 21, 2022, prior to speaking with Mr. Schroeder, Madison asked to speak with Ms. Gretchen Le May, VP of People.  Ms. LeMay indicated that she was not available until Monday and it was agreed that they would speak on that day.

22. On October 21, 2022, Madison raised issues with Mr. Steve Schroeder regarding a known set of common core or nucleus of operative facts regarding the September 28-29, 2022, FDA investigation of a consumer complaint of a Pepsi-Cheeto product, along with other known gaps and deficiencies of compliance, such as food safety plans.

23. During the conversation, Mr. Schroeder told Madison that Mr. Zicher told him that he worked at Kraft and he did not understand.  As if to say, that Mr. Zicher working at Kraft made him more knowledgeable or the outstanding issues were obviated because Mr. Zicher had worked at Kraft.

24. Contrarily, by Mr. Zicher's own admission his LinkedIn page does not support that he ever worked at Kraft. (See Attached Exhibit 4)  Further, FSMA requires that qualified

The facts supporting the plaintiff's claim of discrimination are as follows:

individuals have the requisite training, experience and education[1] qualifications as defined in (21 CFR 117.3) to function in any capacity of Food Safety (21 CFR 117.4(c)).

25. Mr. Schroeder also told Madison that if her solution was to hire more people like Mr. Zicher had suggested he did not agree. Madison acknowledged that hiring more people would not fix the issues, but complying with the rules, regulations and statutes would.

26. Mr. Schroeder also indicated that {Creative Werks} was not as bad as Peanut Corporation of America.

27. Mr. Schroeder also told Madison that since she had not been there that long she should have been trying to make nice with her boss, instead of speaking with him.

28. Immediately after meeting with Mr. Schoerder, Madison began to be ostracized from meetings and ignored. For example, there was a meeting with Ghirardelli, a client that Madison liaised with; she was excluded from the meeting, after receiving an email about the meeting and despite all other relevant parties being involved in the meeting, including Mr. Zicher. There was also a regulatory issue that arose relative to a salmonella outbreak at the Elk Grove facility. Madison was also excluded from this investigation. Additionally, Ms. Lemay did not meet with her as planned either.

29. This harassment and ostracizing created a hostile work environment and de facto issues of Madison's competency internally and externally among stakeholders involved in Creative Werks' business operations. Especially, in view that Madison liaised with Creative Werks's customers regarding their quality and regulatory compliance.

30. Madison was retaliated and discriminated against after raising issues relative to the same common core or nucleus of operative facts that Zicher had previously raised with

---

[1] Mr. Zicher hailed himself out to be a professionally trained musician and golf pro. Mr. Zicher never represented himself as a scientist or having had any related training in the discipline of science.

The facts supporting the plaintiff's claim of discrimination are as follows:

Schroeder and others regarding the FDA investigation of a consumer complaint along with gaps and deficiencies in compliance documents such as food safety plans.

31. On October 26, 2022, at approximately 3:30 pm, Madison was stopped by Wendy Proulx of HR asked Madison to step into the conference room. Ms. LeMay was there in the conference room and it was at that time that Madison was told that she was being suspended with pay for the conversation that was had with Mr. Schroeder. It was also communicated that an investigation would be conducted by an outside attorney and the suspension was pending the attorney's investigation. A written letter was presented to that effect. (See Attached Exhibit 5)

32. Madison pressed Ms. LeMay on what grounds was she being suspended and how had they come to that conclusion. Ms. LeMay finally indicated that they had found that the issues that were raised were unfounded. Madison stated that there was supporting documentation to the issues raised and Madison was instructed by Ms. LeMay to save it for the attorney. Madison was never a part of any investigation that led to the conclusion that these issues were unfounded.

33. On October 27, 2022, Madison was due and owing her sign-on bonus, as evidenced by Madison's offer letter. The signing of the offer letter was a term and condition of Madison's employment at Creative Werks. (See Attached Exhibit 6)

34. In further retaliation, Creative Werks intentionally breached its agreement with Madison by failing to pay her the sign-on bonus that was due and owing to her. Madison further asserts that Creative Werks breached its fiduciary obligations and duty to Madison to not discriminate against her.

6

The facts supporting the plaintiff's claim of discrimination are as follows:

35. When Madison was finally contacted to speak with Creative Werks' outside legal counsel, who was to be acting as an independent fact finder, Madison indicated that she felt like she needed legal counsel.

36. Ms. LeMay indicated that it was not necessary as this was an in-house matter and that Madison did not need any legal counsel.

37. Madison insisted that she could not reconcile how a third (3rd) party that was unfamiliar with the issues and the organization could conduct an investigation when they themselves had not or could not for whatever reason.

38. Madison also requested her personnel file and it was provided. There was nothing in the file adverse except the suspension letter.

39. Ms. Lemay confirmed by email that nothing was in the personnel file except things related to onboarding and the suspension letter.

40. Madison complained that she was being retaliated and discriminated against.

41. After Madison insisted on counsel, Madison was allowed to have legal counsel. Madison was again aggrieved, as she was only given a day or so to secure legal counsel, when in fact it had taken Creative Werks more than a week to secure the counsel. A firm that had been used on several occasions by Mr. Schroeder and his alter ego Creative Werks.

42. Madison was again retaliated and aggrieved when her suspension with pay turned into a suspension without pay after exercising her right to legal counsel.

43. Madison again complained that she was being retaliated and discriminated against.

44. Madison also indicated that she felt she was being made to see their outside legal counsel as a part of a contrived scheme to further their adverse actions, cause her irreparable harm(s) and further conspire against Madison's protected rights.

7

The facts supporting the plaintiff's claim of discrimination are as follows:

45. In furtherance of Creative Werks' scheme to engage in pretext and violate Madison's protected rights, Creative Werks induced Madison to believe that the outside counsel, Ford-Harrison Law Firm, was an independent fact finder for Creative Werks.

46. Gretchen LeMay of Creative Werks further induced Madison into believing that meeting with Ford Harrison was a term and condition of Madison's employment.

47. Madison also contends that being forced to meet with Ford-Harrison as a term and condition of Madison's employment was an intimidation tacit and that was harrassive in nature.

48. Madison relied on Creative Werks' inducement to meet with its alleged independent factfinder, Ford-Harrison to Madison's detriment.

49. Madison attended a meeting with the alleged independent factfinder-Ford Harrison on December 20, 2022.

50. The Law Firm of Ford Harrison indicated and represented that it was an independent fact finder, acting on behalf of Creative Werks.

51. Ford Harrison is an employment law firm that specializes in employment law but did not demonstrate an adequate understanding of the subject matter contained in the risk analysis. Madison spoke with them for over 6 hours. Only an hour was spent talking about random excerpts of the report.

52. Ford Harrison previously represented Creative Werks in a number of employment related matters.

53. As a subsequent remedial measure, in January of 2023, Creative Werks' legal counsel, Ford Harrison, contacted Madison's legal counsel to make an offer of $50,000. After

The facts supporting the plaintiff's claim of discrimination are as follows:

stating that Madison's claims were unfounded. It was also stated that Madison could not

return because Mr. Zicher did not want to work with Madison.

54. Mr. Schroeder and his alter ego Creative Werks would provide Madison with $50,000.00

in exchange for her waiving any claims against them. A quid-pro-quo.

55. It is unreasonable to assert that a monetary offer from Creative Werks supported the

contention that Madison's assertions and allegations were unfounded.

56. Madison again requested her personnel file pursuant to the Illinois Personnel Review Act

to review the findings of the investigation that allegedly supported their contentions that

Madison's assertions were unfounded.

57. Ford-Harrison on behalf of Creative Werks declined to provide Madison's personnel file

in contravention of the Illinois Personnel Review Act or the results of the investigation

(See Attached Exhibit 7).

58. Ford-Harrison also indicated that there had not been anything added to Madison's

personnel file since her request in 2022.

59. Within reason, the results of the investigation or a disposition should have been added to

Madison's personnel file to support the Defendant's alleged legitimate findings.

60. Ford-Harrison stated that Creative Werks was claiming privilege to the investigation and

its findings and would not be sharing any information based on client-attorney

relationship.

61. This explanation for denying Madison access to their findings that should have been

contained in Madison's personnel file belies the assertion that the outside counsel from

Ford Harrison was acting as an independent fact finder.

The facts supporting the plaintiff's claim of discrimination are as follows:

62. Further, to date Creative Werks has not and cannot point to any non-retaliatory or non-discriminatory reason for suspending Madison. Nor can Creative Werks point to any company or public policy that Madison violated relative to Madison's employment to warrant Madison's suspension and de facto discharge/termination.

63. The Defendant's deceptive actions and conduct of inducing Madison to speak with their legal counsel under the assumption that this was an independent factfinder and a term and condition of Madison's employment, support the intentional furtherance of a contrived scheme to engage in pretext to justify the adverse actions it had taken while continuing to conspire to violate Madison's protected rights and inflict other adverse actions and irreparable harms upon Madison.

64. In furtherance of the scheme to conspire to engage in pretext and in continued violation of Madison's protected rights, Creative Werks and its alter ego, Mr. Schroeder, hired an expert witness.

65. Creative Werks' expert witness further gaslighted Madison, impugning and undermining her professional reputation, characterizing her as an extremist and an alarmist. When in fact Mr. Zicher, a 41-year-old white male, had also raised the same common core or nucleus of operative facts with Mr. Schroeder and others regarding the FDA investigation of a consumer complaint along with gaps and deficiencies in compliance documents such as food safety plans was not subject to such characterization nor had he been subject to any adverse employment or disciplinary actions.

66. Contrarily, to that date there had been two (2) consumer complaints and several (3rd) third-party audits that captured numerous non-compliances. (See Attached Exhibit 8)

The facts supporting the plaintiff's claim of discrimination are as follows:

67. Creative Werks' expert witness claimed to be a Food Scientist, but yet in reality by her own admission on her LinkedIn page is only a microbiologist[2]. (see Attached Exhibit 9)

68. The Department of Labour does not characterize these professions as the same. They are distinctly different. Thus this claim of being a food scientist is disingenuous, misleading and patently false.

69. There were other issues relative to Creative Werks' expert witness' relative work experience along with the construct and content of her opinion in compliance with the **Fed Rule of Evidence Rule** 702-expert witnesses.

70. Further, Defendant's expert witness provided an opinion that Defendant was compliant with the Food Safety and Modernization Act. This is in direct contradiction to Mr. Zicher's declaration stating that Madison was hired to write food safety plans. An admission that Defendant was not in compliance.

71. These two (2) competing interests and differing schools of thought relative to Defendant being compliant with FSMA and; that Madison's assertions and contentions were unfounded, but yet was hired to write the food safety plans according to Zicher's

---

[2] According to the Bureau of Labor and Statistics: Food scientists and technologists use chemistry, biology, and other sciences to study the basic elements of food. They analyze the nutritional content of food, discover new food sources, and research ways to make processed foods safe and healthy. Food technologists generally work in product development, applying findings from food science research to develop new or better ways of selecting, preserving, processing, packaging, and distributing food. Some food scientists use problem-solving techniques from nanotechnology—the science of manipulating matter on an atomic scale—to develop sensors that can detect contaminants in food. Other food scientists enforce government regulations, inspecting food-processing areas to ensure that they are sanitary and meet waste management standards.

Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Agricultural and Food Scientists, at Agricultural and Food Scientists : Occupational Outlook Handbook (visited August 3, 2023).

The Bureau of Labor and Statistics defines a Microbiologist as a person who "studies microorganisms such as bacteria, viruses, algae, fungi, and some types of parasites. They try to understand how these organisms live, grow, and interact with their environments."
Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, Microbiologists, at https://www.bls.gov/ooh/life-physical-and-social-science/microbiologists.htm (visited July 26, 2023).

The facts supporting the plaintiff's claim of discrimination are as follows:

declaration dated ___ create an unexplainable anomaly of riddled inconsistencies that squarely put Creative Werks in a conundrum of creating direct evidence of engaging in pretext and other unlawful acts.

72. The Defendant's actions were premeditated, calculated, intentional, willful, malicious, and in reckless disregard of Madison's rights to not be further harassed, gaslighted, or humiliated in furtherance of Defendants' contrived schemes of conspiracy, in using its Legal Counsel as an alleged fact finder and hiring an expert witness, to discriminate against Madison and to continue to violate her federally protected rights. The Defendants' actions are extreme and shocking.

73. What is even more alarming and shocking to the mind is that Defendants were knowingly willfully and recklessly operating a business in contravention of the Food Safety and Modernization Act and the Bioterrorism Act of 2002, as evidenced by the adulterated food products that entered into the stream of commerce and the other outstanding compliance identified by the FDA and other third (3rd) party audits. Instead of Defendant remediating the non-compliance(s) and public safety issues, risks and hazards, Defendant, as a subterfuge, has focused a considerable amount of time and resources affixed on conspiring, harassing and discriminating against Madison.

74. Defendants intentionally, willfully and recklessly engaged in an unlawful enterprise that defied and mocked public policy, by introducing adulterated food products for human consumption into the stream of commerce that created public safety risks and hazards that were harmful to consumers. (See Attached Exhibit 8)

75. Defendants' actions were also intentional, willful, and in reckless disregard of justice and its administration.

The facts supporting the plaintiff's claim of discrimination are as follows:

76. The Defendant's actions were also intentional, willful, and in reckless disregard of public policy and public safety. Public policy mandates adulterated products introduced into the stream of commerce are in contravention of the Food Safety and Modernization Act and the Bioterrorism Act of 2002.

77. Defendant did not investigate or remedy Madison's complaints but retaliated against her by suspending her, withholding her sign-on bonus and other benefits, and subjecting her to further harassment and other adverse employment actions including a defacto termination.

78. As a result of the Defendants' unlawful actions, Madison suffered emotional distress, humiliation, loss of income and benefits, and damage to her reputation and career.

EEOC FORM 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 2024CR 0389 440-2023-09356 # 240925.038 |

and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Mary Madison | 7732979569 | 09/26/1968 |

| Street Address | City, State and ZIP Code |
|---|---|
| 9758 S. Charles | Chicago, IL 60643 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| Creative Werks, LLC | 500+ | 6308602222 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1460 Brummel | ElkGrove Village, IL 60007 |

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☒ OTHER (Specify) harassment

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 10/26/2022   Latest: 11/08/2022

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was suspended on October 26, 2022 in retaliation for raising violations of the FFDCA as amended by FSMA to the owner of the company on Friday October 21, 2022. My employer provided a letter stating the same. ▮▮▮
I was never a part of any investigation.
I was subject to further retaliation and harassment when I was not paid my bonus that was due and owing to me on October 27, 2022.
▮▮▮
I was further retaliated against and harassed when my paid suspension was converted to a suspension without pay on November 8, 2022 after telling my employer that they retaliated against me and for asking for legal counsel to attend the mandatory meeting with their outside legal counsel.
I was told by my employer that they were an independent fact finder.
Further, my employer conspired with outside counsel to further violate my protected rights to create a pretext.
I was further harassed when I had to go to their outside legal counsel under the premise of them being an independent fact finder. On December 20, 2022, I spent over 6 hours speaking with their counsel, with over 5+ hours speaking about other issues not related to the issues that I was supposed to be speaking with them about .
On January 18, 2023, the law firm indicated that my assertions were unfounded and that I could not come back to work because ▮▮▮ could not work with me.
On January 20, 2023, the law firm claimed privilege when I asked for the investigation findings. ▮▮▮
The firm and my employer refused to share the investigation findings and my personnel file.
On January 23, 2023, I informed my employer that I had been treated differently than others who had violated company and public policy; including ▮▮▮ a white male.
I am technically still on suspension.

OFFICIAL SEAL
EDWIN WALKER
Notary Public - State of Illinois
My Commission Expires 08/22/2026

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 08/17/2023  Date  Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)  8/18/23 |

DEPT. OF HUMAN RIGHTS
INTAKE DIVISION
09/25/2023
RECEIVED
BY: _____

EEOC REDACTED

**CHARGE OF DIS          NATION**

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

Charge Presented To:

[ ] FEPA

[X] EEOC

cy(ies) Charge No(s):

and EEOC

State or local Agency, if any

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

Also, during the course of my employment I refused to engage in and oppose activity that violated the Food Safety and Modernization Act and the Bioterrorism Act.

State of: _Illinois_

County of: _DuPage_

The foregoing instrument was acknowledged ____ . 18 23 by Mary D. Madison

**OFFICIAL SEAL**
**EDWIN WALKER**
Notary Public - State of Illinois
My Commission Expires 06/22/2026

Notary Public _06/22/2026_

My Commission Expires

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

08/17/2023
Date

Charging Party Signature

NOTARY – When necessary for State or Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

8/18/23

*OUT OF PRONG FASTENERS*





## Certified Mail service provides the following benefits:

- A receipt (this portion of the Certified Mail label).
- A unique identifier for your mailpiece.
- Electronic verification of delivery or attempted delivery.
- A record of delivery (including the recipient's signature) that is retained by the Postal Service™ for a specified period.

**Important Reminders:**

- You may purchase Certified Mail service with First-Class Mail®, First-Class Package Service®, or Priority Mail® service.
- Certified Mail service is *not* available for International mail.
- Insurance coverage is *not* available for purchase with Certified Mail service. However, the purchase of Certified Mail service does not change the insurance coverage automatically included with certain Priority Mail items.
- For an additional fee, and with a proper endorsement on the mailpiece, you may request the following services:
  - Return receipt service, which provides a record of delivery (including the recipient's signature). You can request a hardcopy return receipt or an electronic version. For a hardcopy return receipt, complete PS Form 3811, *Domestic Return Receipt*; attach PS Form 3811 to your mailpiece; for an electronic return receipt, see a retail associate for assistance. To receive a duplicate return receipt for no additional fee, present this USPS®-postmarked Certified Mail receipt to the retail associate.
  - Restricted delivery service, which provides delivery to the addressee specified by name, or to the addressee's authorized agent.
  - Adult signature service, which requires the signee to be at least 21 years of age (not available at retail).
  - Adult signature restricted delivery service, which requires the signee to be at least 21 years of age and provides delivery to the addressee specified by name, or to the addressee's authorized agent (not available at retail).
- To ensure that your Certified Mail receipt is accepted as legal proof of mailing, it should bear a USPS postmark. If you would like a postmark on this Certified Mail receipt, please present your Certified Mail item at a Post Office™ for postmarking. If you don't need a postmark on this Certified Mail receipt, detach the barcoded portion of this label, affix it to the mailpiece, apply appropriate postage, and deposit the mailpiece.

**IMPORTANT: Save this receipt for your records.**

PS Form **3800**, January 2023 (Reverse) PSN 7530-02-000-9047

## Certified Mail service provides the following benefits:

- A receipt (this portion of the Certified Mail label).
- A unique identifier for your mailpiece.
- Electronic verification of delivery or attempted delivery.
- A record of delivery (including the recipient's signature) that is retained by the Postal Service™ for a specified period.

**Important Reminders:**

- You may purchase Certified Mail service with First-Class Mail®, First-Class Package Service®, or Priority Mail® service.
- Certified Mail service is *not* available for International mail.
- Insurance coverage is *not* available for purchase with Certified Mail service. However, the purchase of Certified Mail service does not change the insurance coverage automatically included with certain Priority Mail items.
- For an additional fee, and with a proper endorsement on the mailpiece, you may request the following services:
  - Return receipt service, which provides a record of delivery (including the recipient's signature). You can request a hardcopy return receipt or an electronic version. For a hardcopy return receipt, complete PS Form 3811, *Domestic Return Receipt*; attach PS Form 3811 to your mailpiece; for an electronic return receipt, see a retail associate for assistance. To receive a duplicate return receipt for no additional fee, present this USPS®-postmarked Certified Mail receipt to the retail associate.
  - Restricted delivery service, which provides delivery to the addressee specified by name, or to the addressee's authorized agent.
  - Adult signature service, which requires the signee to be at least 21 years of age (not available at retail).
  - Adult signature restricted delivery service, which requires the signee to be at least 21 years of age and provides delivery to the addressee specified by name, or to the addressee's authorized agent (not available at retail).
- To ensure that your Certified Mail receipt is accepted as legal proof of mailing, it should bear a USPS postmark. If you would like a postmark on this Certified Mail receipt, please present your Certified Mail item at a Post Office™ for postmarking. If you don't need a postmark on this Certified Mail receipt, detach the barcoded portion of this label, affix it to the mailpiece, apply appropriate postage, and deposit the mailpiece.

**IMPORTANT: Save this receipt for your records.**

PS Form **3800**, January 2023 (Reverse) PSN 7530-02-000-9047

CHARGE NO: <u>2024CR0389</u>

STATE OF ILLINOIS )
                        ) SS

COUNTY OF COOK )

<u>Alfredo Pedraza</u>, DEPOSES AND STATES THAT HE DID SERVE A COPY OF THE ATTACHED ON THE <u>2nd</u> DAY OF <u>November</u>, 2023 BY REGULAR MAIL/CERTIFIED MAIL, FROM THE STATE OF ILLINOIS, 555 WEST MONROE STREET, 7TH FLOOR, CHICAGO, ILLINOIS 60661.

       x       NOTICE OF PERFECTED CHARGE TO *RESPONDENT*

       x       NOTICE OF PERFECTED CHARGE TO *COMPLAINANT (COPY TO RESPONDENT)*

       x       COPY OF CHARGE

       x       IDHR NOTICE TO PARTIES ON CREDIBILITY

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Alfredo Pedraza, *Office Associate*

November 2, 2023
*Date*

Rev: 9/17
#1



ILLINOIS DEPARTMENT OF
**Human Rights**

JB Pritzker, Governor
James L. Bennett, Director

November 2, 2023

CHIEF EXECUTIVE OFFICER
CREATIVE WERKS, LLC.
1460 BRUMMEL
ELK GROVE VILLAGE, IL 60007

Complainant: MARY MADISON
Charge No.: 2024CR0389

Dear Respondent:

The above-named Complainant has filed the attached charge alleging that you have violated a provision of the Illinois Human Rights Act ('Act'). See the Illinois Compiled Statutes, 775 ILCS 5/1-101 et. seq. The Act prohibits discrimination in the areas of Employment, Financial Credit, Real Estate Transactions, Public Accommodations, and Sexual Harassment in Education.

Even though the above named complainant filed this charge initially with the U. S. Equal Employment Opportunity Commission ('EEOC'), the Act requires the Illinois Department of Human Rights ('IDHR') to also process Complainant's charge. See 775 ILCS 5/7A-102(A-1).

Where a charge of employment discrimination is filed, the Act requires that the employer have 15 or more employees or have a public contract, unless the charge alleges discrimination based on disability, sexual harassment, retaliation, or pregnancy.

If you believe that you may not be subject to the Act, contact:

Thomas F. Roeser, Pre-Investigations Coordinator, at (312) 814-6295.

The Illinois Human Rights Act requires that a Respondent to a charge provide pertinent information to IDHR upon request. You are required to preserve and maintain all records, including paper, electronic, or other formats, pertaining to this charge. Your failure to provide pertinent information upon request may be construed against you.

IDHR requires that you provide the following information within 60 days of receipt of this notice:

1)    A Position Statement in response to the charge.

2)    A full Response to the enclosed Questionnaire.

If you combine your Position Statement with your Questionnaire Response, you must clearly state in your Position Statement that the two documents have been combined.

'Pursuant to the Illinois Identity Protection Act [5 ILCS 179/1 et. seq.], IDHR is prohibited from collecting or using social security numbers. You must redact social security numbers from any documents before submitting them to IDHR.'

Note: IDHR will review the EEOC's investigation file as part of the investigation. If you have already provided the requested information to the EEOC, your response should identify the correspondence in which the requested information can be found. Any information not previously provided to the EEOC must be provided within 60 days of receipt of this notice.

Please address (1) the Position Statement and (2) the Response to the Questionnaire to:

Intake – Unassigned Case Unit
Illinois Department of Human Rights
555 West Monroe Street
7th Floor
Chicago, Illinois 60661

Sincerely,
Unassigned Case Unit
Intake Division
(312) 814-6201
Enclosures

Intake / IN-5 (SB1122/CR/SR)
4/17



ILLINOIS DEPARTMENT OF

**Human Rights**

JB Pritzker, Governor
James L. Bennett, Director

November 2, 2023

MARY MADISON
9758 S CHARLES
CHICAGO, IL 60643

RE:     Charge No.: 2024CR0389
        Respondent: CREATIVE WERKS, LLC.
Complaint or Civil Action Filing Dates:     **9/5/2024 through 12/3/2024**

Dear Complainant:

You have chosen to have the discrimination charge you previously filed with the U.S. Equal Employment Opportunity Commission ('EEOC') investigated by the Illinois Department of Human Rights ('IDHR') under the Illinois Human Rights Act.  IDHR has received a copy of EEOC's determination and your request for the Department to investigate.  A copy of the charge has been served on the Respondent.  Keep this letter for reference if you need to telephone or come to IDHR.

You are required to preserve and maintain all records, including paper, electronic, or other formats, pertaining to this charge.  If your charge involves the basis of disability, IDHR requires that two additional forms be completed to determine whether IDHR has jurisdiction over your identified medical condition.  If we do not have copies of these documents in your file, we have included copies with this notice.

1)     Verification of Disability.
Please give the Verification of Disability form to your physician for completion.  Request your physician return the completed form by mail to IDHR's address below within 30 days of your receipt of this notice; and

2)     Consent form.
The consent form allows IDHR to review your physician's documentation.  Please fill out the consent form and return it to IDHR, again, within 30 days of your receipt of this notice.

If your charge does not involve the basis of disability, then the Verification of Disability and Consent Forms are not needed and are not enclosed.

IDHR's role is to conduct a neutral investigation of the allegations in your charge.  It is your responsibility to cooperate with IDHR's investigation and provide all pertinent information you have concerning the case by the dates requested.

An investigator will contact you after the case is assigned. IDHR must complete the investigation of your case by issuing its report of findings within 365 days from the date the EEOC issued its decision on your charge.  IDHR's investigation time may be extended if you and Respondent agree in writing.

If IDHR does not complete the investigation of your case by timely issuing its report of findings, you may either file a complaint with the Human Rights Commission or commence a civil action in the appropriate circuit court within 90 days after the expiration of the 365 days (or the extended time). We have calculated the time above (see Complaint or Civil Action Filing Dates). While we have made this calculation with the best of intentions, errors can occur. The Human Rights Commission has ruled that it is your responsibility to count the number of days properly. If you file a complaint or commence a civil action in circuit court outside this 90-day period, your complaint or civil action may be deemed untimely and dismissed.

Once 455 days (365 days [or the extended time] plus 90 days) have passed, IDHR must dismiss your charge with prejudice without any further right to proceed if you have not filed a complaint with the Human Rights Commission, or commenced a civil action in the appropriate court. Therefore, you may wish to contact an attorney to decide the best way for you to handle your case.

If you file a complaint with the Human Rights Commission, the form of the complaint must be in accordance with section 7A-102(F) of the Human Rights Act. You must serve a copy of the complaint filed with the Human Rights Commission on IDHR on the same day that you file a complaint with the Commission. The Human Rights Commission will then schedule a hearing for your case before an Administrative Law Judge.

If you commence a civil action in circuit court, the form of the complaint must be in accordance with the Illinois Code of Civil Procedure. Please also serve a copy of your complaint on the EEOC: 500 West Madison Street, Suite 2000, Chicago, IL 60661. If you file a complaint with the Commission, you may not later commence a civil action in circuit court.

You must advise IDHR of all changes of name, address, or telephone numbers. If you do not do so, IDHR may dismiss your case if it cannot locate you.


SB1122 IN-6 Non-Med
CR/SR
4/17



ILLINOIS DEPARTMENT OF
**Human Rights**

JB Pritzker, Governor
James L. Bennett, Director

## CREDIBILITY NOTICE

**The Cooper v. Salazar Injunction**

The Illinois Department of Human Rights (IDHR) is under a federal-court injunction that, among other things, orders the IDHR:

'To cease permanently from relying on credibility determinations made without affording the rights of confrontation and cross-examination'.

See, Cooper v. Salazar, #98 C 2930, U.S. District Court for the Northern District of Illinois, order dated November 1, 2001, at p. 26, ¶1.

**Meaning of the Cooper Injunction**

The IDHR cannot assess the credibility of Complainant's testimony, the testimony of Complainant's witnesses or the testimony of Respondent's representatives or the witnesses of Respondent where there is conflicting testimony. In other words, if the determination of substantial evidence turns on issues of credibility, the IDHR should make a finding of substantial evidence so that a trier of fact may resolve those issues of credibility. This means that if a determination of lack of substantial evidence requires the IDHR to make a finding of fact as to conflicting evidence, the IDHR will make a finding of substantial evidence so that credibility may be resolved by the Human Rights Commission at a Public Hearing.

The Illinois Human Rights Act defines 'substantial evidence' as:

'Evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance'. Illinois Human Rights Act §7A-102(D)(2), codified at 775 ILCS 5/7A-102(D)(2).

**The Meaning of Credibility**

The Illinois Department of Human Rights is an investigatory agency. The IDHR's purpose is to gather all of the evidence from each of the parties as to whether Respondent may or may not have discriminated against the Complainant within the meaning of the Illinois Human Rights Act. The IDHR's purpose is to review all of the evidence and make a determination based upon the law as to whether there is sufficient evidence of discrimination to file a complaint against the Respondent with the Illinois Human Rights Commission. The IDHR will not make a finding that evidence submitted by a party is either believable or not believable. Thus, the IDHR will not base its findings on the fact that one of the parties is not telling the truth or that one party's evidence is not believable. If the resolution of the charge of discrimination requires believing the evidence of one party over another party, the IDHR will make a finding of Substantial Evidence and refer the matter to the Illinois Human Rights Commission so that a trier of fact may resolve the case.

**Conflicting evidence exists when there are:**

1) Statements of a person with material firsthand knowledge contradicted by statements of a different person with material firsthand knowledge.
2) Business records contradicted by oral statements of a person with material firsthand knowledge.
3) Business records of one person contradicted by business records of another person.

By the authority of the State of Illinois

(2212013ENGChargeProcessing)IDHR.Preinvestigation@illinois.gov

Complainant: MARY MADISON        Charge Number: 2024CR0389

Respondent: CREATIVE WERKS, LLC.

### RESPONDENT QUESTIONNAIRE

IDHR requires that as Respondent, you must provide evidence related to Complainant's charge allegations, including a full Response to this Questionnaire.

You must also file a Position Statement to the charge allegations. If you choose to combine your Response to this Questionnaire into your Position Statement, you must clearly state in your Position Statement that the two documents have been combined.

### NOTE THAT LIST OR SUMMARIES OF DATA REQUESTED MUST BE SUPPORTED BY COPIES OF UNDERLYING DOCUMENTS WITHOUT EXCEPTION.

1. State the full legal name and address of Respondent named herein, and describe briefly the type of work carried on by Respondent at this address.

2. State the name, title and telephone number of the individual from who further information concerning the charge may be obtained.

3. If Respondent employs 100 or more persons, please attach a copy of the most recent EEO Report for the location in question. If not, state the total number of employees at the location and the number of employees within the Complainant's protected group(s). Also state the number of employees within Complainant's position title/job classification. In addition, state the number of employees within Complainant's protected group(s), holding that position title/job classification as of the date of the alleged violation.

4. In addition to the information requested herein, please provide a written position statement on each of the allegations of the charge. For each person having direct knowledge of the allegation(s), provide name, title and a phone number where the person may be reached for questioning. You may also include any documentary evidence, affidavits, and other written statements, including any additional information and explanation you deem relevant to the charge.

5. If an information technology program, computer algorithm, machine-based system, artificial intelligence, predictive data analytics tool, or other computer-based system ("software") were utilized in any process related to the charge allegation(s):
   a. Identify name of the software used.
   b. Describe how the software was utilized/involved.
   c. Did you notify Complainant about the software used. If so, provide a copy of the notification.

6. If Complainant was employed at Respondent, provide the following personnel data on Complainant:
   d. Date of hire.
   e. Position(s) in which Complainant was employed. (If more than one, list each and the relevant dates).
   c. Copies of all other personnel records relevant to the charge, including, but not limited to:
      i. Job Descriptions
      ii. Work quality evaluations.
      iii. Work samples.
      iv. Attendance records.

Charge Number: 2024CR0389
Page 2 of 4

        v.     Disciplinary records.

        vi.    Any medical records describing Complainant's condition, if applicable.

    d.    Copies of all correspondence relevant to the charge, including electronic and hard copy communications. For the Sender and Recipient, identify their positions and respective contact information.

On the Issue of Harassment:

B1.    Provide a copy of Respondent's policy regarding harassment, as well as the procedures Respondent follows in the investigation of internal complaints of harassment.

B2.    For the individual(s) responsible for investigating internal complaints of harassment provide:

    a.    Name.

    b.    Title.

B3.    State whether Complainant brought to Respondent's attention any complaint of harassment. If yes:

    a.    State whether an investigation was conducted.

    b.    Provide a copy and the results of Respondent's investigation of Complainant's internal complaint of harassment.

B4.    If there have been other complaints of harassment against the individual whom Complainant alleges committed harassment, for each employee who filed a complaint, provide:

    a.    Name.

    b.    Title.

    c.    Sexual Harassment and Retaliation.

    d.    Copies of any reports of findings or results of Respondent's investigations.

    e.    A copy of any notice of disciplinary action taken against the individual.

B5.    For each employee receiving counseling and/or disciplinary action in the twelve month period preceding the date of the alleged violation for having committed harassment against any of Respondent's employees, provide:

    a.    Name.

    b.    Title.

    c.    Documentation of disciplinary action.

On the Issue of Suspension:

D1.    Provide a detailed explanation of Respondent's policy concerning disciplinary actions, including, but not limited to:

    a.    A copy of the policy.

    b.    A copy of all applicable collective bargaining agreements and/or company rules.

    c.    State how many disciplinary actions an employee receives before discharge.

D2.    Provide the following information regarding Complainant's disciplinary actions:

Charge Number: 2024CR0389
Page 3 of 4

a. Copies of all personnel notices reflecting disciplinary actions.

b. For the person(s) issuing disciplinary actions, provide:

    i. Name.

    ii. Title.

    iii. Race;.

    iv. A telephone number where each may be reached for questioning.

D3. If Complainant's job performance was a factor in Respondent's action, provide:

a. A copy of Complainant's job description.

b. Explain specifically how Complainant was deficient in meeting the job requirements.

c. Explain how, when and under what circumstances Complainant was made aware of those deficiencies.

d. For the person(s) who measured Complainant's performance, identify by:

    i. Name.

    ii. Title.

    iii. Race;.

e. Explain the performance standards Complainant was expected to meet.

f. Explain how Complainant was deficient in meeting these standards.

g. For each employee supervised by the same person(s) who evaluated Complainant's performance for the twelve month period preceding the date of the alleged violation, provide:

    i. Name.

    ii. Title.

    iii. Race;.

    iv. Copies of their evaluations and work samples.

D4. If Complainant's attendance was a factor in the Respondent's action, respond to the following:

a. Explain the standards for satisfactory employee attendance, and define what constitutes an occurrence of absence, tardiness, leaving the job early, and failure to make proper notification.

b. Explain how Complainant was deficient in meeting attendance standards.

c. Explain the system of progressive discipline used relating to attendance.

d. Provide copies of attendance records for the Complainant's department and for the comparisons named or referred to in the Complainant's charge for the twelve month period preceding the alleged date of violation. Include for each:

    i. Name.

    ii. Title.

    iii. Race;.

D5. If low production was a factor in the Respondent's action, respond to the following:

Charge Number: 2024CR0389
Page 4 of 4

        a.    Submit copies of production records or work samples for the Complainant, other employees in Complainant's department, and for the comparisons named or referred to in the Complainant's charge for the twelve month period preceding the alleged date of violation. Identify each by:

             i.    Name.

             ii.    Title.

             iii.    Race;.

D6.    For each employee receiving the same type of disciplinary action as Complainant during the twelve month period preceding the date of the alleged violation, provide:

        a.    Name.

        b.    Title.

        c.    Race;.

        d.    Date of hire.

        e.    Disciplinary record.

        f.    Details of the specific reasons for disciplinary action for each employee.

        g.    Documentation of each disciplinary action.

Regarding the basis of RETALIATION, provide the following information:

ZZ1.    If, in addition to filing this charge, Complainant has opposed or protested allegedly discriminatory treatment, provide:

        a.    Date of opposition.

        b.    Manner in which the opposition was made.

        c.    Copies of relevant documents

ZZ2.    State whether other persons at Respondent have in some manner opposed or protested allegedly discriminatory treatment. State whether those person(s) named or referred to in the responses to this questionnaire took any of these actions. For example:

        a.    Have other discrimination charges been filed with any regulatory agency within the last five years?

        b.    Has anyone at Respondent filed a grievance alleging some type of discrimination?

        c.    Has anyone at Respondent protested or mentioned an allegation of discriminatory treatment in meetings with supervisors or managers?

        d.    Provide relevant documents.



ILLINOIS DEPARTMENT OF
# Human Rights

JB Pritzker, Governor
James L. Bennett, Director

November 2, 2023

MARY MADISON
9758 S CHARLES
CHICAGO, IL 60643

RE:     Charge No.: 2024CR0389
        Respondent: CREATIVE WERKS, LLC.
Complaint or Civil Action Filing Dates: **9/5/2024 through 12/3/2024**

Dear Complainant:

You have chosen to have the discrimination charge you previously filed with the U.S. Equal Employment
Opportunity Commission ('EEOC') investigated by the Illinois Department of Human Rights ('IDHR') under
the Illinois Human Rights Act. IDHR has received a copy of EEOC's determination and your request for
the Department to investigate. A copy of the charge has been served on the Respondent. Keep this letter
for reference if you need to telephone or come to IDHR.

You are required to preserve and maintain all records, including paper, electronic, or other formats,
pertaining to this charge. If your charge involves the basis of disability, IDHR requires that two additional
forms be completed to determine whether IDHR has jurisdiction over your identified medical condition. If
we do not have copies of these documents in your file, we have included copies with this notice.

1)      Verification of Disability.
Please give the Verification of Disability form to your physician for completion. Request your physician
return the completed form by mail to IDHR's address below within 30 days of your receipt of this notice;
and

2)      Consent form.
The consent form allows IDHR to review your physician's documentation. Please fill out the consent form
and return it to IDHR, again, within 30 days of your receipt of this notice.

If your charge does not involve the basis of disability, then the Verification of Disability and Consent Forms
are not needed and are not enclosed.

IDHR's role is to conduct a neutral investigation of the allegations in your charge. It is your responsibility
to cooperate with IDHR's investigation and provide all pertinent information you have concerning the case
by the dates requested.

An investigator will contact you after the case is assigned. IDHR must complete the investigation of your
case by issuing its report of findings within 365 days from the date the EEOC issued its decision on your
charge. IDHR's investigation time may be extended if you and Respondent agree in writing.

If IDHR does not complete the investigation of your case by timely issuing its report of findings, you may either file a complaint with the Human Rights Commission or commence a civil action in the appropriate circuit court within 90 days after the expiration of the 365 days (or the extended time). We have calculated the time above (see Complaint or Civil Action Filing Dates). While we have made this calculation with the best of intentions, errors can occur. The Human Rights Commission has ruled that it is your responsibility to count the number of days properly. If you file a complaint or commence a civil action in circuit court outside this 90-day period, your complaint or civil action may be deemed untimely and dismissed.

Once 455 days (365 days [or the extended time] plus 90 days) have passed, IDHR must dismiss your charge with prejudice without any further right to proceed if you have not filed a complaint with the Human Rights Commission, or commenced a civil action in the appropriate court. Therefore, you may wish to contact an attorney to decide the best way for you to handle your case.

If you file a complaint with the Human Rights Commission, the form of the complaint must be in accordance with section 7A-102(F) of the Human Rights Act. You must serve a copy of the complaint filed with the Human Rights Commission on IDHR on the same day that you file a complaint with the Commission. The Human Rights Commission will then schedule a hearing for your case before an Administrative Law Judge.

If you commence a civil action in circuit court, the form of the complaint must be in accordance with the Illinois Code of Civil Procedure. Please also serve a copy of your complaint on the EEOC: 500 West Madison Street, Suite 2000, Chicago, IL 60661. If you file a complaint with the Commission, you may not later commence a civil action in circuit court.

You must advise IDHR of all changes of name, address, or telephone numbers. If you do not do so, IDHR may dismiss your case if it cannot locate you.


SB1122 IN-6 Non-Med
CR/SR
4/17

Charge No: _____

Dear Respondent:

A charge of unlawful discrimination (charge) alleging that you have violated the provisions of the Illinois Human Rights Act (see the Illinois Compiled Statutes, 775 ILCS 5/1-101) was filed with the Illinois Department of Human Rights ("IDHR").

Please provide IDHR with the following information for your contact person. The contact person would be your legal representative in responding to this charge of unlawful discrimination (charge):

Name: _____  Title: _____

Firm/Company Name: _____

Address: _____  Suite No.: _____

City: _____  State: _____  ZIP: _____

Direct Phone #: _____  Fax #: _____

Cell Phone #: _____

Email: _____

☐    Email Consent: By checking this box, I consent to service of notices by IDHR via electronic mail.

By providing this information, IDHR will serve any and all notices upon the contact person listed above for a period of two (2) years, unless you earlier notify IDHR in writing of a different contact person.

Please direct your letter to the attention of:

| | **("C" in the Charge Number):** | **("S" in the Charge Number):** |
|---|---|---|
| By Mail: | Unassigned Case Unit-Chicago | Unassigned Case Unit-Springfield |
| | Illinois Department of Human Rights | Illinois Department of Human Rights |
| | 555 West Monroe Street, 7th Floor | 524 S. 2nd Street, Suite 300 |
| | Chicago, IL 60661 | Springfield, IL 62701 |
| Fax #: | (312) 814-6251 | (217) 785-5106 |
| Email: | IDHR.Intake@illinois.gov | IDHR.Intake@illinois.gov |

If you have any questions regarding the above information, please contact the Intake Division at (312) 814-6201. **Please return within 10 days**.

Thank you for your cooperation in this matter.

Sincerely,
Intake Unassigned Case Unit
Intake Division

IN-5 packet (HB 3092)
Rev. 02/23



ILLINOIS DEPARTMENT OF
**Human Rights**

JB Pritzker, Governor
James L. Bennett, Director

### NOTICE OF RIGHT TO OPT OUT

Dear Complainant and Respondent:

Pursuant to Public Act 100-1066, Public Act 100-0221, and Section 7A-102(C-1) of the Illinois Human Rights Act [775 ILCS 5/7A-102(C-1)], the Illinois Department of Human Rights ("IDHR") is required to provide to Complainant and to Respondent notice of Complainant's right to opt out of IDHR's investigation to file a civil action in circuit court.

To opt out of IDHR's investigation, Complainant must submit a request in writing to IDHR within 60 days of receipt of this notice.  Upon receipt of Complainant's request, IDHR will send to the parties that (1)
 a notice of right to commence a civil action in circuit court.

IDHR's Opt Out Request Form is available at the following location on IDHR's website:

dhr.illinois.gov/opt-out

Sincerely,

INTAKE UNIT

INTAKE/IN-6 (7A-102(C-1))
Rev. 10/2023



ILLINOIS DEPARTMENT OF
# Human Rights

JB Pritzker, Governor
James L. Bennett, Director

September, 25 2023

MARY MADISON
9758 S. CHARLES
CHICAGO, IL 60643

Re: **MARY MADISON V CREATIVE WERKS, LLC # 240925.038**

Dear Complainant:

You are receiving this letter because you filed a charge with the United States Equal Employment Opportunity Commission (EEOC). The EEOC and the Illinois Department of Human Rights (Department) are parties to a cooperative agreement. Under this agreement, when you filed your charge of discrimination with the EEOC, a copy of the charge was automatically filed with the Department. The Department is keeping a copy of your EEOC charge on file to preserve jurisdiction under Illinois law.

Since you filed your discrimination charge initially with the EEOC, the EEOC is the governmental agency responsible for investigating the charge and the investigation will be conducted pursuant to the rules and procedures adopted by the EEOC. The Department will take no action on your charge until the EEOC issues its findings. **After the EEOC issues its findings**, if you want the Department to take any further action on your charge, you must send the Department a copy of the EEOC's findings within 30 days after service of the EEOC's findings on you. Please also send a one sentence written statement requesting that the Department investigate your charge and include the above Control Number. You may submit a copy of the EEOC's findings by either of the following methods:

**By Mail:** Send your EEOC findings and written statement via U.S. Postal certified mail, return receipt requested, to: Illinois Department of Human Rights, Attn: EEOC Referred Charges/Intake Unit, 555 West Monroe, 7th Floor, Chicago, IL 60661.

**In Person:** Bring an original and one copy of your EEOC findings and written statement to the Department. The Department will stamp and return the copies to you for your records.

If you received the EEOC's findings prior to receipt of this letter, you have 30 days from the date of this letter to send the Department a copy of the EEOC's findings. Upon receipt of the EEOC's findings, the Department will mail you a notice as to what further action the Department may take on your charge.

The 365-day time period for the Department to investigate your EEOC charge is tolled while the EEOC is investigating your charge and does not begin to run until the EEOC issues its findings. Your failure to timely provide the EEOC's findings to the Department will result only in the Department closing your file. **This process does not affect the investigation of your charge at EEOC.** If you do not wish to proceed with the Department, you do not need to take any further action.

This letter **does not apply** to any settlement of this charge the parties have made with the EEOC.

**If you have any questions, please contact Thomas F. Roeser, Pre-Investigations Coordinator, at (312) 814-6295. Please do not contact the EEOC.**

ILLINOIS DEPARTMENT OF HUMAN RIGHTS

PRE1-EEOC 30
Rev 8/18

555 West Monroe, Floor 7, Chicago, IL 60661, (312) 814-6200, TTY (866) 740-3953, Housing Line (800) 662-3942
524 South 2nd Street, Springfield, IL 62701, (217) 785-5100
2309 West Main Street, Marion, IL 62959 (618) 993-7463
www.illinois.gov/dhr

CC: CREATIVE WERKS, LLC
1460 BRUMMEL AVENUE
ELK GROVE VILLAGE, IL 60007



ILLINOIS DEPARTMENT OF
**Human** Rights

JB Pritzker, Governor
James L. Bennett, Director

September, 25 2023

MARY MADISON
9758 S. CHARLES
CHICAGO, IL 60643

Re:  **MARY MADISON  V  CREATIVE WERKS, LLC  # 240925.038**

Dear Complainant:

You are receiving this letter because you filed a charge with the United States Equal Employment Opportunity Commission (EEOC). The EEOC and the Illinois Department of Human Rights (Department) are parties to a cooperative agreement. Under this agreement, when you filed your charge of discrimination with the EEOC, a copy of the charge was automatically filed with the Department. The Department is keeping a copy of your EEOC charge on file to preserve jurisdiction under Illinois law.

Since you filed your discrimination charge initially with the EEOC, the EEOC is the governmental agency responsible for investigating the charge and the investigation will be conducted pursuant to the rules and procedures adopted by the EEOC. The Department will take no action on your charge until the EEOC issues its findings.  **After the EEOC issues its findings**, if you want the Department to take any further action on your charge, you must send the Department a copy of the EEOC's findings within 30 days after service of the EEOC's findings on you.  Please also send a one sentence written statement requesting that the Department investigate your charge and include the above Control Number.  You may submit a copy of the EEOC's findings by either of the following methods:

**By Mail:**    Send your EEOC findings and written statement via U.S. Postal certified mail, return receipt requested, to:  Illinois Department of Human Rights, Attn: EEOC Referred Charges/Intake Unit, 555 West Monroe, 7th Floor, Chicago, IL 60661.

**In Person:**  Bring an original and one copy of your EEOC findings and written statement to the Department. The Department will stamp and return the copies to you for your records.

If you received the EEOC's findings prior to receipt of this letter, you have 30 days from the date of this letter to send the Department a copy of the EEOC's findings.  Upon receipt of the EEOC's findings, the Department will mail you a notice as to what further action the Department may take on your charge.

The 365-day time period for the Department to investigate your EEOC charge is tolled while the EEOC is investigating your charge and does not begin to run until the EEOC issues its findings.  Your failure to timely provide the EEOC's findings to the Department will result only in the Department closing your file.  **This process does not affect the investigation of your charge at EEOC.**  If you do not wish to proceed with the Department, you do not need to take any further action.

This letter **does not apply** to any settlement of this charge the parties have made with the EEOC.

**If you have any questions, please contact Thomas F. Roeser, Pre-Investigations Coordinator, at (312) 814-6295. Please do not contact the EEOC.**

ILLINOIS DEPARTMENT OF HUMAN RIGHTS.

PRE1-EEOC 30
Rev 8/18

555 West Monroe, Floor 7, Chicago, IL 60661, (312) 814-6200, TTY (866) 740-3953, Housing Line (800) 662-3942
524 South 2nd Street, Springfield, IL 62701, (217) 785-5100
2309 West Main Street, Marion, IL 62959 (618) 993-7463
www.illinois.gov/dhr

CREATIVE WERKS, LLC
CC: 1460 BRUMMEL AVENUE
ELK GROVE VILLAGE, IL 60007

DEPT. OF HUMAN RIGHTS
INTAKE DIVISION

OCT 20 2023

RECEIVED

# MARY MADISON

October 11, 2023

RE: Investigation Control # 240925.038

Good day,

May I ask that the above-mentioned matter be investigated at the Department of Human Rights. For your reference, I have attached the findings from the EEOC and a copy of the communication from the department.

Respectfully,

Mary Madison
7732979569



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Chicago District Office
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 9/5/2023

**To:** Ms. Mary D. Madison
9758 S Charles St
CHICAGO, IL 60643

Charge No: 440-2023-09356

EEOC Representative and email:  NIA MOORE
Investigator
nia.moore@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 440-2023-09356.

On behalf of the Commission,

Digitally Signed By:Diane I. Smason
9/5/2023

Diane I. Smason
Acting District Director

**Cc:** Creative Werks

Please retain this notice for your records.

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also
plan to sue claiming violations of State law, please be aware that time limits may be shorter and
other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination,
you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt
generally means the date when you (or your representative) opened this email or mail. You should
**keep a record of the date you received this notice**. Once this 90-day period has passed, your
right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an
attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of
your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in
court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This
time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the
ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under
Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your
lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.
Whether you file in Federal or State court is a matter for you to decide after talking to your
attorney. You must file a "complaint" that contains a short statement of the facts of your case
which shows that you are entitled to relief. Filing this Notice is not enough. For more information
about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals
who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or
2) a "Section 83" request. You may request your charge file under either or both procedures.
EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or
Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and
for your review.

**To make a FOIA request for your charge file**, submit your request online at
https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a
FOIA request for your charge file by U.S. Mail by submitting a signed, written request

identifying your request as a "FOIA Request" for Charge Number 440-2023-09356 to the District Director at Diane I. Smason, 230 S Dearborn Street

Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 440-2023-09356 to the District Director at Diane I. Smason, 230 S Dearborn Street

Chicago, IL 60604.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

CERTIFIED MAIL

CAROL STREAM, IL 601
14 OCT 2023 PM 5 L

9589 0710 5270 0714 4122 02

U.S. POSTAGE PAID
FCM LETTER
EVERGREEN PARK, IL 6080;
OCT 14, 2023

$4.35

R2304E106559-20

60661

Retail

UNITED STATES
POSTAL SERVICE

RDC 99

60805-999955

Department of Human Rights
555 West Monroe, Floor 7
Chicago, Il        60661

DEPT. OF HUMAN RIGHTS
INTAKE DIVISION

OCT 20 2023

RECEIVED

BY: _____

9788 S Charles
Cty 6443

Charge No. 2024CR0389
Page 1 of 5

Complainant: MARY MADISON            Charge Number: 2024CR0389

Respondent: CREATIVE WERKS, LLC.

### COMPLAINANT QUESTIONNAIRE

In order to assist the IDHR in investigating your charge, please complete and return the following questionnaire to the IDHR **within 30 days** of the date you received this questionnaire.

- If you are represented by an attorney, consult with your attorney prior to completing this questionnaire.
- Provide your answers on a separate sheet of paper. Identify the question number for each response. Use additional sheets as necessary.
- If you are not sure of the answer to any question, you may leave the question blank and the investigator will follow up with you at a later time.

Provide a copy of any documents (such as letters, journals, emails, or other evidence), which relate to the charge allegations.

1. Provide information about Respondent:
   a. State the full legal name(s) (as identified on your W-2 form).
   b. Address of Respondent.
   c. Briefly Describe the type of work carried on by Respondent at this address.

2. On what date did you start working for Respondent?

3. Who hired you? Give name, job title, Race;.

4. Please list in chronological order each position you held at the Respondent and the date you started in that position.

5. What were the job duties in the position you held on the date of the incident? Please include a job description if you have one.

6. Who was your immediate supervisor? Give name, job title, Race;.

7. Who else worked for your immediate supervisor? Give names, job titles, Race; for each person.

8. What do you want to happen as a result of filing your charge?

9. List any witnesses you may have. Witnesses are persons who can support or have first-hand knowledge of the allegations in your charge. Witnesses are **NOT** character references. Witnesses are not contacted during the screening process. Therefore, it is very important you tell us in detail what each witness would tell us, if contacted, during an investigation. Identify each witness by:
   a. Name
   b. Home address
   c. Home telephone number
   d. Relationship to you (co-worker, friend, relative, etc,)
   e. What did the witness see, hear, or experience that would support any of your allegations? Be specific, don't just say "they can tell you what happened."

10. Provide your e-mail address if you have one.

CP (Boilerplate)
09/2023

Charge No. 2024CR0389
Page 2 of 5

11.     If Respondent notified you that an information technology program or computer-based system ('software") was used in any process related to your charge allegation(s):

    a.     On what date Respondent notified you.

    b.     Who notified you? Give name, job title, (Basis All).

    c.     Identify name of the software used (if known).

    d.     Describe how the software was utilized/involved (if known).

    e.     Provide a copy of the email or correspondence notifying you of the software use.

On the Issue of Discharge:

A1.     When were you terminated?

A2.     Provide the name, the position title, Age; of the person who terminated you.

A3.     How were you notified of your termination? Please provide a copy of the termination letter or summary of the conversation.

A4.     What reason(s) were given for your termination?

A5.     Do you disagree with the reason(s) given for your termination? Explain.

A6.     Were you a probationary employee?

A7.     Does the employer have a progressive disciplinary policy?

A8.     Did you receive any discipline (warnings, reprimands or suspensions) prior to the termination? Provide the details of when the discipline was received and the reason of each prior discipline. Please provide copies, if you have them.

A9.     Did you receive regular evaluations? If yes, how were your most recent performance reviews? Provide copies, if you have them.

A10.    Who took over your job duties? What is that person's Age;?

A11.    If the Respondent has claimed that conduct is the reason for your termination, has anyone else done what you are accused of doing, or something similar? If your answer is yes, give their name(s), position title(s), Age;.

A12.    Explain what each person(s) did, the dates, and what type of discipline this person(s) received.

A13.    Did anyone at Respondent make any statements about your Age;. If your answer is yes, give their name(s), position title(s), Age;.

A14.    Explain what each person(s) said and the date(s) when they made the statement(s). Identify any witnesses.

On the Issue of Harassment

B1.     Identify the harassers by name, position, Age;, and work-place relationship to you.

B2.     List the specific instances of the alleged harassment. Include dates on which the conduct occurred. If the conduct occurred more than once, state how often the conduct occurred (the number of times per day, week, etc.).

CP (Boilerplate)
09/2023

Charge No. 2024CR0389
Page 3 of 5

B3.   Did you complain about the harassment to anyone within the company?  If yes, give their:

    a.   Name

    b.   Position title

    c.   Date of complaint.

B4.   Was any action taken because of your complaint?

B5.   Why do you think the alleged harasser(s) engaged in this conduct toward you?  Explain:

B6.   Did anyone else witness any of the incidents of harassment that happened to you?  If so, provide their name(s), position, and a description of what each person saw or heard.

B7.   Has the same alleged harasser subjected any other employees to this same type of conduct or behavior?  If yes, who?  Explain in detail, including date(s), name(s), and position(s):

B8.   Does the Respondent have an anti-harassment policy?  If yes, explain your understanding of the policy:

B9.   If you did not report the harassment, state the reason why you did not.

B10.   Do you have any items or documents that evidence the harassing conduct?  If so, please provide copies.


On the Issue of Terms and Conditions

C1.   Why do you believe that your Age; is the reason(s) you were treated differently?

C2.   Describe all the ways in which you were treated differently because of your Age;.  Be specific. Include dates, names, position title, Age; of those who engaged in the different treatment towards you.

C3.   Does the Respondent have a policy or practice addressing the identified unequal terms and conditions alleged in your charge?  If yes, explain your understanding of the policy and/or practice:

C4.   Include the date, names, position title, Age; of other workers who were treated differently in the same situation as you.  Include any documents you may have.

C5.   Include the date, names, position title Age; of other workers who were treated more favorably in the same situation as you. Include any documents you may have.

C6.   Why do you believe that your Age; was a factor in the treatment you received? Explain fully.

C7.   Were you treated differently than persons who were not of the same Age; as you? Describe how they were treated differently than you. Include the dates, names, positions, and the Age; of each person responsible for the different treatment.

C8.   Was any type of internal complaint or grievance procedure with the Respondent available to you? If so, did you file a complaint or grievance? What happened with your complaint or grievance? Send copies of all paperwork relating to that complaint or grievance.


On the Issue of Oral or Written Reprimand

M1.   What level of disciplinary action was taken against you?  Include the date on which such action was taken.  Provide copies of the disciplinary documents, if available.


CP (Boilerplate)
09/2023

Charge No. 2024CR0389
Page 4 of 5

M2.   Who made the decision to take disciplinary action against you? What is that person's position and Age;? If there are separate disciplinary actions involved in your charge, identify who made the decision in each case, their position and Age;.

M3.   What reasons were given for the discipline? Provide any documents that refer to the disciplinary action, if available.

M4.   Does the employer have a progressive discipline policy? If yes, explain your understanding of the policy. Provide a copy of the policy, if available.

M5.   Have you received warnings or disciplinary action previously? If yes, describe.

M6.   Describe the events leading up to the disciplinary action on this most recent occasion. Be specific and include dates.

M7.   Was there any grievance or complaint process available to you? If yes, did you file a grievance or complaint? What was the result of the grievance or complaint process? Provide any documents related to that grievance or complaint, if available.

M8.   Why do you think the disciplinary action was taken because of your Age;? Explain.

M9.   Is there someone else who engaged in the same conduct as you, or whose job performance was comparable? If yes, give their name, position and Age;. What, if any, disciplinary action did that person receive?


On the Issue of Harassment

B11.   Identify the harassers by name, position, Race;, and work-place relationship to you.

B12.   List the specific instances of the alleged harassment. Include dates on which the conduct occurred. If the conduct occurred more than once, state how often the conduct occurred (the number of times per day, week, etc.).

B13.   Did you complain about the harassment to anyone within the company? If yes, give their:

   a.      Name

   b.      Position title

   c.      Date of complaint.

B14.   Was any action taken because of your complaint?

B15.   Why do you think the alleged harasser(s) engaged in this conduct toward you? Explain:

B16.   Did anyone else witness any of the incidents of harassment that happened to you? If so, provide their name(s), position, and a description of what each person saw or heard.

B17.   Has the same alleged harasser subjected any other employees to this same type of conduct or behavior? If yes, who? Explain in detail, including date(s), name(s), and position(s):

B18.   Does the Respondent have an anti-harassment policy? If yes, explain your understanding of the policy:

B19.   If you did not report the harassment, state the reason why you did not.

B20.   Do you have any items or documents that evidence the harassing conduct? If so, please provide copies.


CP (Boilerplate)
09/2023

Charge No. 2024CR0389
Page 5 of 5

On the Issue of Suspension

D1.　On what date were you suspended and how long the suspension lasted.

D2.　Who made the decision to suspend you? What is that person's title and Race;?

D3.　What reason(s) were given for the suspension? Provide any documents that refer to the suspension.

D4.　Does the employer have a progressive discipline policy? If yes, provide a copy of the policy, if available, and explain your understanding of the policy.

D5.　Have you received previous warnings or disciplinary action? If yes, describe.

D6.　Describe the events leading up to the suspension on this most recent occasion.

D7.　Why do you think the suspension was unfair or discriminatory? Explain.

D8.　If your attendance, conduct or work performance was a factor in your suspension, explain your understanding of Respondent's policy, and how you were allegedly in violation of the policy.

D9.　Is there someone else who engaged in the same conduct as you, or whose job performance is comparable? Give their name(s), position title and Race;. What, if any, disciplinary action did that person receive?
　　　a.

CP (Boilerplate)
09/2023

# M Gmail

Mary Madison <assist2law@gmail.com>

**Exhibit 32**

## Rule 11 Notice-23-CV-16476

**Jon D. Cohen** <JCohen@dickinson-wright.com>                     Sun, Dec 8, 2024 at 6:17 PM
To: Mary Madison <assist2law@gmail.com>, "Joseph R. Delehanty" <JDelehanty@dickinson-wright.com>

Respectfully Mary, you are not allowed to police the language I use in my client's Answer nor the affirmative defenses raised by my clients. In *the Initial Status Report*, you objected to using the term "terminated" and as a concession, so we did not have to file separate statements, I agreed to your suggestion. The Court generally prefers that the parties come to such agreements, but they are not contracts between the parties addressing minutia of the case. The initial status report is to generally apprise the Court as to the salient legal and factual issues, to provide some context to the case, help to frame discovery and the like. It is not a request to admit. I think you should check with a lawyer on this issue. If you bring a motion, I will obviously reply but I will seek attorney fees for your bringing a *frivolous* motion. Further, I don't see the logic in your argument at any level. If you are affirmatively asserting that you are suing only for suspension with pay but not for termination thereafter, is that to say are not seeking damages based on the loss of your salary? If that really is the case, I would be happy to work with you to remove that issue from discovery and an agreed order that you are not seeking such damages.



**Jon D. Cohen**
Member
O:312-377-4565
JCohen@dickinsonwright.com

55 West Monroe, Suite 1200, Chicago, IL 60603

From: Mary Madison <assist2law@gmail.com>
**Sent:** Sunday, December 8, 2024 1:32 PM
**To:** Jon D. Cohen <JCohen@dickinson-wright.com>; Joseph R. Delehanty <JDelehanty@dickinson-wright.com>
**Subject:** Rule 11 Notice-23-CV-16476

Good day,

Hope this finds you well.

Please take note of the Rule 11 notice attached for your reference and immediate attention.

Thank you kindly.

Cheers

The information contained in this e-mail, including any attachments, is confidential, intended only for the named recipient(s), and may be legally privileged. If you are not the intended recipient, please delete the e-mail and any attachments, destroy any printouts that you may have made and notify us immediately by return e-mail. Neither this transmission nor any attachment shall be deemed for any

purpose to be a "signature" or "signed" under any electronic transmission acts, unless otherwise specifically stated herein. Thank you.